EFCOA.ELC

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF PENNSYLVANIA

In re                                          :

                                             Chapter 13

 Gabriel Bravo                               :

                               :     Bankruptcy No. 21-12926

                               :     Adversary No.

                               :     Civil Action No. 22-4820

## CERTIFICATE OF APPEAL FROM ORDERS OF
## THE BANKRUPTCY JUDGE DATED 10/18/2022 (#106)  & 11/22/2022 (#118)
## ENTERED ON THE DOCKET 10/19/2022 (#106) & 11/22/2022 (#118)

        I, Timothy B. McGrath, Clerk of the U.S. Bankruptcy Court, Eastern District of Pennsylvania, herewith electronically transmit the record on appeal filed 12/04/2022 and certify that the above proceeding was properly before the Honorable Magdeline D. Coleman, Bankruptcy Judge.

                                           For the Court

                                           Timothy B. McGrath
                                           Clerk

                                           By: _Antoinette Stevenson_
                                               Deputy Clerk

**Counsel of Record**

                          David A. Scholl, Esquire

                          Law Office of David A. Scholl

                          512 Hoffman Street

                          Philadelphia, PA 19148

                          Counsel for Debtor, Gabriel Bravo/
                          Appellant

                          Justin L. Krik, Esquire
                          JLK Law PLLC d/b/a Krik Law
                          1500 JFK Blvd.
                          Suite 630

Philadelphia, PA 19102
Counsel for Creditor E-Z Cashing, LLC

Kenneth E. West, Esquire
Office of the Chapter 13 Standing Trustee
1234 Market Street
Suite 1813
Philadelphia, PA 19107
Chapter 13 Trustee

United States Trustee
Office of the United States Trustee Robert
N.C. Nix Federal Building
900 Market Street
Suite 320
Philadelphia, PA 19107

Repeat−PAEB, RepeatPACER, APPEAL

# U.S. Bankruptcy Court
## Eastern District of Pennsylvania (Philadelphia)
## Bankruptcy Petition #: 21−12926−mdc

*Date filed:* 10/28/2021
*Deadline for filing claims:* 01/06/2022
*Deadline for filing claims (govt.):* 04/26/2022

*Assigned to:* Chief Judge Magdeline D. Coleman
Chapter 13
Voluntary
Asset

*Debtor*
**Gabriel Bravo**
1168 South 9th Street
Philadelphia, PA 19147
PHILADELPHIA−PA
SSN / ITIN: xxx−xx−6638

represented by **DAVID A. SCHOLL**
Law Office of David A. Scholl
512 Hoffman Street
Philadelphia, PA 19148
610 550 1765
Email: judgescholl@gmail.com

*Trustee*
**KENNETH E. WEST**
Office of the Chapter 13 Standing Trustee
1234 Market Street − Suite 1813
Philadelphia, PA 19107
215−627−1377

represented by **KENNETH E. WEST**
Office of the Chapter 13 Standing
Trustee
1234 Market Street − Suite 1813
Philadelphia, PA 19107
215−627−1377
Fax : 215−627−6299
Email: ecfemails@ph13trustee.com

*U.S. Trustee*
**United States Trustee**
Office of United States Trustee
Robert N.C. Nix Federal Building
900 Market Street
Suite 320
Philadelphia, PA 19107
(215)597−4411

| Filing Date | # | | Docket Text |
|---|---|---|---|
| 10/28/2021 | | 1 | Chapter 13 Voluntary Petition for Individual . Fee Amount $313 Filed by Gabriel Bravo. Government Proof of Claim Deadline: 04/26/2022. Atty Disclosure Statement due 11/12/2021. Chapter 13 Plan due by 11/12/2021. Schedules AB−J due 11/12/2021. Statement of Financial Affairs due 11/12/2021. Summary of Assets and Liabilities Form B106 due 11/12/2021. Incomplete Filings due by 11/12/2021. (SCHOLL, DAVID) (Entered: 10/28/2021) |
| 10/28/2021 | | 2 | Matrix List of Creditors Filed. Number of pages filed: 2, Filed by DAVID A. SCHOLL on behalf of Gabriel Bravo. (SCHOLL, DAVID) (Entered: 10/28/2021) |
| 10/28/2021 | | 3 | Statement of Social Security Number Received. Filed by DAVID A. SCHOLL on behalf of Gabriel Bravo. (SCHOLL, DAVID) (Entered: 10/28/2021) |

| 10/28/2021 | | | Receipt of Voluntary Petition (Chapter 13)( 21−12926) [misc,volp13a] ( 313.00) Filing Fee. Receipt number A23697811. Fee Amount $ 313.00. (re: Doc# 1) (U.S. Treasury) (Entered: 10/28/2021) |
| 10/28/2021 | | 4 | Certificate of Credit Counseling Filed by DAVID A. SCHOLL on behalf of Gabriel Bravo. (SCHOLL, DAVID) (Entered: 10/28/2021) |
| 10/29/2021 | | 5 | Order Entered the debtor having failed to file or submit with the petition all of the documents required by Fed. R. Bankr.P.1007, It is hereby ORDERED that this case **MAY BE DISMISSED WITHOUT FURTHER NOTICE** if the documents listed are not filed by deadlines listed: Means Test Calculation Form 122C−2 −If Applicable− Due: 11/12/2021. Chapter 13 Statement of Your Current Monthly Income and Calculation of Commitment Period Form 122C−1 Due 11/12/2021. Atty Disclosure Statement due 11/12/2021. Chapter 13 Plan due by 11/12/2021. Schedules AB−J due 11/12/2021. Statement of Financial Affairs due 11/12/2021. Summary of Assets and Liabilities Form B106 due 11/12/2021. Any request for an extension of time must be filed prior to the expiration of the deadlines listed. (D., Tasha) (Entered: 10/29/2021) |
| 10/29/2021 | | | Name of Trustee assigned to case: KENNETH E. WEST. (D., Tasha) (Entered: 10/29/2021) |
| 10/29/2021 | | 6 | Motion to Extend Automatic Stay Filed by Gabriel Bravo Represented by DAVID A. SCHOLL (Counsel). (SCHOLL, DAVID) (Entered: 10/29/2021) |
| 10/29/2021 | | 7 | Notice of (related document(s): 6 Motion to Extend Automatic Stay ) Filed by Gabriel Bravo. Hearing scheduled 11/23/2021 at 10:30 AM at nix2 − Courtroom #2. (SCHOLL, DAVID) (Entered: 10/29/2021) |
| 10/31/2021 | | 8 | BNC Certificate of Mailing − Voluntary Petition. Number of Notices Mailed: (related document(s) (Related Doc # 5)). No. of Notices: 1. Notice Date 10/31/2021. (Admin.) (Entered: 11/01/2021) |
| 11/01/2021 | | 9 | Entry/Notice of Appearance and Request for Notice by JUSTIN L. KRIK Filed by JUSTIN L. KRIK on behalf of E−Z Cashing, LLC. (KRIK, JUSTIN) **Modified on 11/2/2021−To add wording to reflect PDF**. (D., Tasha). (Entered: 11/01/2021) |
| 11/04/2021 | | 10 | Disclosure of Compensation of Attorney for Debtor in the amount of $1000 Debtor Gabriel Bravo Filed by DAVID A. SCHOLL on behalf of Gabriel Bravo. (SCHOLL, DAVID) (Entered: 11/04/2021) |
| 11/05/2021 | | 11 | Response to Motion to Extend Automatic Stay filed by Debtor Gabriel Bravo Filed by E−Z Cashing, LLC (related document(s)6). (Attachments: # 1 Service List # 2 Proposed Order) (KRIK, JUSTIN) (Entered: 11/05/2021) |
| 11/05/2021 | | 12 | Schedules A/B − J ,*Summaries, and Statement of Financial Affairs* Filed by DAVID A. SCHOLL on behalf of Gabriel Bravo. (SCHOLL, DAVID) (Entered: 11/05/2021) |
| 11/05/2021 | | 13 | Chapter 13 Statement of Your Current Monthly Income and Calculation of Commitment Period for 3 Years Form 122C−1. Disposable Income Is Determined Filed by DAVID A. SCHOLL on behalf of Gabriel Bravo. (SCHOLL, DAVID) (Entered: 11/05/2021) |

| | | | |
|---|---|---|---|
| 11/05/2021 | | 14 | Chapter 13 Plan Filed by Gabriel Bravo. (SCHOLL, DAVID) (Entered: 11/05/2021) |
| 11/10/2021 | | 15 | Meeting of Creditors. The Debtor has filed a Plan. This Plan proposes payment to the trustee of $100.00 per month for 36 months. Filed by KENNETH E. WEST. 341(a) meeting to be held on 12/15/2021 at 09:30 AM at ALTERNATE TELEPHONIC CONFERENCE (For Trustee Use Only). Objection to Dischargeability of Certain Debts due: 2/13/2022. Proofs of Claims due by 1/6/2022. Government Proof of Claim Deadline: 04/26/2022. Last day to Object to Confirmation 12/27/2021.Confirmation Hearing scheduled 1/6/2022 at 09:30 AM at nix2 − Courtroom #2. (WEST, KENNETH) (Entered: 11/10/2021) |
| 11/12/2021 | | 16 | BNC Certificate of Mailing − Meeting of Creditors. Number of Notices Mailed: (related document(s) (Related Doc # 15)). No. of Notices: 11. Notice Date 11/12/2021. (Admin.) (Entered: 11/13/2021) |
| 11/15/2021 | | 17 | The upcoming 341(a) meeting is scheduled to be held remotely..For participation by telephone, please call and to join the meeting.. More information can be found in the attached pdf document.. (WEST, KENNETH) (Entered: 11/15/2021) |
| 11/19/2021 | | 18 | Objection to Claim Number 1 by Claimant EZ Cashing, LLC. Filed by Gabriel Bravo. (SCHOLL, DAVID) (Entered: 11/19/2021) |
| 11/19/2021 | | 19 | Notice of Objection to claim of EZ Cashing, LLC Filed by Gabriel Bravo (related document(s)18). Hearing scheduled 1/5/2022 at 10:30 AM at nix2 − Courtroom #2. (SCHOLL, DAVID) (Entered: 11/19/2021) |
| 11/22/2021 | | 20 | Hearing RESCHEDULED 6 Motion to Extend Automatic Stay Filed by Gabriel Bravo Represented by DAVID A. SCHOLL (Counsel). Hearing scheduled 1/6/2022 at 11:00 AM at nix2 − Courtroom #2. (G., Eileen) (Entered: 11/22/2021) |
| 11/22/2021 | | 21 | Hearing RESCHEDULED on 18 Objection to Claim Number 1 by Claimant EZ Cashing, LLC. Filed by Gabriel Bravo. filed by Debtor Gabriel Bravo. Hearing RE−scheduled 1/6/2022 at 11:00 AM at nix2 − Courtroom #2. (G., Eileen) (Entered: 11/22/2021) |
| 11/23/2021 | | 22 | Hearing Continued on 6 Motion to Extend Automatic Stay Filed by Gabriel Bravo Represented by DAVID A. SCHOLL (Counsel).Hearing scheduled 1/6/2022 at 11:00 AM at nix2 − Courtroom #2. (G., Eileen) (Entered: 11/23/2021) |
| 11/23/2021 | | 23 | Order entered Granting Motion to Extend Automatic Stay(Related Doc # 6. A further hearing on the Motion shall be held on January 6, 2022, at 11:00 AM in Bankruptcy Courtroom No. 2, Robert N.C. Nix Federal Building & Courthouse, 900 Market Street, Second Floor, Philadelphia Pennsylvania to consider further extension of the automatic stay. Counsel for Debtor shall serve this Order on all interested parties by Electronic Means and/or first class mail. (D., Virginia) (Entered: 11/23/2021) |
| 11/23/2021 | | 24 | Hearing Set 6 Motion to Extend Automatic Stay Filed by Gabriel Bravo Represented by DAVID A. SCHOLL (Counsel). Hearing scheduled 1/6/2022 at 11:00 AM at nix2 − Courtroom #2. (D., Virginia) (Entered: 11/23/2021) |
| 11/24/2021 | | 25 | |

| | | | |
|---|---|---|---|
| | | | BNC Certificate of Mailing − Hearing Set. Number of Notices Mailed: (related document(s) (Related Doc # 20)). No. of Notices: 2. Notice Date 11/24/2021. (Admin.) (Entered: 11/25/2021) |
| 11/25/2021 | | 26 | BNC Certificate of Mailing − PDF Document. (related document(s) (Related Doc # 23)). No. of Notices: 11. Notice Date 11/25/2021. (Admin.) (Entered: 11/26/2021) |
| 11/30/2021 | | 27 | Monthly Operating Report for Filing Period Initial Certification of Business Debtor Filed by DAVID A. SCHOLL on behalf of Gabriel Bravo. (SCHOLL, DAVID) (Entered: 11/30/2021) |
| 12/07/2021 | | 28 | Monthly Operating Report for Filing Period November, 2021 Filed by DAVID A. SCHOLL on behalf of Gabriel Bravo. (SCHOLL, DAVID) (Entered: 12/07/2021) |
| 12/13/2021 | | 29 | Response to Objection to Claim filed by Debtor Gabriel Bravo Filed by E−Z Cashing, LLC (related document(s)18). (Attachments: # 1 Exhibit # 2 Proposed Order # 3 Service List) (KRIK, JUSTIN) (Entered: 12/13/2021) |
| 12/16/2021 | | | Meeting of Creditors Held and Concluded on: 12/15/2021. (WEST, KENNETH) (Entered: 12/16/2021) |
| 12/21/2021 | | 30 | Amended Chapter 13 Plan Filed by Gabriel Bravo (related document(s)14). (SCHOLL, DAVID) (Entered: 12/21/2021) |
| 12/21/2021 | | 31 | Amended Schedule J − Your Expenses Filed by DAVID A. SCHOLL on behalf of Gabriel Bravo. (SCHOLL, DAVID) (Entered: 12/21/2021) |
| 01/05/2022 | | 32 | Exhibit *EXHIBITS IN SUPPORT OF MOTION TO EXTEND STAY. COPIES HAVE BEEN PROVIDED TO RESPONDENT. D−1, D−2, D−3.* Filed by DAVID A. SCHOLL on behalf of Gabriel Bravo (related document(s)6). (SCHOLL, DAVID) (Entered: 01/05/2022) |
| 01/05/2022 | | 33 | Certificate of Service *of Motion to Extend Automatic Stay and Court's Order of November 23, 2021* Filed by DAVID A. SCHOLL on behalf of Gabriel Bravo (related document(s)6). (SCHOLL, DAVID) (Entered: 01/05/2022) |
| 01/06/2022 | | 34 | Confirmation Hearing scheduled 2/10/2022 at 09:30 AM at Courtroom #2. (D., Tasha) (Entered: 01/06/2022) |
| 01/06/2022 | | 35 | Hearing Continued on 6 Motion to Extend Automatic Stay Filed by Gabriel Bravo Represented by DAVID A. SCHOLL (Counsel). filed by Debtor Gabriel Bravo. Trial scheduled 2/15/2022 at 01:00 PM at Courtroom #2. (D., Tasha) (Entered: 01/06/2022) |
| 01/06/2022 | | 36 | Hearing Continued on 18 Objection to Claim Number 1 by Claimant EZ Cashing, LLC. Filed by Gabriel Bravo. filed by Debtor Gabriel Bravo. Trial scheduled 2/15/2022 at 01:00 PM at Courtroom #2. (D., Tasha) (Entered: 01/06/2022) |
| 01/07/2022 | | 37 | Proposed Order Re: *Continuing Hearing and Extending Stay* Filed by DAVID A. SCHOLL on behalf of Gabriel Bravo (related document(s)6). (SCHOLL, DAVID) (Entered: 01/07/2022) |
| 01/10/2022 | | 38 | |

| | | | |
|---|---|---|---|
| | | | Order: It is hereby ORDERED that pending further order of this court the automatic stay is EXTENDED with respect to all creditors who were served with the Motion or Notice of the Motion and shall remain in effect until February 15, 2022, unless modified by the court in accordance with 11 U.S.C. section 362(d) and Bankruptcy Rule 4001(a) and a further hearing on the Motion shall be held on February 15, 2022, at 1:00 PM in Bankruptcy Courtroom No. 2 to consider further extension of the automatic stay. (related document(s)6). (S., Antoinette) (Entered: 01/10/2022) |
| 01/12/2022 | | 39 | BNC Certificate of Mailing − PDF Document. (related document(s) (Related Doc # 38)). No. of Notices: 1. Notice Date 01/12/2022. (Admin.) (Entered: 01/13/2022) |
| 01/23/2022 | | 40 | Order governing procedures at evidentiary hearing conducted remotely by video conference. (related document(s)6, 18). (S., Antoinette) (Entered: 01/24/2022) |
| 01/24/2022 | | 41 | Entry of Appearance and Request for Notice by PAMELA ELCHERT THURMOND Filed by PAMELA ELCHERT THURMOND on behalf of CITY OF PHILADELPHIA. (THURMOND, PAMELA) **Modified on 1/25/2022 to change text to match PDF document.** (S., Antoinette). (Entered: 01/24/2022) |
| 01/26/2022 | | 42 | BNC Certificate of Mailing − PDF Document. (related document(s) (Related Doc # 40)). No. of Notices: 1. Notice Date 01/26/2022. (Admin.) (Entered: 01/27/2022) |
| 02/10/2022 | | 43 | Pre−Trial Statement Filed by DAVID A. SCHOLL on behalf of Gabriel Bravo. (SCHOLL, DAVID) (Entered: 02/10/2022) |
| 02/10/2022 | | 44 | Document in re: *Part II of Two Parts.Pre−Trial Statement including Exhibit and Witness Lists(see Part I)* Filed by DAVID A. SCHOLL on behalf of Gabriel Bravo (related document(s)6). (SCHOLL, DAVID) (Entered: 02/10/2022) |
| 02/10/2022 | | 45 | Confirmation Hearing Continued on 15 Confirmation Hearing scheduled 3/10/2022 at 09:30 AM at Courtroom #2. (S., Antoinette) (Entered: 02/10/2022) |
| 02/10/2022 | | 46 | **INCORRECT ENTRY−WRONG CASE NUMBER ON ATTACHMENT**Pre−Trial Statement Filed by JUSTIN L. KRIK on behalf of E−Z Cashing, LLC. (KRIK, JUSTIN) Modified on 2/11/2022 (S., Antoinette). (Entered: 02/10/2022) |
| 02/12/2022 | | 47 | Motion to Sell Filed by Gabriel Bravo Represented by DAVID A. SCHOLL (Counsel). (SCHOLL, DAVID) (Entered: 02/12/2022) |
| 02/13/2022 | | 48 | Notice of (related document(s): 47 Motion to Sell ) *Motion for Permission to Sell Real Estate* Filed by Gabriel Bravo. Hearing scheduled 3/8/2022 at 11:30 AM at Courtroom #2. (SCHOLL, DAVID) (Entered: 02/13/2022) |
| 02/15/2022 | | 49 | Order: It is hereby ORDERED that pending further order of this court, the automatic stay is EXTENDED with respect to all creditors who were served with the Motion or Notice of the Motion and shall remain in effect until March 8, 2022, unless modified by the court and a further hearing is scheduled for 3/8/2022 at 11:30 AM at Courtroom #2. re:6 (S., Antoinette) (Entered: 02/16/2022) |

| | | | |
|---|---|---|---|
| 02/15/2022 | | 50 | Evidentiary Hearing held and hrg Continued on 6 Motion to Extend Automatic Stay Filed by Gabriel Bravo Represented by DAVID A. SCHOLL (Counsel).. Hearing scheduled 3/8/2022 at 11:30 AM at Courtroom #2. (simultaneous briefs to be filed by 3/1/22 5 p.m.) (G., Eileen) (Entered: 02/16/2022) |
| 02/15/2022 | | 51 | Evidentiary Hearing Held on 18 Objection to Claim Number 1 by Claimant EZ Cashing, LLC. Filed by Gabriel Bravo. filed by Debtor Gabriel Bravo (related document(s),18). Held Under Advisement; simultaneous briefs to be filed by 3/18/22 5:00 p.m. (G., Eileen) (Entered: 02/16/2022) |
| 02/18/2022 | | 52 | BNC Certificate of Mailing − PDF Document. (related document(s) (Related Doc # 49)). No. of Notices: 1. Notice Date 02/18/2022. (Admin.) (Entered: 02/19/2022) |
| 03/01/2022 | | 53 | Brief *in Support of Motion to Extend Automatic Stay* Filed by DAVID A. SCHOLL on behalf of Gabriel Bravo (related document(s)6). (SCHOLL, DAVID) (Entered: 03/01/2022) |
| 03/02/2022 | | 54 | Response to Motion to Sell filed by Debtor Gabriel Bravo Filed by CITY OF PHILADELPHIA (related document(s)47). (Attachments: # 1 Certificate of Service) (THURMOND, PAMELA) (Entered: 03/02/2022) |
| 03/04/2022 | | 55 | Motion to Compel *Responses to Discovery to E−Z Cashing, LLC* Filed by Gabriel Bravo Represented by DAVID A. SCHOLL (Counsel). (Attachments: # 1 Exhibit Discovery) (SCHOLL, DAVID) (Entered: 03/04/2022) |
| 03/04/2022 | | 56 | Notice of (related document(s): 55 Motion to Compel *Responses to Discovery to E−Z Cashing, LLC*) Filed by Gabriel Bravo. Hearing scheduled 3/29/2022 at 10:30 AM at Courtroom #2. (SCHOLL, DAVID) **Modified on 3/7/2022−See corrective entry dated 3/7/2022.** (S., Antoinette). (Entered: 03/04/2022) |
| 03/05/2022 | | 57 | Monthly Operating Report for Filing Period December 2021 − February 2022 *(12/21, 01/22, 02/22)* Filed by DAVID A. SCHOLL on behalf of Gabriel Bravo. (SCHOLL, DAVID) (Entered: 03/05/2022) |
| 03/05/2022 | | 58 | Pre−Confirmation Certification of Compliance with Post Petition Obligations in Accordance with 11 U.S.C. Section 1325 (a)(8) and (a)(9) Filed by DAVID A. SCHOLL on behalf of Gabriel Bravo (related document(s)30). (SCHOLL, DAVID) (Entered: 03/05/2022) |
| 03/07/2022 | | | Corrective Entry re: Changed text from telephone hearing to courtroom location #2 per PDF document. (related document(s)56). (S., Antoinette) (Entered: 03/07/2022) |
| 03/08/2022 | | 59 | Hearing Continued on 47 Motion to Sell Filed by Gabriel Bravo Represented by DAVID A. SCHOLL (Counsel).. Hearing scheduled 4/5/2022 at 11:00 AM at Courtroom #2. (G., Eileen) (Entered: 03/08/2022) |
| 03/08/2022 | | 60 | Hearing Continued on 6 Motion to Extend Automatic Stay Filed by Gabriel Bravo Represented by DAVID A. SCHOLL (Counsel). Hearing scheduled 4/5/2022 at 11:00 AM at Courtroom #2. (G., Eileen) (Entered: 03/08/2022) |

| | | | |
|---|---|---|---|
| 03/08/2022 | | 61 | Order: It is hereby ORDERED that pending further order of this court, the automatic stay is EXTENDED with respect to all creditors who were served with the Motion or Notice of the Motion and shall remain in effect until April 5, 2022, unless modified by the court and a further hearing is scheduled for 4/5/2022 at 11:30 AM at Courtroom #2. (related document(s)6). (S., Antoinette) (Entered: 03/08/2022) |
| 03/10/2022 | | 62 | Confirmation Hearing Continued on 15 Confirmation Hearing scheduled 4/7/2022 at 09:30 AM at Courtroom #2. (S., Antoinette) (Entered: 03/10/2022) |
| 03/10/2022 | | 63 | BNC Certificate of Mailing − PDF Document. (related document(s) (Related Doc # 61)). No. of Notices: 0. Notice Date 03/10/2022. (Admin.) (Entered: 03/11/2022) |
| 03/18/2022 | | 64 | Brief *of Debtor Addressing His Objections to the Proof of Claim of E−Z Cashing, LLC* Filed by DAVID A. SCHOLL on behalf of Gabriel Bravo. (SCHOLL, DAVID) (Entered: 03/18/2022) |
| 03/18/2022 | | 65 | Brief *in Opposition to Debtor's Objections* Filed by JUSTIN L. KRIK on behalf of E−Z Cashing, LLC (related document(s) 51 ). (KRIK, JUSTIN) (Entered: 03/18/2022) |
| 03/22/2022 | | 66 | Second Amended Chapter 13 Plan Filed by Gabriel Bravo (related document(s)30). (SCHOLL, DAVID) (Entered: 03/22/2022) |
| 03/23/2022 | | 67 | Certificate of Service *of Motion to compel Discovery from E−Z Cashing, LLC* Filed by DAVID A. SCHOLL on behalf of Gabriel Bravo (related document(s)55). (SCHOLL, DAVID) (Entered: 03/23/2022) |
| 03/23/2022 | | 68 | Certificate of No Response to *Debtor's Motion Compel Discovery from E−Z Cashing, LLC* Filed by DAVID A. SCHOLL on behalf of Gabriel Bravo (related document(s)55). (SCHOLL, DAVID) (Entered: 03/23/2022) |
| 03/24/2022 | | 69 | Response to Motion to Compel filed by Debtor Gabriel Bravo Filed by E−Z Cashing, LLC (related document(s)55). (Attachments: # 1 Exhibit Discovery Responses) (KRIK, JUSTIN) (Entered: 03/24/2022) |
| 03/29/2022 | | 70 | Hearing Continued on 55 Motion to Compel *Responses to Discovery to E−Z Cashing, LLC* Filed by Gabriel Bravo Represented by DAVID A. SCHOLL (Counsel). . Hearing scheduled 4/7/2022 at 11:00 AM at Courtroom #1. (G., Eileen) (Entered: 03/29/2022) |
| 03/30/2022 | | 71 | Objection to Confirmation of Plan Filed by PAMELA ELCHERT THURMOND on behalf of CITY OF PHILADELPHIA (related document(s)66). (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Certificate of Service) (THURMOND, PAMELA) (Entered: 03/30/2022) |
| 04/04/2022 | | 72 | **INCORRECT ENTRY**Response to Response filed by Creditor E−Z Cashing, LLC *Withdrawn* Filed by E−Z Cashing, LLC (related document(s)11) **Modified on 4/5/2022−This entry has been re docketed using the correct event code.** (S., Antoinette). (Entered: 04/04/2022) |
| 04/04/2022 | | 73 | **CORRECT ENTRY**Praecipe to Withdraw E−Z Cashing, LLC's Response to Debtor's Motion for Continuance of the Stay beyond thirty (30) day period Filed by JUSTIN L. KRIK on behalf of E−Z Cashing, |

| | | | |
|---|---|---|---|
| | | | LLC (related document(s)11). (S., Antoinette) (Entered: 04/05/2022) |
| 04/05/2022 | | 74 | Hearing Continued on 47 Motion to Sell Filed by Gabriel Bravo Represented by DAVID A. SCHOLL (Counsel). Bravo. Hearing scheduled 6/2/2022 at 11:00 AM at Courtroom #2. (G., Eileen) (Entered: 04/05/2022) |
| 04/05/2022 | | 75 | Hearing Held on 6 Motion to Extend Automatic Stay Filed by Gabriel Bravo Represented by DAVID A. SCHOLL (Counsel). (related document(s),6). ORDER to be entered (G., Eileen) (Entered: 04/05/2022) |
| 04/05/2022 | | 76 | Order: It is hereby ORDERED that the Motion is GRANTED. It is hereby ORDERED that the automatic stay in this case is extended beyond thirty (30) days after the duration of this case as to ALL creditors of the Debtor unless relief from same is granted. (Related Doc # 6 (S., Antoinette) (Entered: 04/05/2022) |
| 04/07/2022 | | 77 | Order: It is Ordered, Adjudged and Decreed that the Motion to Compel the First Set of Requests for Discovery is DENIED WITHOUT PREJUDICE. (Related Doc # 55, 69) (S., Antoinette) (Entered: 04/07/2022) |
| 04/07/2022 | | 78 | Confirmation Hearing Continued on 15 Confirmation Hearing scheduled 6/2/2022 at 09:30 AM at Courtroom #2. (S., Antoinette) (Entered: 04/07/2022) |
| 04/07/2022 | | 79 | Hearing Held on 55 Motion to Compel Responses to Discovery to E−Z Cashing, LLC Filed by Gabriel Bravo Represented by DAVID A. SCHOLL (Counsel). Motion denied. Order to be entered. (S., Antoinette) (Entered: 04/07/2022) |
| 04/07/2022 | | 80 | BNC Certificate of Mailing − PDF Document. (related document(s) (Related Doc # 76)). No. of Notices: 1. Notice Date 04/07/2022. (Admin.) (Entered: 04/08/2022) |
| 04/09/2022 | | 81 | BNC Certificate of Mailing − PDF Document. (related document(s) (Related Doc # 77)). No. of Notices: 1. Notice Date 04/09/2022. (Admin.) (Entered: 04/10/2022) |
| 06/02/2022 | | 82 | Confirmation Hearing Continued on 15 Confirmation Hearing scheduled 7/14/2022 at 09:30 AM at Courtroom #2. (S., Antoinette) (Entered: 06/02/2022) |
| 06/02/2022 | | 83 | Hearing Continued on 47 Motion to Sell Filed by Gabriel Bravo Represented by DAVID A. SCHOLL (Counsel). Hearing scheduled 6/30/2022 at 11:00 AM at Courtroom #2. (S., Antoinette) (Entered: 06/02/2022) |
| 06/29/2022 | | 84 | **INCORRECT**Amended Document *SCHEDULE A/B: PROPERTY* Filed by DAVID A. SCHOLL on behalf of Gabriel Bravo (related document(s)76). (SCHOLL, DAVID) Modified on 6/30/2022 (J., Randi). (Entered: 06/29/2022) |
| 06/29/2022 | | 85 | **CORRECT** Schedule A/B , Schedule C Filed by DAVID A. SCHOLL on behalf of Gabriel Bravo . (J., Randi) (Entered: 06/30/2022) |
| 06/30/2022 | | 86 | Hearing Held on 47 Motion to Sell Filed by Gabriel Bravo Represented by DAVID A. SCHOLL (Counsel). filed by Debtor Gabriel Bravo (related document(s),47). Motion to sell withdrawn. (D., Tasha) (Entered: |

| | | | |
|---|---|---|---|
| | | | 06/30/2022) |
| 07/14/2022 | | 87 | Confirmation Hearing scheduled 8/18/2022 at 11:00 AM at Courtroom #2. (D., Tasha) (Entered: 07/14/2022) |
| 07/20/2022 | | 88 | Second Motion to Sell Property Under Section 363(b), Rule 3004 Filed by Gabriel Bravo Represented by DAVID A. SCHOLL (Counsel). (SCHOLL, DAVID) (Entered: 07/20/2022) |
| 07/20/2022 | | 89 | Notice of (related document(s): 88 Second Motion to Sell Property Under Section 363(b), Rule 3004 ) Filed by Gabriel Bravo. Hearing scheduled 8/18/2022 at 11:00 AM at Courtroom #2. (SCHOLL, DAVID) **Modified on 7/21/2022−See corrective entry dated 7/21/2022.** (S., Antoinette). (Entered: 07/20/2022) |
| 07/21/2022 | | | Corrective Entry re: Changed location per PDF document. (related document(s)89). (S., Antoinette) (Entered: 07/21/2022) |
| 08/18/2022 | | 90 | Confirmation Hearing scheduled 9/15/2022 at 11:00 AM at Courtroom #2. (D., Tasha) (Entered: 08/18/2022) |
| 08/18/2022 | | 91 | Hearing Continued on 88 Second Motion to Sell Property Under Section 363(b), Rule 3004 Filed by Gabriel Bravo Represented by DAVID A. SCHOLL (Counsel). filed by Debtor Gabriel Bravo. Hearing scheduled 9/15/2022 at 11:00 AM at Courtroom #2. (D., Tasha) (Entered: 08/18/2022) |
| 09/15/2022 | | 92 | Confirmation Hearing scheduled 9/29/2022 at 11:00 AM at Courtroom #2. (D., Tasha) (Entered: 09/15/2022) |
| 09/15/2022 | | 93 | Hearing Continued on 88 Second Motion to Sell Property Under Section 363(b), Rule 3004 Filed by Gabriel Bravo Represented by DAVID A. SCHOLL (Counsel). filed by Debtor Gabriel Bravo. Hearing scheduled 9/29/2022 at 11:00 AM at Courtroom #2. (D., Tasha) (Entered: 09/15/2022) |
| 09/28/2022 | | 94 | Exhibit *Agreement of Sale of 1122 South 9th St., Philaelphia, PA. 18147* Filed by DAVID A. SCHOLL on behalf of Gabriel Bravo (related document(s)88). (SCHOLL, DAVID) (Entered: 09/28/2022) |
| 09/29/2022 | | 95 | Confirmation Hearing Continued on 15 Confirmation Hearing scheduled 10/6/2022 at 11:00 AM at Courtroom #2. (S., Antoinette) (Entered: 09/29/2022) |
| 09/29/2022 | | 96 | Hearing Continued on 88 Second Motion to Sell Property Under Section 363(b), Rule 3004 Filed by Gabriel Bravo Represented by DAVID A. SCHOLL (Counsel). Hearing scheduled 10/6/2022 at 11:00 AM at Courtroom #2. (S., Antoinette) (Entered: 09/29/2022) |
| 10/05/2022 | | 97 | Application for Compensation for DAVID A. SCHOLL, Debtor's Attorney, Period: 10/6/2021 to 10/5/2022, Fee: $20,000, Expenses: $. Filed by DAVID A. SCHOLL Represented by Self(Counsel). (SCHOLL, DAVID) (Entered: 10/05/2022) |
| 10/05/2022 | | 98 | Notice of (related document(s): 97 Application for Compensation for DAVID A. SCHOLL, Debtor's Attorney, Period: 10/6/2021 to 10/5/2022, Fee: $20,000, Expenses: $.) Filed by Gabriel Bravo. (SCHOLL, DAVID) (Entered: 10/05/2022) |

| | | | |
|---|---|---|---|
| 10/05/2022 | | 99 | Proposed Order Re: *Order to Sell Real Estate and to Distribute Proceeds* Filed by DAVID A. SCHOLL on behalf of Gabriel Bravo (related document(s)88). (SCHOLL, DAVID) (Entered: 10/05/2022) |
| 10/06/2022 | | 100 | Praecipe to Withdraw *Objection to Sale Motion* Filed by PAMELA ELCHERT THURMOND on behalf of CITY OF PHILADELPHIA (related document(s)54). (THURMOND, PAMELA) (Entered: 10/06/2022) |
| 10/06/2022 | | 101 | Confirmation Hearing Continued on 15 Confirmation Hearing scheduled 11/17/2022 at 09:30 AM at Courtroom #2. (S., Antoinette) (Entered: 10/06/2022) |
| 10/06/2022 | | 102 | Hearing Held on 88 Second Motion to Sell Property Under Section 363(b), Rule 3004 Filed by Gabriel Bravo Represented by DAVID A. SCHOLL (Counsel). (related document(s),88). Settled. Order to be submitted. (S., Antoinette) (Entered: 10/06/2022) |
| 10/13/2022 | | 103 | Proposed Consent Order RE: *Second Motion to Sell Real Estate and to Distribute Proceeds* Filed by DAVID A. SCHOLL on behalf of Gabriel Bravo (related document(s)88). (SCHOLL, DAVID) (Entered: 10/13/2022) |
| 10/17/2022 | | 104 | Order entered granting Second Motion to sell real estate and to distribute proceeds. (Related Doc 88) (S., Antoinette) (Entered: 10/17/2022) |
| 10/18/2022 | | 105 | Third Amended Chapter 13 Plan Filed by Gabriel Bravo (related document(s)66). (SCHOLL, DAVID) (Entered: 10/18/2022) |
| 10/18/2022 | | 106 | Order: It is hereby ORDERED and DETERMINED that the Claim Objection is OVERRULED. (related document(s)18). (S., Antoinette) (Entered: 10/19/2022) |
| 10/19/2022 | | 107 | BNC Certificate of Mailing − PDF Document. (related document(s) (Related Doc # 104)). No. of Notices: 1. Notice Date 10/19/2022. (Admin.) (Entered: 10/20/2022) |
| 10/20/2022 | | 108 | Objection to Confirmation of Plan Filed by PAMELA ELCHERT THURMOND on behalf of CITY OF PHILADELPHIA (related document(s)105). (Attachments: # 1 Certificate of Service) (THURMOND, PAMELA) (Entered: 10/20/2022) |
| 10/21/2022 | | 109 | BNC Certificate of Mailing − PDF Document. (related document(s) (Related Doc # 106)). No. of Notices: 0. Notice Date 10/21/2022. (Admin.) (Entered: 10/22/2022) |
| 10/30/2022 | | 110 | Certificate of No Response to *Application of Debtor's Counsel for Compensation* Filed by DAVID A. SCHOLL on behalf of Gabriel Bravo (related document(s)97). (SCHOLL, DAVID) (Entered: 10/30/2022) |
| 10/30/2022 | | 111 | Motion to Reconsider (related documents Order (Generic)) *Order of October 18, 2022* Filed by Gabriel Bravo Represented by DAVID A. SCHOLL (Counsel) (related document(s)106). (SCHOLL, DAVID) (Entered: 10/30/2022) |
| 10/30/2022 | | 112 | Notice of (related document(s): 111 Motion to Reconsider (related documents Order (Generic)) *Order of October 18, 2022*) Filed by Gabriel Bravo. Hearing scheduled 11/22/2022 at 10:30 AM at Courtroom #2. |

| | | | |
|---|---|---|---|
| | | | (SCHOLL, DAVID) **Modified on 10/31/2022−See corrective entry dated 10/31/2022.** (S., Antoinette). (Entered: 10/30/2022) |
| 10/31/2022 | | | Corrective Entry re: Corrected hearing location from telephonic to courtroom #2 per PDF document. (related document(s)112). (S., Antoinette) (Entered: 10/31/2022) |
| 11/09/2022 | | 113 | Monthly Operating Report for Filing Period March 2022 − November 2022 Filed by DAVID A. SCHOLL on behalf of Gabriel Bravo. (SCHOLL, DAVID) (Entered: 11/09/2022) |
| 11/15/2022 | | 114 | Response to Motion to Reconsider filed by Debtor Gabriel Bravo Filed by E−Z Cashing, LLC (related document(s)111). (Attachments: # 1 Proposed Order # 2 Service List) (KRIK, JUSTIN) (Entered: 11/15/2022) |
| 11/17/2022 | | 115 | Confirmation Hearing Continued on 15 Confirmation Hearing scheduled 12/8/2022 at 11:00 AM at Courtroom #2. (S., Antoinette) (Entered: 11/17/2022) |
| 11/22/2022 | | 116 | Hearing Held on 111 Motion to Reconsider (related documents Order (Generic)) *Order of October 18, 2022* Filed by Gabriel Bravo Represented by DAVID A. SCHOLL (Counsel) (related document(s)106). (related document(s),111). ORDER to be submitted (G., Eileen) (Entered: 11/22/2022) |
| 11/22/2022 | | 117 | Proposed Order Re: *Motion for Reconsideration* Filed by DAVID A. SCHOLL on behalf of Gabriel Bravo (related document(s)111). (SCHOLL, DAVID) (Entered: 11/22/2022) |
| 11/22/2022 | | 118 | Order: It is hereby ORDERED as follows the Motion is GRANTED as to the $500 payment made by the Debtor to E. Z. Cashing, LLC in November 2021. The Debtor shall be given credit for that payment at settlement. For the reasons stated on the record at that hearing, in all other respects, the Motion is DENIED. (Related Doc # 111) (S., Antoinette) (Entered: 11/22/2022) |
| 11/24/2022 | | 119 | BNC Certificate of Mailing − PDF Document. (related document(s) (Related Doc # 118)). No. of Notices: 1. Notice Date 11/24/2022. (Admin.) (Entered: 11/25/2022) |
| 12/04/2022 | | 120 | Notice of Appeal to District Court. . Fee Amount $298.00 Filed by Gabriel Bravo (related document(s)118, 106). Appellant Designation due by 12/19/2022. Transmission of record on appeal to District Court Due Date:01/3/2023. (SCHOLL, DAVID) (Entered: 12/04/2022) |
| 12/04/2022 | | | Receipt of Notice of Appeal( 21−12926−mdc) [appeal,ntcapl] ( 298.00) Filing Fee. Receipt number A24560942. Fee Amount $ 298.00. (re: Doc# 120) (U.S. Treasury) (Entered: 12/04/2022) |
| 12/05/2022 | | 121 | Court's Certificate of Mailing of Notice of Appeal. Number of Notices: 7. Sent to: Judge Magdeline D. Coleman (via Courtroom Deputy). David A. Scholl, Esquire, Kenneth E. West, Esquire/Trustee, Justin L. Krik, Esquire, U.S. District Court, U.S. Trustee−mailed electronically. Gabriel Bravo, Debtor−mailed through the BNC. (related document(s)120). (S., Antoinette) (Entered: 12/05/2022) |
| 12/05/2022 | | 122 | Electronic Transmission to District Court re: Notice of Appeal. (related document(s)120). (S., Antoinette) (Entered: 12/05/2022) |

| | | | |
|---|---|---|---|
| 12/05/2022 | | 123 | Notice of Docketing Record on Appeal to District Court. Civil Action Case Number: 22−4820, assigned to Judge John M. Younge. (related document(s)120). (S., Antoinette) (Entered: 12/05/2022) |
| 12/07/2022 | | 124 | BNC Certificate of Mailing − PDF Document. (related document(s) (Related Doc # 121)). No. of Notices: 1. Notice Date 12/07/2022. (Admin.) (Entered: 12/08/2022) |
| 12/08/2022 | | 125 | Confirmation Hearing Continued on 15 Confirmation Hearing scheduled 12/22/2022 at 11:00 AM at Courtroom #2. (S., Antoinette) (Entered: 12/08/2022) |
| 12/13/2022 | | 126 | Status Report Re: 104 Order entered granting Second Motion to sell real estate and to distribute proceeds. (Related Doc 88) (S., Antoinette) Filed by DAVID A. SCHOLL on behalf of Gabriel Bravo (related document(s)104). (SCHOLL, DAVID) (Entered: 12/13/2022) |
| 12/15/2022 | | 127 | Appellant Designation of Contents For Inclusion in Record On Appeal Filed by Gabriel Bravo. Appellee designation due by 12/29/2022. Transmission of Designation Due by 01/17/2023. (SCHOLL, DAVID) (Entered: 12/15/2022) |
| 12/15/2022 | | 128 | Appellant Designation of Contents For Inclusion in Record On Appeal *Designation of Issues* Filed by Gabriel Bravo. Appellee designation due by 12/29/2022. Transmission of Designation Due by 01/17/2023. (SCHOLL, DAVID) (Entered: 12/15/2022) |
| 12/22/2022 | | 129 | 13 Confirmation Hearing Continued 15 . Confirmation Hearing scheduled 1/26/2023 at 11:00 AM at Courtroom #2. (W., Christine) (Entered: 12/22/2022) |
| 12/23/2022 | | 130 | Objection to Confirmation of Plan Filed by KENNETH E. WEST (related document(s)105). (Attachments: # 1 Proposed Order)(WEST, KENNETH) (Entered: 12/23/2022) |
| 12/23/2022 | | 131 | Certificate of Service Filed by KENNETH E. WEST on behalf of KENNETH E. WEST (related document(s)130). (WEST, KENNETH) (Entered: 12/23/2022) |
| 12/28/2022 | | 132 | Motion to Dismiss Case. There has been unreasonable delay by debtor(s) that is prejudicial to creditors pursuant to 11 U.S.C. Section 1307(c)(1). Filed by KENNETH E. WEST Represented by KENNETH E. WEST (Counsel). (Attachments: # 1 Proposed Order # 2 Service List) (WEST, KENNETH) (Entered: 12/28/2022) |
| 12/28/2022 | | 133 | Notice of (related document(s): 132 Motion to Dismiss Case. There has been unreasonable delay by debtor(s) that is prejudicial to creditors pursuant to 11 U.S.C. Section 1307(c)(1). ) Filed by KENNETH E. WEST. Hearing scheduled 1/26/2023 at 11:00 AM at Courtroom #2. (WEST, KENNETH) (Entered: 12/28/2022) |
| 12/30/2022 | | 134 | Order Re: As set forth in the Reconsideration Order, because Claimant acknowledged that a Post−Judgment Payment the Debtor made in the amount of $500.00 in November 2021 was not credited, the Debtor shall be given credit for that payment. (related document(s)118, 111). (W., Christine) (Entered: 12/30/2022) |
| 01/01/2023 | | 135 | |

| | | | BNC Certificate of Mailing − PDF Document. (related document(s) (Related Doc # <u>134</u>)). No. of Notices: 1. Notice Date 01/01/2023. (Admin.) (Entered: 01/02/2023) |
|---|---|---|---|

**IN THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN
DISTRICT OF PENNSYLVANIA**

In Re:  GABRIEL BRAVO,             :       **CHAPTER 13**
               Debtor           :       **BANKRUPTCY NO. 21-12926**

**APPELLANT'S DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON
APPEAL**

GABRIEL BRAVO ("the Appellant") )now comes and designates the following

items to be included in the Record of this matter on appeal:

| NO. ON DOCKET | ITEM |
|---|---|
|  | Docket Entries in bankruptcy case |
|  | Proof of Claim of E-Z Cashing, LLC, Claim No. 1 |
| 18 | Objection to Proof of Claim of E-Z Cashing, LLC, No. 1 |
| 29 | Response to Objection to Claim |
| 43 & 44 | Pre-Trial Statement of Debtor with Exhibits |
| 46 | Pre-Trial Statement of E-Z Cashing, LLC |
| 50 | Transcript of Zoom Hearing on Objection to Claim |
| 64 | Brief of Debtor Addressing Objection to Claim |
| 65 | Brief in Opposition to Debtor's Objection |
| 100 | Order that the Objection is Overruled |
| 111 | Motion to Reconsider Order of October 18, 2022 |

114     Response to Motion to Reconsider

116     Transcript of Hearing on Motion to Reconsider

118     Order that Motion to Reconsider Is Granted in Part

120     Notice of Appeal

_____

/s/DAVID A. SCHOLL

512 Hoffman Street

Philadelphia, PA  19148

610-550-1765
Attorney for Debtor/Appellant

## IN THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In Re:  GABRIEL BRAVO, | : | CHAPTER 13 |
| Debtor | : | BANKRUPTCY NO. 21-12926 |

### APPELLANT'S DESIGNATION OF ISSUES TO BE PRESENTED ON  APPEAL

GABRIEL BRAVO  ("the Appellant") now comes and designates the following issues to be presented by him in this matter on appeal:

1.   Whether the bankruptcy court correctly determined that res judicata barred the Debtor from arguing that the court should consider or credit the payments that the Debtor made to the creditor during two prior bankruptcy cases.


2.   Whether the failure to credit payments made to the creditor by the Debtor during the two prior bankruptcy cases constituted such improper and fraudulent conduct that res judicata should not have been applied in favor of the creditor.

-

_____

/s/ DAVID A. SCHOLL
512 Hoffman Street
Philadelphia, PA  19148
610-550-1765
Attorney for Debtor/Appellant

| Fill in this information to identify the case: | |
|---|---|
| Debtor 1 | Gabriel Bravo |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | Eastern District of Pennsylvania |
| Case number | 21-12926-mdc |

## Official Form 410

# Proof of Claim

04/19

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

### Part 1:   Identify the Claim

| | |
|---|---|
| 1. **Who is the current creditor?** | E-Z Cashing, LLC <br> Name of the current creditor (the person or entity to be paid for this claim) <br><br> Other names the creditor used with the debtor _____ |
| 2. **Has this claim been acquired from someone else?** | ☑ No <br> ☐ Yes.  From whom? _____ |

3. **Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| Justin L. Krik, Esquire <br> Name | E-Z Cashing, LLC <br> Name |
| 1500 JFK Blvd., Ste. 630 <br> Number        Street | 110 Avis Avenue <br> Number        Street |
| Philadelphia        PA        19102 <br> City        State        ZIP Code | Lakewood        NJ        08701 <br> City        State        ZIP Code |
| Contact phone  267-831-3180 | Contact phone  c/o 267-831-3180 |
| Contact email  jkrik@kriklaw.com | Contact email  c/o jkrik@kriklaw.com |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ — __ __ __ __ — __ __ __ __ — __ __ __ __ — __ __ __ __ — __ __ — __ __

| | |
|---|---|
| 4. **Does this claim amend one already filed?** | ☑ No <br> ☐ Yes.  Claim number on court claims registry (if known) _____      Filed on _____ <br> MM  / DD  / YYYY |
| 5. **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No <br> ☐ Yes.  Who made the earlier filing? _____ |

**Part 2:**    **Give Information About the Claim as of the Date the Case Was Filed**

| | | |
|---|---|---|

**6.** **Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7.** **How much is the claim?**    $ _____139,800.54    **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8.** **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Money loaned and Consent Judgment

**9.** **Is all or part of the claim secured?**

☐ No

☑ Yes. The claim is secured by a lien on property.

**Nature of property:**

☑ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe:    1122 South 9th Street, Philadelphia, PA 19147

**Basis for perfection:**    Consent Judgment on Mortgage

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**    $ _____166,800.00

**Amount of the claim that is secured:**    $ _____139,800.54

**Amount of the claim that is unsecured:**    $ _____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**    $ _____

**Annual Interest Rate** (when case was filed) __6.75__ %

☑ Fixed

☐ Variable

**10.** **Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**    $ _____

**11.** **Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☑ No | |
|---|---|---|
| | ☐ Yes. *Check one:* | **Amount entitled to priority** |
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |

## Part 3:   Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   11/01/2021
                   MM / DD / YYYY

/s/ Justin L. Krik

Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Justin | Lee | Krik |
|---|---|---|---|
| | First name | Middle name | Last name |

Title      Attorney for E-Z Cashing, LLC

Company    JLK Law PLLC d/b/a Krik Law
           Identify the corporate servicer as the company if the authorized agent is a servicer.

Address    1500 JFK Blvd., Ste. 630
           Number        Street

           Philadelphia                    PA        19102
           City                            State     ZIP Code

Contact phone    267-831-3180        Email    jkrik@kriklaw.com

**In re: Bravo – 21-12926-mdc**

<u>Pre-Petition</u> – all charges through 10/27/21

| | |
|---|---|
| Consent Judgment | $136,865.70 |
| (with Reassessed Damages per 6/2/21 Order) | |
| Interest on Consent Judgment (6/2/21 – 10/27/21) | $   2,934.84 |
| (148 days x $19.83 per diem) | |
| **TOTAL (PRE-PETITION)** | **$139,800.54** |

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION – CIVIL

| | | |
|---|---|---|
| **E-Z CASHING, LLC** | : | **JUNE TERM, 2015** |
| | : | |
| v. | : | **NO. 00453** |
| | : | |
| **GABRIEL BRAVO,** *et al.* | : | **Control No. 21022388** |

## ORDER

**AND NOW**, this 2ⁿᵈ day of June 2021,

upon consideration of Plaintiff's Motion to Reassess Damages filed under Control

Number 21022388, and the response, it is hereby **ORDERED** and **DECREED** that the

motion is **GRANTED** and Plaintiff's November 29, 2016, *in rem* judgment by agreement

is reassessed at $136,865.70.


**BY THE COURT:**


_____ **J.**

15060453-Bayview Loan Servicing, Llc Vs Bravo

15060045300102

COMMON PLEAS COURT OF PHILADELPHIA
TRIAL DIVISION - CIVIL
TRIAL WORKSHEET

| Event: _____ , at __/__/__ __:__ in _____ |
| Scheduled: __/__/__ , NON-JURY   MR - MORTGAGE FORECLOSURE |

| Judge's Name: | Signature: X _Mary D Johns_ |

| Caption: | Case Type: |
| BAYVIEW LOAN SERVICING, LLC VS BRAVO | 3N - NOT RESIDENTIA |
| Term and Number:   | If Consolidated: | OWNER |
| #1506-00453   |   Term and Number(s) | OCCUP-M |

| TRIAL DATE | ACTUAL: | TOTAL AMOUNT | NUMBER OF DAYS | DATE SHEET PREPARED |
| 11/29/16 | ( ) JURY  (X) NON-JURY | | | 11/29/16 |

| Disposition Date: |
| 11/29/16 |

FULL DESCRIPTION OF DISPOSITION (To Be Entered VERBATIM On The Docket):

_Case Settled after assignment for trial._

Bayview Loan Servicing,-WSJDA

15060045300034

( )  DEFAULT JUDGMENT/COURT ORDERED
( )  DIRECTED VERDICT
( )  DISCONTINUANCE ORDERED
( )  TRANSFER TO BINDING
     ARBITRATION

( )  FINDING FOR DEFENDANT (NON-JURY)
( )  FINDING FOR PLAINTIFF (NON-JURY)

( )  DAMAGES ASSESSED

( )  JUDGMENT ENTERED BY AGREEMENT
( )  JUDGMENT ENTERED
( )  JUDGMENT SATISFIED

( )  JURY VERDICT FOR PLAINTIFF
( )  JURY VERDICT FOR DEFENDANT
( )  MISTRIAL
( )  HUNG JURY

( )  NON-PROS ENTERED
( )  NON-SUIT ENTERED
( )  SETTLED PRIOR TO ASSIGNMENT FOR
     TRIAL    (TEAM LEADERS,only)

(X)  SETTLED AFTER ASSIGNMENT FOR TRIAL
     ( )PRIOR TO JURY SELECTION
     ( )AFTER JURY SWORN

( )  OTHER (EXPLAIN)_____

DOCKETED
COMPLEX LIT CENTER

NOV 2 9 2016

J. STEWART

(CONTINUED NEXT PAGE)

## COURT OF COMMON PLEAS PHILADELPHIA COUNTY, PENNSYLVANIA

| | |
|---|---|
| Bayview Loan Servicing, LLC, a Delaware Limited Liability Company,<br><br>　　　　　**Plaintiff,**<br><br>　　**vs.**<br><br>Gabriel Bravo and Guadalupe Bravo,<br><br>　　　　　**Defendants** | No.: 150600453<br><br><br>**CIVIL ACTION**<br>**MORTGAGE FORECLOSURE** |

### CONSENT ORDER

**AND NOW**, this _29th_ day of _November_ , 2016, it is hereby:

**ORDERED AND DECREED** that an *in rem* judgment in mortgage foreclosure is entered in favor of Plaintiff and against Defendant in the amount of $105,613.62, together with interest accruing at a per diem of $19.83, from November 1, 2016 until the date of Sheriff Sale, plus any other fees and costs legally recoverable.

**IT IS FURTHER ORDERED** that this Order will not be entered until the 90th day from the date it is filed.

**IT IS FURTHER ORDERED** that a facsimile version of signatures on this document shall be treated for all purposes as the equivalent of the original signatures.

*Agreed to by:*

Roger Fay, Esquire　　　　　　　　　Date: _11-29-16_
Milstead & Associates, LLC
Counsel for Plaintiff


John J. D'Angelo, Esquire　　　　　　Date: _11-8-16_
Attorney for Defendants


BY THE COURT:

_____
J.

UPON RECORDING RETURN TO:

Bayview Loan Servicing
4425 Ponce de Leon Blvd., 5th Fl.
Coral Gables, Florida 33146
Attention: Collateral Department

# OPEN-END MORTGAGE & SECURITY AGREEMENT

## { PENNSYLVANIA }

### [This Mortgage Secures Future Advances]

### Gabriel Bravo and Guadalupe Bravo

**as mortgagor**
**(Borrower)**

**To**

### InterBay Funding, LLC, a Delaware Limited Liability Company

**as mortgagee**
**(Lender)**

1

51382000
Page: 1 of 34
02/17/2006 11:40AM

This Document Recorded          Doc Id: 51382000
02/17/2006                      Receipt #: 477427
11:40AM                         Rec Fees: 126.50
Doc Code: M   Commissioner of Records, City of Philadelphia

**THIS MORTGAGE AND SECURITY AGREEMENT** (the "Security Instrument") is made as of January 31, 2006, by Gabriel Bravo and Guadalupe Bravo whose address is 836 Federal Street, Phialdelphia, PA 19147, as mortgagor ("Borrower") to InterBay Funding, LLC, a Delaware Limited Liability Company, whose address is 1301 Virginia Drive, Ste #403, Fort Washington, PA 19034, as mortgagee ("Lender").

## R E C I T A L S:

Borrower by its Promissory Note of even date herewith given to Lender is indebted to Lender in the principal sum of Seventy-One Thousand Two Hundred Fifty and No/100 Dollars ($71,250.00) in lawful money of the United States of America (the Note together with all extensions, renewals, modifications, substitutions and amendments thereof shall collectively be referred to as the "Note"), with interest from the date thereof at the rates set forth in the Note, principal and interest to be payable in accordance with the terms and conditions provided in the Note and with a maturity date of March 1, 2036.

By its execution hereof, Borrower desires to secure the payment of the Debt (hereinafter defined) and the performance of all of its obligations under the Note and the Other Obligations (hereinafter defined) and any and all other indebtedness now or hereafter owing by Borrower to Lender.

## ARTICLE 1. - GRANTS OF SECURITY

Section 1.1.      PROPERTY MORTGAGED. Borrower does hereby irrevocably mortgage, grant, bargain, sell, pledge, assign, warrant, transfer and convey to Lender with mortgage covenants upon the Statutory Condition and, as provided and/or authorized by applicable law, with the STATUTORY POWER OF SALE, and grant a security interest to Lender in, the following property, rights, interests and estates now owned, or hereafter acquired by Borrower to the fullest extent permitted by applicable law (collectively, the "Property"):

(a)      Land. The real property described in *Exhibit "A"* attached hereto and made a part hereof (the "Land");

(b)      Additional Land. All additional lands, estates and development rights hereafter acquired by Borrower for use in connection with the Land and the development of the Land and all additional lands and estates therein which may, from time to time, by supplemental mortgage or otherwise be expressly made subject to the lien of this Security Instrument;

(c)      Improvements. The buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter erected or located on the Land (the "Improvements");

(d)      Easements. All easements, servitudes rights-of-way or use, rights, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, and all estates, rights, titles, interests, privileges, liberties, servitudes, tenements, hereditaments and appurtenances of any nature whatsoever, in any way now or hereafter belonging, relating or pertaining to the Land and the Improvements and the reversion and reversions, remainder and remainders, and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Land, to the center line thereof and all the estates, rights, titles, interests, dower and rights of dower, courtesy and rights of courtesy, property, possession, claim and demand whatsoever, both at law and in equity, of Borrower of, in and to the Land and the Improvements and every part and parcel thereof, with the appurtenances thereto;

(e)      Fixtures and Personal Property. All machinery, equipment, fixtures (including, but not limited to, all heating, air conditioning, plumbing, lighting, communications and elevator fixtures) trade fixtures and other property of every kind and nature whatsoever owned by Borrower, or in which Borrower has or shall have an interest, including without limitation, letter of credit rights, deposit accounts, payment intangibles, investment property, electronic chattel paper, timber to be cut and farm animals and, now or hereafter located upon the Land and the Improvements, or appurtenant thereto, and usable in connection with the present or future operation and occupancy of the Land and the Improvements and all building equipment, materials and supplies of any nature whatsoever owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located upon the Land and the Improvements, or appurtenant thereto, or usable in connection with the present or future operation and occupancy of the Land and the Improvements (collectively, the "Personal Property"), and the right, title and interest of Borrower in and to any of the

1

6.B          G B

Personal Property which may be subject to any security interests, as defined in the Uniform Commercial Code, as adopted and enacted by the state or states where any of the Property is located (the "Uniform Commercial Code"), superior in lien to the lien of this Security Instrument, and all proceeds and products of all of the above;

(f)  Leases and Rents. All leases, subleases and other agreements affecting the use, enjoyment or occupancy of the Land and/or the Improvements heretofore or hereafter entered into and all extensions, amendments and modifications thereto, whether before or after the filing by or against Borrower of any petition for relief under Creditors Rights Laws (hereinafter defined) (the "Leases") and all right, title and interest of Borrower, its successors and assigns therein and thereunder, including, without limitation, any guaranties of the lessees' obligations thereunder, cash or securities deposited thereunder to secure the performance by the lessees of their obligations thereunder and all rents, additional rents, revenues, room revenues, accounts, accounts receivable, issues and profits (including all oil and gas or other mineral royalties and bonuses) from the Land and the Improvements whether paid or accruing before or after the filing by or against Borrower of any petition for relief under the Creditors Rights Laws (the "Rents") and all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Debt;

(g)  Insurance Proceeds. All proceeds of and any unearned premiums on any insurance policies covering the Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Property;

(h)  Condemnation Awards. All awards or payments, including interest thereon, which may heretofore and hereafter be made with respect to the Property, whether from the exercise of the right of eminent domain (including, but not limited to any transfer made in lieu of or in anticipation of the exercise of the right), or for a change of grade, or for any other injury to or decrease in the value of the Property;

(i)  Tax Certiorari. All refunds, rebates or credits in connection with a reduction in real estate taxes and assessments charged against the Property as a result of tax certiorari or any applications or proceedings for reduction;

(j)  Conversion. All proceeds of the conversion, voluntary or involuntary, of any of the foregoing including, without limitation, proceeds of insurance and condemnation awards, into cash or liquidation claims;

(k)  .  Rights. The right, in the name and on behalf of Borrower, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Lender in the Property;

(l)  Agreements. All agreements, contracts, certificates, instruments, franchises, permits, licenses, plans, specifications and other documents, now or hereafter entered into, and all rights therein and thereto, respecting or pertaining to the use, occupation, construction, management or operation of the Land and any part thereof and any Improvements or respecting any business or activity conducted on the Land and any part thereof and all right, title and interest of Borrower therein and thereunder, including, without limitation, the right, upon the occurrence and during the continuance of an Event of Default (hereinafter defined), to receive and collect any sums payable to Borrower thereunder;

(m)  Intangibles. All trade names, trademarks, servicemarks, logos, copyrights, goodwill, books and records and all other intellectual property rights and general intangibles relating to or used in connection with the operation of the Property;

(n)  Cash and Accounts. Cash and Accounts. All cash funds, deposit accounts and other rights and evidence of rights to cash, all present and future funds, accounts, instruments, accounts receivable, documents, causes of action, or claims now or hereafter held, created or otherwise capable of credit to the Debtor/Borrower; and

(o)  Other Rights. Any and all other rights of Borrower in and to the items set forth in Subsections (a) through (n) above.

Section 1.2.    ASSIGNMENT OF LEASES AND RENTS. Borrower hereby absolutely and unconditionally assigns to Lender Borrower's right, title and interest in and to all current and future Leases and Rents; it being intended by Borrower that this assignment constitutes a present, absolute assignment and not an assignment for additional security only. Notwithstanding the foregoing, Lender grants to Borrower a revocable license to collect and receive the Rents. Borrower shall hold a portion of the Rents sufficient to discharge all current sums due on the Debt, for use in the payment of such sums.

2

Section 1.3.    SECURITY AGREEMENT. This Security Instrument is both a real property mortgage and a "security agreement" within the meaning of the Uniform Commercial Code. The Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of Borrower in the Property. By executing and delivering this Security Instrument, Borrower hereby grants to Lender, as security for the Obligations (hereinafter defined), a security interest in the Personal Property as well as all other property and interests set forth in Section 1.1 herein to the full extent that the same may be subject to the Uniform Commercial Code. If required by Lender, Borrower shall execute UCC-1 Financing Statements covering said property for filing with the appropriate county and/or state filing offices. In any event, Lender is permitted to unilaterally file a UCC-1 Financing Statement covering all of the Property.

Section 1.4.    PLEDGE OF MONIES HELD. Borrower hereby pledges to and grants a continuing security interest in favor of Lender any and all monies now or hereafter held by Lender, including, without limitation, any sums deposited in the Escrow Fund (hereinafter defined), Net Proceeds (hereinafter defined) and condemnation awards or payments (hereinafter described) as additional security for the Obligations until expended or applied as provided in this Security Instrument.

## CONDITIONS TO GRANT

TO HAVE AND TO HOLD the above granted and described Property to the use and benefit of Lender, and the successors and assigns of Lender, forever;

PROVIDED, HOWEVER, these presents are upon the express condition that, if Borrower shall well and truly pay to Lender the Debt at the time and in the manner provided in the Note and this Security Instrument, shall perform the Other Obligations as set forth in this Security Instrument and shall abide by and comply with each and every covenant and condition set forth herein and in the Note, these presents and the estate hereby granted shall cease, terminate and be void, except to the extent any provision herein provides that it shall survive the repayment of the obligations.

## ARTICLE 2. - DEBT AND OBLIGATIONS SECURED

Section 2.1.    DEBT. This Security Instrument and the grants, assignments and transfers made pursuant to the terms hereafter are given for the purpose of securing the payment of the following, in such order of priority as Lender may determine in its sole discretion (the "Debt"):

(a)    the indebtedness evidenced by the Note in lawful money of the United States of America;

(b)    interest, default interest, late charges and other sums, as provided in the Note, this Security Instrument or the Other Security Documents (hereinafter defined);

(c)    the Prepayment Consideration (defined in the Note), if any;

(d)    all other monies agreed or provided to be paid by Borrower in the Note, this Security Instrument or the Other Security Documents (hereinafter defined);

(e)    all sums advanced pursuant to this Security Instrument to protect and preserve the Property and the lien and the security interest created hereby; and

(f)    all sums advanced and costs and expenses incurred by Lender in connection with the Debt or any part thereof, any renewal, extension, or change of or substitution for the Debt or any part thereof, or the acquisition or perfection of the security therefor, whether made or incurred at the request of Borrower or Lender; and

(g)    any and all additional advances made by Lender to complete Improvements or to preserve or protect the Property, or for taxes, assessments or insurance premiums, or for the performance of any of Borrower's obligations hereunder or under the Other Security Documents (hereinafter defined).

Section 2.2.    OTHER OBLIGATIONS. This Security Instrument and the grants, assignments and transfers made pursuant to the terms hereof are also given for the purpose of securing the performance of the following (the "Other Obligations"):

(a)    all other obligations of Borrower contained herein;

3

(b)      each obligation of Borrower contained in the Note and in the Other Security Documents; and

(c)      each obligation of Borrower contained in any renewal, extension, amendment, modification, consolidation, change of, or substitution or replacement for, all or any part of the Note, this Security Instrument or the Other Security Documents.

(d)      any and all other indebtedness now or hereafter owing by Borrower to Lender.

Section 2.3.      DEBT AND OTHER OBLIGATIONS.  Borrower's obligations for the payment of the Debt and the performance of the Other Obligations shall be referred to collectively as the "Obligations."

Section 2.4.      PAYMENTS.  Unless payments are made in the required amount in immediately available funds at the place where the Note is payable, remittances in payment of all or any part of the Debt shall not, regardless of any receipt or credit issued therefor, constitute payment until the required amount is actually received by Lender in funds immediately available at the place where the Note is payable (or any other place as Lender, in Lender's sole discretion, may have established by delivery of written notice thereof to Borrower) and shall be made and accepted subject to the condition that any check or draft may be handled for collection in accordance with the practice of the collecting bank or banks; provided, however, Lender shall not be required to accept payment for any Obligation in cash.  Acceptance by Lender of any payment in an amount less than the amount then due shall be deemed an acceptance on account only, and the failure to pay the entire amount then due shall be and continue to be an Event of Default.

## ARTICLE 3. - BORROWER COVENANTS

Borrower covenants and agrees that:

Section 3.1.      PAYMENT OF DEBT AND PERFORMANCE OF OBLIGATIONS.  Borrower will pay the Debt at the time and in the manner provided in the Note and in this Security Instrument; without relief from valuation or appraisement laws, and shall promptly and fully perform all of the Obligations in this Security Agreement and the Other Security Documents (hereinafter defined).

Section 3.2.      INCORPORATION BY REFERENCE.  All the covenants, conditions and agreements contained in (a) the Note and (b) all and any of the documents other than the Note or this Security Instrument now or hereafter executed by Borrower and/or others and by or in favor of Lender, which wholly or partially secure or guaranty payment of the Note or are otherwise executed and delivered in connection with the Loan (the "Other Security Documents") are hereby made a part of this Security Instrument to the same extent and with the same force as if fully set forth herein.

Section 3.3.      INSURANCE.  Borrower shall maintain with respect to the Property at all times, insurance against loss or damage by fire and other casualties and hazards by insurance written on an "all risks" basis including specifically windstorm and/or hail damage, in an amount not less than the replacement cost thereof, naming Lender as loss payee and additional insured; (ii) if the Property is required to be insured pursuant to the National Flood Reform Act of 1994, and the regulations promulgated there under, flood insurance is required in the amount equal to the lesser of the loan amount or the maximum available under the National Flood Insurance Program, but in no event should the amount of coverage be less than the value of the improved structure, naming Lender as additional insured and loss payee; and (iii) liability insurance providing coverage in such amount as Lender may require but in no event less than $500,000.00 naming Lender as an additional insured; and (iv) such other insurances as Lender may reasonably require from time to time.

All casualty insurance policies shall contain an endorsement or agreement by the insurer in form satisfactory to Lender that any loss shall be payable in accordance with the terms of such policy notwithstanding any act of negligence of Borrower and the further agreement of the insurer waiving rights of subrogation against Lender, and rights of set-off, counterclaim or deductions against Borrower.

All insurance policies shall be in form, provide coverages, be issued by companies and be in amounts satisfactory to Lender.  At least 30 days prior to the expiration of such policy, Borrower shall furnish Lender with evidence satisfactory to Lender that such policy has been renewed or replaced.  All such policies shall provide that the policy will not be canceled or materially amended without at least 30 days prior written notice to Lender.  In the event Borrower fails to provide, maintain, keep in force and furnish to Lender the policies of insurance in such amounts, at such premium, for such risks and by such means as Lender chooses, then Lender may procure such insurance at Borrower's sole cost and expense, provided Lender shall have no responsibility to obtain any insurance, but if Lender does obtain insurance, Lender shall have no responsibility to assure that the insurance obtained shall be adequate or provide any

4

protection to Borrower.

In the event of a foreclosure of the Security Instrument or other transfer of title to the Property in extinguishment in whole or in part of the Debt, all right, title and interest of Borrower in and to the Policies then in force concerning the Property, to the extent assignable, and all proceeds payable thereunder shall thereupon vest in Lender or the purchaser at such foreclosure or other transferee in the event of such other transfer of title.

Section 3.4.    PAYMENT OF TAXES, ETC.

(a)    Borrower shall promptly pay by the date same are initially payable all taxes, assessments, impact fees, levies, inspection and license fees, water rates, sewer rents and other governmental impositions, including, without limitation, vault and meter charges and license fees for the use of vaults, chutes and similar areas adjoining the Land, now or hereafter levied or assessed or imposed against the Property or any part thereof (the "Taxes") not paid from the Escrow Fund (hereinafter defined), all ground rents, maintenance charges and similar charges, now or hereafter levied or assessed or imposed against the Property or any part thereof (the "Other Charges"), and all charges for utility services provided to or imposed against the Property as same become due and payable. Borrower will deliver to Lender, receipts or other, evidence satisfactory to Lender that the Taxes, Other Charges and utility service charges have been so paid or are not then delinquent. Borrower shall not suffer and shall promptly cause to be paid and discharged any lien or charge whatsoever, which may be or become a lien or charge against the Property, except to the extent sums sufficient to pay all Taxes and Other Charges have been deposited with Lender in accordance with the terms of this Security Instrument.

(b)    After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any of the Taxes, provided that (i) no Event of Default has occurred and is continuing under the Note, this Security Instrument or any of the Other Security Documents, (ii) Borrower is permitted to do so under the provisions of any other mortgage, deed of trust or deed to secure debt affecting the Property, (iii) such proceeding shall suspend the collection of the Taxes from Borrower and from the Property or Borrower shall have paid all of the Taxes under protest, (iv) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder, (v) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, canceled or lost and (vi) Borrower shall have deposited with Lender adequate reserves (determined by Lender in its sole discretion) for the payment of the Taxes, together with all interest and penalties thereon, unless Borrower has paid all of the Taxes under protest, and Borrower shall have furnished such other security as may be required in the proceeding, or as may be reasonably requested by Lender to insure the payment of any contested Taxes, together with all interest and penalties thereon, taking into consideration the amount in the Escrow Fund available for payment of Taxes.

Section 3.5.    ESCROW FUND. In addition to the initial deposits with respect to Taxes and Insurance Premiums made by Borrower to Lender on the date hereof to be held by Lender in escrow, Borrower shall pay to Lender on the first day of each calendar month (a) one-twelfth of an amount which would be sufficient to cover the payment of the Taxes payable, or estimated by Lender to be payable, during the next ensuing twelve (12) months and (b) one-twelfth of an amount which would be sufficient to pay the Insurance Premiums due for the renewal of the coverage afforded by the Policies upon the expiration thereof (the amounts in (a) and (b) above shall be called the "Escrow Fund"). Borrower agrees to notify Lender immediately of any changes to the amounts, schedules and instructions for payment of any Taxes and Insurance Premiums of which it has or obtains knowledge and authorizes Lender or its agent to obtain the bills for Taxes directly from the appropriate taxing authority. The Escrow Fund and the payments of interest or principal or both, payable pursuant to the Note shall be added together and shall be paid as an aggregate sum by Borrower to Lender. Provided there are sufficient amounts in the Escrow Fund and no Event of Default exists, Lender shall be obligated to pay the Taxes and Insurance Premiums as they become due on their respective due dates on behalf of Borrower by applying the Escrow Fund to the payments of such Taxes and Insurance Premiums required to be made by Borrower. If the amount of the Escrow Fund shall exceed the amounts reasonably necessary for the payment of Taxes and Insurance Premiums, Lender shall, in its discretion, return any excess to Borrower or credit such excess against future payments to be made to the Escrow Fund. In allocating such excess, Lender may deal with the person shown on the records of Lender to be the owner of the Property. If the Escrow Fund is not sufficient to pay the items set forth in (a) and (b) above as and when they are due, Borrower shall promptly pay to Lender, upon demand, an amount which Lender shall reasonably estimate as sufficient to make up the deficiency. Unless otherwise required by applicable state or federal law, the Escrow Fund shall not constitute a trust fund and may be commingled with other monies held by Lender. Unless otherwise required by applicable state or federal law, no earnings or interest on the Escrow Fund shall be payable to Borrower.

5

Upon payment in full of the Debt, and full performance of the Obligations, the funds remaining in the Escrow Fund, if any, shall be paid to the record owner of the Land encumbered by the lien of this Security Instrument within a reasonable time following the date of such full payment and performance.

Section 3.6.    CONDEMNATION.  Borrower shall promptly give Lender notice of the actual or threatened commencement of any condemnation or eminent domain proceeding and shall deliver to Lender copies of any and all papers, documents, surveys and correspondence served or received in connection with such proceedings. Notwithstanding any taking by any public or quasi-public authority through eminent domain or otherwise (including, but not limited to any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Security Instrument and the Debt shall not be reduced until any award or payment therefor shall have been actually received and applied by Lender, after the deduction of expenses of collection, to the reduction or discharge of the Debt.  Lender shall not be limited to the interest paid on the award by the condemning authority but shall be entitled to receive out of the award interest at the rate or rates provided in the Note.  Borrower hereby assigns and shall cause all awards and payments made in any condemnation or eminent domain proceeding, to be paid directly to Lender.  Lender may apply any award or payment to the reduction or discharge of the Debt whether or not then due and payable. If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the award or payment, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the award or payment, or a portion thereof sufficient to pay the Debt.  In addition, Borrower authorizes Lender, at Lender's option but without any obligation, as attorney-in-fact for Borrower to commence, appear in and prosecute, in Borrower's or Lender's name, any action or proceeding relating to any condemnation (which term for purposes hereunder shall mean any action regarding damage or taking by any governmental authority, quasi-governmental authority, any party having power of condemnation, or any transfer by private sale in lieu thereof) or other taking of the Property and to settle or compromise any claim in connection with such condemnation or other taking.  Notwithstanding any application of condemnation proceeds by Lender to the Debt, Borrower shall repair, restore and rebuild the Property affected by the condemnation to a condition as close to that existing prior to such condemnation as is reasonable practicable, and otherwise sufficient for the use and enjoyment thereof as determined by Lender.

Section 3.7.    RESTORATION AFTER CASUALTY.

    (a)    In the event of loss, Borrower shall give immediate written notice to the insurance carrier and to Lender.  Borrower hereby authorizes and appoints Lender as attorney-in-fact for Borrower to make proof of loss, to adjust and compromise any claims under policies of property damage insurance, to appear in and prosecute any action arising from such property damage insurance policies, to collect and receive the proceeds of property damage insurance, and to deduct from such proceeds Lender's expenses incurred in the collection of such proceeds.  This power of attorney is coupled with an interest and therefore is irrevocable.  However, nothing contained in this Section 3.7 shall require Lender to incur any expense or take any action.  Lender may, at Lender's option, (1) hold the balance of such proceeds to be used to reimburse Borrower for the cost of restoring and repairing the Property to the equivalent of its original condition or to a condition approved by Lender (the "Restoration"), or (2) apply the balance of such proceeds to the payment of the Debt, whether or not then due.  To the extent Lender determines to apply insurance proceeds to Restoration, Lender shall do so in accordance with Lender's then-current policies relating to the restoration of casualty damage on similar properties.

    (b)    Lender shall not exercise its option to apply insurance proceeds to the payment of the Debt if all of the following conditions are met: (1) no Event of Default (or any event which, with the giving of notice or the passage of time, or both, would constitute an Event of Default) has occurred and is continuing; (2) Lender determines, in its discretion, that there will be sufficient funds to complete the Restoration; (3) Lender determines, in its discretion, that the net cash flow from the Property after completion of the Restoration will be sufficient to meet all operating costs and other expenses, deposits to the Escrow Fund, deposits to reserves and loan repayment obligations relating to the Property; (4) Lender determines, in its discretion, that the Restoration will be completed before the earlier of (A) one year before the maturity date of the Note or (B) one year after the date of the loss or casualty; and (5) upon Lender's request, Borrower provides Lender evidence of the availability during and after the Restoration of the insurance required to be maintained by Borrower pursuant to Section 3.3.

Section 3.8.    LEASES AND RENTS.  Borrower shall maintain, enforce and cause to be performed all of the terms and conditions under any Lease or sublease, which may constitute a portion of the Property.  Borrower shall not, without the consent of Lender enter into any new Lease of all or any portion of the Property, agree to the cancellation or surrender under any Lease of all or any portion of the Property, agree to prepayment of Rents, issues or profits (other than Rent paid at the signing of a lease or sublease), modify any such Lease so as to shorten the term, decrease the Rent, accelerate the payment of Rent, or change the terms of any renewal option, provided that such action (taking into account, in the case of

6

a termination, reduction in rent, surrender of space or shortening of term, the planned alternative use of the affected space) does not have a materially adverse effect on the value of the Property taken as a whole, and provided that such Lease, as amended, modified or waived, is otherwise in compliance with the requirements of this Security Instrument and any subordination agreement binding upon Lender with respect to such Lease. Any such purported new Lease, cancellation surrender, prepayment or modification made without the written consent of Lender shall be void as against Lender.

Section 3.9.    MAINTENANCE AND USE OF PROPERTY.  Borrower shall cause the Property to be maintained in a good and safe condition and repair. The Improvements and the Personal Property shall not be removed, demolished or materially altered (except for normal replacement of the Personal Property with replacement property of equal or greater value) without the consent of Lender. Borrower shall promptly repair, replace or rebuild any part of the Property which may be destroyed by any casualty, or become damaged, worn or dilapidated or which may be affected by any condemnation or taking proceeding and shall complete and pay for any structure at any time in the process of construction or repair on the Land. Borrower shall not initiate, join in, acquiesce in, or consent to any change in any private restrictive covenant, zoning law or other public or private restriction, limiting, defining or changing the uses which may be made of the Property or any part thereof. If under applicable zoning provisions the use of all or any portion of the Property is or shall become a nonconforming use, Borrower will not cause or permit the nonconforming use to be discontinued or the nonconforming Improvement to be abandoned without the express written consent of Lender, and Borrower shall take such other steps as Lender may require to establish the legality of such non-conforming use.

Section 3.10.    WASTE.  Borrower shall not commit or suffer any waste of the Property or make any change in the use of the Property which will in any way materially increase the risk of fire or other hazard arising out of the operation of the Property, or take any action that might invalidate or give cause for cancellation of any Policy, or substantially increase the rates thereunder, or do or permit to be done thereon anything that may in any way impair the value of the Property or the security of this Security Instrument. Borrower will not, without the prior written consent of Lender, permit any drilling or exploration for or extraction, removal, or production of any minerals from the surface or the subsurface of the Land, regardless of the depth thereof or the method of mining or extraction thereof.

Section 3.11.    COMPLIANCE WITH LAWS.

(a)    Borrower shall promptly comply with all existing and future federal, state and local laws, orders, ordinances, governmental rules and regulations or court orders affecting the Property, and the use thereof, including any Environmental Law (hereinafter defined) ("Applicable Laws").

(b)    Borrower shall from time to time, upon Lender's request, provide Lender with evidence reasonably satisfactory to Lender that the Property complies with all Applicable Laws or is exempt from compliance with Applicable Laws.

(c)    Notwithstanding any provisions set forth herein or in any document regarding Lender's approval of alterations of the Property, Borrower shall not alter the Property in any manner which would materially increase Borrower's responsibilities for compliance with Applicable Laws without the prior written approval of Lender. Lender's approval of the plans, specifications, or working drawings for alterations of the Property shall create no responsibility or liability on behalf of Lender for their completeness, design, sufficiency or their compliance with Applicable Laws. The foregoing shall apply to tenant improvements constructed by Borrower or by any of its tenants. Lender may condition any such approval upon receipt of a certificate of compliance with Applicable Laws from an independent architect, engineer, or other person acceptable to Lender.

(d)    Borrower shall give prompt notice to Lender of the receipt by Borrower of any notice related to a violation or threatened violation of any Applicable Laws and of the commencement or threatened commencement of any proceedings or investigations which relate to compliance with Applicable Laws.

(e)    After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceedings, promptly initiated and conducted in good faith and with due diligence, the Applicable Laws affecting the Property, provided that (i) no Event of Default has occurred and is continuing under the Note, this Security Instrument or any of the Other Security Documents; (ii) Borrower is permitted to do so under the provisions of any other mortgage, deed of trust or deed to secure debt affecting the Property; (iii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower or the Property is subject and shall not constitute a default thereunder; (iv) neither the Property, any part thereof or interest therein, any of the tenants or occupants thereof, Borrower, nor Lender shall be affected in any material adverse way as a result of such proceeding; (v)

7

G.B    ⌐B

non-compliance with the Applicable Laws shall not impose civil or criminal liability on Borrower or Lender; and (vi) Borrower shall have furnished to Lender all other items reasonably requested by Lender.

Section 3.12.  **BOOKS AND RECORDS**

(a)     Borrower shall keep and maintain at all times at the Property or the management agent's offices, and upon Lender's request shall make available at the Property, complete and accurate books of account and records (including copies of supporting bills and invoices) adequate to reflect correctly the operation of the Property, and copies of all written contracts, Leases, and other instruments which affect the Property. Following a default by Borrower, the books, records, contracts, Leases and other instruments shall be subject to examination and inspection at any reasonable time by Lender.

(b)     Following a default by Borrower, Borrower shall furnish to Lender all of the following:

(1)     within ten (10) days following Lender's written request and thereafter annually within 120 days after the end of each fiscal year of Borrower, a statement of income and expenses for Borrower's operation of the Property for that fiscal year, a statement of changes in financial position of Borrower relating to the Property for that fiscal year and, when requested by Lender, a balance sheet showing all assets and liabilities of Borrower relating to the Property as of the end of that fiscal year;

(2)     within ten (10) days following Lender's written request and thereafter annually within 120 days after the end of each fiscal year of Borrower, and at any other time upon Lender's request, a rent schedule for the Property showing the name of each tenant, and for each tenant, the space occupied, the lease expiration date, the rent payable for the current month, the date through which rent has been paid, and any related information requested by Lender;

(3)     within ten (10) days following Lender's written request and thereafter annually within 120 days after the end of each fiscal year of Borrower, and at any other time upon Lender's request, an accounting of all security deposits held pursuant to all Leases, including the name of the institution (if any) and the names and identification numbers of the accounts (if any) in which such security deposits are held and the name of the person to contact at such financial institution, along with any authority or release necessary for Lender to access information regarding such accounts;

(4)     within ten (10) days following Lender's written request and thereafter annually within 120 days after the end of each fiscal year of Borrower, and at any other time upon Lender's request, a statement that identifies all owners of any interest in Borrower and the interest held by each, if Borrower is a corporation, all officers and directors of Borrower, and if Borrower is a limited liability company, all managers who are not members;

(5)     within ten (10) days following Lender's written request and thereafter monthly a property management report for the Property, showing the number of inquiries made and rental applications received from tenants or prospective tenants and deposits received from tenants and any other information requested by Lender;

(6)     within ten (10) days following Lender's written request and thereafter monthly a balance sheet, a statement of income and expenses for Borrower and a statement of changes in financial position of Borrower for Borrower's most recent fiscal year; and

(7)     within ten (10) days following Lender's written request and thereafter monthly a statement of income and expense for the Property for the prior month or quarter.

(c)     Each of the statements, schedules and reports required hereunder shall be certified to be complete and accurate by an individual having authority to bind Borrower, and shall be in such form and contain such detail as Lender may reasonably require; provided that Lender, in Lender's sole discretion, may require that any statements, schedules or reports be audited at Borrower's expense by independent certified public accountants acceptable to Lender.

(d)     If Borrower fails to provide in a timely manner the statements, schedules and reports required hereunder, Lender shall have the right to have Borrower's books and records audited, at Borrower's expense, by independent certified public accountants selected by Lender in order to obtain such statements, schedules and reports, and all related costs and expenses of Lender shall become immediately due and payable and shall become an additional part of the Debt.

(e)     If an Event of Default has occurred and is continuing, Borrower shall deliver to Lender upon written demand all books and records relating to the Property or its operation.

8

(f)       Borrower authorizes Lender to obtain a credit report on Borrower at any time.

(g)       Borrower, any Guarantor and any Indemnitor shall furnish Lender with such other additional financial or management information (including State and Federal tax returns) as may, from time to time, be reasonably required by Lender in form and substance satisfactory to Lender.

(h)       Borrower, any Guarantor and any Indemnitor shall furnish to Lender and its agents convenient facilities for the examination and audit of any such books and records.

Section 3.13.       PAYMENT FOR LABOR AND MATERIALS.  Borrower will promptly pay when due all bills and costs for labor, materials, and specifically fabricated materials incurred in connection with the Property and never permit to exist in respect of the Property or any part thereof any lien or security interest, even though inferior to the liens and the security interests hereof, and in any event never permit to be created or exist in respect of the Property or any part thereof any other or additional lien or security interest other than the liens or security interests hereof, except for the Permitted Exceptions (defined below).

Section 3.14.       PERFORMANCE OF OTHER AGREEMENTS.  Borrower shall observe and perform each and every term to be observed or performed by Borrower pursuant to the terms of any agreement or recorded instrument affecting or pertaining to the Property, or given by Borrower to Lender for the purpose of further securing an Obligation and any amendments, modifications or changes thereto.

Section 3.15.       CHANGE OF NAME, IDENTITY OR STRUCTURE.  Borrower shall not change Borrower's name, identity (including its trade name or names) or, if not an individual, Borrower's corporate, partnership or other structure or jurisdiction where the Borrower is organized without notifying the Lender of such change in writing at least thirty (30) days prior to the effective date of such change and, in the case of a change in Borrower's structure or the jurisdiction where Borrower is organized, without first obtaining the prior written consent of the Lender.

Section 3.16.       EXISTENCE.  Borrower will continuously maintain (a) its existence and shall not dissolve or permit its dissolution, (b) its rights to do business in the state where the Property is located and (c) its franchises and trade names.

Section 3.17.       MANAGEMENT.  The Property shall be managed by either: (a) Borrower or an entity affiliated with Borrower and approved by Lender for so long as Borrower or said affiliated entity is managing the Property in a first class manner; or (b) a professional property management company approved by Lender.  Management by an affiliated entity or a professional property management company shall be pursuant to a written agreement approved by Lender which shall be in all respects subordinate to this Security Instrument. Following a default by Borrower, no manager shall be removed or replaced or the terms of any management agreement modified or amended without the prior written consent of Lender. In the event (x) of default hereunder or under any management contract then in effect, which default is not cured within any applicable grace or cure period or (y) of the bankruptcy or insolvency of the manager, Lender shall have the right to immediately terminate, or to direct Borrower to immediately terminate, such management contract and to retain, or to direct Borrower to retain, a new management agent approved by Lender.  All Rents generated by or derived from the Property shall first be utilized solely for current expenses directly attributable to the ownership and operation of the Property, including, without limitation, current expenses relating to Borrower's liabilities and obligations with respect to the Note, this Security Instrument and the Other Security Documents, and none of the Rents generated by or derived from the Property shall be diverted by Borrower and utilized for any other purpose unless all such current expenses attributable to the ownership and operation of the Property have been fully paid and satisfied.

Section 3.18.       PRINCIPAL PLACE OF BUSINESS.  In the event that Borrower shall change the principal place of business or chief executive office, or, in the event Borrower is one or more natural persons, the location of its permanent residence, all as set forth in Subsection 4.18 below, Borrower shall immediately notify Lender in writing.  Borrower shall execute and deliver such additional financing statements, security agreements and other instruments which may be necessary to effectively evidence or perfect Lender's security interest in the Property as a result of such change of principal place of business or residence.

ARTICLE 4. - REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to Lender that:

Section 4.1.       WARRANTY OF TITLE.  Borrower has good and marketable title to the Property and has the right to

9

mortgage, grant, bargain, sell, pledge, assign, warrant, transfer and convey the same and that Borrower possesses an unencumbered fee simple absolute estate in the Land and the Improvements and that it owns the Property free and clear of all liens, encumbrances and charges whatsoever except for those exceptions shown in the title insurance policy insuring the lien of this Security Instrument (the "Permitted Exceptions"). Borrower shall forever warrant, defend and preserve the title and the validity and priority of the lien of this Security Instrument and shall forever warrant and defend the same to Lender against the claims of all persons whomsoever, and shall make such further assurances to perfect fee simple title to the Property as Lender may reasonably require.

Section 4.2.    LEGAL STATUS AND AUTHORITY.  Borrower (a) is duly organized, validly existing and in good standing under the laws of its state of organization or incorporation; (b) is duly qualified to transact business and is in good standing in the state where the Property is located; and (c) has all necessary approvals, governmental and otherwise, and full power and authority to own, operate and lease the Property. Borrower (and the undersigned representative of Borrower, if any) has full power, authority and legal right to execute this Security Instrument, and to mortgage, grant, bargain, sell, pledge, assign, warrant, transfer and convey the Property pursuant to the terms hereof and to keep and observe all of the terms of this Security Instrument on Borrower's part to be performed.

Section 4.3.    VALIDITY OF DOCUMENTS.  (a) The execution, delivery and performance of the Note, this Security Instrument and the Other Security Documents and the borrowing evidenced by the Note (i) are within the power and authority of Borrower; (ii) have been authorized by all requisite organizational action; (iii) have received all necessary approvals and consents, corporate, governmental or otherwise; (iv) will not violate, conflict with, result in a breach of or constitute (with notice or lapse of time, or both) a default under any provision of law, any order or judgment of any court or governmental authority, the articles of incorporation, by-laws, partnership or trust agreement, articles of organization, operating agreement, or other governing instrument of Borrower, or any indenture, agreement or other instrument to which Borrower is a party or by which it or any of its assets or the Property is or may be bound or affected; (v) will not result in the creation or imposition of any lien, charge or encumbrance whatsoever upon any of its assets, except the lien and security interest created hereby; and (vi) will not require any authorization or license from, or any filing with, any governmental or other body (except for the recordation of this Security Instrument in appropriate land records in the State where the Property is located and except for Uniform Commercial Code filings relating to the security interest created hereby), and (b) the Note, this Security Instrument and the Other Security Documents constitute the legal, valid and binding obligations of Borrower, enforceable in accordance with their terms.

Section 4.4.    LITIGATION.  There is no action, suit or proceeding, judicial, administrative or otherwise (including any condemnation or similar proceeding), pending or, to the best of Borrower's knowledge, threatened or contemplated against Borrower, a Guarantor, if any, an Indemnitor, if any, or against or affecting the Property that has not been disclosed to Lender by Borrower in writing.

Section 4.5.    STATUS OF PROPERTY.

(a)    Borrower has obtained all necessary certificates, licenses and other approvals, governmental and otherwise, necessary for the operation of the Property and the conduct of its business and all required zoning, building code, land use, environmental and other similar permits or approvals, all of which are in full force and effect as of the date hereof and not subject to revocation, suspension, forfeiture or modification.

(b)    The Property and the present and contemplated use and occupancy thereof are in full compliance with all applicable zoning ordinances, building codes, land use laws, Environmental Laws and other similar laws.

(c)    The Property is served by all utilities required for the current or contemplated use thereof. All utility service is provided by public utilities and the Property has accepted or is equipped to accept such utility service.

(d)    All public roads and streets necessary for service of and access to the Property for the current or contemplated use thereof have been completed, are serviceable and all-weather and are physically and legally open for use by the public, and have been dedicated to and accepted for public maintenance by the applicable municipal or county authorities.

(e)    The Property is served by public water and sewer systems.

(f)    The Property is free from damage caused by fire or other casualty.

(g)    All costs and expenses of any and all labor, materials, supplies and equipment used in the

10

construction of the Improvements have been paid in full.

(h)     Borrower has paid in full for, and is the owner of, all furnishings, fixtures and equipment (other than tenants'' property) used in connection with the operation of the Property, free and clear of any and all security interests, liens or encumbrances, except the lien and security interest created hereby.

(i)     All liquid and solid waste disposal, septic and sewer systems located on the Property are in a good and safe condition and repair and in compliance with all Applicable Laws.

(j)     No portion of the Improvements is located in an area identified by the Federal Emergency Management Agency or any successor thereto as an area having special flood hazards pursuant to the Flood Insurance Acts or, if any portion of the Improvements is located within such area, Borrower has obtained and will maintain the insurance required pursuant to the terms hereof.

(k)     All the Improvements lie within the boundaries of the Land.

Section 4.6.     NO FOREIGN PERSON. Borrower is not a "foreign person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code of 1986, as amended and the related Treasury Department regulations.

Section 4.7.     SEPARATE TAX LOT. The Property is assessed for real estate tax purposes as one or more wholly independent tax lot or lots, separate from any adjoining land or improvements not constituting a part of such lot or lots, and no other land or improvements is assessed and taxed together with the Property or any portion thereof.

Section 4.8.     LEASES. Except as disclosed in the rent roll for the Property delivered to and approved by Lender, (a) Borrower is the sole owner of the entire lessor's interest in the Leases; (b) the Leases are valid and enforceable and in full force and effect; (c) all of the Leases are arms-length agreements with bona fide, independent third parties; (d) no party under any Lease is in default; (e) all Rents due have been paid in full; (f) the terms of all alterations, modifications and amendments to the Leases are reflected in the certified occupancy statement delivered to and approved by Lender; (g) none of the Rents reserved in the Leases have been assigned or otherwise pledged or hypothecated; (h) none of the Rents have been collected for more than one (1) month in advance (except a security deposit shall not be deemed rent collected in advance); (i) the premises demised under the Leases have been completed in accordance with the Leases, and the tenants under the Leases have accepted the same and have taken possession of the same on a rent-paying basis; (j) there exist no offsets or defenses to the payment of any portion of the Rents and Borrower has no monetary obligation to any tenant under any Lease; (k) Borrower has received no notice from any tenant challenging the validity or enforceability of any Lease; (l) there are no agreements with the tenants under the Leases other than expressly set forth in each Lease; (m) the Leases are valid and enforceable against Borrower and the tenants set forth therein; (n) no Lease contains an option to purchase, right of first refusal to purchase, right of first refusal to relet, or any other similar provision; (o) no person or entity has any possessory interest in, or right to occupy, the Property except under and pursuant to a Lease; (p) each Lease is subordinate to this Security Instrument, either pursuant to its terms or a recordable subordination agreement; (q) no Lease has the benefit of a non-disturbance agreement that would be considered unacceptable to prudent institutional lenders; (r) all security deposits relating to the Leases reflected on the certified rent roll delivered to Lender have been collected by Borrower; and (s) no brokerage commissions or finders fees are due and payable regarding any Lease.

Section 4.9.     FINANCIAL CONDITION.

(a)     (i) Borrower is solvent and no proceeding under Creditors Rights Laws (hereinafter defined) with respect to Borrower has been initiated, and (ii) Borrower has received reasonably equivalent value for the granting of this Security Instrument.

(b)     No petition in bankruptcy has been filed by or against Borrower, any Guarantor, any Indemnitor or any related entity, or any principal, general partner or member thereof, in the last seven (7) years, and neither Borrower, any Guarantor, any Indemnitor nor any related entity, or any principal, general partner or member thereof, in the last seven (7) years has ever made any assignment for the benefit of creditors or taken advantage of any Creditors Rights Laws.

Section 4.10.     BUSINESS PURPOSES. The loan evidenced by the Note secured by the Security Instrument and the Other Security Documents (the "Loan") is solely for the business purpose of Borrower, and is not for personal, family, household, or agricultural purposes.

Section 4.11.     TAXES. Borrower, any Guarantor and any Indemnitor have filed all federal, state, county, municipal,

11

and city income, personal property and other tax returns required to have been filed by them and have paid all taxes and related liabilities which have become due pursuant to such returns or pursuant to any assessments received by them. Neither Borrower, any Guarantor nor any Indemnitor knows of any basis for any additional assessment in respect of any such taxes and related liabilities for prior years.

Section 4.12.   MAILING ADDRESS. Borrower's mailing address, as set forth in the opening paragraph hereof or as changed in accordance with the provisions hereof, is true and correct.

Section 4.13.   NO CHANGE IN FACTS OR CIRCUMSTANCES. All information in the application for the Loan submitted to Lender and in all financial statements, rent rolls, reports, certificates and other documents submitted in connection with the application or in satisfaction of the terms thereof, are accurate, complete and correct in all respects. There has been no adverse change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise misleading.

Section 4.14.   DISCLOSURE. Borrower has disclosed to Lender all material facts and has not failed to disclose any material fact that could cause any representation or warranty made herein to be materially misleading.

Section 4.15.   THIRD PARTY REPRESENTATIONS. Each of the representations and the warranties made by each Guarantor and Indemnitor in any Other Security Document(s) is true and correct in all material respects.

Section 4.16.   ILLEGAL ACTIVITY. No portion of the Property has been or will be purchased, improved, equipped or furnished with proceeds of any illegal activity and to the best of Borrower's knowledge, there are no illegal activities or activities relating to controlled substances at the Property.

Section 4.17.   PERMITTED EXCEPTIONS. None of the Permitted Exceptions, individually or in the aggregate, materially interfere with the benefits of the security intended to be provided by the Security Instrument, the Note, and the Other Security Documents, materially and adversely affect the value of the Property, impair the use or the operation of the Property or impair Borrower's ability to pay its obligations in a timely manner.

Section 4.18.   PRINCIPAL PLACE OF BUSINESS. Borrower's principal place of business is as set forth in the opening paragraph to this Security Instrument.

Section 4.19.   PROPERTY USE. The Property shall continue to be used in accordance with its present use, and for no other use without the prior written consent of Lender.

## ARTICLE 5. - OBLIGATIONS AND RELIANCE

Section 5.1.   RELATIONSHIP OF BORROWER AND LENDER. The relationship between Borrower and Lender is solely that of debtor and creditor, and Lender has no fiduciary or other special relationship with Borrower, and no term or condition of any of the Note, this Security Instrument and the Other Security Documents shall be construed so as to deem the relationship between Borrower and Lender to be other than that of debtor and creditor.

Section 5.2.   NO RELIANCE. The members, general partners, principals and (if Borrower is a trust) beneficial owners of Borrower are experienced in the ownership and operation of properties similar to the Property, and Borrower and Lender are relying solely upon such expertise in connection with the ownership and operation of the Property. Borrower is not relying on Lender's expertise, business acumen or advice in connection with the Property.

Section 5.3.   NO LENDER OBLIGATIONS. Notwithstanding anything to the contrary contained herein, Lender is not undertaking the performance of (a) any obligations under the Leases; or (b) any obligations with respect to such agreements, contracts, certificates, instruments, franchises, permits, trademarks, licenses and other documents. By accepting or approving anything required to be observed, performed or fulfilled or to be given to Lender pursuant to this Security Instrument, the Note or the Other Security Documents, including without limitation, any officer's certificate, balance sheet, statement of profit and loss or other financial statement, survey, appraisal, or insurance policy, Lender shall not be deemed to have warranted, consented to, or affirmed the sufficiency, the legality or effectiveness of same, and such acceptance or approval thereof shall not constitute any warranty or affirmation with respect thereto by Lender.

Section 5.4.   RELIANCE. Borrower recognizes and acknowledges that in accepting the Note, this Security Instrument and the Other Security Documents, Lender is expressly and primarily relying on the truth and accuracy of the warranties and representations set forth herein without any obligation to investigate the Property and notwithstanding any

12

investigation of the Property by Lender; that such reliance existed on the part of Lender prior to the date hereof; that the warranties and representations are a material inducement to Lender in accepting the Note, this Security Instrument and the Other Security Documents; and that Lender would not be willing to make the Loan and accept this Security Instrument in the absence of the warranties and representations as set forth herein.

## ARTICLE 6. - FURTHER ASSURANCES

Section 6.1.          RECORDING OF SECURITY INSTRUMENT, ETC.  Borrower forthwith upon the execution and delivery of this Security Instrument and thereafter, from time to time, will cause this Security Instrument and any of the Other Security Documents creating a lien or security interest or evidencing the lien hereof upon the Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect and perfect the lien or security interest hereof upon, and the interest of Lender in, the Property. Borrower will pay all taxes, filing, registration or recording fees, and all expenses incident to the preparation, execution, acknowledgment and/or recording of the Note, this Security Instrument, the Other Security Documents, any note or mortgage supplemental hereto, any security instrument with respect to the Property and any instrument of further assurance, and any modification or amendment of the foregoing documents, and all federal, state, county and municipal taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of this Security Instrument, any mortgage supplemental hereto, any security instrument with respect to the Property or any instrument of further assurance, and any modification or amendment of the foregoing documents, except where prohibited by law so to do.

Section 6.2.          FURTHER ACTS, ETC.  Borrower will, at the cost of Borrower, and without expense to Lender, do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, mortgages, assignments, notices of assignments, transfers and assurances as Lender shall, from time to time, reasonably require, for the better assuring, conveying, assigning, transferring, and confirming unto Lender the Property and rights hereby mortgaged, granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted and transferred or intended now or hereafter so to be, or which Borrower may be or may hereafter become bound to convey or assign to Lender, or for carrying out the intention or facilitating the performance of the terms of this Security Instrument or for filing, registering or recording this Security Instrument, or for complying with all applicable state or federal law, Borrower, on demand, will execute and deliver and hereby authorizes Lender, following 10 days' notice to Borrower, to execute in the name of Borrower or without the signature of Borrower to the extent Lender may lawfully do so, one or more financing statements, chattel mortgages or other instruments, to evidence or perfect more effectively the security interest of Lender in the Property. Borrower grants to Lender an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Lender hereunder.

Section 6.3.          CHANGES IN TAX, DEBT CREDIT AND DOCUMENTARY STAMP LAWS.

(a)          If any law is enacted or adopted or amended after the date of this Security Instrument which deducts the Debt from the value of the Property for the purpose of taxation or which imposes a tax, either directly or indirectly, on the Debt or Lender's interest in the Property, Borrower will pay the tax, with interest and penalties thereon, if any. If Lender is advised by counsel chosen by it that the payment of tax by Borrower would be unlawful or taxable to Lender or unenforceable or provide the basis for a defense of usury, then Lender shall have the option, exercisable by written notice of not less than ninety (90) days, to declare the Debt immediately due and payable.

(b)          Borrower will not claim or demand or be entitled to any credit or credits on account of the Debt for any part of the Taxes or Other Charges assessed against the Property, or any part thereof.

(c)          If at any time the United States of America, any State thereof or any subdivision of any such State shall require revenue or other stamps to be affixed to the Note, this Security Instrument, or any of the Other Security Documents or impose any other tax or charge on the same, Borrower will pay for the same, with interest and penalties thereon, if any.

Section 6.4.          ESTOPPEL CERTIFICATES.

(a)          After request by Lender, Borrower, within ten (10) days, shall furnish Lender or any proposed assignee with a statement, duly acknowledged and certified, setting forth (i) the original principal amount of the Note, (ii) the unpaid principal amount of the Note, (iii) the rate of interest of the Note, (iv) the terms of payment and maturity date of the Note, (v) the date installments of interest and/or principal were last paid, (vi) that, except as provided in such statement, there are no defaults or events which with the passage of time or the giving of notice or both, would constitute

an event of default under the Note or the Security Instrument, (vii) that the Note and this Security Instrument are valid, legal and binding obligations and have not been modified or if modified, giving particulars of such modification, (viii) whether any offsets or defenses exist against the obligations secured hereby and, if any are alleged to exist, a detailed description thereof, (ix) that all Leases are in full force and effect and (provided the Property is not a residential multifamily property) have not been modified (or if modified, setting forth all modifications), (x) the date to which the Rents thereunder have been paid pursuant to the Leases, (xi) whether or not, to the best knowledge of Borrower, any of the lessees under the Leases are in default under the Leases, and, if any of the lessees are in default, setting forth the specific nature of all such defaults, (xii) the amount of security deposits held by Borrower under each Lease and that such amounts are consistent with the amounts required under each Lease, and (xiii) as to any other matters reasonably requested by Lender and reasonably related to the Leases, the obligations secured hereby, the Property or this Security Instrument.

(b)     Borrower shall use its best efforts to deliver to Lender, promptly upon request, duly executed estoppel certificates from any one or more lessees as required by Lender attesting to such facts regarding the Lease as Lender may require, including, but not limited to attestations that each Lease covered thereby is in full force and effect with no defaults thereunder on the part of any party, that none of the Rents have been paid more than one month in advance, except as security, and that the lessee claims no defense or offset against the full and timely performance of its obligations under the Lease.

(c)     Upon any transfer or proposed transfer of the Property at Lender's request, Borrower, any Guarantors and any Indemnitor(s) shall provide an estoppel certificate in such form, substance and detail as Lender may require.

Section 6.5.     FLOOD INSURANCE.  After Lender's request, Borrower shall deliver evidence satisfactory to Lender that no portion of the Improvements is situated in a federally designated "special flood hazard area" or, if it is, that Borrower has obtained insurance meeting the requirements hereof.

Section 6.6.     REPLACEMENT DOCUMENTS.  Upon receipt of an affidavit of an officer of Lender as to the loss, theft, destruction or mutilation of the Note or any Other Security Document which is not of public record, and, in the case of any such mutilation, upon surrender and cancellation of such Note or Other Security Document, Borrower will issue, in lieu thereof, a replacement Note or Other Security Document, dated the date of such lost, stolen, destroyed or mutilated Note or Other Security Document in the same principal amount thereof and otherwise of like tenor.

## ARTICLE 7. - DUE ON SALE/ENCUMBRANCE

Section 7.1.     TRANSFER DEFINITIONS.  For purposes of this Article, an "Affiliated Manager" shall mean any managing agent in which Borrower, any Guarantor or Indemnitor has, directly or indirectly, any legal, beneficial or economic interest; a "Restricted Party" shall mean Borrower, any Guarantor, any Indemnitor, or any Affiliated Manager or any shareholder, partner, member or non-member manager, or any direct or indirect legal or beneficial owner of Borrower, any Guarantor, any Indemnitor, any Affiliated Manager or any non-member manager; and a "Sale" shall mean a voluntary or involuntary sale, conveyance, transfer or pledge of a legal or beneficial interest.

Section 7.2.     NO SALE/ENCUMBRANCE.

(a)     Borrower shall not sell, convey, mortgage, grant, bargain, encumber, pledge, assign, grant options with respect to, or otherwise transfer or dispose of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) the Property or any part thereof or any legal or beneficial interest therein (collectively a "Transfer"), other than pursuant to Leases of space in the Improvements to tenants in accordance with the provisions hereof without the prior written consent of Lender.

(b)     A Transfer shall include, but not be limited to, (i) an installment sales agreement wherein Borrower agrees to sell the Property or any part thereof for a price to be paid in installments; (ii) an agreement by Borrower leasing all or a substantial part of the Property for other than actual occupancy by a space tenant thereunder or a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any Leases or any Rents; (iii) if a Restricted Party is a corporation, any merger, consolidation or Sale or Pledge of such corporation's stock or the creation or issuance of new stock in one or a series of transactions, by which such corporation's stock shall be vested in a party or parties who are not now shareholders; (iv) if a Restricted Party is a limited or general partnership or joint venture, any merger or consolidation or the change, removal, resignation or addition of a general

14

partner or the Sale or Pledge of the partnership interest of any general partner or any profits or proceeds relating to such partnership interest, or the Sale or Pledge of limited partnership interests or the creation or issuance of new limited partnership·interests in one or a series of transactions, by which such limited partnership interests shall be vested in a party or parties who are not now limited partners; (v) if a Restricted Party is a limited liability company, any merger or consolidation or the change, removal, resignation or addition of a managing member or non-member manager (or if no managing member, any member) or the Sale or Pledge of the membership interest of a managing member (or if no managing member, any member) or any profits or proceeds relating to such membership interest, or the Sale or Pledge of non-managing membership interests or the creation or issuance of new non-managing membership interests in one or a series of transactions, by which such non-managing membership interests shall be vested in a party or parties who are not now non-managing members; (vi) if a Restricted Party is a trust or nominee trust, any merger, consolidation or the Sale or Pledge of the legal or beneficial interest in a Restricted Party by which, in one or a series of transactions, such beneficial or legal interests shall be vested in a party or parties who are not now legal or beneficial owners; or (vii) the removal or the resignation of the managing agent (including, without limitation, an Affiliated Manager) other than in accordance herewith.

Section 7.3.        PERMITTED TRANSFERS. Notwithstanding anything to the contrary contained herein, the following transfers shall not be deemed to be a Transfer: (a) a transfer by devise or descent or by operation of law upon the death of a member, partner or shareholder of a Restricted Party; and (b) the Sale or Pledge of stock or limited partnership or non-managing membership interests in a Restricted Party by which, in one or a series of transactions, in the aggregate, not more than forty-nine percent (49%) of the stock, limited partnership interests or non-managing membership interests (as the case may be) in a Restricted Party, shall be vested in parties not now having an ownership interest; provided, however, no such transfer shall result in the change of voting control in the Restricted Party, and as a condition to each such transfer, Lender shall receive not less than ten (10) days prior written notice of such proposed transfer.

Section 7.4         ASSIGNMENT/ASSUMPTION. Notwithstanding anything to the contrary contained in this Article 7, and in addition to the transfers permitted hereunder, Lender may, in Lender's sole and absolute discretion, permit a sale, assignment, or other transfer of the Property, provided that: (i) Lender receives sixty (60) days prior written notice of the proposed transfer hereunder; (ii) no Event of Default has occurred and is continuing; and (iii) all underwriting requirements deemed necessary by Lender (in its sole and absolute discretion) are satisfied, including but not limited to the following:

(a)   Borrower shall pay any and all fees and out-of-pocket costs incurred in connection with the transfer of the Property (including, without limitation, Lender's counsel fees and disbursements and all recording fees, title insurance premiums and mortgage and intangible taxes);

(b)   The proposed transferee (the "Transferee") or Transferee's principals must have demonstrated expertise in owning and operating properties similar in location, size and operation to the Property, which expertise shall be determined by Lender, in Lender's sole discretion;

(c)   Transferee and Transferee's principals shall, as of the date of such transfer, have an aggregate net worth and liquidity acceptable to Lender, in Lender's sole discretion;

(d)   Transferee shall assume all of the obligations of Borrower under the Loan Documents in all respects, including, without limitation, by entering into an assumption agreement in form and substance satisfactory to Lender (in Lender's sole discretion) and one or more Transferee's principals shall execute in favor of Lender a Guaranty and an Affidavit and Indemnity of Borrower and Guarantor Regarding Hazardous and Toxic Materials;

(e)   No Event of Default or event which, with the giving of notice, passage of time or both, shall constitute an Event of Default, shall otherwise occur as a result of such transfer, and Transferee and Transferee's principals shall deliver (A) all organization documentation requested by Lender, which shall be satisfactory to Lender (in Lender's sole discretion), and (B) all certificates, agreements and covenants required by Lender; and

(f)   Borrower shall deliver, at its sole cost and expense, an endorsement to the existing title policy insuring the Security Instrument, as modified by the assumption agreement, as a valid first lien on the Property and naming the Transferee as owner of the Property, which endorsement shall insure that, as of the date of the recording of the assumption agreement, the Property shall not be subject to any additional exceptions or liens other than those contained in the title policy issued on the date hereof.

15



If all Lender requirements have been satisfied (including but not limited to those listed hereinabove) and Lender approves the proposed transfer to the Transferee, then Borrower shall be released from all liability under this Security Instrument, the Note and the Other Loan Documents immediately upon the transfer of the Property to the Transferee.

## ARTICLE 8. - DEFAULT

Section 8.1.        EVENTS OF DEFAULT. The occurrence of any one or more of the following events shall constitute an "Event of Default":

(a)        if any portion of the Debt is not paid on or prior to the date the same is due or if the entire Debt is not paid on or before the Maturity Date;

(b)        if Borrower fails to repay any sum paid or advanced by Lender under the terms of this Security Instrument or any Other Loan Document;

(c)        if Borrower fails to repay any sum owed to Lender or its successor or assignee under the terms of any other Security Instrument, promissory note or other loan document in connection with any other loan; provided that such failure to repay shall constitute an Event of Default hereunder only if the person or entity to which payment is owed under such other Security Instrument, promissory note or other loan document is the holder of the Note;

(d)        if any of the Taxes or Other Charges is not paid when the same is due and payable except to the extent sums sufficient to pay such Taxes and Other Charges have been deposited with Lender in accordance with the terms of this Security Instrument;

(e)        if the Policies are not kept in full force and effect, or if the Policies are not delivered to Lender as provided herein;

(f)        if Borrower violates or does not comply with any of the provisions of this Security Instrument or any Other Loan Document;

(g)        if any representation or warranty of Borrower, any Indemnitor or any person guaranteeing payment of the Debt or any portion thereof or performance by Borrower of any of the terms of this Security Instrument (a "Guarantor"), or any member, general partner, principal or beneficial owner of any of the foregoing, made herein or in any guaranty, or in any certificate, report, financial statement or other instrument or document furnished to Lender shall have been false or misleading in any material respect when made;

(h)        if (i) Borrower or any managing member or general partner of Borrower, or any Guarantor or Indemnitor shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to its debts or debtors ("Creditors Rights Laws"), seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or the Borrower or any managing member or general partner of Borrower, or any Guarantor or Indemnitor shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against Borrower or any managing member or general partner of Borrower or any Guarantor or Indemnitor any case, proceeding or other action of a nature referred to in clause (i) above which (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of sixty (60) days; or (iii) there shall be commenced against the Borrower or any managing member or general partner of Borrower, or any Guarantor or Indemnitor any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets which results in the entry of any order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within sixty (60) days from the entry thereof; or (iv) the Borrower or any managing member or general partner of Borrower or any Guarantor or Indemnitor shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above; or (v) the Borrower or any managing member or general partner of Borrower, or any Guarantor or Indemnitor shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due;

16

(i)       if Borrower shall be in default beyond applicable notice and grace periods under any other mortgage, deed of trust, deed to secure debt or other security agreement covering any part of the Property whether it be superior or junior in lien to this Security Instrument;

(j)       if the Property becomes subject to any mechanic's, materialman's or other lien other than a lien for any Taxes not then due and payable and the lien shall remain undischarged of record (by payment, bonding or otherwise) for a period of thirty (30) days;

(k)       if any federal or state tax lien is filed against Borrower, any member or general partner of Borrower, any Guarantor, any Indemnitor or the Property and same is not discharged of record within thirty (30) days after same is filed;

(l)       if any default occurs under any guaranty or indemnity executed in connection herewith, and such default continues after the expiration of applicable grace periods, if any; or

(m)       if Borrower files of record, without the prior written consent of Lender which Lender may grant or withhold for any reason in its sole and absolute discretion, any notice limiting the maximum principal amount that may be secured hereunder; or

(n)       if Borrower sells, transfers (whether voluntary or by operation of law), pledges, hypothecates or further encumbers all or any part of the Property or any interest therein or any interest in the Borrower (except as otherwise expressly provided herein), or additionally assigns all or any part of the rents, income or profits arising therefrom, in either case without the prior written consent of Lender, which may be withheld for any reason in Lender's sole and absolute discretion; or

(o)       if Borrower or any Guarantor or Indemnitor is dissolved, merges into another entity, or otherwise terminates its existence (other than as specifically allowed pursuant to the terms hereof) or if the person(s) controlling such entity shall take any action authorizing or leading to the same; or

(p)       if for more than ten (10) days after notice from Lender, Borrower shall continue to be in default under any other term, covenant or condition of the Note, this Security Instrument or the Other Security Documents in the case of any default which can be cured by the payment of a sum of money or for thirty (30) days after notice from Lender in the case of any other default, provided that if such default cannot reasonably be cured within such thirty (30) day period and Borrower shall have commenced to cure such default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for so long as it shall require Borrower in the exercise of due diligence to cure such default, it being agreed that no such extension shall be for a period in excess of sixty (60) days.

## ARTICLE 9. - RIGHTS AND REMEDIES

Section 9.1       REMEDIES. Upon the occurrence of any Event of Default, to the extent permitted by applicable law, Borrower agrees that Lender may take any action available at law, in equity, and as otherwise provided in this Security Instrument, without notice or demand, as it deems advisable to protect and enforce its rights against Borrower in and to the Property, including, but not limited to the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as Lender may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of Lender:

(a)       declare the entire unpaid Debt to be immediately due and payable;

(b)       institute proceedings, judicial or otherwise, for the complete foreclosure of this Security Instrument under any applicable state or federal law in which case the Property or any interest therein may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner;

(c)       with or without entry, to the extent permitted and pursuant to the procedures provided by applicable state or federal law, institute proceedings for the partial foreclosure of this Security Instrument for the portion of the Debt then due and payable, subject to the continuing lien and security interest of this Security Instrument for the balance of the Debt not then due, unimpaired and without loss of priority;

17

(d)     sell for cash or upon credit the Property or any part thereof and all estate, claim, demand, right, title and interest of Borrower therein and rights of redemption thereof, pursuant to power of sale or otherwise, at one or more sales, in one or more parcels, at such time and place, upon such terms and after such notice thereof as may be required or permitted by law;

(e)     institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained herein, in the Note or in the Other Security Documents;

(f)     recover judgment on the Note either before, during or after any proceedings for the enforcement of this Security Instrument or the Other Security Documents;

(g)     apply for the appointment of a receiver, trustee, liquidator or conservator of the Property, without notice and without regard for the adequacy of the security for the Debt and without regard for the solvency of Borrower, any Guarantor, Indemnitor or of any person, firm or other entity liable for the payment of the Debt;

(h)     subject to any applicable state or federal law, the license granted to Borrower to collect and receive rents hereunder shall automatically be revoked and Lender may enter into or upon the Property, either personally or by its agents, nominees or attorneys and dispossess Borrower and its agents and servants therefrom, without liability for trespass, damages or otherwise and exclude Borrower and its agents or servants wholly therefrom, and take possession of all rent rolls, leases (including the form lease) and amendments and exhibits, subleases (including the form sublease) and amendments and exhibits and rental and license agreements with the tenants, subtenants and licensees in possession of the Property or any part or parts thereof; tenants', subtenants' and licensees' money deposits or other property (including, without limitation, any letter of credit) given to secure tenants', subtenants' and licensees' obligations under leases, subleases or licenses, together with a list of the foregoing; all lists pertaining to current rent and license fee arrears; any and all architects' plans and specifications, licenses and permits, documents, books, records, accounts, surveys and property which relate to the management, leasing, operation, occupancy, ownership, insurance, maintenance, or service of or construction upon the Property and Borrower agrees to surrender possession thereof and of the Property to Lender upon demand, and thereupon Lender may (i) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with all and every part of the Property and conduct the business thereat; (ii) complete any construction on the Property in such manner and form as Lender deems advisable; (iii) make alterations, additions, renewals, replacements and improvements to or on the Property; (iv) exercise all rights and powers of Borrower with respect to the Property, whether in the name of Borrower or otherwise, including without limitation, the right to make, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive all Rents of the Property and every part thereof; (v) either require Borrower (A) to pay monthly in advance to Lender, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of such part of the Property as may be occupied by Borrower, or (B) to vacate and surrender possession of the Property to Lender or to such receiver and, in default thereof, Borrower may be evicted by summary proceedings or otherwise; and (vi) apply the receipts from the Property to the payment of the Debt, in such order, priority and proportions as Lender shall deem appropriate in its sole discretion after deducting therefrom all expenses (including reasonable attorneys' fees) incurred in connection with the aforesaid operations and all amounts necessary to pay the Taxes, Other Charges, Insurance Premiums and other expenses in connection with the Property, as well as just and reasonable compensation for the services of Lender, its counsel, agents and employees;

(i)     exercise any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code, including, without limiting the generality of the foregoing: (i) the right to take possession of the Personal Property or any part thereof, and to take such other measures as Lender may deem necessary for the care, protection and preservation of the Personal Property, and (ii) request Borrower at its expense to assemble the Personal Property and make it available to Lender at a convenient place acceptable to Lender. Any notice of sale, disposition or other intended action by Lender with respect to the Personal Property sent to Borrower in accordance with the provisions hereof at least five (5) days prior to such action, shall constitute commercially reasonable notice to Borrower;

(j)     apply any sums then deposited in the Escrow Fund and any other sums held in escrow or otherwise by Lender in accordance with the terms of this Security Instrument or any Other Security Document to the payment of the following items in any order in its sole discretion: (i) Taxes and Other Charges; (ii) Insurance Premiums; (iii) interest on the unpaid principal balance of the Note; (iv) amortization of the unpaid principal balance of the Note; and (v) all other sums payable pursuant to the Note, this Security Instrument and the Other Security Documents, including, without limitation, advances made by Lender pursuant to the terms of this Security Instrument;

(k)     surrender the Policies maintained pursuant hereto, collect the unearned Insurance Premiums and apply such sums as a credit on the Debt in such priority and proportion as Lender in its discretion shall deem proper,

18

G.B        B

and in connection therewith, Borrower hereby appoints Lender as agent and attorney-in-fact (which is coupled with an interest and is therefore irrevocable) for Borrower to collect such unearned Insurance Premiums;

(l)     apply the undisbursed balance of any net proceeds deficiency deposit, together with interest thereon, to the payment of the Debt in such order, priority and proportions as Lender shall deem to be appropriate in its discretion; or

(m)     pursue such other remedies as Lender may have under applicable state or federal law.

In the event of a sale, by foreclosure, to the extent permitted by applicable law, power of sale, or otherwise, of less than all of the Property, this Security Instrument shall continue as a lien and security interest on the remaining portion of the Property unimpaired and without loss of priority. Notwithstanding the provisions of this Section to the contrary, if any Event of Default shall occur, and the Lender elects to declare the entire unpaid Debt to be automatically due and payable, such remedy may be pursued without any further notice, demand or other action by Lender.

Section 9.2.     APPLICATION OF PROCEEDS. The purchase money, proceeds and avails of any disposition of the Property, or any part thereof, or any other sums collected by Lender pursuant to the Note, this Security Instrument or the Other Security Documents, may be applied by Lender to the payment of the Debt in such priority and proportions as Lender in its discretion shall deem proper and which are in accordance with applicable law or as shall be required by a court of competent jurisdiction.

Section 9.3.     RIGHT TO CURE DEFAULTS. Upon the occurrence of any Event of Default or if Borrower fails to make any payment or to do any act as herein provided, Lender may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder, make or do the same in such manner and to such extent as Lender may deem necessary to protect the security hereof. Lender is authorized to enter upon the Property for such purposes, or appear in, defend, or bring any action or proceeding to protect its interest in the Property or to foreclose this Security Instrument or collect the Debt. The cost and expense of any cure hereunder (including reasonable attorneys' fees to the extent permitted by law), with interest at the Default Rate (defined in the Note), shall constitute a portion of the Debt and shall be due and payable to Lender upon demand. All costs and expenses incurred by Lender in remedying any Event of Default or failed payment or act or in appearing in, defending, or bringing any such action or proceeding shall bear interest at the Default Rate defined in the Note, for the period after notice from Lender that such cost or expense was incurred to the date of payment to Lender. All such costs and expenses incurred by Lender together with interest thereon calculated at the Default Rate shall be deemed to constitute a portion of the Debt and be secured by this Security Instrument and the Other Security Documents and shall be immediately due and payable upon demand by Lender therefor.

Section 9.4.     ACTIONS AND PROCEEDINGS. At any time, Lender has the right to appear in and defend, compromise or settle any action or proceeding brought with respect to the Property, and after the occurrence and during the continuance of an Event of Default, to bring any action or proceeding, in the name and on behalf of Borrower, which Lender, in its discretion, decides should be brought to protect its interest in the Property.

Section 9.5.     RECOVERY OF SUMS REQUIRED TO BE PAID. Lender shall have the right from time to time to take action to recover any sum or sums which constitute a part of the Debt as the same become due, without regard to whether or not the balance of the Debt shall be due, and without prejudice to the right of Lender thereafter to bring an action of foreclosure, or any other action, for a default or defaults by Borrower existing at the time such earlier action was commenced.

Section 9.6.     EXAMINATION OF BOOKS AND RECORDS. Lender, its agents, accountants and attorneys shall have the right upon prior written notice to Borrower (unless an Event of Default exists, in which case no notice shall be required), to examine and audit, during reasonable business hours, the records, books, management and other papers of Borrower and its affiliates or of any Guarantor or Indemnitor which pertain to their financial condition or the income, expenses and operation of the Property, at the Property or at any office regularly maintained by Borrower, its affiliates or any Guarantor or Indemnitor where the books and records are located. Lender and its agents shall have the right upon notice to make copies and extracts from the foregoing records and other papers at no cost to Lender.

Section 9.7.     OTHER RIGHTS, ETC.

(a)     The failure of Lender to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Security Instrument. Borrower shall not be relieved of Borrower's obligations

hereunder by reason of (i) the failure of Lender to comply with any request of Borrower, any Guarantor or any Indemnitor to take any action to foreclose this Security Instrument or otherwise enforce any of the provisions hereof or of the Note or the Other Security Documents, (ii) the release, regardless of consideration, of the whole or any part of the Property, or of any person liable for the Debt or any portion thereof, or (iii) any agreement or stipulation by Lender extending the time of payment, changing the rate of interest, or otherwise modifying or supplementing the terms of the Note, this Security Instrument or the Other Security Documents.

        (b)     It is agreed that the risk of loss or damage to the Property is on Borrower, and Lender shall have no liability whatsoever for decline in value of the Property, for failure to maintain the Policies, or for failure to determine whether insurance in force is adequate as to the amount of risks insured. Possession by Lender shall not be deemed an election of judicial relief, if any such possession is requested or obtained, with respect to any Property or collateral not in Lender's possession.

        (c)     Lender may resort for the payment of the Debt to any other security held by or guaranties given to Lender in such order and manner as Lender, in its discretion, may elect. Lender may take action to recover the Debt, or any portion thereof, or to enforce any covenant hereof without prejudice to the right of Lender thereafter to foreclose this Security Instrument. The rights of Lender under this Security Instrument shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others. No act of Lender shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision. Lender shall not be limited exclusively to the rights and remedies herein stated but shall be entitled to every right and remedy now or hereafter afforded at law or in equity.

Section 9.8.     RIGHT TO RELEASE ANY PORTION OF THE PROPERTY. Lender may release any portion of the Property for such consideration as Lender may require without, as to the remainder of the Property, in any way impairing or affecting the lien or priority of this Security Instrument, or improving the position of any subordinate lienholder with respect thereto, except to the extent that the obligations hereunder shall have been reduced by the actual monetary consideration, if any, received by Lender for such release, and may accept by assignment, pledge or otherwise any other property in place thereof as Lender may require without being accountable for so doing to any other lienholder. This Security Instrument shall continue as a lien and security interest in the remaining portion of the Property.

Section 9.9.     VIOLATION OF LAWS. If the Property is not in compliance with Applicable Laws, Lender may impose additional requirements upon Borrower in connection herewith including, without limitation, monetary reserves or financial equivalents.

Section 9.10.     RIGHT OF ENTRY. Lender and its agents shall have the right to enter and inspect the Property at all reasonable times.

Section 9.11.     SUBROGATION. If any or all of the proceeds of the Note have been used to extinguish, extend or renew any indebtedness heretofore existing against the Property, then, to the extent of the funds so used, Lender shall be subrogated to all of the rights, claims, liens, titles, and interests existing against the Property heretofore held by, or in favor of, the holder of such indebtedness and such former rights, claims, liens, titles, and interests, if any, are not waived but rather are continued in full force and effect in favor of Lender and are merged with the lien and security interest created herein as cumulative security for the repayment of the Debt, the performance and discharge of Borrower's obligations hereunder, under the Note and the Other Security Documents and the performance and discharge of the Other Obligations.

## ARTICLE 10. - ENVIRONMENTAL HAZARDS

Section 10.1.     ENVIRONMENTAL DEFINITIONS. For the purpose of this Section, "Environmental Law" means any present and future federal, state and local laws, statutes, ordinances, rules, regulations, standards, policies and other government directives or requirements, as well as common law, including but not limited to the Comprehensive Environmental Response, Compensation and Liability Act and the Resource Conservation and Recovery Act, that apply to Borrower or the Property and relate to Hazardous Materials. "Environmental Liens" means all Liens and other encumbrances imposed pursuant to any Environmental Law, whether due to any act or omission of Borrower or any other person or entity. "Environmental Report" means the written reports resulting from the environmental site assessments of the Property delivered to Lender. "Hazardous Materials" shall mean petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives, flammable materials; radioactive materials; polychlorinated biphenyls ("PCBs") and compounds containing them; lead and lead-based paint; asbestos or

asbestos-containing materials in any form that is or could become friable; underground or above-ground storage tanks, whether empty or containing any substance; any substance the presence of which on the Property is prohibited by any federal, state or local authority; any substance that requires special handling; and any other material or substance now or in the future defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," or "pollutant" within the meaning of any Environmental Law. "Release" of any Hazardous Materials includes but is not limited to any release, deposit, discharge, emission, leaking, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing or other movement of Hazardous Materials.

Section 10.2.        ENVIRONMENTAL REPRESENTATIONS AND WARRANTIES. Borrower represents and warrants that: (a) there are no Hazardous Materials or underground storage tanks in, on, or under the Property, except those that are both (i) in compliance with Environmental Laws and with permits issued pursuant thereto (if such permits are required), if any, and (ii) either (A) in amounts not in excess of that necessary to operate the Property or (B) fully disclosed to and approved by Lender in writing pursuant to an Environmental Report; (b) there are no past, present or threatened (defined below) Release of Hazardous Materials in violation of any Environmental Law and which would require remediation by a governmental authority in, on, under or from the Property except as described in the Environmental Report; (c) there is no threat of any Release of Hazardous Materials migrating to the Property except as described in the Environmental Report; (d) there is no past or present non-compliance with Environmental Laws, or with permits issued pursuant thereto, in connection with the Property except as described in the Environmental Report; (e) Borrower does not know of, and has not received, any written or oral notice or other communication from any person or entity (including but not limited to a governmental entity) relating to Hazardous Materials in, on, under or from the Property; and (f) Borrower has truthfully and fully provided to Lender, in writing, any and all information relating to environmental conditions in, on, under or from the Property known to Borrower or contained in Borrower's files and records, including but not limited to any reports relating to Hazardous Materials in, on, under or migrating to or from the Property and/or to the environmental condition of the Property.

Section 10.3.        ENVIRONMENTAL COVENANTS. Borrower covenants and agrees that so long as Borrower owns, manages, is in possession of, or otherwise controls the operation of the Property: (a) all uses and operations on or of the Property, whether by Borrower or any other person or entity, shall be in compliance with all Environmental Laws and permits issued pursuant thereto; (b) there shall be no Releases of Hazardous Materials in, on, under or from the Property; (c) there shall be no Hazardous Materials in, on, or under the Property, except those that are both (i) in compliance with all Environmental Laws and with permits issued pursuant thereto, if and to the extent required, and (ii) (A) in amounts not in excess of that necessary to operate the Property or (B) fully disclosed to and approved by Lender in writing; (d) Borrower shall keep the Property free and clear of all Environmental Liens; (e) Borrower shall, at its sole cost and expense, fully and expeditiously cooperate in all activities pursuant to this Section, including but not limited to providing all relevant information and making knowledgeable persons available for interviews; (f) Borrower shall, at its sole cost and expense, perform any environmental site assessment or other investigation of environmental conditions in connection with the Property, pursuant to any reasonable written request of Lender, upon Lender's reasonable belief that the Property is not in full compliance with all Environmental Laws, and share with Lender the reports and other results thereof, and Lender and other Indemnified Parties (hereinafter defined) shall be entitled to rely on such reports and other results thereof; (g) Borrower shall, at its sole cost and expense, comply with all reasonable written requests of Lender to (i) reasonably effectuate remediation of any Hazardous Materials in, on, under or from the Property; and (ii) comply with any Environmental Law; (h) Borrower shall not allow any tenant or other user of the Property to violate any Environmental Law; and (i) Borrower shall immediately notify Lender in writing after it has become aware of (A) any presence or Release or threatened Releases of Hazardous Materials in, on, under, from or migrating towards the Property; (B) any non-compliance with any Environmental Laws related in any way to the Property; (C) any actual or potential Environmental Lien; (D) any required or proposed remediation of environmental conditions relating to the Property; or (E) any written or oral notice or other communication of which Borrower becomes aware from any source whatsoever (including but not limited to a governmental entity) relating in any way to Hazardous Materials. Any failure of Borrower to perform its obligations pursuant to this Section 10.3 shall constitute bad faith waste with respect to the Property.

Section 10.4.        LENDER'S RIGHTS. Lender and any other person or entity designated by Lender, including but not limited to any representative of a governmental entity, and any environmental consultant, and any receiver appointed by any court of competent jurisdiction, shall have the right, but not the obligation, to enter upon the Property at all reasonable times to assess any and all aspects of the environmental condition of the Property and its use, including but not limited to conducting any environmental assessment or audit at Borrower's expense (the scope of which shall be determined in Lender's sole discretion) and taking samples of soil, groundwater or other water, air, or building materials, and conducting other invasive testing. Borrower shall cooperate with and provide access to Lender and any such person or entity designated by Lender.

Section 10.5.        OPERATIONS AND MAINTENANCE PROGRAMS. If recommended by the Environmental Report or any other environmental assessment or audit of the Property, Borrower shall establish and comply with an operations and maintenance program with respect to the Property, in form and substance reasonably acceptable to Lender, prepared by an environmental consultant reasonably acceptable to Lender, which program shall address any asbestos containing material or lead based paint that may now or in the future be detected at or on the Property. Without limiting the generality of the preceding sentence, Lender may require (a) periodic notices or reports to Lender in form, substance and at such intervals as Lender may specify, (b) an amendment to such operations and maintenance program to address changing circumstances, laws or other matters, (c) at Borrower's sole expense, supplemental examination of the Property by consultants specified by Lender, (d) access to the Property by Lender, its agents or servicer, to review and assess the environmental condition of the Property and Borrower's compliance with any operations and maintenance program, and (e) variation of the operations and maintenance program in response to the reports provided by any such consultants.

## ARTICLE 11. - INDEMNIFICATION

Section 11.1.        GENERAL INDEMNIFICATION. Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties (defined below) from and against any and all Losses (defined below) imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any one or more of the following (a) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (b) any use, nonuse or condition in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (c) performance of any labor or services or the furnishing of any materials or other property in respect of the Property or any part thereof; (d) any failure of the Property to be in compliance with any Applicable Laws; (e) any and all claims and demands whatsoever which may be asserted against Lender by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants, or agreements contained in any Lease; (f) Borrower's breach of any term, covenant, condition, representation or warranty contained herein; or (g) the payment of any commission, charge or brokerage fee to anyone which may be payable in connection with the funding of the Loan evidenced by the Note and secured by this Security Instrument. Any amounts payable to Lender by reason of the application of this Section shall become immediately due and payable and shall bear interest at the Default Rate from the date loss or damage is sustained by Lender until paid. The term "Losses" shall mean any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, fines, penalties, charges, fees, judgments, awards, amounts paid in settlement of whatever kind or nature (including but not limited to attorneys' fees and other costs of defense). The term "Indemnified Parties" shall mean (a) Lender, (b) any prior owner or holder of the Note, (c) any servicer or prior servicer of the Loan, (d) any Investor (defined below) or any prior Investor in any Participations (defined below), (e) any trustees, custodians or other fiduciaries who hold or who have held a full or partial interest in the Loan for the benefit of any Investor or other third party, (f) any receiver or other fiduciary appointed in a foreclosure or other Creditors Rights Laws proceeding, (g) any officers, directors, shareholders, partners, members, employees, agents, servants, representatives, contractors, subcontractors, affiliates or subsidiaries of any and all of the foregoing, and (h) the heirs, legal representatives, successors and assigns of any and all of the foregoing (including, without limitation, any successors by merger, consolidation or acquisition of all or a substantial portion of the Indemnified Parties' assets and business), in all cases whether during the term of the Loan or as part of or following a foreclosure of the Loan.

Section 11.2.        MORTGAGE, DOCUMENTARY STAMPS AND/OR INTANGIBLE TAX. Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any tax or fee on the making and/or recording of this Security Instrument, the Note or any of the Other Security Documents.

Section 11.3.        DUTY TO DEFEND: ATTORNEYS' FEES AND OTHER FEES AND EXPENSES. Upon written request by any Indemnified Party, Borrower shall defend such Indemnified Party (if requested by any Indemnified Party, in the name of the Indemnified Party) by attorneys and other professionals approved by the Indemnified Parties. Notwithstanding the foregoing, any Indemnified Parties may, in their sole discretion, engage their own attorneys and other professionals to defend or assist them, and, at the option of Indemnified Parties, their attorneys shall control the resolution of any claim or proceeding. Upon demand, Borrower shall pay or, in the sole discretion of the Indemnified Parties, reimburse, the Indemnified Parties for the payment of reasonable fees and disbursements of attorneys, engineers, environmental consultants, laboratories, surveyors, title searches and other professionals in connection therewith, which any Indemnified Parties may engage as a result of any Losses.

Section 11.4.        ENVIRONMENTAL INDEMNITY. As between Borrower and Lender, all risk of loss

22

associated with non-compliance with Environmental Laws, or with the presence of any Hazardous Material at, upon, within, contiguous to or otherwise affecting the Property, shall lie solely with Borrower. Accordingly, Borrower shall bear all risks and costs associated with any loss (including any loss in value attributable to Hazardous Materials), damage or liability therefrom, including all costs of removal of Hazardous Materials or other remediation required by Lender or by law. Borrower shall indemnify, defend and hold Lender harmless from and against all loss, liabilities, damages, claims, costs and expenses (including reasonable costs of defense) arising out of or associated, in any way, with the non-compliance with Environmental Laws, or the existence of Hazardous Materials in, on, or about the Property, or a breach of any representation, warranty or covenant contained in Article 10 hereof, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute or common law, including those arising from the joint, concurrent, or comparative negligence of Lender; however, Borrower shall not be liable under such indemnification to the extent such loss, liability, damage, claim, cost or expense results solely from Lender's gross negligence or willful misconduct. Borrower's obligations hereunder shall arise upon the discovery of the presence of any Hazardous Material, whether or not any governmental authority has taken or threatened any action in connection with the presence of any Hazardous Material, and whether or not the existence of any such Hazardous Material or potential liability on account thereof is disclosed in any site assessment and shall continue notwithstanding the repayment of the Note or any transfer or sale of any right, title and interest in the Property (by foreclosure, deed in lieu of foreclosure or otherwise). Of even date herewith, Borrower and other persons or entities (collectively, Borrower and such other parties, the "Indemnitors") may as circumstances require execute and deliver a certain environmental indemnity agreement in favor of the Lender incorporating the environmental indemnities set forth herein as well as additional provisions and requirements with respect to environmental matters (the "Environmental Indemnity"). In the event an Environmental Indemnity is executed, it shall be included in the definition of "Other Security Documents".

## ARTICLE 12. - WAIVERS

Section 12.1.        WAIVER OF COUNTERCLAIM. Borrower hereby waives the right to assert a counterclaim, other than a mandatory or compulsory counterclaim, in any action or proceeding brought against it by Lender arising out of or in any way connected with this Security Instrument, the Note, any of the Other Security Documents, or the Obligations.

Section 12.2.        MARSHALLING AND OTHER MATTERS. Borrower hereby waives, to the extent permitted by law, the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale hereunder of the Property or any part thereof or any interest therein. Further, Borrower hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of this Security Instrument on behalf of Borrower, and on behalf of each and every person acquiring any interest in or title to the Property subsequent to the date of this Security Instrument and on behalf of all persons to the extent permitted by applicable state or federal law.

Section 12.3.        WAIVER OF NOTICE. Borrower shall not be entitled to any notices of any nature whatsoever from Lender except (a) with respect to matters for which this Security Instrument specifically and expressly provides for the giving of notice by Lender to Borrower and (b) with respect to matters for which Lender is required by applicable state or federal law to give notice, and Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Security Instrument does not specifically and expressly provide for the giving of notice by Lender to Borrower.

Section 12.4.        WAIVER OF STATUTE OF LIMITATIONS. Borrower hereby expressly waives and releases to the fullest extent permitted by law, the pleading of any statute of limitations as a defense to payment of the Debt or performance of its Other Obligations.

Section 12.5.        SOLE DISCRETION OF LENDER. Wherever pursuant to this Security Instrument (a) Lender exercises any right given to it to approve or disapprove, (b) any arrangement or term is to be satisfactory to Lender, or (c) any other decision or determination is to be made by Lender, the decision to approve or disapprove all decisions that arrangements or terms are satisfactory or not satisfactory, and all other decisions and determinations made by Lender, shall be in the sole discretion of Lender, except as may be otherwise expressly and specifically provided herein.

Section 12.6.        WAIVER OF FORECLOSURE DEFENSE. Borrower hereby waives any defense Borrower might assert or have by reason of Lender's failure to make any tenant or lessee of the Property a party defendant in any foreclosure proceeding or action instituted by Lender.

## ARTICLE 13. - NOTICES

Section 13.1.          NOTICES. All notices or other written communications hereunder shall be deemed to have been properly given (a) upon delivery, if delivered in person with receipt acknowledged by the recipient thereof, (b) one (1) Business Day (defined below) after having been deposited for overnight delivery with any reputable overnight courier service; or (c) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, addressed to Borrower or Lender, as the case may be, at the addresses set forth on the first page of this Security Instrument or addressed as such party may from time to time designate by written notice to the other parties.

Either party by notice to the other may designate additional or different addresses for subsequent notices or communications. For purposes of this Subsection, "Business Day" shall mean a day on which commercial banks are not authorized or required by law to close in New York, New York.

## ARTICLE 14. - CHOICE OF LAW

Section 14.1.          CHOICE OF LAW. This Security Instrument and any determination of deficiency judgments shall be governed, construed, applied and enforced in accordance with the laws of the state in which the Property is located and applicable federal law.

Section 14.2.          PROVISIONS SUBJECT TO LAW. All rights, powers and remedies provided in this Security Instrument may be exercised only to the extent that the exercise thereof does not violate any applicable state or federal law and are intended to be limited to the extent necessary so that they will not render this Security Instrument invalid, unenforceable or not entitled to be recorded, registered or filed under any applicable state or federal law.

## ARTICLE 15. - SECONDARY MARKET

Section 15.1.          TRANSFER OF LOAN. Lender may, at any time, sell, transfer or assign the Note, this Security Instrument and the Other Security Documents, and any or all servicing rights with respect thereto, or grant participations therein (the "Participations") or issue mortgage passthrough certificates or other securities evidencing a beneficial interest in a rated or unrated public offering or private placement (the "Securities"). Lender may forward to each purchaser, transferee, assignee, servicer, participant, or investor in such Participations or Securities (collectively, the "Investor") or any Rating Agency rating such Securities, each prospective Investor, and any organization maintaining databases on the underwriting and performance of commercial mortgage loans, all documents and information which Lender now has or may hereafter acquire relating to the Debt and to Borrower, any Guarantor, any Indemnitor(s) and the Property, whether furnished by Borrower, any Guarantor, any Indemnitor(s) or otherwise, as Lender determines necessary or desirable. Borrower irrevocably waives any and all rights it may have under applicable state or federal law to prohibit such disclosure, including but not limited to any right of privacy.

Section 15.2.          COOPERATION. Borrower, any Guarantor and any Indemnitor agree to cooperate with Lender in connection with any transfer made pursuant to this Section, including, without limitation, the delivery of an estoppel certificate required pursuant to the terms hereof and such other documents as may be reasonably requested by Lender. Borrower shall also furnish and Borrower, any Guarantor and any Indemnitor consent to Lender furnishing to such Investors or such prospective Investors or such Rating Agency any and all information concerning the Property, the Leases, the financial condition of Borrower, any Guarantor and any Indemnitor as may be requested by Lender, any Investor or any prospective Investor or any Rating Agency in connection with any sale, transfer or Participations or Securities.

## ARTICLE 16. - COSTS

Section 16.1.          PERFORMANCE AT BORROWER'S EXPENSE. Borrower acknowledges and confirms that Lender shall impose certain administrative processing and/or commitment fees in connection with (a) the extension, renewal, modification, amendment and termination of the Loan, (b) the release or substitution of collateral therefor, (c) obtaining certain consents, waivers and approvals with respect to the Property, or (d) the review of any Lease or proposed Lease or the preparation or review of any subordination, non-disturbance agreement (the occurrence of any of the above

24

*GB.*          *GB*

shall be called an "Event"). Borrower further acknowledges and confirms that it shall be responsible for the payment of all costs of reappraisal of the Property or any part thereof, whether required by law, regulation, Lender or any governmental or quasi-governmental authority. Borrower hereby acknowledges and agrees to pay, immediately, with or without demand, all such fees (as the same may be increased or decreased from time to time), and any additional fees of a similar type or nature which may be imposed by Lender from time to time, upon the occurrence of any Event or otherwise. Wherever it is provided for herein that Borrower pay any costs and expenses, such costs and expenses shall include, but not be limited to, all reasonable counsel fees of Lender.

Section 16.2.          COUNSEL FEES FOR ENFORCEMENT. (a) Borrower shall pay all reasonable counsel fees incurred by Lender in connection with (i) the preparation of the Note, this Security Instrument and the Other Security Documents; and (ii) the items set forth in this Article, and (b) Borrower shall pay to Lender on demand any and all expenses, including legal fees incurred or paid by Lender in protecting its interest in the Property or in collecting any amount payable under the Note, this Security Instrument or the Other Security Documents, or in enforcing its rights hereunder with respect to the Property, whether or not any legal proceeding is commenced hereunder or thereunder, together with interest thereon at the Default Rate from the date paid or incurred by Lender until such expenses are paid by Borrower.

## ARTICLE 17. - DEFINITIONS

Section 17.1.          GENERAL DEFINITIONS. Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Security Instrument may be used interchangeably in singular or plural form and the word "Borrower" shall mean "each Borrower and any subsequent owner or owners of the Property or any part thereof or any interest therein," the word "Lender" shall mean "Lender and any subsequent holder of the Note," the word "Note" shall mean "the Note and any other evidence of indebtedness secured by this Security Instrument," the word "person" shall include an individual, corporation, limited liability company, partnership, trust, unincorporated association, government, governmental authority, and any other entity, the word "Property" shall include any portion of the Property and any interest therein, and the phrases "counsel fees" shall include any and all attorneys", paralegal and law clerk fees and disbursements, including, but not limited to fees and disbursements at the pre-trial, trial and appellate levels incurred or paid by Lender in protecting its interest in the Property, the Leases and the Rents and enforcing its rights hereunder, whether with respect to retained firms, the reimbursement for the expenses of in-house staff or otherwise.

Section 17.2.          HEADINGS, ETC. The headings and captions of various Articles and Sections of this Security Instrument are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

## ARTICLE 18. - MISCELLANEOUS PROVISIONS

Section 18.1.          NO ORAL CHANGE. This Security Instrument, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

Section 18.2.          LIABILITY. If Borrower consists of more than one person, the obligations and liabilities of each such person hereunder shall be joint and several. This Security Instrument shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors, assigns, heirs, personal representatives, executors and administrators forever.

Section 18.3.          INAPPLICABLE PROVISIONS. If any term, covenant or condition of the Note or this Security Instrument is held to be invalid, illegal or unenforceable in any respect, the Note and this Security Instrument shall be construed without such provision.

Section 18.4.          DUPLICATE ORIGINALS; COUNTERPARTS. This Security Instrument may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original. This Security Instrument may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Security Instrument. The failure of any party hereto to execute this

Security Instrument, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

Section 18.5.        NUMBER AND GENDER.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

Section 18.6.        LEGAL DESCRIPTION.  Borrower represents to Lender that it has reviewed and delivered to Lender a copy of the legal description set forth in Exhibit "A"; that such legal description is the accurate and proper legal description of the Land; and Borrower further acknowledges that neither Lender nor Lender's counsel prepared or reviewed such legal description.  Borrower shall indemnify, defend and hold Lender harmless from and against any and all losses, liabilities, claims, damages, expenses, obligations, penalties, actions, judgments, suits, costs or disbursements of any kind or nature whatsoever, including the reasonable fees and actual expenses of Lender's counsel, in connection with any claim that title to the Property is impaired due to or based upon an inaccurate or improper legal description set forth herein.

Section 18.7.        INCONSISTENCIES.  In the event of any inconsistencies between the terms and conditions of this Article and the other provisions of this Security Instrument, the terms and conditions of this Article shall control and be binding.

Section 18.8.        WAIVER OF TRIAL BY JURY.  BORROWER BY ACCEPTANCE OF THIS SECURITY INSTRUMENT, HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THE LOAN, THE APPLICATION FOR THE LOAN, THE NOTE, THIS SECURITY INSTRUMENT OR THE OTHER SECURITY DOCUMENTS OR ANY ACTS OR OMISSIONS OF LENDER OR BORROWER.

[NO FURTHER TEXT - SIGNATURES APPEAR ON NEXT PAGE]

IN WITNESS WHEREOF, this Security Instrument has been executed by borrower the day and year first above written.

Signed, sealed and delivered
in the presence of:

_Gabriel Brbuv_
Print Name:_____

Borrower(s):

_Gabriel Bravo_
Gabriel Bravo

Print Name:_____

Signed, sealed and delivered
in the presence of:

_GuAdALupe BrAuo_
Print Name:_____

_GuAdAl upe BrAu_
Print Name:_____

Borrower(s):

_GuNdALupe BrAuo_
Guadalupe Bravo

This Instrument prepared by:
Upon recording return to:

Antonio Chimienti, Esq.
Bayview Loan Servicing
4425 Ponce de Leon Blvd., 5th Fl.
Coral Gables, Florida 33146
Attention: Collateral Department

27

ACKNOWLEDGMENT

| | |
|---|---|
| COMMONWEALTH OF<br>PENNSYLVANIA | )<br>ss.: |
| COUNTY OF *Philadelphia* | ) |

The foregoing instrument was acknowledged before me on January 31, 2006 by Gabriel Bravo and Guadalupe Bravo. He/she is personally known to me or produced _____ as identification, and did/did not take an oath.

[Official Notary Seal]

_____
Notary Public, Commonwealth of Pennsylvania
Print or Type Name: _____
My Commission Expires: _____

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
WENDY FALLON KERSCH, Notary Public
Upper Southampton Twp., Bucks County
My Commission Expires June 14, 2009

28

JAN. 19. 2006  3:57PM    C  ZENS' ABSTRACT                    NO. 2034   P. 6

 **OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY**

**SCHEDULE C**
**Legal Description**

File Number:

ALL THAT CERTAIN LOT OR PIECE OF GROUND WITH THE BUILDINGS AND IMPROVEMENTS THEREON ERECTED, DESCRIBED ACCORDING TO A SURVEY THEREOF MADE BY BEN H. JOSEPH, SURVEYOR AND REGULATOR OF THE SECOND DISTRICT ON NOVEMBER 18, 1948, AS FOLLOWS, TO WIT:

SITUATE ON THE WEST SIDE OF NINTH STREET AT THE DISTANCE OF ONE HUNDRED FIFTY-THREE FEET TWO INCHES (153'2") NORTHWARD FROM THE NORTH SIDE OF ELLSWORTH STREET IN SAID WARD AND CITY, THENCE EXTENDING NORTH SEVENTY-EIGHT DEGREES ONE MINUTE, FORTY-TWO SECONDS WEST FIFTY TWO FEET (N. 78 DEGREES 1' 42" W 52') TO A POINT, THENCE NORTH ELEVEN DEGREES, SEVENTEEN MINUTES, EIGHTEEN SECONDS EAST ON A LINE PARALLEL WITH SAID NINTH STREET FOURTEEN FEET SIX AND FIVE-EIGHTHS INCHES (N 11 DEGREES 17' 19" E 14' 6-5/8") TO A POINT, TGEBCE SOUTH SEVENTY-SEVEN DEGREES, THIRTY MINUTES FORTY-TWO SECONDS EAST FIFTY-TWO FEET, ONE-EIGHTH OF AN INCH (S 77 DEGREES 30' 42" E 52' 0-1/8") TO THE WEST SIDE OF NINTH STREET, THENCE SOUTH ELEVEN DEGREES, SEVENTEEN MINUTES, EIGHTEEN SECONDS WEST ALONG THE SAID NINTH STREET FOURTEEN FEET ONE INCH (S 11 DEGREES 17' 18" W 14' 1") TO THE POINT AND PLACE OF BEGINNING.

BEING NO. 1122 SOUTH 9TH STREET.

BEING THE SAME PROPERTY CONVEYED UNTO GABRIEL BRAVO AND GUADALUPE BRAVO BY DEED FROM VINCENT ALESTRA DATED JUNE 6, 2005 AND RECORDED JUNE 13, 2005 AMONG THE DEED BOOKS OF PHILADELPHIA COUNTY, PA IN DOCUMENT ID 51198158.

ALSO BEING THE SAME  PROPERTY CONVEYED UNTO VINCENT ALESTRA BY DEED FROM FRANK RAFFAELE, III, DATED JULY 7, 2003 AND RECORDED JULY 14, 2003 AMONG THE DEED BOOKS OF PHILADELPHIA COUNTY, PA IN DOCUMENT ID 50710820.

Parcel No:

## RIDER TO MORTGAGE AND SECURITY AGREEMENT
### { PENNSYLVANIA }

THIS RIDER is made January 31, 2006, and is incorporated into and shall be deemed to amend and supplement the Mortgage and Security Agreement (the "Security Instrument") of the same date hereof, given by Gabriel Bravo and Guadalupe Bravo (the "Borrower") to secure that certain Promissory Note in the amount of Seventy-One Thousand Two Hundred Fifty and No/100 Dollars ($71,250.00) (the "Note") given to InterBay Funding, LLC, a Delaware Limited Liability Company, (the "Lender"), on the same date hereof and covering the Property described in the Security Instrument and located at 1122 South 9th Street, Philadelphia, PA 19147 (the "Property Address").

In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

1. The Security Instrument is also known as an Open End Mortgage and Security Agreement.

2. The following sentence is added at the end of Section 4.5 (g): All contractors have filed a "no lien stipulation" in the Prothonotary's office in the county where the Property is located.

3. Section 9.12 CONFESSION OF JUDGMENT IN EJECTMENT is added to the Security Instrument and reads as follows: BORROWER HEREBY IRREVOCABLY AUTHORIZES AND EMPOWERS THE PROTHONOTARY, CLERK OR ANY ATTORNEY OF ANY COURT OF RECORD OF THE COMMONWEALTH OF PENNSYLVANIA OR ELSEWHERE, UPON THE OCCURRENCE OF AN EVENT OF DEFAULT, TO APPEAR FOR AND CONFESS JUDGMENT AGAINST BORROWER, AS WELL AS AGAINST ALL PERSONS CLAIMING UNDER, BY OR THROUGH BORROWER, AND IN FAVOR OF LENDER, ITS SUCCESSORS OR ASSIGNS, AS OF ANY TERM, PAST, PRESENT OR FUTURE, WITH OR WITHOUT DECLARATION, FOR POSSESSION, CONTROL OR BOTH OF THE PREMISES, IMPROVEMENTS AND BUILDING EQUIPMENT, WITHOUT THE NECESSITY OF FILING ANY BOND AND WITHOUT ANY STAY OF EXECUTION OR APPEAL. THIS INSTRUMENT, OR A COPY HEREOF VERIFIED BY AFFIDAVIT, SHALL BE SUFFICIENT WARRANT THEREFOR: WHEREUPON, APPROPRIATE PROCESS TO OBTAIN POSSESSION, CONTROL OR BOTH OF THE PREMISES, IMPROVEMENTS AND BUILDING EQUIPMENT, INCLUDING LEVY AND EXECUTION, MAY BE ISSUED FORTHWITH, WITHOUT ANY PRIOR WRIT OR PROCEEDING WHATSOEVER. BORROWER HEREBY RELEASES AND AGREES TO RELEASE LENDER AND SAID ATTORNEYS FROM ALL PROCEDURAL ERRORS AND DEFECTS WHATSOEVER IN ENTERING SUCH JUDGMENT OR JUDGMENTS OR IN CAUSING SUCH WRITS OR PROCESS TO BE ISSUED OR IN ANY PROCEEDING THEREON OR CONCERNING THE SAME, PROVIDED THAT LENDER SHALL HAVE FILED IN SUCH ACTION OR ACTIONS AN AFFIDAVIT OR AFFIDAVITS MADE BY SOMEONE ON LENDER'S BEHALF SETTING FORTH THE FACTS NECESSARY TO AUTHORIZE THE ENTRY OF SUCH JUDGMENT OR JUDGMENTS ACCORDING TO THE TERMS OF THIS INSTRUMENT, OF WHICH FACTS SUCH AFFIDAVIT OR AFFIDAVITS SHALL BE PRIMA FACIE EVIDENCE. IT IS HEREBY EXPRESSLY AGREED THAT IF FOR ANY REASON AFTER ANY SUCH ACTION OR ACTIONS HAVE BEEN COMMENCED THE SAME SHALL BE DISCONTINUED, MARKED SATISFIED OF RECORD OR BE TERMINATED, OR POSSESSION OF THE PREMISES, IMPROVEMENTS OR BUILDING EQUIPMENT REMAINS IN OR IS RESTORED TO BORROWER OR ANYONE CLAIMING



1                                                    ⌐-B

UNDER, BY OR THROUGH BORROWER, LENDER MAY, WHENEVER AND AS OFTEN AS LENDER SHALL HAVE THE RIGHT TO AGAIN TAKE POSSESSION OF THE PREMISES, IMPROVEMENTS AND BUILDING EQUIPMENT, BRING ONE OR MORE FURTHER CONFESSIONS IN THE MANNER SET FORTH HEREIN TO RECOVER POSSESSION OF THE PREMISES, IMPROVEMENTS AND BUILDING EQUIPMENT. THE AUTHORITY AND POWER ABOVE GIVEN SHALL CONTINUE FROM TIME TO TIME AND AT ALL TIMES UNTIL FINAL PAYMENT IN FULL OF ALL SECURED INDEBTEDNESS.

4. Article 19 Special Pennsylvania Provisions is added to the Security Instrument and reads as follows:

FUTURE ADVANCES: The Security Instrument secures such future or additional advances (in addition to the principal amount of the Note) as may be made by Lender or the holder hereof, at its exclusive option, to Borrower or its successors or assigns in title, for any purpose, provided that all such advances are made within 20 years from the date of the Security Instrument or within such lesser period of time as may be provided by law as a prerequisite for the sufficiency of actual notice or record notice of such optional future or additional advances as against the rights of creditors or subsequent purchasers for valuable consideration to the same extent as if such future or additional advances were made on the date of the execution of the Security Instrument. The total amount of indebtedness secured by the Security Instrument may be increased or decreased from time to time, but the total unpaid balance so secured at any one time shall not exceed a maximum principal amount equal to two times the amount first set forth in the Security Instrument, plus interest thereon and any disbursements made under the Security Instrument for the payment of impositions, taxes, assessments, levies, insurance, or otherwise with interest on such disbursements. It is the intent of the parties that the Security Instrument shall secure the payment of the Note and any additional advances made from time to time pursuant to any additional promissory notes or otherwise contemplated under the Loan Documents, all of said indebtedness being equally secured hereby and having the same priority as any amounts advanced as of the date of the Security Instrument. It is agreed that any additional sum or sums advanced by Lender shall be equally secured with, and have the same priority as, the original indebtedness evidenced by the Note and shall be subject to all of the terms, provisions and conditions of the Security Instrument, whether or not such additional loans or advances are evidenced by other promissory notes of Borrower and whether or not identified by a recital that it or they are secured by the Security Instrument. It is further agreed that any additional promissory note or promissory notes executed and delivered pursuant to this paragraph shall automatically be deemed to be included in the term "Note" wherever it appears in the context of the Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Rider to Pennsylvania Mortgage and Security Agreement and agrees that the terms hereof are hereby incorporated into and with the terms of the Security Instrument as if both the Security Instrument and this instrument are one and the same document. Nothing contained herein shall invalidate or change any terms of the Security Instrument except to the extent as maybe explicitly set forth herein.

Signed, sealed and delivered
in the presence of:

Borrower(s):

2

Print Name: _Gabriel Bravo_

_[signature: Gabriel Bravo]_
Gabriel Bravo

Print Name:_____

Signed, sealed and delivered                    Borrower(s):
in the presence of:

_Guadalupe Bravo_          _[signature: Guadalupe Bravo]_
Print Name:_____                    Guadalupe Bravo

_Guadalupe Bravo_
Print Name:_____

3

_GB_

ACKNOWLEDGMENT

COMMONWEALTH OF ) 
PENNSYLVANIA ss.: 
COUNTY OF _Philadelphia_ )

The foregoing instrument was acknowledged before me on January 31, 2006 by Gabriel Bravo and Guadalupe Bravo. He/she is personally known to me or produced _____me_____ as identification, and did/did not take an oath.

[Official Notary Seal]

Notary Public, Commonwealth of Pennsylvania
Print or Type Name: _Wendy Fallon Kersch_
My Commission Expires: _____

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
WENDY FALLON KERSCH, Notary Public
Upper Southampton Twp., Bucks County
My Commission Expires June 14, 2009

4

Assignment 1

51637499
Page: 1 of 4
02/22/2007 04.06PM

**Assignor Ln#:**

This Document Recorded
02/22/2007
04:06PM
Doc Code: A        Commissioner of Records, City of Philadelphia

Doc Id: 51637499
Receipt #: 576709
Rec Fee: 124.50

Page 1

## ASSIGNMENT OF MORTGAGE

FOR GOOD AND VALUABLE CONSIDERATION, the sufficiency of which
is hereby acknowledged, the undersigned,
INTERBAY FUNDING, LLC, A DELAWARE LIMITED LIABILITY COMPANY,
WHOSE ADDRESS IS 4425 PONCE DE LEON BLVD., 4TH FL , CORAL
GABLES, FL 33146, (ASSIGNOR),
by these presents does convey, grant, sell, assign, transfer and
set over the described mortgage together with the certain note(s)
described therein together with all interest secured thereby, all
liens, and any rights due or to become due thereon to
BAYVIEW LOAN SERVICING, LLC, A DELAWARE LIMITED LIABILITY
COMPANY, WHOSE ADDRESS IS 4425 PONCE DE LEON BLVD., 5TH FL ,
CORAL GABLES, FL 33146, ITS SUCCESSORS OR ASSIGNS, (ASSIGNEE).
Said mortgage dated 01/31/2006  in the amount of $71,250.00
made by
GABRIEL BRAVO AND GUADALUPE BRAVO
to INTERBAY FUNDING, LLC
recorded on 02/17/2006 , in the Office of the Recorder of Deeds
of PHILADELPHIA  County, Pennsylvania, in Book  ,
Page    (or Document No. 51382000 )

Mortgage Premise: 1122 S. 9TH STREET
                  PHIALEDELPHIA, PA 19147

In Witness whereof, the said Corporation has caused this
instrument
to be executed in its corporate name by ROBERT G. HALL  its VICE
PRESIDENT
and authorized signer,
THIS 30TH DAY OF AUGUST IN THE YEAR 2006
INTERBAY FUNDING, LLC

BY:
    ROBERT G. HALL
    VICE PRESIDENT

(onn3/FRMPH1

Assignor Ln#:

ASSIGNMENT OF MORTGAGE                     Page 2

STATE OF FLORIDA           COUNTY OF Dade
On 08/30/2006 , before me, Jason James (#DD428371)  the
Undersigned, Notary Public, personally appeared ROBERT G. HALL ,
who acknowledged him/herself to be the VICE PRESIDENT  of
INTERBAY FUNDING, LLC  a corporation, and that s/he as such,
being authorized so to do, executed the foregoing instrument for
the purposes therein contained, by signing the name of the
corporation by themselves as such corporate officers.
IN WITNESS WHEREOF, I hereunto set my hand and official seal.

Jason James (#I
My commission expires: 05/11/2009

JASON JAMES
NOTARY PUBLIC - STATE OF FLORIDA
Commission #
Expires: MAY 11, 2009

I _____, do certify that the address of the above assignee is:
BAYVIEW LOAN SERVICING, LLC, A DELAWARE LIMITED LIABILITY COMPANY, WHOSE
ADDRESS IS 4425 PONCE DE LEON BLVD., 5TH FL , CORAL GABLES, FL 33146, ITS SUCCESSORS OR
ASSIGNS, (ASSIGNEE).

Prepared by:
J. Lesinski/NTC,2100 Alt. 19 North, Palm Harbor, FL 34683 (800)346-9152
Return To:
Nationwide Title Clearing
2100 Alt. 19 North
Palm Harbor, FL 34683

form5/FRMPH1

Loan Number                                                    Page 3
Assignment of Mortgage from:
INTERBAY FUNDING, LLC, A DELAWARE LIMITED LIABILITY COMPANY, WHOSE
ADDRESS IS 4425 PONCE DE LEON BLVD., 4TH FL , CORAL GABLES, FL 33146,
(ASSIGNOR),
to:
BAYVIEW LOAN SERVICING, LLC, A DELAWARE LIMITED LIABILITY COMPANY,
WHOSE ADDRESS IS 4425 PONCE DE LEON BLVD., 5TH FL , CORAL GABLES, FL
33146, ITS SUCCESSORS OR ASSIGNS, (ASSIGNEE).

Mortgagor: GABRIEL BRAVO AND GUADALUPE BRAVO

When Recorded Return To:
Nationwide Title Clearing
2100 Alt. 19 North
Palm Harbor, FL 34683

All that certain lot or piece of ground situated in
Mortgage Premise: 1122 S. 9TH STREET
                  PHILADELPHIA, PA 19147
PHILADELPHIA
(Borough or Township, if stated), Commonwealth of Pennsylvania.
Being more particularly described in said mortgage.


SEE ATTACHED EXHIBIT A

form5i/FRMPH1

**Legal Description**

ALL THAT CERTAIN LOT OR PIECE OF GROUND WITH THE BUILDINGS AND IMPROVEMENTS THEREON ERECTED, DESCRIBED ACCORDING TO A SURVEY THEREOF MADE BY BEN H. JOSEPH, SURVEYOR AND REGULATOR OF THE SECOND DISTRICT ON NOVEMBER 18, 1946, AS FOLLOWS, TO WIT:

SITUATE ON THE WEST SIDE OF NINTH STREET AT THE DISTANCE OF ONE HUNDRED FIFTY-THREE FEET TWO INCHES (153'2") NORTHWARD FROM THE NORTH SIDE OF ELLSWORTH STREET IN SAID WARD AND CITY, THENCE EXTENDING NORTH SEVENTY-EIGHT DEGREES ONE MINUTE, FORTY-TWO SECONDS WEST FIFTY TWO FEET (N. 78 DEGREES 1' 42" W 52') TO A POINT, THENCE NORTH ELEVEN DEGREES, SEVENTEEN MINUTES, EIGHTEEN SECONDS EAST ON A LINE PARALLEL WITH SAID NINTH STREET FOURTEEN FEET SIX AND FIVE-EIGHTHS INCHES (N 11 DEGREES 17' 19" E 14' 6-5/8") TO A POINT, TGEBCE SOUTH SEVENTY-SEVEN DEGREES, THIRTY MINUTES FORTY-TWO SECONDS EAST FIFTY-TWO FEET, ONE-EIGHTH OF AN INCH (S 77 DEGREES 30' 42" E 52' 0-1/8") TO THE WEST SIDE OF NINTH STREET, THENCE SOUTH ELEVEN DEGREES, SEVENTEEN MINUTES, EIGHTEEN SECONDS WEST ALONG THE SAID NINTH STREET FOURTEEN FEET ONE INCH (S 11 DEGREES 17'.18" W 14' 1") TO THE POINT AND PLACE OF BEGINNING.

BEING NO. 1122 SOUTH 9TH STREET.

BEING THE SAME PROPERTY CONVEYED UNTO GABRIEL BRAVO AND GUADALUPE BRAVO BY DEED FROM VINCENT ALESTRA DATED JUNE 8, 2005 AND RECORDED JUNE 13, 2005 AMONG THE DEED BOOKS OF PHILADELPHIA COUNTY, PA IN DOCUMENT ID 51198158.

ALSO BEING THE SAME  PROPERTY CONVEYED UNTO VINCENT ALESTRA BY DEED FROM FRANK RAFFAELE, III, DATED JULY 7, 2003 AND RECORDED JULY 14, 2003 AMONG THE DEED BOOKS OF PHILADELPHIA COUNTY, PA IN DOCUMENT ID 50710820.

Parcel No:

# IN THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In Re:  **GABRIEL BRAVO,**         :     **CHAPTER 13**

        **Debtor**            : **BANKRUPTCY NO. 21-12926**

## ORDER SUR DEBTOR'S OBJECTIONS TO PROOF OF CLAIM FILED BY E-Z CASHING, LLC ("EZ") AND COUNTERCLAIM AGAINST EZ

AND NOW, this      day of January, 2022, it is hereby ORDERED

as follows:

1. The Objections are SUSTAINED.

2. The Proof of Claim filed by EZ is REDUCED to $_____.

3. The Debtor is awarded $500 on account of his Counterclaim against EZ.

_____
J.

13

# IN THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN
## DISTRICT OF PENNSYLVANIA

In Re:  **GABGIEL BRAVO,**                    :        **CHAPTER 13**

       **Debtor**                              : **BANKRUPTCY NO. 21-12926**

## DEBTOR'S OBJECTIONS TO PROOF OF CLAIM NO. 7-1 ("the POC") FILED BY THE E-Z CASHING, LLC ("EZ" or "Creditor") AND DEBTOR'S COUNTERCLAIM AGAINST EZ

The Debtor now comes and makes the following Objections ("the

Objections") to the POC filed in this case by the EZ (No. 1) and Debtor's Counterclaim against

EZ for violation of the automatic stay:

1. A copy of the first seven pages of the POC filed by EZ (No. 1) (all but the

original loan documents) on or about November 1, 2021, and claiming a total of $139,800.54 is

is attached as an Exhibit hereto.

2. The Order of June 2, 2021, of the Court of Common Pleas of Philadelphia

County sets forth only the gross amount of the Claimant's reassessed damages, without

considering any post-judgment payments made by the Debtor to the Claimant on account of the

claim.  The Court therefore did not consider it appropriate to deduct any of the payments made

by the Debtor to the Claimant during the course of either the Debtor's 2017 or his 2018

bankruptcy cases.  The Debtor in fact paid to the Creditor $31,284, during those cases plus at

least $500 during these cases, which must be credited to the Debtor to ascertain the correct net

amount of the claim

3. In order to accurately fix the net amount of the claim, the amount of these

payments must be deducted from the claim.

4. The proof of claim of the Claimant must be measured by the balance of the

claim on the date that it is paid off less the uncredited amounts that the Debtor has paid the

Claimant after the original entry of the judgment.

      5. After the prior cases were filed in 2017 and 2018, the principal of EZ, Joel Weiser, came to the Debtor's restaurant and demanded of the Debtor's wife that the Debtor call him to discuss the claim of EZ.

      6. On June 18, 2019, Mr. Weiser again came to the restaurant. The Debtor, his wife, and his son were present, and taped the encounter. During the course of this encounter, Mr. Weiser proceeded to berate the Debtor in a loud voice for filing this bankruptcy case and the adversary proceeding against him, made numerous threats that he was going to foreclose on the property, demonstrated numerous threatening gestures, and caused great stress and worry to the Debtor and his family.

      7. During the course of ultimately-unsuccessful efforts to settle the Debtor's Objections and Counterclaims to the Claimant's proof of claim in the prior case, the Claimant agreed to compensate the Debtor in the amount of $500 for these stay violations, but in fact this sum was never paid or otherwise credited for these stay violations.

      8. As a result of these actions, EZ is liable to the Debtor for compensatory of $500 or for punitive damages, and attorney's fee incurred in pursuing these ounterclaimss, pursuant to 11 U.S.C. section 362(k).

      WHEREFORE, the Debtor requests that this court will enter the Proposed Order accompanying the Objections.

                        /s/DAVID A. SCHOLL
                        512 Hoffman Street
                        Philadelphia, PA.  19148
                        610-550-1765
                        Attorney for Debtor

Fill in this information to identify the case:

Debtor 1    Gabriel Bravo

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:    Eastern District of Pennsylvania

Case number    21-12926-mdc

## Official Form 410

# Proof of Claim

04/19

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

E-Z Cashing, LLC
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
| --- | --- |
| Justin L. Krik, Esquire<br>Name | E-Z Cashing, LLC<br>Name |
| 1500 JFK Blvd., Ste. 630<br>Number    Street | 110 Avis Avenue<br>Number    Street |
| Philadelphia    PA    19102<br>City    State    ZIP Code | Lakewood    NJ    08701<br>City    State    ZIP Code |
| Contact phone 267-831-3180 | Contact phone c/o 267-831-3180 |
| Contact email jkrik@kriklaw.com | Contact email c/o jkrik@kriklaw.com |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) _____    Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

16

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

**7. How much is the claim?**  $ _____ 139,800.54 . **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Money loaned and Consent Judgment

**9. Is all or part of the claim secured?**

☐ No

☑ Yes.  The claim is secured by a lien on property.

**Nature of property:**

☑ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe:        1122 South 9th Street, Philadelphia, PA 19147

**Basis for perfection:**        Consent Judgment on Mortgage

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**                  $    166,800.00

**Amount of the claim that is secured:**    $    139,800.54

**Amount of the claim that is unsecured:** $ _____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**  $ _____

**Annual Interest Rate** (when case was filed) 6.75 %

☑ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. Amount necessary to cure any default as of the date of the petition.  $ _____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

Official Form 410                              **Proof of Claim**                              page 2

17

**In re: Bravo – 21-12926-mdc**
Pre-Petition – all charges through 10/27/21

| | |
|---|---|
| Consent Judgment | $136,865.70 |
| (with Reassessed Damages per 6/2/21 Order) | |
| Interest on Consent Judgment (6/2/21 – 10/27/21) | $  2,934.84 |
| (148 days x $19.83 per diem) | |
| | |
| **TOTAL (PRE-PETITION)** | **$139,800.54** |

12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ _____ |
| ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ _____ |
| ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ _____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ _____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ _____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $ _____ |

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3:   Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   11/01/2021
                   MM / DD / YYYY

/s/ Justin L. Krik
_____
Signature

**Print the name of the person who is completing and signing this claim:**

| | | | |
|---|---|---|---|
| Name | Justin | Lee | Krik |
| | First name | Middle name | Last name |
| Title | Attorney for E-Z Cashing, LLC | | |
| Company | JLK Law PLLC d/b/a Krik Law | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 1500 JFK Blvd., Ste. 630 | | |
| | Number     Street | | |
| | Philadelphia | PA | 19102 |
| | City | State | ZIP Code |
| Contact phone | 267-831-3180 | Email jkrik@kriklaw.com | |

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION – CIVIL

| | | |
|---|---|---|
| **E-Z CASHING, LLC** | : | **JUNE TERM, 2015** |
| | : | |
| **v.** | : | **NO. 00453** |
| | : | |
| **GABRIEL BRAVO,** *et al.* | : | **Control No. 21022388** |

### ORDER

AND NOW, this 2ⁿᵈ day of June 2021, upon consideration of Plaintiff's Motion to Reassess Damages filed under Control Number 21022388, and the response, it is hereby **ORDERED** and **DECREED** that the motion is **GRANTED** and Plaintiff's November 29, 2016, *in rem* judgment by agreement is reassessed at $136,865.70.

BY THE COURT:

_____ J.

150600453-Bayview Loan Servicing, Llc Vs Bravo

15060045300102

COMMON PLEAS COURT OF PHILADELPHIA
TRIAL DIVISION - CIVIL
TRIAL WORKSHEET

```
+------------------------------------------------------------------+
| Event: _____ , at __/__/__ __:__ in _____   |
| Scheduled: __/__/__ , NON-JURY   MR - MORTGAGE FORECLOSURE       |
+------------------------------------------------------------------+
| Judge's Name:            |          | Signature:                 |
|                          |          | X  Mary D Johns            |
+------------------------------------------------------------------+
| Caption:                                        | Case Type:     |
|       BAYVIEW LOAN SERVICING, LLC VS BRAVO       | 3N -           |
|                                                  | NOT            |
+--------------------------------------------------| RESIDENTIA     |
| Term and Number:  | If Consolidated:             | OWNER          |
| #1506-00453       |    Term and Number(s)        | OCCUP-M        |
+------------------------------------------------------------------+
| TRIAL   | ACTUAL:      | TOTAL AMOUNT | NUMBER OF | DATE SHEET    |
| DATE    | ( ) JURY     |              | DAYS      | PREPARED      |
| 11/29/16| (X) NON-JURY |              |           | 11/29/16      |
+------------------------------------------------------------------+
| Disposition Date: |                                              |
| 11/29/16          |                                              |
+------------------------------------------------------------------+
| FULL DESCRIPTION OF DISPOSITION (To Be Entered VERBATIM On The Docket): |
```

*Case Settled after assignment for trial.*

Bayview Loan Servicing,-WSJDA

15060045300034

( ) DEFAULT JUDGMENT/COURT ORDERED    ( ) JURY VERDICT FOR PLAINTIFF
( ) DIRECTED VERDICT                   ( ) JURY VERDICT FOR DEFENDANT        **DOCKETED**
( ) DISCONTINUANCE ORDERED             ( ) MISTRIAL                          **COMPLEX LIT CENTER**
( ) TRANSFER TO BINDING                ( ) HUNG JURY
    ARBITRATION                                                              NOV 2 9 2016
                                       ( ) NON-PROS ENTERED
( ) FINDING FOR DEFENDANT (NON-JURY)   ( ) NON-SUIT ENTERED                  **J. STEWART**
( ) FINDING FOR PLAINTIFF (NON-JURY)   ( ) SETTLED PRIOR TO ASSIGNMENT FOR
                                           TRIAL   (TEAM LEADERS, only)
( ) DAMAGES ASSESSED
                                       (X) SETTLED AFTER ASSIGNMENT FOR TRIAL
( ) JUDGMENT ENTERED BY AGREEMENT          ( ) PRIOR TO JURY SELECTION
( ) JUDGMENT ENTERED                       ( ) AFTER JURY SWORN
( ) JUDGMENT SATISFIED
                                       ( ) OTHER (EXPLAIN)_____


(CONTINUED NEXT PAGE)

COPIES SENT PURSUANT TO Pa.R.C.P. 236(b)  J. STEWART  11/29/2016

**COURT OF COMMON PLEAS PHILADELPHIA COUNTY, PENNSYLVANIA**

| | |
|---|---|
| Bayview Loan Servicing, LLC, a Delaware Limited Liability Company, | No.: 150600453 |
| **Plaintiff,** | |
| vs. | **CIVIL ACTION** **MORTGAGE FORECLOSURE** |
| Gabriel Bravo and Guadalupe Bravo, | |
| **Defendants** | |

**CONSENT ORDER**

**AND NOW,** this _29th_ day of _November_, 2016, it is hereby:

**ORDERED AND DECREED** that an *in rem* judgment in mortgage foreclosure is entered in favor of Plaintiff and against Defendant in the amount of $105,613.62, together with interest accruing at a per diem of $19.83, from November 1, 2016 until the date of Sheriff Sale, plus any other fees and costs legally recoverable.

**IT IS FURTHER ORDERED** that this Order will not be entered until the 90th day from the date it is filed.

**IT IS FURTHER ORDERED** that a facsimile version of signatures on this document shall be treated for all purposes as the equivalent of the original signatures.

*Agreed to by:*

_____     Date: _11-29-16_
Roger Fay, Esquire
Milstead & Associates, LLC
Counsel for Plaintiff

_____     Date: _11-8-16_
John J. D'Angelo, Esquire
Attorney for Defendants

BY THE COURT:

J. _____

22

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE:                                          : CHAPTER 13
                                                : NO: 21-12926-mdc
      GABRIEL BRAVO                             :
             Debtor,                    :
                                                     :

### E-Z CASHING, LLC'S RESPONSE IN OPPOSITION
### TO DEBTOR'S OBJECTION TO PROOF OF CLAIM AND COUNTERCLAIM

1.  Admitted upon information and belief.  By way of further response, the Proof of Claim

    calculations were as follows:

| | |
|---|---|
| Consent Judgment | $136,865.70 |
|     (Reassessed Damages per 6/2/21 Order) | |
| Interest on Consent Judgment    (6/2/21 – 10/27/21) | $   2,934.84 |
|     (148 days x $19.83 per diem) | |
| **TOTAL (PRE-PETITION)** | **$139,800.54** |

2.  Denied.  It is specifically denied that the Order of June 2, 2021, entered in the Court of

    Common Pleas of Philadelphia County (the "6/2/21 Order") fails to consider any of the

    items raised by Debtor in this averment, strict proof thereof is demanded at time of

    hearing.  Without waiver and by way of further response, the 6/2/21 Order was entered

    by the Honorable Paula A. Patrick after submission of E-Z Cashing, LLC's Motion to

    Reassess Damages and Debtor's Answer thereto with New Matter, raising identical

    monetary claims.  A true and correct copy of Debtor's Answer is attached hereto as

    Exhibit "A,"  See ¶18.  E-Z Cashing, LLC sought an additional $16,169.55 but did not

    receive it.  It is denied that the 6/2/21 Order provides any opinion upon which the

    Debtor's assumption of the Court's reasoning can be based.  Nevertheless, Debtor's

    recourse to the failure of the 6/2/21 Order to account as he wished would have been to

seek reconsideration or appeal the State Court, neither of which occurred.  This issue is barred by res judicata and collateral estoppel.

3.  Denied.  It is specifically denied that a "fix" or deduction is needed.  Without waiver and by way of further response, the 6/2/21 Order, accounted for the issues raised in this averment.  The Debtor is precluded from raising this identical issue.

4.  Denied.  The averments contained within this paragraph are denied as conclusions of law to which no response is required. Without waiver and by way of further response, the calculation of E-Z Cashing, LLC's claim was determined by the State Court pursuant to the 6/2/21 Order which is final.  Since Debtor raises no allegations of uncredited payments since the 6/2/21 Order, the Objection must be denied.

5.  Denied.  Any and all alleged claims for violation of the stay during a prior bankruptcy are specifically denied, as well as is the Debtor's characterization of the interaction of the parties.

6.  Denied.  Any and all alleged claims for violation of the stay during a prior bankruptcy are specifically denied, as well as is the Debtor's characterization of the interaction of the parties.

7.  Denied.  While it is admitted that no settlement was reached on any aspect of the either party's claims, E-Z Cashing, LLC is without sufficient information to form a belief as to the truth of this averment.

8.  Denied.  It is specifically denied that E-Z Cashing, LLC is liable to Debtor for compensatory damages, punitive damages, or attorney's fees.

WHEREFORE, E-Z Cashing respectfully requests that Debtor's Objection to the Proof

of Claim be overruled and that any counterclaim be dismissed.

**KRIK LAW**

**DATE:  12/13/21**                    **BY:  /s/ Justin L. Krik**
                                       **JUSTIN L. KRIK, ESQUIRE**
                                       **ATTORNEY ID #203006**
                                       **KRIK LAW**
                                       **1500 JFK Blvd., Suite 630**
                                       **Philadelphia, PA 19102**
                                       **(267) 831-3180**

**FILED**
11 MAR 2021 11:41 am
**Civil Administration**
E. MEENAN

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY, PENNSYLVANIA
TRIAL DIVISION-CIVIL

E-Z CASHING, LLC,                    :
                                     :
  **Plaintiff**                      :
                                     :
        v.                           :
                                     :   **JUNE TERM, 2015, NO. 00453**
GABRIEL BRAVO AND                    :
GUADALUPE BRAVO,                     :
                                     :
  **Defendants**

### ORDER GRANTING PLAINTIFF'S MOTION TO REASSESS DAMAGES IN PART

AND NOW, this          day of                    , 2021, upon consideration of the

Plaintiff's Motion to Reassess Damages, and the Defendants' Answer and New Matter

In response thereto, the amount of the Plaintiff's damages, as of April 1, 2021, are

Assessed at $105,681.70.

_____

# EXHIBIT A

1

Case ID: 150600453
Control No.: 21026888

David A. Scholl, Esquire
512 Hoffman Street
Philadelphia, PA. 19148
Attorney No. 02498
610-550-1765
Attorney for Defendants

## IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY, PENNSYLVANIA
### TRIAL DIVISION-CIVIL

E-Z CASHING, LLC,

     **Plaintiff**

       **v.**

GABRIEL BRAVO AND
GUADALUPE BRAVO,

:

     **Defendants**

                  :
                  :
                  :

                  :    **JUNE TERM, 2015, NO. 00453**

### ANSWER OF DEFENDANTS TO PLAINTIFF'S MOTION TO REASSESS DAMAGES, WITH NEW MATTER

    1.  Denied.  This is a somewhat complex commercial matter.

    2. through 9.  Admitted.

    10. Denied.  The entry of the judgment resulted in a merger of all claims under the documents in issue with the amount of the judgment entered.  This precludes the addition of all of the charges set forth herein in addition to post-judgment interest.  Furthermore, certain of the additional alleged costs were not expended, and many of them were not reasonable, and therefore they are not properly chargeable to the Defendants.  The Plaintiff has failed to credit

2

Case ID: 150600453
Control No.: 21022888

many post-judgment payments made by the Defendants to the Plaintiff, as set forth in /new Matter hereinafter.

11. Denied.  The additional sums sought by the Plaintiff merged with the judgment and are for that reason not chargeable to the Defendants, and further the alleged amounts claimed are in large part unreasonable and therefore not chargeable.  The Debtor paid for all taxes and insurance in 2017.  The attorneys' fees requested are not supported by any time records and are grossly excessive.  The inspection fees were not actually incurred and are unreasonable.  No additional fees have been established to have been incurred.  As set forth hereinafter, the Defendants have made numerous payments to the Plaintiff which are not credited.

12.  Denied that the amount set forth herein is a reasonable measure of the reasonable balance of the amount due at present.

13.  It is denied that the Plaintiff is due to the amount set forth in the Motion.

14. The documents referenced do not support the unreasonable and excessive amounts requested.

15.  It is denied that the Motion need not be verified.

16.  It is admitted that the Motion has been filed, but the sum sought is excessive and unreasonable.

3

Case ID: 150600453
Control No.: 21022888

## NEW MATTER

17.  During his initial bankruptcy the Debtor made six payments of $720 to

the Plaintiff, not only four.


18.  During his most recent bankruptcy, the Debtor remitted $1288/month to

the Plaintiff each month from October, 2018, through March, 2020, a total of

$23,184, plus an additional $1000/month from April through November, 2020,

an additional $8000, for a grand total of $31,184 for which the Plaintiff has

not credited the Defendants.


WHEREFORE, The Defendants respectfully request that the Plaintiff's

judgment should be reassessed in an amount of not more than $105,681.70..




Respectfully submitted,


David A. Scholl, Esquire
512 Hoffman Street
Philadelphia, PA.  19148
Attorney No.  02498
610-550-1765
Attorney for Defendants

Case ID: 150600453
Control No.: 21022988

**VERIFICATION**

Due to the short period ot time provided to file this Answer to the Motion, which was not served on the Defendants until on or about March 4, 2021, the Defendants' counsel was unable to obtain a verification from the Defendants, and therefore this pleading is verified by their counsel, David A. Scholl, Esquire, who declares, under penalty of perjury for any false statements, that the Statements in the foregoing Answer to Plaintiff's Motion to Reassess Damages are true and correct to the best of his knowledge, information, and belief.

DAVID A. SCHOLL, ESQUIRE

Dated:  3-11-21

David A. Scholl, Esquire
512 Hoffman Street
Philadelphia, PA. 19148
Attorney No. 02498
610-550-1765
Attorney for Defendants

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY, PENNSYLVANIA
TRIAL DIVISION-CIVIL

E-Z CASHING, LLC,                          :

    Plaintiff                          :

                                      :

      v.

                                     :     JUNE TERM, 2015, NO. 00453

GABRIEL BRAVO AND
GUADALUPE BRAVO,

    Defendants

## DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION TO REASSESS DAMAGES

       GABRIEL and GUADALUPE BRAVO ("the Defendants") are husband and

wife Mexican immigrants who have owned and operated several Mexican restaurants in

South Philadelphia for about twenty years.  For the past ten years, they have operated Festiva

Acapulco Restaurant at 1122-24 South 9th St., Philadelphia, PA. 19147. The 1122 half is owned

by a third party and rented by the Defendants. The 1124 half is owned by the Defendants, and is

subject to the Plaintiff's mortgage.  In the past year, the restaurant has been limited to take-out

services on account of the pandemic, which has greatly temporarily diminished the Defendants'

income and ability to make mortgage payments to the Plaintiff.

       The history of this case from the date of its filing on June 3, 2015, through the

date of the entry of a consent judgment on November 16, 2016, is accurately stated in the

1

Case ID: 150600453
Control No.: 21023888

Plaintiff's Brief in support of the Motion. Also accurately stated are the events leading to the
filing of a second bankruptcy case by the Defendant Husband, although the correct number of the
case was Bankr. No. 18-15931.

Where the parties differ in their respective positions is, first, the legal
ramifications of the entry of the consent judgment. Under the controlling tenets of In re
Stendardo, 991 F.2d 1009 (3d Cir. 1999), since there are no provisions in the loan documents
stating otherwise, none of the post-judgment costs asserted by the Plaintiff can be collected
except for post-judgment interest at the Pennsylvania statutory rate. Consequently, all of the
"Post-Consent Judgment Charges" set forth in paragraph 11 of the Motion cannot be collected.
Although the Plaintiff is well-aware of this issue, which was noted by the bankruptcy court in
the briefing of the Defendants' Objection to the Plaintiff's proof of claim in the second case, the
Plaintiff studiously avoids even mentioning this issue.

Moreover, these charges are not otherwise collectable. The Defendants paid the
2017 real estate taxes and insurance themselves. Also, the amount of any attorneys' fees
demanded is not supported by any statements of the tasks performed and hourly rates of the
professionals performing the services has not been set forth, as required by In re Gordon-Brown,
340 B.R. 751 (Bankr. E.D. Pa. 2006). The "inspection fees" are in no sense described and are
grossly excessive. There are no receipts or descriptions of the "Misc. Fees" sought.

The other main issue of difference is the Plaintiff's failure to give the Defendants
credit for most of their post-judgment payments made by the Defendants to the Plaintiff. During
the Defendant-Husband's first bankruptcy case, the Defendants presented evidence that they
submitted six post-petition payments of $720 each, not just four payments as the Plaintiff recites.
However, most egregious is the Plaintiff's failure to make any reference to the substantial
payments made by the Defendants to the Plaintiff during the second bankruptcy case of the
Husband-Debtor. Although it was ultimately established that the post-petition regular mortgage

Case ID: 150600453
Control No.: 21032388

Payments should have been less than $500/month, the Defendants, in an abundance of caution, remitted $1288 monthly to the Plaintiff from October, 2018, through March, 2020, which amounted to a total of $23,184, and then remitted $1000/month from Arpil, 2020, through November, 2020, an additional $8000.  Thus, the Plaintiff understates the credit to which the Defendants are entitled by s total of $31,184.

The result is that the Plaintiff has significantly misstated the amount of the debt which it is owed by the Defendants. Without consideration of the Defendants' post-petition payments, the amount of the consent judgment and interest is no more than the amount of the judgment plus interest of $136,865.70.  Deducting the Defendants' post-judgment payments of $31,284 reduces  the accurate amount of the Plaintiff's debt balance to no more than $105,681.70.

Dated:  March 12, 2021

/s/ DAVID A. SCHOLL

512 Hoffman Street

Philadelphia, PA  19148

610-550-1765

Attorney for Defendants

Case ID: 150600453
Control No.: 21033388

**UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: | : CHAPTER 13 |
| | : NO: 21-12926-mdc |
|     GABRIEL BRAVO | : |
|             Debtor, | : |
| | : |

## <u>ORDER</u>

AND NOW, this          day of                , 2021, upon consideration of the Debtor's

Objection to the Proof of Claim of E-Z Cashing, LLC and the response thereto, it is ORDERED,

ADJUDGED and DECREED that Objection to E-Z Cashing, LLC's Proof of Claim are

OVERRRULED.

**BY THE COURT:**

_____
                                                 **J.**

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE:                                              : CHAPTER 13
                                                    : NO: 21-12926-mdc
      GABRIEL BRAVO                         :
          Debtor,                  :
                                                    :

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Response to Debtor's

Objection to Claim was served on the date listed below via ECF as follows:

David A. Scholl, Esquire                Kenneth West
Law Offices of David A. Scholl          1234 Market Street, Suite 1813
512 Hoffman Street                      Philadelphia, PA  19107
Philadelphia, PA 19148                  *Chapter 13 Standing Trustee*
*Attorney for Debtor*

                                        Office of the U.S. Trustee
                                        200 Chestnut Street, Suite 502
                                        Philadelphia, PA  19106

*U.S. Trustee* and the following by regular mail, postage prepaid, as follows:

Gabriel Bravo
1168 South 9th Street
Philadelphia, PA 19147

**KRIK LAW**

**DATE:  12/13/21**            **BY:  */s/ Justin L. Krik***
                               **JUSTIN L. KRIK, ESQUIRE**
                               **ATTORNEY ID #203006**
                               **KRIK LAW**
                               **1500 JFK Blvd., Suite 630**
                               **Philadelphia, PA 19102**
                               **(267) 831-3180**

# UNITED STATES BANKRUPTCY COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re:                                    :        Chapter 13

Gabriel Bravo,                            :

          Debtor.                         :        Bankruptcy No. 21-12926-MDC


### DEBTOR'S PRE-TRIAL STATEMENT

### (PART I OF TWO PARTS)

**PURSUANT TO THIS HONORABLE COURT'S ORDER DATED JANUARY 23, 2022 GOVERNING PROCEDURES AT EVIDENTIARY HEARING CONDUCTED REMOTELY BY VIDEO CONFERENCE, DEBTOR, GABRIEL BRAVO, BY COUNSEL, SUBMITS THE FOLLOWING:**

**A. PRE-TRIAL DISCLOSURE DOCUMENTS – EXHIBITS D-1 THRU D-30**

**1. BRAVO'S POST-PETITION PAYMENTS MADE DIRECTLY TO E-Z CASHING, LLC, <u>BUT NOT YET CREDITED</u>**

   a) D-1  US POSTAL MONEY ORDER#24310624353 Dated 12.06.2017 ($720.00)

   b) D-2  US POSTAL MONEY ORDER#24310624331 Dated 12.06.2017($720.00)

   c) D-3  US Postal Money Order Copy of top (Other Particulars NOT Visible; Debtor will give testimony in support of)

   d) D-4  US POSTAL MONEY ORDER#24885795576 Dated 02.28.2018($720.00)

   e) D-5 US POSTAL MONEY ORDER#243106381561 Dated 04.02.2018($720.00)

- October 2018 ($1288)   (D-6)  COLLECTIVELY CONSISTING OF COPIES OF TWO UNITED STATES POSTAL MONEY ORDERS TOTALING $1288.00 TOGETHER WITH COVER LETTER DATED OCTOBER 19,2018

-  November 2018($1288)  (D-7) NOVEMBER 2018 TRANSMITTAL LETTER BY DEBTOR'S COUNSEL

- December 2018 ($1288)  (D-8) COVER LETTER DATED DECEMBER 5, 2018 REFERENCING DECEMBER 2018 PAYMENT OF $1288.00

- January 2019 ($1288)    (D-9) COLLECTIVELY TWO US POSTAL MONEY ORDERS DATED FEBRUARY 4, 2019 & FEBRUARY 1, 2019 TOTALING $1288.00 WITH HANDWRITTEN NOTATION INDICATING "PAYMENT JANUARY 2019

- February 2019 ($1288)   (D-10) COLLECTIVELY TWO US POSTAL MONEY ORDERS TOTALING $1288.00.

- March 2019 ($1288)        (D-11) COLLECTIVELY TWO US POSTAL MONEY ORDERS DATED MARCH 4, 2019 TOTALING $1288

- April 2019 ($1288)        (D-12) COLLECTIVELY TWO US POSTAL MONEY ORDERS DATED APRIL 1, 2019 TOTALING $1,288.00

- May 2019 ($1288)        (D-13) COLLECTIVELY TWO US POSTAL MONEY ORDERS DATED MAY 13, 2019 TOTALING $1,288.00

- June 2019  ($1288)       (D-14) COLLECTIVELY TWO US POSTAL MONEY ORDERS DATED JUNE 21, 2019 TOTALING $1,288.00

- July 2019($1288)          (D-15) COLLECTIVELY  TWO US POSTAL MONEY ORDERS DATED JULY 30, 2019 TOTALING $1,288.00

- **August 2019 ($1288)   (D-16) COLLECTIVELY TWO US POSTAL MONEY ORDERS DATED AUGUST 27, 2019 TOTALING $1,288.00**

- **September 2019 ($1288)   (D-17) COLLECTIVELY TWO US POSTAL MONEY ORDERS DATED SEPTEMBER 25, 2019 TOTALING$1,288.00**

- **October 2019 ($1288)   (D-18) COLLECTIVELY TWO US POSTAL MONEY ORDERS DATED OCTOBER 17, 2019 TOTALING $1,288.00**

- **November 2019 ($1288)   (D-19) COLLECTIVELY TWO US POSTAL MONEY ORDERS DATED NOVEMBER 21, 2019 TOTALING $1,288.00**

- **December 2019 ($1288)   (D-20) COLLECTIVELY TWO US POSTAL MONEY ORDERS DATED DECEMBER 13, 2019 TOTALING $1,288.00**

- **January 2020 ($1288)   (D-21) COLLECTIVELY TWO US POSTAL MONEY ORDERS DATED JANUARY 23, 2020 TOTALING $1,288.00**

- **February 2020 ($1288)   (D-22) COLLECTIVELY TWO US POSTAL MONEY ORDERS DATED FEBRUARY 21, 2020 TOTALING $1,288.00**

- **February 2020 ($1000)   (D-23) COLLECTIVELY TWO US POSTAL MONEY ORDERS DATED FEBRUARY 21, 2020 TOTALING $1,040.00**

- **May 2020   (D-24) (BLANK)**

- **May 2020 ($1040)   (D-25) COLLECTIVELY TWO US POSTAL MONEY ORDERS DATED MAY 28, 2020 TOTALING $1040.00**

- **July 2020 ($1040)   (D-26) COLLECTIVELY TWO US POSTAL MONEY ORDERS DATED JULY 16, 2020 TOTALING $1,040.00**

- **July 2020 ($1040)   (D-27)COLLECTIVELY TWO US POSTAL MONEY ORDERS DATED JULY 22, 2020 TOTALING $1,040.00**

## B. OTHER EXHIBITS

1. **D-28. AGREEMENT FOR THE SALE OF COMMERCIAL REAL ESTATE**

2. **D-29. DEBTOR'S CHAPTER 13 PLAN IN CASE #21-12926-MDC**

3. **D-30. DEBTOR'S CHAPTER 13 PLAN IN CASE#18-15931-MDC**

## C. PRE-TRIAL DISCLOSURE REQUIREMENTS – PROPOSED WITNESSES

1. **GABRIEL BRAVO, DEBTOR HEREIN**
   a. **Summary of anticipated testimony:  Filed plan contemplating sale of 1122 S. 9th St. property to owner of 1124 S. 9th St. for sum easily sufficient to pay off E-Z Cashing mortgage, quite different from prior plans seeking terms or loans for a payoff of mortgage. Paid about $30,000 to E-Z Cashing during prior bankruptcies; recount flagrant violation of stay during 2018 case which remains uncompensated**
   b. **Email address: GabrielBravo007@gmail.com**
   c. **Location: Home at 1168 S. 9th St., Philadelphia, PA.  19147**
   d. **Other attendees: GUADALUPE BRAVO, Debtor's wife**
   e. **Documents:  All Listed Above**

2. **JOEL WEISER, PRINCIPAL, E-Z CASHING, LLC, RESPONDENT HEREIN**
   a. **Summary of anticipated testimony:**
   b. **(Principal of E-Z Cashing, LLC; hostile witness; questions about payments received during cases, stay violation)**
   c.
   d.
   e.

3. **ZAIJIE "JACK" ZHAO, PROSPECTIVE BUYER'S REALTOR, POSSIBLE REBUTTAL WITNESS ONLY**

   a. **Summary of anticicpated testimony: Verify purchase of 1122 S. 9th St.,Philadelphia, PA. 19147**

   b.Email laddress:

   c.Location: Philadelphia, PA.

   d. No other attendees

   e. Documents: Agreement of Sale of 1122 S. 9th St., Philadelphia, PA. 19147:

D. **OTHER ATTENDEES TO TRIAL: Autherine B. Smith(Non-Speaker), with Mr. Scholl (Speaker) asmithscholl@gmail.com**

 

 Respectfully submitted,

Dated: February 10, 2022     /s/David A. Scholl

Law Office of
David A. Scholl
512 Hoffman Street
Philadelphia, PA  19148-2523
Main: (610)550-1765
Autherine B. Smith
Backup: (215)316-0175

**Page 5**

D-1 – D-5



# D-6

## COLLECTIVELY CONSISTING OF COPIES OF TWO UNITED STATES POSTAL MONEY ORDERS TOTALING $1288.00 TOGETHER WITH COVER LETTER BY DEBTOR'S COUNSEL DATED OCTOBER 9, 2018

David A. Scholl, Esquire
512 Hoffman Street
Philadelphia, PA. 19148
610-550-1765
fax 267-639-9178
email: judgescholl@gmail.com

October 11, 2018

EZ Cashing, LLC
110 Avis Avenue
Lakewood, NJ 08701

Re: In re Gabriel Bravo, Bankr. No. 18-15931 (Bankr. E.D. Pa.)

DearSirs and/or Mesdames:

      Enclosed are money orders to your order in the amounts of $1000 and $288, which constitute the October payments to your company on the Mortgage which you hold on my above-named Debtor client's property at 1122 South 9th St., Philadelphia, PA. 19147. Please credit this to his account. Please advise me if you have any comment on this matter. Thank you for your anticipated cooperation.

Sincerely,

David A. Scholl

cc: Mr Gabriel Bravo



44

# D-7

# November 2018 TRANSMITTAL LETTER BY DEBTOR'S COUNSEL TO EZ CASHING LLC

David A. Scholl, Esquire
512 Hoffman Street
Philadelphia, PA. 19148
610-550-1765
fax 267-639-9178
email: judgescholl@gmail.com

December 5, 2018

E-Z Cashing, LLC
110 Avis Avenue
Lakewood, NJ 08701

Re: Gabriel Bravo, Bankr. No. 18-15931

Dear Sirs and/or Mesdames:

       Enclosed are two money orders in the total amount of $1288, which is the regular
November mortgage payment due to your company.  Mr. Bravo advises us that he will be sending you
the December payment shortly.   Thank you for your attention to this remittance.

                  Sincerely,

.

                  David A. Scholl

cc: Mr. Gabriel Bravo

# D-8

# COVER LETTER BY DEBTOR'S COUNSEL DATED DECEMBER 5, 2018

David A. Scholl, Esquire
512 Hoffman Street
Philadelphia, PA.  19148
610-550-1765
fax 267-639-9178
email: judgescholl@gmail.com

December 5, 2018

E-Z Cashing, LLC
110 Avis Avenue
Lakewood, NJ  08701

Re: Gabriel Bravo, Bankr. No. 18-15931

Dear Sirs and/or Mesdames:

      Enclosed are two money orders in the total amount of $1288, which is the regular
November mortgage payment due to your company.  Mr. Bravo advises us that he will be sending you
the December payment shortly.   Thank you for your attention to this remittance.

                    Sincerely,

                    David A. Scholl

cc:  Mr. Gabriel Bravo

# D-9

# COLLECTIVELY TWO US POSTAL MONEY ORDERS DATED FEBRUARY 4, 2019 & FEBRUARY 1, 2019 TOTALING $1,288.00

# WITH HANDWRITTEN NOTATION INDICATING "PAYMENT JANUARY 2019"

D-9





# D-10

# COLLECTIVELY TWO US POSTAL MONEY ORDERS DATED FEBRUARY 4, 2019 & FEBRUARY 1, 2019 TOTALING $1,288.00



# D-11

# COLLECTIVELY TWO US POSTAL MONEY ORDERS DATED MARCH 4, 2019 TOTALING $1,288.00



# D-12

# COLLECTIVELY TWO US POSTAL MONEY ORDERS DATED APRIL 1, 2019 TOTALING $1,288.00



# D-13

# COLLECTIVELY TWO US POSTAL MONEY ORDERS DATED MAY 13, 2019 TOTALING $1,288.00





# D-14

# COLLECTIVELY TWO US POSTAL MONEY ORDERS DATED JUNE 21, 2019 TOTALING $1,288.00





(handwritten, right margin, vertical) Payment of June 2019

# D-15

# COLLECTIVELY TWO US POSTAL MONEY ORDERS DATED JULY 30, 2019 TOTALING $1,288.00



# D-16

# COLLECTIVELY TWO US POSTAL MONEY ORDERS DATED AUGUST 27, 2019 TOTALING $1,288.00



# D-17

# COLLECTIVELY TWO US POSTAL MONEY ORDERS DATED SEPTEMBER 25, 2019 TOTALING $1,288.00



**UNITED STATES POSTAL SERVICE®**

**CUSTOMER'S RECEIPT**

SEE BACK OF THIS RECEIPT FOR IMPORTANT CLAIM INFORMATION

**NOT NEGOTIABLE**

Pay to EZ cbshing LLc
Address 110 AVIS AVenue
Lbke wood NJ 08701

KEEP THIS RECEIPT FOR YOUR RECORDS

Serial Number 25451713260

Year, Month, Day 2019-09-25    Post Office 191471    Amount $1,000.00    Clerk 15

---

**UNITED STATES POSTAL SERVICE**

**POSTAL MONEY ORDER**

Serial Number 25451713260

2019-09-25    191471    U.S. Dollars and Cents $1000.00

One Thousand Dollars and 00/100

Clerk 15

Pay to EZ cbshing LLc
Address 110 AVIS AVenue
Lbke wood NJ 08701
Memo Sept. 2019 pbyment

666218l 132800
1122 s 9 s+ phila
191777

SEE REVERSE WARNING • NEGOTIABLE ONLY IN THE U.S. AND POSSESSIONS

⑆00000800⑆  25451713260⑈

---

**UNITED STATES POSTAL SERVICE®**

**CUSTOMER'S RECEIPT**

SEE BACK OF THIS RECEIPT FOR IMPORTANT CLAIM INFORMATION

**NOT NEGOTIABLE**

Pay to EZ cbshing LLc
Address 110 AVIS AVenue
Lbke wood NJ 08701

KEEP THIS RECEIPT FOR YOUR RECORDS

Serial Number 25451713271

Year, Month, Day 2019-09-25    Post Office 191471    Amount $288.00    Clerk 15

---

**UNITED STATES POSTAL SERVICE**

**POSTAL MONEY ORDER**

Serial Number 25451713271

2019-09-25    191471    U.S. Dollars and Cents $288.00

Two Hundred Eighty Eight Dollars and 00/100

Clerk 15

Pay to EZ cbshing LLc
Address 110 AVIS AVenue
Lbke wood NJ 08701
Memo Sept. 2019 pbyment

666218l 132800
1122 s 9 s+ phila

SEE REVERSE WARNING • NEGOTIABLE ONLY IN THE U.S. AND POSSESSIONS

⑆00000800⑆  25451713271⑈

Pbyment 01 2019

# D-18

# COLLECTIVELY TWO US POSTAL MONEY ORDERS DATED OCTOBER 17, 2019 TOTALING $1,288.00









# D-19

# COLLECTIVELY TWO US POSTAL MONEY ORDERS DATED NOVEMBER 21, 2019 TOTALING $1,288.00



# D-20

# COLLECTIVELY TWO US POSTAL MONEY ORDERS DATED DECEMBER 13, 2019 TOTALING $1,288.00



PAYment of Dec 2019

CUSTOMER'S RECEIPT

UNITED STATES POSTAL SERVICE

SEE BACK OF THIS RECEIPT FOR IMPORTANT CLAIM INFORMATION

NOT NEGOTIABLE

KEEP THIS RECEIPT FOR YOUR RECORDS

Pay to EZ cashing LLc
Address 110 AVIS AVenue
Lake wood NJ 08701

25451801381     2019-12-13     191471     $1,000.00     03

POSTAL MONEY ORDER

UNITED STATES POSTAL SERVICE

25451801381     $1000.00

Pay to EZ cashing LLc     Gabriel Bravo
110 AVIS Ave     1022 S 3 st phil
Lake wood NJ     19172
Payment of Dec 2019

CUSTOMER'S RECEIPT

UNITED STATES POSTAL SERVICE

SEE BACK OF THIS RECEIPT FOR IMPORTANT CLAIM INFORMATION

NOT NEGOTIABLE

KEEP THIS RECEIPT FOR YOUR RECORDS

Pay to EZ cashing LLc
Address 110 AVIS AVenue
Lake wood NJ 08701

25451801392     2019-12-13     191471     $288.00     03

POSTAL MONEY ORDER

UNITED STATES POSTAL SERVICE

25451801392     $288.00

EZ cashing LLc     Gabriel Bravo
110 AVIS Ave     1022 S 3 st
Lake wood NJ 08701     phil pa 19172
Payment of Dec 2019

73

# D-21

# COLLECTIVELY TWO US POSTAL MONEY ORDERS DATED JANUARY 23, 2020 TOTALING $1,288.00



# D-22

# COLLECTIVELY TWO US POSTAL MONEY ORDERS DATED FEBRUARY 21, 2020 TOTALING $1,288.00





# D-23

# COLLECTIVELY TWO US POSTAL MONEY ORDERS DATED FEBRUARY 21, 2020 TOTALING $1,288.00





# D-24

# BLANK

# D-25

# COLLECTIVELY TWO US POSTAL MONEY ORDERS DATED MAY 28, 2020 TOTALING $1,040.00

**CUSTOMER'S RECEIPT**

UNITED STATES POSTAL SERVICE

SEE BACK OF THIS RECEIPT FOR IMPORTANT CLAIM INFORMATION

KEEP THIS RECEIPT FOR YOUR RECORDS

NOT NEGOTIABLE

Pay to F Z e6 5h14 LLC
Address 1122 s g st phlde PA
110 AVIS Avenue Lakewood NJ
Year, Month, Day 2020-05-28   Post Office 191471   Amount $1,000.00   Clerk 10

Serial Number 26409954767

**POSTAL MONEY ORDER**

UNITED STATES POSTAL SERVICE

Serial Number 26409954767

$1000.00

One Thousand Dollars and 00/100

Clerk 10

Pay to F Z c6 5h14 LLC
Address 110 AVIS AVE
Lakewood NJ
Memo MARch 2020 Payment

1122 s 9 st phlb PA 19142

NEGOTIABLE ONLY IN THE U.S. AND POSSESSIONS

00000800 2:

26409954 767

---

**CUSTOMER'S RECEIPT**

UNITED STATES POSTAL SERVICE

SEE BACK OF THIS RECEIPT FOR IMPORTANT CLAIM INFORMATION

KEEP THIS RECEIPT FOR YOUR RECORDS

NOT NEGOTIABLE

Pay to F Z c6 5h14 LLC
Address 110 AVIS Avenue
Lakewood NJ 08701   Year, Month, Day 2020-05-28   Post Office 191471   Amount $40.00   Clerk 10

Serial Number 26409954791

**POSTAL MONEY ORDER**

UNITED STATES POSTAL SERVICE

Serial Number 26409954791

$40.00

Forty Dollars and 00/100

Clerk 10

Pay to F Z c6 5h14 LLC
Address 110 AVIS AVE
Lakewood NJ 08701
Memo MARch 2020 Payment

Geb Guiol Blsuo
1122 s 9 st
phlb PA 19142

NEGOTIABLE ONLY IN THE U.S. AND POSSESSIONS

00000800 2:

26409954 791

Payment of March 2020

March 2020 Payment

# D-26

# COLLECTIVELY TWO US POSTAL MONEY ORDERS DATED JULY 16, 2020 TOTALING $1,040.00



# D-27

# COLLECTIVELY TWO US POSTAL MONEY ORDERS DATED JULY 22, 2020 TOTALING $1,040.00





## UNITED STATES BANKRUPTCY COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE:                          :          CHAPTER 13

GABRIEL BRAVO,                  :

DEBTOR                          :          CASE#21-12926-MDC

                                :

### DEBTOR'S PRE-TRIAL STATEMENT

### PART II

D-28    COMMERCIAL SALES AGREEMENT

D-29    CHAPTER 13 PLAN IN CASE#21-12926-MDC

D-30    THIRD AMENDED PLAN IN CASE#18-15931-MDC

# D-28

# COMMERCIAL SALES AGREEMENT

## AGREEMENT FOR THE SALE OF COMMERCIAL REAL ESTATE          ASC

This form recommended and approved for, but not restricted to use by, the members of the Pennsylvania Association of Realtors® (PAR).

### PARTIES

| BUYER(S): GE capital or its assignee | SELLER(S): BRAVO GABRIEL AND GUADALUPE BRAVO |
|---|---|

### PROPERTY

PROPERTY ADDRESS **1122 S 9TH ST**

ZIP **19147-4610**

in the municipality of **PHILADELPHIA**
County of **Philadelphia**, in the Commonwealth of Pennsylvania.
Identification (e.g., Parcel #; Lot, Block; Deed Book, Page, Recording Date):

Tax ID #(s): **882917141**

### BUYER'S RELATIONSHIP WITH PA LICENSED BROKER

☐ **No Business Relationship (Buyer is not represented by a broker)**

| Broker (Company) **GE 21 REALTY** | Licensee(s) (Name) **JACK ZHAO** |
|---|---|
| Company Address | Direct Phone(s) **(267)815-6816** |
| | Cell Phone(s) |
| Company Phone | Fax |
| Company Fax | Email **KAIZIZHAO2007@HOTMAIL.COM** |

Broker is (check only one):
☒ Buyer Agent (Broker represents Buyer only)
☐ Dual Agent (See Dual and/or Designated Agent box below)

Licensee(s) is (check only one):
☐ Buyer Agent (all company licensees represent Buyer)
☐ Buyer Agent with Designated Agency (only Licensee(s) named above represent Buyer)
☐ Dual Agent (See Dual and/or Designated Agent box below)

☐ Transaction Licensee (Broker and Licensee(s) provide real estate services but do not represent Buyer)

### SELLER'S RELATIONSHIP WITH PA LICENSED BROKER

☐ **No Business Relationship (Seller is not represented by a broker)**

| Broker (Company) | Licensee(s) (Name) |
|---|---|
| Company Address | Direct Phone(s) |
| | Cell Phone(s) |
| Company Phone | Fax |
| Company Fax | Email |

Broker is (check only one):
☐ Seller Agent (Broker represents Seller only)
☐ Dual Agent (See Dual and/or Designated Agent box below)

Licensee(s) is (check only one):
☐ Seller Agent (all company licensees represent Seller)
☐ Seller Agent with Designated Agency (only Licensee(s) named above represent Seller)
☐ Dual Agent(See Dual and/or Designated Agent box below)

☐ Transaction Licensee (Broker and Licensee(s) provide real estate services but do not represent Seller)

### DUAL AND/OR DESIGNATED AGENCY

A Broker is a Dual Agent when a Broker represents both Buyer and Seller in the same transaction. A Licensee is a Dual Agent when a Licensee represents Buyer and Seller in the same transaction. All of Broker's licensees are also Dual Agents UNLESS there are separate Designated Agents for Buyer and Seller. If the same Licensee is designated for Buyer and Seller, the Licensee is a Dual Agent.

**By signing this Agreement, Buyer and Seller each acknowledge having been previously informed of, and consented to, dual agency, if applicable.**

Buyer Initials: _____          ASC Page 1 of 9          Seller Initials: _____

Pennsylvania Association of Realtors®

COPYRIGHT PENNSYLVANIA ASSOCIATION OF REALTORS® 2020
rev.11/20; rel.6/20

GE21 Realty, 1118 s 12th st Philadelphia PA 19147                                    Phone: 2675344515          Fax:                    1122 s 9th st
F W                          Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com

89

1. By this Agreement, dated _____ November 1, 2021 _____, Seller hereby agrees to sell and convey to Buyer, who agrees to purchase, the identified Property.

2. **PURCHASE PRICE AND DEPOSITS (3-15)**
   (A) Purchase Price $ 200,000.00 _____
   ( Two Hundred Thousand _____ U.S. Dollars), to be paid by Buyer as follows:

   1. Initial Deposit, within _____ days (5 if not specified) of Execution Date,
      if not included with this Agreement:                                    $ _____ 10,000.00
   2. Additional Deposit within _____ days of the Execution Date:            $ _____
   3. _____              $ _____
   Remaining balance will be paid at settlement.

   (B) **All funds paid by Buyer, including deposits, will be paid by check, cashier's check or wired funds. All funds paid by Buyer within 30 DAYS of settlement, including funds paid at settlement, will be by cashier's check or wired funds, but not by personal check.**
   (C) Deposits, regardless of the form of payment and the person designated as payee, will be paid in U.S. Dollars to Broker for Seller (unless otherwise stated here: _____ ), who will retain deposits in an escrow account in conformity with all applicable laws and regulations until consummation or termination of this Agreement. Only real estate brokers are required to hold deposits in accordance with the rules and regulations of the State Real Estate Commission. Checks tendered as deposit monies may be held uncashed pending the execution of this Agreement.

3. **SETTLEMENT AND POSSESSION (6-13)**
   (A) Settlement Date is April 6, 2022 _____, or before if Buyer and Seller agree.
   (B) Settlement will occur in the county where the Property is located or in an adjacent county, during normal business hours, unless Buyer and Seller agree otherwise.
   (C) At time of settlement, the following will be pro-rated on a daily basis between Buyer and Seller, reimbursing where applicable: current taxes; rents; interest on mortgage assumptions; condominium fees and homeowner association fees; water and/or sewer fees, together with any other lienable municipal service fees. All charges will be pro-rated for the period(s) covered. Seller will pay up to and including the date of settlement and Buyer will pay for all days following settlement, unless otherwise stated here: _____
   _____
   (D) For purposes of prorating real estate taxes, the "periods covered" are as follows:
      1. Municipal tax bills for all counties and municipalities in Pennsylvania are for the period from January 1 to December 31.
      2. School tax bills for the Philadelphia, Pittsburgh and Scranton School Districts are for the period from January 1 to December 31. School tax bills for all other school districts are for the period from July 1 to June 30.
   (E) Conveyance from Seller will be by fee simple deed of special warranty unless otherwise stated here: _____
   _____
   (F) Payment of transfer taxes will be divided equally between Buyer and Seller unless otherwise stated here: _____
   _____
   (G) Possession is to be delivered by deed, existing keys and physical possession to a vacant Property free of debris, with all structures broom-clean, at day and time of settlement, unless Seller, before signing this Agreement, has identified in writing that the Property is subject to a lease.
   (H) If Seller has identified in writing that the Property is subject to a lease, possession is to be delivered by deed, existing keys and assignment of existing leases for the Property, together with security deposits and interest, if any, at day and time of settlement. Seller will not enter into any new leases, nor extend existing leases, for the Property without the written consent of Buyer. Buyer will acknowledge existing lease(s) by initialing the lease(s) at the execution of this Agreement, unless otherwise stated in this Agreement.
   ☐ **Tenant-Occupied Property Addendum (PAR Form TOP) is attached and made part of this Agreement.**

4. **DATES/TIME IS OF THE ESSENCE (3-15)**
   (A) Written acceptance of all parties will be on or before: February 7, 2022
   (B) The Settlement Date and all other dates and times identified for the performance of any obligations of this Agreement are of the essence and are binding.
   (C) The Execution Date of this Agreement is the date when Buyer and Seller have indicated full acceptance of this Agreement by signing and/or initialing it. For purposes of this Agreement, the number of days will be counted from the Execution Date, excluding the day this Agreement was executed and including the last day of the time period. **All changes to this Agreement should be initialed and dated.**
   (D) The Settlement Date is not extended by any other provision of this Agreement and may only be extended by mutual written agreement of the parties.
   (E) Certain terms and time periods are pre-printed in this Agreement as a convenience to the Buyer and Seller. All pre-printed terms and time periods are negotiable and may be changed by striking out the pre-printed text and inserting different terms acceptable to all parties, except where restricted by law.

5. **FIXTURES AND PERSONAL PROPERTY (6-20)**
   (A) It is possible for certain items of personal property to be so integrated into the Property that they become fixtures and will be regarded as part of the Property and therefore included in a sale. Buyer and Seller are encouraged to be specific when negotiating what items will be included or excluded in this sale.

Buyer Initials: _____          ASC Page 2 of 9          Seller Initials: _____

63  (B) INCLUDED in this sale are all existing items permanently installed in the Property, free of liens, including plumbing; heating;
64      HVAC equipment; lighting fixtures (including chandeliers and ceiling fans); and water treatment systems, unless otherwise stated
65      below; any remaining heating, cooking and other fuels stored on the Property at the time of settlement. Also included: _____
66      _____
67      _____
68      _____
69  (C) The following items are not owned by Seller and may be subject to a lease or other financing agreement: _____
70      _____
71  (D) EXCLUDED fixtures and items: _____
72      _____

73  **6.  ZONING (4-14)**
74      Failure of this Agreement to contain the zoning classification (except in cases where the property {and each parcel thereof, if subdi-
75      vidable} is zoned solely or primarily to permit single-family dwellings) will render this Agreement voidable at Buyer's option, and, if
76      voided, any deposits tendered by the Buyer will be returned to the Buyer without any requirement for court action.
77      **Zoning Classification, as set forth in the local zoning ordinance:** _____

78  **7.  FINANCING CONTINGENCY (4-14)**
79      ☐  WAIVED. This sale is NOT contingent on financing, although Buyer may obtain financing and/or the parties may include an
80          appraisal contingency.
81      ☒  ELECTED.
82      (A) This sale is contingent upon Buyer obtaining financing according to the following terms:

| First Loan on the Property | Second Loan on the Property |
|---|---|
| Loan Amount $ 140,000.00 | Loan Amount $ _____ |
| Minimum Term _____ years | Minimum Term _____ years |
| Type of Loan _____ | Type of Loan _____ |
| Interest rate  4.250  %; however, **Buyer agrees to accept the interest rate as may be committed by the lender,** not to exceed a maximum interest rate of _____ %. | Interest rate _____ %; however, **Buyer agrees to accept the interest rate as may be committed by the lender,** not to exceed a maximum interest rate of _____ %. |

90  (B) **Financing Commitment Date** _____
91  (C) Within _____ days (10 if not specified) from the Execution Date of this Agreement, Buyer will make a completed, written appli-
92      cation for the financing terms stated above to a responsible lender(s) of Buyer's choice. **Broker for Buyer, if any, otherwise**
93      **Broker for Seller, is authorized to communicate with the lender(s) to assist in the financing process.**
94  (D) **Should Buyer furnish false or incomplete information to Seller, Broker(s), or the lender(s) concerning Buyer's legal or**
95      **financial status, or fail to cooperate in good faith in processing the financing application, which results in the lender(s)**
96      **refusing to approve a financing commitment, Buyer will be in default of this Agreement.**
97  (E) Upon receipt of a financing commitment, Buyer will promptly deliver a copy of the commitment to Seller. Unless otherwise agreed to in
98      writing by Buyer and Seller, if a written commitment is not received by Seller by the above date, this Agreement may be terminated by
99      Buyer or Seller, with all deposit monies returned to Buyer according to the terms of Paragraph 24. Buyer will be responsible for any
100     premiums for mechanics' lien insurance and/or title search, or fee for cancellation of same, if any; AND/OR any premiums for flood
101     insurance and/or fire insurance with extended coverage, insurance binder charges or cancellation fee, if any; AND/OR any appraisal fees
102     and charges paid in advance to lender.

103 **8.  CHANGE IN BUYER'S FINANCIAL STATUS (6-20)**
104     If a change in Buyer's financial status affects Buyer's ability to purchase, Buyer will, within _____ days (5 if not specified) of said
105     change notify Seller and lender(s) to whom the Buyer submitted loan application, if any, in writing. A change in financial status
106     includes, but is not limited to, loss or a change in income; Buyer's having incurred a new financial obligation; entry of a judgment
107     against Buyer. **Buyer understands that applying for and/or incurring an additional financial obligation may affect Buyer's**
108     **ability to purchase.**

109 **9.  SELLER REPRESENTATIONS (1-20)**
110     (A) **Status of Water**
111         Seller represents that the Property is served by:
112         ☒ Public Water  ☐ Community Water  ☐ On-site Water  ☐ None  ☐ _____
113     (B) **Status of Sewer**
114         1.  Seller represents that the Property is served by:
115             ☒ Public Sewer          ☐ Community Sewage Disposal System          ☐ Ten-Acre Permit Exemption (see Sewage Notice 2)
116             ☐ Individual On-lot Sewage Disposal System (see Sewage Notice 1)   ☐ Holding Tank (see Sewage Notice 3)
117             ☐ Individual On-lot Sewage Disposal System in Proximity to Well (see Sewage Notice 1; see Sewage Notice 4, if applicable)
118             ☐ None (see Sewage Notice 1)        ☐ None Available/Permit Limitations in Effect (see Sewage Notice 5)
119
120         2.  **Notices Pursuant to the Pennsylvania Sewage Facilities Act**
121             **Notice 1: There is no currently existing community sewage system available for the subject property.** Section 7 of the
122             Pennsylvania Sewage Facilities Act provides that no person shall install, construct, request bid proposals for construction, alter,
123             repair or occupy any building or structure for which an individual sewage system is to be installed, without first obtaining a
124             permit. Buyer is advised by this notice that, before signing this Agreement, Buyer should contact the local agency charged with
125             administering the Act to determine the procedure and requirements for obtaining a permit for an individual sewage system. The

126 **Buyer Initials:** _____                    ASC Page 3 of 9                          **Seller Initials:** _____

127  local agency charged with administering the Act will be the municipality where the Property is located or that municipality
128  working cooperatively with others.
129  **Notice 2: This Property is serviced by an individual sewage system installed under the ten-acre permit exemption provisions**
130  **of Section 7 of the Pennsylvania Sewage Facilities Act.** (Section 7 provides that a permit may not be required before installing,
131  constructing, awarding a contract for construction, altering, repairing or connecting to an individual sewage system where a ten-acre
132  parcel or lot is subdivided from a parent tract after January 10, 1987). Buyer is advised that soils and site testing were not conducted
133  and that, should the system malfunction, the owner of the Property or properties serviced by the system at the time of a malfunction
134  may be held liable for any contamination, pollution, public health hazard or nuisance which occurs as a result.
135  **Notice 3: This Property is serviced by a holding tank (permanent or temporary) to which sewage is conveyed by a**
136  **water carrying system and which is designed and constructed to facilitate ultimate disposal of the sewage at another**
137  **site.** Pursuant to the Pennsylvania Sewage Facilities Act, Seller must provide a history of the annual cost of maintaining the
138  tank from the date of its installation or December 14, 1995, whichever is later.
139  **Notice 4: An individual sewage system has been installed at an isolation distance from a well that is less than the dis-**
140  **tance specified by regulation.** The regulations at 25 Pa. Code §73.13 pertaining to minimum horizontal isolation distances
141  provide guidance. Subsection (b) of §73.13 states that the minimum horizontal isolation distance between an individual water
142  supply or water supply system suction line and treatment tanks shall be 50 feet. Subsection (c) of §73.13 states that the hor-
143  izontal isolation distance between the individual water supply or water supply system suction line and the perimeter of the
144  absorption area shall be 100 feet.
145  **Notice 5: This lot is within an area in which permit limitations are in effect and is subject to those limitations.** Sewage facilities
146  are not available for this lot and construction of a structure to be served by sewage facilities may not begin until the municipality com-
147  pletes a major planning requirement pursuant to the Pennsylvania Sewage Facilities Act and regulations promulgated thereunder.
148  (C) Seller represents and warrants that Seller has no knowledge except as noted in this Agreement that: (1) The premises have been
149  contaminated by any substance in any manner which requires remediation; (2) The Property contains wetlands, flood plains, or any
150  other environmentally sensitive areas, development of which is limited or precluded by law; (3) The Property contains asbestos,
151  polychlorinated biphenyls, lead-based paint or any other substance, the removal or disposal of which is subject to any law or reg-
152  ulation; and (4) Any law has been violated in the handling or disposing of any material or waste or the discharge of any material
153  into the soil, air, surface water, or ground water.
154  (D) Seller agrees to indemnify and to hold Broker harmless from and against all claims, demands, or liabilities, including attorneys
155  fees and court costs, which arise from or are related to the environmental condition or suitability of the Property prior to, during,
156  or after Seller's occupation of the Property including without limitation any condition listed in Paragraph 9(C).
157  (E) Seller is not aware of historic preservation restrictions regarding the Property unless otherwise stated here: _____
158  _____
159  _____
160  (F) Seller represents that, as of the date Seller signed this Agreement, no public improvement, condominium or homeowner asso-
161  ciation assessments have been made against the Property which remain unpaid, and that no notice by any government or public
162  authority has been served upon Seller or anyone on Seller's behalf, including notices relating to violations of zoning, housing,
163  building, safety or fire ordinances that remain uncorrected, and that Seller knows of no condition that would constitute a violation
164  of any such ordinances that remain uncorrected, unless otherwise specified here: _____
165  _____
166  (G) Seller knows of no other potential notices (including violations) and/or assessments except as follows: _____
167  _____
168  (H) Access to a public road may require issuance of a highway occupancy permit from the Department of Transportation.
169  (I) **Internet of Things (IoT) Devices**
170  1.  The presence of smart and green home devices that are capable of connecting to the Internet, directly or indirectly, and the data
171  stored on those various devices make up a digital ecosystem in the Property sometimes referred to as the "Internet of Things
172  (IoT)." Buyer and Seller acknowledge that IoT devices may transmit data to third parties outside of the control of their owner.
173  2.  On or before settlement, Seller will make a reasonable effort to clear all data stored on all IoT devices located on the Property
174  and included in the sale. Seller further acknowledges that all personal devices owned by Seller (including but not limited to
175  cellular telephones, personal computers and tablets) having connectivity to any IoT device(s) located on the Property will be
176  disconnected and cleared of relevant data prior to settlement. Further, no attempts will be made after settlement by Seller or
177  anyone on Seller's behalf to access any IoT devices remaining on the Property.
178  3.  Following settlement, Buyer will make a reasonable effort to clear all stored data from any IoT device(s) remaining on the
179  Property and to restrict access to said devices by Seller, Seller's agents or any third party to whom Seller may have previously
180  provided access. This includes, but is not limited to, restoring IoT devices to original settings, changing passwords or codes,
181  updating network settings and submitting change of ownership and contact information to device manufacturers and service
182  providers.
183  4.  This paragraph will survive settlement.
184  **10. WAIVER OF CONTINGENCIES (9-05)**
185  **If this Agreement is contingent on Buyer's right to inspect and/or repair the Property, or to verify insurability, environmental**
186  **conditions, boundaries, certifications, zoning classification or use, or any other information regarding the Property, Buyer's**
187  **failure to exercise any of Buyer's options within the times set forth in this Agreement is a WAIVER of that contingency and**
188  **Buyer accepts the Property and agrees to the RELEASE in Paragraph 26 of this Agreement.**

189  Buyer Initials: _____          **ASC Page 4 of 9**          Seller Initials: _____

**11. BUYER'S DUE DILIGENCE (3-15)**

190

191 ☒ **WAIVED.** This sale is NOT contingent upon the results of any inspection(s), although Buyer may inspect the Property (includ-
192 ing fixtures and any personal property specifically listed herein). Buyer agrees to purchase the Property **IN ITS PRESENT**
193 **CONDITION,** regardless of the results of any inspection(s) or findings that Buyer may learn of after the Execution Date of this
194 Agreement.

195 ☐ **ELECTED.** This sale IS contingent upon the results of inspection(s). It is Buyer's responsibility to determine that the con-
196 dition and permitted use of the property is satisfactory. Buyer may, within _____ days (30 if not specified) from the Execution
197 Date of this Agreement, conduct due diligence (Due Diligence Period), which includes, but is not limited to, verifying that the
198 condition, permitted use, insurability, environmental conditions, boundaries, certifications, deed restrictions, zoning classifi-
199 cations and any other features of the Property are satisfactory. Buyer may request that the property be inspected, at Buyer's
200 expense, by qualified professionals to determine the physical, structural, mechanical and environmental condition of the land,
201 improvements or their components, or for the suitability of the property for Buyer's needs. If, as the result of Buyer's due
202 diligence, Buyer determines that the Property is not suitable for Buyer's needs, Buyer may, prior to the expiration of the Due
203 Diligence Period, terminate this Agreement by written notice to Seller, with all deposit monies returned to Buyer according to
204 the terms of Paragraph 24 of this Agreement. In the event that Buyer has not provided Seller with written notice of Buyer's
205 intent to terminate this Agreement prior to the end of the Due Diligence Period, this Agreement shall remain in full force and
206 effect in accordance with the terms and conditions as more fully set forth in this Agreement.

207 (A) **Buyer has been given the opportunity to inspect the Property** (including fixtures and any personal property specifically listed
208 herein) **and, subject to the Due Diligence contingency if elected, agrees to purchase the Property IN ITS PRESENT CON-**
209 **DITION unless the parties agree otherwise in writing. Buyer's decision to purchase the Property is a result of Buyer's own**
210 **inspections and determinations and not because of or in reliance on any representations made by Seller or any other party.**
211 Buyer acknowledges that Brokers, their licensees, employees, officers or partners have not made an independent examination or
212 determination of the structural soundness of the Property, the age or condition of the components, environmental conditions, the
213 permitted uses, nor of conditions existing in the locale where the Property is situated; nor have they made a mechanical inspection
214 of any of the systems contained therein.

215 (B) Any repairs required by this Agreement will be completed in a workmanlike manner.
216 (C) Revised flood maps and changes to Federal law may substantially increase future flood insurance premiums or require insurance
217 for formerly exempt properties. Buyer should consult with one or more insurance agents regarding the need for flood insurance
218 and possible premium increases.

**12. NOTICES, ASSESSMENTS AND MUNICIPAL REQUIREMENTS (4-14)**

219

220 (A) In Pennsylvania, taxing authorities (school districts and municipalities) and property owners may appeal the assessed value of a
221 property at the time of sale, or at any time thereafter. A successful appeal by a taxing authority may result in a higher assessed value
222 for the property and an increase in property taxes. Also, periodic county-wide property reassessments may change the assessed
223 value of the property and result in a change in property tax.

224 (B) With the exception of county-wide reassessments, assessment appeal notices, notices of change in millage rates or increases in
225 rates, in the event any other notices, including violations, and/or assessments are received after Seller has signed this Agreement
226 and before settlement, Seller will within _____ days (10 if not specified) of receiving the notices and/or assessments provide a
227 copy of the notices and/or assessments to Buyer and will notify Buyer in writing that Seller will:

228 1. Fully comply with the notices and/or assessments, at Seller's expense, before settlement. If Seller fully complies with the
229 notices and/or assessments, Buyer accepts the Property and agrees to the RELEASE in Paragraph 26 of this Agreement, OR
230 2. Not comply with the notices and/or assessments. If Seller chooses not to comply with the notices and/or assessments, or **fails**
231 **within the stated time to notify Buyer whether Seller will comply,** Buyer will notify Seller in writing within _____ days
232 (10 if not specified) that Buyer will:

233 a. Comply with the notices and/or assessments at Buyer's expense, accept the Property, and agree to the RELEASE in
234 Paragraph 26 of this Agreement, OR
235 b. Terminate this Agreement by written notice to Seller, with all deposit monies returned to Buyer according to the terms of
236 Paragraph 24 of this Agreement.

237 **If Buyer fails to respond** within the time stated in Paragraph 12(B) (2) **or fails to terminate** this Agreement by written notice to
238 Seller within that time, **Buyer will accept the Property** and agree to the RELEASE in Paragraph 26 of this Agreement.

239 (C) If required by law, within  30  DAYS from the Execution Date of this Agreement, but in no case later than  15  DAYS prior to
240 Settlement Date, Seller will order at Seller's expense a certification from the appropriate municipal department(s) disclosing notice
241 of any uncorrected violations of zoning, housing, building, safety or fire ordinances and/or a certificate permitting occupancy of the
242 Property. If Buyer receives a notice of any required repairs/improvements, Buyer will promptly deliver a copy of the notice to Seller.

243 (D) Seller has no knowledge of any current or pending condemnation or eminent domain proceedings after the signing of this Agreement,
244 any portion of the Property should be subject to condemnation or eminent domain proceedings. Buyer will have the option to terminate this Agreement by
245 Seller shall immediately advise Buyer, in writing, of such proceedings. Buyer will have the option to terminate this Agreement by
246 written notice to Seller within _____ days (15 days if not specified) after Buyer learns of the filing of such proceedings, with
247 all deposit monies returned to Buyer according to the terms of Paragraph 24 of this Agreement. **Buyer's failure to provide notice**
248 **of termination within the time stated will constitute a WAIVER of this contingency and all other terms of this Agreement**
249 **remain in full force and effect.**

**13. TAX DEFERRED EXCHANGE (4-14)**

250

251 (A) If Seller notifies Buyer that it wishes to enter into a tax deferred exchange for the Property pursuant to the Internal Revenue Code,
252 Buyer agrees to cooperate with Seller in connection with such exchange, including the execution of such documents as may be
253 reasonably necessary to conduct the exchange, provided that there shall be no delay in the agreed-to settlement date, and that any

254 **Buyer Initials:** _____        **ASC Page 5 of 9**        **Seller Initials:** _____

255 additional costs associated with the exchange are paid solely by Seller. Buyer is aware that Seller anticipates assigning Seller's
256 interest in this Agreement to a third party under an Exchange Agreement and consents to such assignment. Buyer shall not be
257 required to execute any note, contract, deed or other document providing any liability which would survive the exchange, nor shall
258 Buyer be obligated to take title to any property other than the Property described in this Agreement. Seller shall indemnify and
259 hold harmless Buyer against any liability which arises or is claimed to have arisen from any aspect of the exchange transaction
260 (B) If Buyer notifies Seller that it wishes to enter into a tax deferred exchange for the Property pursuant to the Internal Revenue Code,
261 Seller agrees to cooperate with Buyer in connection with such exchange, including the execution of such documents as may be
262 reasonably necessary to conduct the exchange, provided that there shall be no delay in the agreed-to settlement date, and that any
263 additional costs associated with the exchange are paid solely by Buyer. Seller is aware that Buyer has assigned Buyer's interest
264 in this Agreement to a third party under an Exchange Agreement and consents to such assignment. Seller shall not be required
265 to execute any note, contract, deed or other document providing any liability which would survive the exchange. Buyer shall
266 indemnify and hold harmless Seller against any liability which arises or is claimed to have arisen from any aspect of the exchange
267 transaction.

268 **14. COMMERCIAL CONDOMINIUM (10-01)**
269 [X] NOT APPLICABLE.
270 [ ] APPLICABLE. Buyer acknowledges that the condominium unit to be transferred by this Agreement is intended for nonresidential
271 use, and that Buyer may agree to modify or waive the applicability of certain provisions of the Uniform Condominium Act of
272 Pennsylvania (68 Pa.C.S. §3101 *et seq.*).

273 **15. TITLES, SURVEYS AND COSTS (6-20)**
274 (A) The Property will be conveyed with good and marketable title that is insurable by a reputable title insurance company at the reg-
275 ular rates, free and clear of all liens, encumbrances, and easements, **excepting however** the following: existing deed restrictions;
276 historic preservation restrictions or ordinances; building restrictions; ordinances; easements of roads; easements visible upon the
277 ground; easements of record; and privileges or rights of public service companies, if any.
278 (B) Buyer will pay for the following: (1) Title search, title insurance and/or mechanics' lien insurance, or any fee for cancellation;
279 (2) Flood insurance, fire insurance, hazard insurance, mine subsidence insurance, or any fee for cancellation; (3) Appraisal fees
280 and charges paid in advance to mortgage lender; (4) Buyer's customary settlement costs and accruals.
281 (C) Any survey or surveys required by the title insurance company or the abstracting company for preparing an adequate legal descrip-
282 tion of the Property (or the correction thereof) will be obtained and paid for by Seller. Any survey or surveys desired by Buyer or
283 required by the mortgage lender will be obtained and paid for by Buyer.
284 (D) If a change in Seller's financial status affects Seller's ability to convey title to the Property as set forth in this Agreement on or
285 before the Settlement Date, or any extension thereof, Seller shall, within _____ days (5 if not specified) notify Buyer, in writing.
286 A change in financial status includes, but is not limited to, Seller filing bankruptcy; filing of a foreclosure law suit against the
287 Property; entry of a monetary judgment against Seller; notice of public tax sale affecting the Property; and Seller learning that
288 the sale price of the Property is no longer sufficient to satisfy all liens and encumbrances against the Property. In the event of the
289 death of Seller, the representative of the estate, or a surviving Seller shall immediately notify Buyer
290 (E) If Seller is unable to give good and marketable title that is insurable by a reputable title insurance company at the regular rates, as
291 specified in Paragraph 15(A), Buyer may terminate this Agreement by written notice to Seller, or take such title as Seller can convey.
292 If the title condition precludes Seller from conveying title, Buyer's sole remedy shall be to terminate this Agreement. Upon termina-
293 tion, all deposit monies shall be returned to Buyer according to the terms of Paragraph 24 of this Agreement and Seller will reimburse
294 Buyer for any costs incurred by Buyer for any inspections or certifications obtained according to the terms of this Agreement, and
295 for those items specified in Paragraph 15(B) items (1), (2), (3) and in Paragraph 15(C).
296 (F) Oil, gas, mineral, or other rights of this Property may have been previously conveyed or leased, and Sellers make no representa-
297 tion about the status of those rights unless indicated elsewhere in this Agreement.
298 [ ] Oil, Gas and Mineral Rights Addendum (PAR Form OGM) is attached and made part of this Agreement.
299 (G) **COAL NOTICE (Where Applicable)**
300 THIS DOCUMENT MAY NOT SELL, CONVEY, TRANSFER, INCLUDE OR INSURE THE TITLE TO THE COAL AND RIGHTS OF SUPPORT UNDER-
301 NEATH THE SURFACE LAND DESCRIBED OR REFERRED TO HEREIN, AND THE OWNER OR OWNERS OF SUCH COAL MAY HAVE THE COM-
302 PLETE LEGAL RIGHT TO REMOVE ALL SUCH COAL AND IN THAT CONNECTION, DAMAGE MAY RESULT TO THE SURFACE OF THE LAND AND
303 ANY HOUSE, BUILDING OR OTHER STRUCTURE ON OR IN SUCH LAND. (This notice is set forth in the manner provided in Section 1 of
304 the Act of July 17, 1957, P.L. 984.) "Buyer acknowledges that he may not be obtaining the right of protection against subsidence
305 resulting from coal mining operations, and that the property described herein may be protected from damage due to mine subsid-
306 ence by a private contract with the owners of the economic interests in the coal. This acknowledgement is made for the purpose
307 of complying with the provisions of Section 14 of the Bituminous Mine Subsidence and the Land Conservation Act of April 27,
308 1966." Buyer agrees to sign the deed from Seller which deed will contain the aforesaid provision.
309 (H) The Property is not a "recreational cabin" as defined in the Pennsylvania Construction Code Act unless otherwise stated here: _____
310
311 (I) 1. This property is not subject to a Private Transfer Fee Obligation unless otherwise stated here: _____
312
313 [ ] Private Transfer Fee Addendum (PAR Form PTF) is attached and made part of this Agreement.
314 2. **Notice Regarding Private Transfer Fees:** In Pennsylvania, Private Transfer Fees are defined and regulated in the Private
315 Transfer Fee Obligation Act (Act 1 of 2011; 68 Pa.C.S. §§ 8101, et. seq.), which defines a Private Transfer Fee as "a fee that
316 is payable upon the transfer of an interest in real property, or payable for the right to make or accept the transfer, if the obli-
317 gation to pay the fee or charge runs with title to the property or otherwise binds subsequent owners of property, regardless of
318 whether the fee or charge is a fixed amount or is determined as a percentage of the value of the property, the purchase price or
319 other consideration given for the transfer." A Private Transfer Fee must be properly recorded to be binding, and sellers must

320 **Buyer Initials:** _____ 　　　　**ASC Page 6 of 9**　　　　**Seller Initials:** _____

321 disclose the existence of the fees to prospective buyers. Where a Private Transfer Fee is not properly recorded or disclosed,
322 the Act gives certain rights and protections to buyers.

**16. MAINTENANCE AND RISK OF LOSS (10-06)**
324 (A) Seller will maintain the Property, grounds, fixtures and personal property specifically listed in this Agreement in its present con-
325 dition, normal wear and tear excepted.
326 (B) Seller will promptly notify the Buyer if, at any time prior to the time of settlement, all or any portion of the Property is destroyed,
327 or damaged as a result of any cause whatsoever.
328 (C) Seller bears the risk of loss from fire or other casualties until settlement. If any property included in this sale is destroyed and not
329 replaced, Buyer will:
330 1. Accept the Property in its then current condition together with the proceeds of any insurance recovery obtainable by Seller, OR
331 2. Terminate this Agreement by written notice to Seller, with all deposit monies returned to Buyer according to the terms of
332 Paragraph 24 of this Agreement.

**17. RECORDING (9-05)**
334 This Agreement will not be recorded in the Office of the Recorder of Deeds or in any other office or place of public record. If Buyer
335 causes or permits this Agreement to be recorded, Seller may elect to treat such act as a default of this Agreement.

**18. ASSIGNMENT (1-10)**
337 This Agreement is binding upon the parties, their heirs, personal representatives, guardians and successors, and to the extent assign-
338 able, on the assigns of the parties hereto. Buyer will not transfer or assign this Agreement without the written consent of Seller unless
339 otherwise stated in this Agreement. Assignment of this Agreement may result in additional transfer taxes.

**19. GOVERNING LAW, VENUE AND PERSONAL JURISDICTION (9-05)**
341 (A) The validity and construction of this Agreement, and the rights and duties of the parties, will be governed in accordance with the
342 laws of the Commonwealth of Pennsylvania.
343 (B) The parties agree that any dispute, controversy or claim arising under or in connection with this Agreement or its performance by either
344 party submitted to a court shall be filed exclusively by and in the state or federal courts sitting in the Commonwealth of Pennsylvania.
345 Seller understands that any documentation provided under this provision may be disclosed to the Internal Revenue Service by
346 Buyer, and that any false statements contained therein could result in punishment by fine, imprisonment, or both.

**20. NOTICE REGARDING CONVICTED SEX OFFENDERS (MEGAN'S LAW) (6-13)**
348 The Pennsylvania General Assembly has passed legislation (often referred to as "Megan's Law," 42 Pa.C.S. § 9791 et seq.) providing
349 for community notification of the presence of certain convicted sex offenders. **Buyers are encouraged to contact the municipal**
350 **police department or the Pennsylvania State Police** for information relating to the presence of sex offenders near a particular prop-
351 erty, or to check the information on the Pennsylvania State Police Web site at www.pamegaslaw.state.pa.us.

**21. CERTIFICATION OF NON-FOREIGN INTEREST (10-01)**
353 ☐ Seller **IS** a foreign person, foreign corporation, foreign partnership, foreign trust, or foreign estate subject to Section 1445 of the
354 Internal Revenue Code, which provides that a transferee (Buyer) of a U.S. real property interest must withhold tax if the transferor
355 (Seller) is a foreign person.
356 ☒ Seller is **NOT** a foreign person, foreign corporation, foreign partnership, foreign trust, or a foreign estate as defined by the Internal
357 Revenue Code, or is otherwise not subject to the tax withholding requirements of Section 1445 of the Internal Revenue Code. To
358 inform Buyer that the withholding of tax is not required upon the sale/disposition of the Property by Seller, Seller hereby agrees
359 to furnish Buyer, at or before closing, with the following:
360 ☐ An affidavit stating, under penalty of perjury, the Seller's U.S. taxpayer identification number and that the Seller is not a for-
361 eign person.
362 ☐ A "qualifying statement," as defined by statute, that tax withholding is not required by Buyer.
363 ☐ Other:

**22. REPRESENTATIONS (1-10)**
365 (A) All representations, claims, advertising, promotional activities, brochures or plans of any kind made by Seller, Brokers, their licens-
366 ees, employees, officers or partners are not a part of this Agreement unless expressly incorporated or stated in this Agreement.
367 This Agreement contains the whole agreement between Seller and Buyer, and there are no other terms, obligations, covenants,
368 representations, statements or conditions, oral or otherwise, of any kind whatsoever concerning this sale. This Agreement will not
369 be altered, amended, changed or modified except in writing executed by the parties.
370 (B) Broker(s) have provided or may provide services to assist unrepresented parties in complying with this Agreement.

**23. BROKER INDEMNIFICATION (6-13)**
372 (A) Buyer and Seller represent that the only Brokers involved in this transaction are: _____
373 _____
374 and that the transaction has not been brought about through the efforts of anyone other than said Brokers. It is agreed that if any
375 claims for brokerage commissions or fees are ever made against Buyer or Seller in connection with this transaction, each party
376 shall pay its own legal fees and costs in connection with such claims. It is further agreed that Buyer and Seller agree to indemnify
377 and hold harmless each other and the above-listed Brokers from and against the non-performance of this Agreement by either
378 party, and from any claim of loss or claim for brokerage commissions, including all legal fees and costs, that may be made by any
379 person or entity. This paragraph shall survive settlement.
380 (B) Seller and Buyer acknowledge that any Broker identified in this Agreement: (1) Is a licensed real estate broker; (2) Is not an
381 expert in construction, engineering, code or regulatory compliance or environmental matters and was not engaged to provide
382 advice or guidance in such matters, unless otherwise stated in writing; and (3) Has not made and will not make any representa-
383 tions or warranties nor conduct investigations of the environmental condition or suitability of the Property or any adjacent prop-
384 erty, including but not limited to those conditions listed in Paragraph 9(C).

385 **Buyer Initials:** _____      **ASC Page 7 of 9**      **Seller Initials:** _____

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com          1122 s 9th st

386 **24. DEFAULT, TERMINATION AND RETURN OF DEPOSITS (1-18)**
387     (A) Where Buyer terminates this Agreement pursuant to any right granted by this Agreement, Buyer will be entitled to a return of all
388         deposit monies paid on account of Purchase Price pursuant to the terms of Paragraph 24(B), and this Agreement will be VOID.
389         Termination of this Agreement may occur for other reasons giving rise to claims by Buyer and/or Seller for the deposit monies.
390     (B) Regardless of the apparent entitlement to deposit monies, Pennsylvania law does not allow a Broker holding deposit monies to
391         determine who is entitled to the deposit monies when settlement does not occur. Broker can only release the deposit monies:
392         1. If this Agreement is terminated prior to settlement and there is no dispute over entitlement to the deposit monies. A written
393            agreement signed by both parties is evidence that there is no dispute regarding deposit monies.
394         2. If, after Broker has received deposit monies, Broker receives a written agreement that is signed by Buyer and Seller, directing
395            Broker how to distribute some or all of the deposit monies.
396         3. According to the terms of a final order of court.
397         4. According to the terms of a prior written agreement between Buyer and Seller that directs the Broker how to distribute the
398            deposit monies if there is a dispute between the parties that is not resolved. (See Paragraph 24 (C))
399     (C) Buyer and Seller agree that if there is a dispute over the entitlement to deposit monies that is unresolved _____ days (180 if not
400         specified) days after the Settlement Date stated in Paragraph 3(A) (or any written extensions thereof) or following date of termina-
401         tion of the Agreement, whichever is earlier, then the Broker holding the deposit monies will, within 30 days of receipt of Buyer's
402         written request, distribute the deposit monies to Buyer unless the Broker is in receipt of verifiable written notice that the dispute is
403         the subject of litigation or mediation. If Broker has received verifiable written notice of litigation or mediation prior to the receipt
404         of Buyer's request for distribution, Broker will continue to hold the deposit monies until receipt of a written distribution agreement
405         between Buyer and Seller or a final court order. Buyer and Seller are advised to initiate litigation or mediation for any portion of
406         the deposit monies prior to any distribution made by Broker pursuant to this paragraph. Buyer and Seller agree that the distribution
407         of deposit monies based upon the passage of time does not legally determine entitlement to deposit monies, and that the parties
408         maintain their legal rights to pursue litigation even after a distribution is made.
409     (D) Buyer and Seller agree that Broker who holds or distributes deposit monies pursuant to the terms of Paragraph 24 or Pennsylvania
410         law will not be liable. Buyer and Seller agree that if any Broker or affiliated licensee is named in litigation regarding deposit
411         monies, the attorneys' fees and costs of the Broker(s) and licensee(s) will be paid by the party naming them in litigation.
412     (E) Seller has the option of retaining all sums paid by Buyer, including the deposit monies, should Buyer:
413         1. Fail to make any additional payments as specified in Paragraph 2, OR
414         2. Furnish false or incomplete information to Seller, Broker(s), or any other party identified in this Agreement concerning
415            Buyer's legal or financial status, OR
416         3. Violate or fail to fulfill and perform any other terms or conditions of this Agreement.
417     (F) **Unless otherwise checked in Paragraph 24(G),** Seller may elect to retain those sums paid by Buyer, including deposit monies:
418         1. On account of purchase price, OR
419         2. As monies to be applied to Seller's damages, OR
420         3. As liquidated damages for such default.
421     (G) ☒ **SELLER IS LIMITED TO RETAINING SUMS PAID BY BUYER, INCLUDING DEPOSIT MONIES, AS LIQUI-**
422         **DATED DAMAGES.**
423     (H) If Seller retains all sums paid by Buyer, including deposit monies, as liquidated damages pursuant to Paragraph 24 (F) or (G), Buyer
424         and Seller are released from further liability or obligation and this Agreement is VOID.
425     (I) Brokers and licensees are not responsible for unpaid deposits.
426 **25. ARBITRATION OF DISPUTES (1-00)**
427     Buyer and Seller agree to arbitrate any dispute between them that cannot be amicably resolved. After written demand for arbitration by
428     either Buyer or Seller, each party will select a competent and disinterested arbitrator. The two so selected will select a third. If selection
429     of the third arbitrator cannot be agreed upon within 30 days, either party may request that selection be made by a judge of a court of
430     record in the county in which arbitration is pending. Each party will pay its chosen arbitrator, and bear equally expenses for the third
431     and all other expenses of arbitration. Arbitration will be conducted in accordance with the provisions of Pennsylvania Common Law
432     Arbitration 42 Pa. C.S.A. §7341 *et seq.* This agreement to arbitrate disputes arising from this Agreement will survive settlement.
433 **26. RELEASE (9-05)**
434     **Buyer releases, quit claims and forever discharges SELLER, ALL BROKERS, their LICENSEES, EMPLOYEES and any**
435     **OFFICER or PARTNER of any one of them and any other PERSON, FIRM or CORPORATION who may be liable by or**
436     **through them, from any and all claims, losses or demands,** including, but not limited to, personal injury and property damage and all
437     of the consequences thereof, whether known or not, which may arise from the presence of termites or other wood-boring insects, radon,
438     lead-based paint hazards, mold, fungi or indoor air quality, environmental hazards, any defects in the individual on-lot sewage disposal
439     system or deficiencies in the on-site water service system, or any defects or conditions on the Property. Should Seller be in default under
440     the terms of this Agreement or in violation of any Seller disclosure law or regulation, this release does not deprive Buyer of any right to
441     pursue any remedies that may be available under law or equity. This release will survive settlement.
442 **27. REAL ESTATE RECOVERY FUND (1-18)**
443     A Real Estate Recovery Fund exists to reimburse any persons who have obtained a final civil judgment against a Pennsylvania real
444     estate licensee (or a licensee's affiliates) owing to fraud, misrepresentation, or deceit in a real estate transaction and who have been
445     unable to collect the judgment after exhausting all legal and equitable remedies. For complete details about the Fund, call (717) 783-
446     3658.
447 **28. COMMUNICATIONS WITH BUYER AND/OR SELLER (6-13)**
448     Wherever this Agreement contains a provision that requires or allows communication/delivery to a Buyer, that provision shall be
449     satisfied by communication/delivery to the Broker for Buyer, if any, except where required by law. If there is no Broker for Buyer,
450     those provisions may be satisfied only by communication/delivery being made directly to the Buyer, unless otherwise agreed to by the

451 **Buyer Initials:** _____

        **Seller Initials:** _____

452 parties. Wherever this Agreement contains a provision that requires or allows communication/delivery to a Seller, that provision shall
453 be satisfied by communication/delivery to the Broker for Seller, if any. If there is no Broker for Seller, those provisions may be satisfied
454 only by communication/delivery being made directly to the Seller, unless otherwise agreed to by the parties.

455 **29. NOTICE BEFORE SIGNING (4-14)**
456 Unless otherwise stated in writing, Buyer and Seller acknowledge that Brokers are not experts in legal or tax matters and that Brokers
457 have not made, nor will they make, any representations or warranties nor conduct research of the legal or tax ramifications of this
458 Agreement. Buyer and Seller acknowledge that Brokers have advised them to consult and retain experts concerning the legal and tax
459 effects of this Agreement and the completion of the sale, as well as the condition and/or legality of the Property, including, but not
460 limited to, the Property's improvements, equipment, soil, tenancies, title and environmental aspects. Buyer and Seller acknowledge
461 receipt of a copy of this Agreement at the time of signing. **This Agreement may be executed in one or more counterparts**, each of
462 which shall be deemed to be an original and which counterparts together shall constitute one and the same Agreement of the Parties.
463 **WHEN SIGNED, THIS AGREEMENT IS A BINDING CONTRACT.** Return of this Agreement, and any addenda and amend-
464 ments ,including **return by electronic transmission**, bearing the signatures of all parties, constitutes acceptance by the parties.

465 **30. SPECIAL CLAUSES (4-14)**
466 (A) **The following are part of this Agreement if checked:**
467 ☐ Appraisal Contingency Addendum to Agreement of Sale (PAR Form ACA)
468 ☐ Short Sale Addendum to Agreement of Sale (PAR Form SHS)
469 ☐ Zoning Approval Contingency Addendum to Agreement of Sale (PAR Form ZA)
470 ☒ **CURRENT OWNER  AND BUYER BOTH AGREE  TENANT TO LEASE BACK THE PROPERTY WITH A 5 YEARS**
471 ☒ **TRIPLE NET LEASE AND 5 YEARS OPTION , RENT WILL BE $1350 MONTHLY WITH 3% ANNUAL  INCREASE**
472 ☐ **PROPERTY SOLD AS IS CONDITION**
473 (B) Additional Terms: **SELLER PROVIDE CLEAN AND MARKETABLE TITLE;**
474
475 _____ Buyer has received the Consumer Notice, where applicable, as adopted by the State Real Estate Commission at 49 Pa.
476 Code §35.336.

477 _____ Buyer has received a statement of Buyer's estimated closing costs before signing this Agreement.

478 _____ Buyer has received the Deposit Money Notice (for cooperative sales when Broker for Seller is holding deposit money)
479 before signing this Agreement.

480 **BUYER** _____ **DATE** _____
        **GE CAPITAL OR ITS ASSIGNEE**
481 Mailing Address _____
482 Phone(s) _____ Fax _____ Email _____
483 **BUYER** _____ **DATE** _____

484 Mailing Address _____
485 Phone(s) _____ Fax _____ Email _____
486 **BUYER** _____ **DATE** _____

487 Mailing Address _____
488 Phone(s) _____ Fax _____ Email _____
489 **AUTHORIZED REPRESENTATIVE** _____
490 Title _____
491 **COMPANY** _____

492 Seller has received the Consumer Notice, where applicable, as adopted by the State Real Estate Commission at 49 Pa. Code § 35.336.
493 Seller has received a statement of Seller's estimated closing costs before signing this Agreement.

494 **VOLUNTARY TRANSFER OF CORPORATE ASSETS (if applicable):** The undersigned acknowledges that he/she is authorized
495 by the Board of Directors to sign this Agreement on behalf of the Seller corporation and that this sale does not constitute a sale, lease, or
496 exchange of all or substantially all the property and assets of the corporation, such as would require the authorization or consent of the
497 shareholders pursuant to 15 P.S. §1311.

498 **SELLER** _____ **DATE** _____
        **OWNER OF RECORD**
499 Mailing Address _____
500 Phone(s) _____ Fax _____ Email _____
501 **SELLER** _____ **DATE** _____

502 Mailing Address _____
503 Phone(s) _____ Fax _____ Email _____
504 **SELLER** _____ **DATE** _____

505 Mailing Address _____
506 Phone(s) _____ Fax _____ Email _____
507 **AUTHORIZED REPRESENTATIVE** _____
508 Title _____
509 **COMPANY** _____

ASC Page 9 of 9
Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com                    1122 s 9th st

97

 **Gmail**

**david scholl <judgescholl@gmail.com>**

## Re: 1122 s 9th st contract
2 messages

kj philly <kaizizhao2007@hotmail.com>                    Mon, Feb 7, 2022 at 11:03 AM
To: david scholl <judgescholl@gmail.com>

david
pls go over this agreement and name is added


**Jack Zhao**

Tel: (267) 815-6816

Fax: (267) 639-5423

1118 S 12TH ST 1F

PHILADELPHIA PA 19147

---

**From:** david scholl <judgescholl@gmail.com>
**Sent:** Sunday, February 6, 2022 11:54 AM
**To:** kj philly <kaizizhao2007@hotmail.com>; Gabrielbravo007@gmail.com <Gabrielbravo007@gmail.com>;
Autherine Scholl <asmithscholl@gmail.com>
**Subject:** Re: 1122 s 9th st contract

Jack--The following correction need to be made to the draft contract for the sale of 1122 s. 9th St., Philadelphia, sent to
me by you on February 4, 2022:  The sellers are Gabriel and Guadalupe Bravo and the date for the contract to be signed
should be later than February 7, 2022.  Otherwise, it appears OK.  I am sending a copy of your and this emails to Mr.
Bravo at the email address above.  I also am sending a copy to my law partner and wife, Autherine Smith Scholl.  David
A. Scholl, 610-550-1765

On Fri, Feb 4, 2022 at 5:30 PM kj philly <kaizizhao2007@hotmail.com> wrote:

Get Outlook for iOS

📄 **agrmt_for_the_sale_of_comm_real_estate__620_ts18227.pdf**
246K

---

kj philly <kaizizhao2007@hotmail.com>                    Mon, Feb 7, 2022 at 11:06 AM
To: david scholl <judgescholl@gmail.com>

David
pls disregard the previous email and the this one also changed the date
[Quoted text hidden]

📄 **agrmt_for_the_sale_of_comm_real_estate__620_ts89888.pdf**
246K

# D-29

# CHAPTER 13 PLAN IN CASE#21-12926-MDC

L.B.F. 3015.1

## UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF PENNSYLVANIA

In re: Gabriel Bravo

Debtor(s)

Chapter 13

Case No. _21-12926_

## Chapter 13 Plan

☐ Original
☐ _____ Amended

Date: _11-5-21_

### THE DEBTOR HAS FILED FOR RELIEF UNDER
### CHAPTER 13 OF THE BANKRUPTCY CODE

### YOUR RIGHTS WILL BE AFFECTED

You should have received from the court a separate Notice of the Hearing on Confirmation of Plan, which contains the date of the confirmation hearing on the Plan proposed by the Debtor. This document is the actual Plan proposed by the Debtor to adjust debts. You should read these papers carefully and discuss them with your attorney. **ANYONE WHO WISHES TO OPPOSE ANY PROVISION OF THIS PLAN MUST FILE A WRITTEN OBJECTION** in accordance with Bankruptcy Rule 3015 and Local Rule 3015-4. **This Plan may be confirmed and become binding, unless a written objection is filed.**

### IN ORDER TO RECEIVE A DISTRIBUTION UNDER THE PLAN, YOU MUST FILE A PROOF OF CLAIM BY THE DEADLINE STATED IN THE NOTICE OF MEETING OF CREDITORS.

**Part 1: Bankruptcy Rule 3015.1(c) Disclosures**

☐ Plan contains non-standard or additional provisions – see Part 9
☐ Plan limits the amount of secured claim(s) based on value of collateral – see Part 4
☐ Plan avoids a security interest or lien – see Part 4 and/or Part 9

**Part 2: Plan Payment, Length and Distribution** – *PARTS 2(c) & 2(e) MUST BE COMPLETED IN EVERY CASE*

**§ 2(a) Plan payments (For Initial and Amended Plans):**

**Total Length of Plan: 36 months.**

**Total Base Amount** to be paid to the Chapter 13 Trustee ("Trustee") $ _3600_
Debtor shall pay the Trustee $ _100_ per month for _36_ months and then
Debtor shall pay the Trustee $_____ per month for the remaining_____months;
**or**
Debtor shall have already paid the Trustee $_____ through month number ____ and
then shall pay the Trustee $_____ per month for the remaining_____ months.

☐ Other changes in the scheduled plan payment are set forth in § 2(d)

1

100

**§ 2(b) Debtor shall make plan payments to the Trustee from the following sources in addition to future wages (Describe source, amount and date when funds are available, if known):**

**§ 2(c) Alternative treatment of secured claims:**

☐ **None.** If "None" is checked, the rest of § 2(c) need not be completed.

☐ **Sale of real property**
*See § 7(c) below for detailed description*

☐ **Loan modification with respect to mortgage encumbering property:**
*See § 4(f) below for detailed description*

**§ 2(d) Other information that may be important relating to the payment and length of Plan:**

**§ 2(e) Estimated Distribution:**

| | | |
|---|---|---|
| A. | Total Priority Claims (Part 3) | |
| 1. | Unpaid attorney's fees | $3000 |
| 2. | Unpaid attorney's costs | $ |
| 3. | Other priority claims (e.g., priority taxes) | $ |
| B. | Total distribution to cure defaults (§ 4(b)) | $ |
| C. | Total distribution on secured claims (§§ 4(c) &(d)) | $ 110,000 |
| D. | Total distribution on general unsecured claims(Part 5) | $ |
| | Subtotal | $ |
| E. | Estimated Trustee's Commission | $300 |
| F. | Base Amount | $ 3300 |

**§2 (f) Allowance of Compensation Pursuant to L.B.R. 2016-3(a)(2)**

☐ **By checking this box, Debtor's counsel certifies that the information contained in Counsel's Disclosure of Compensation [Form B2030] is accurate, qualifies counsel to receive compensation pursuant to L.B.R. 2016-3(a)(2), and requests this Court approve counsel's compensation in the total amount of $ 4000 , with the Trustee distributing to counsel the amount stated in §2(e)A.1. of the Plan. Confirmation of the plan shall constitute allowance of the requested compensation.**

2

## Part 3: Priority Claims

**§ 3(a) Except as provided in § 3(b) below, all allowed priority claims will be paid in full unless the creditor agrees otherwise.**

| Creditor | Claim Number | Type of Priority | Amount to be Paid by Trustee |
|---|---|---|---|
| David A. Scholl, Esq. | | Administrative | $3000 |

**§ 3(b) Domestic Support obligations assigned or owed to a governmental unit and paid less than full amount.**

**X None.** If "None" is checked, the rest of § 3(b) need not be completed.

☐ The allowed priority claims listed below are based on a domestic support obligation that has been assigned to or is owed to a governmental unit and will be paid less than the full amount of the claim. *This plan provision requires that payments in § 2(a) be for a term of 60 months; see 11 U.S.C. § 1322(a)(4).*

| Name of Creditor | Claim Number | Amount to be Paid by Trustee |
|---|---|---|
| | | |
| | | |

3

102

**Part 4: Secured Claims**

### § 4(a) Secured Claims Receiving No Distribution from the Trustee:

☐  X **None.** If "None" is checked, the rest of § 4(a) need not be completed.

| Creditor | Claim Number | Secured Property |
|---|---|---|
| ☐ If checked, the creditor(s) listed below will receive no distribution from the trustee and the parties' rights will be governed by agreement of the parties and applicable nonbankruptcy law. | | |
| ☐ If checked, the creditor(s) listed below will receive no distribution from the trustee and the parties' rights will be governed by agreement of the parties and applicable nonbankruptcy law. | | |

### § 4(b) Curing default and maintaining payments

☐  X **None.** If "None" is checked, the rest of § 4(b) need not be completed.

The Trustee shall distribute an amount sufficient to pay allowed claims for prepetition arrearages; and, Debtor shall pay directly to creditor monthly obligations falling due after the bankruptcy filing in accordance with the parties' contract.

| Creditor | Claim Number | Description of Secured Property and Address, if real property | Amount to be Paid by Trustee |
|---|---|---|---|
| | | | |

**§ 4(c) Allowed secured claims to be paid in full: based on proof of claim or pre-confirmation determination of the amount, extent or validity of the claim**

☐  **X None.** If "None" is checked, the rest of § 4(c) need not be completed.

(1)  Allowed secured claims listed below shall be paid in full and their liens retained until completion of payments under the plan.

(2)  If necessary, a motion, objection and/or adversary proceeding, as appropriate, will be filed to determine the amount, extent or validity of the allowed secured claim and the court will make its determination prior to the confirmation hearing.

(3)  Any amounts determined to be allowed unsecured claims will be treated either: (A) as a general unsecured claim under Part 5 of the Plan or (B) as a priority claim under Part 3, as determined by the court.

(4)  In addition to payment of the allowed secured claim, "present value" interest pursuant to 11 U.S.C. § 1325(a)(5)(B)(ii) will be paid at the rate and in the amount listed below. *If the claimant included a different interest rate or amount for "present value" interest in its proof of claim or otherwise disputes the amount provided for "present value" interest, the claimant must file an objection to confirmation.*

(5)  Upon completion of the Plan, payments made under this section satisfy the allowed secured claim and release the corresponding lien.

| Name of Creditor | Claim Number | Description of Secured Property | Allowed Secured Claim | Present Value Interest Rate | Dollar Amount of Present Value Interest | Amount to be Paid by Trustee |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |

**§ 4(d) Allowed secured claims to be paid in full that are excluded from 11 U.S.C. § 506**

☐  **X None.** If "None" is checked, the rest of § 4(d) need not be completed.

The claims below were either (1) incurred within 910 days before the petition date and secured by a purchase money security interest in a motor vehicle acquired for the personal use of the debtor(s), or (2) incurred within 1 year of the petition date and secured by a purchase money security interest in any other thing of value.

(1)  The allowed secured claims listed below shall be paid in full and their liens retained until completion of payments under the plan.

(2)  In addition to payment of the allowed secured claim, "present value" interest pursuant to 11 U.S.C. § 1325(a)(5)(B)(ii) will be paid at the rate and in the amount listed below. If the claimant included a different interest rate or amount for "present value" interest in its proof of claim, the court will determine the present value interest rate and amount at the confirmation hearing.

| Name of Creditor | Claim Number | Description of Secured Property | Allowed Secured Claim | Present Value Interest Rate | Dollar Amount of Present Value Interest | Amount to be Paid by Trustee |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |

5

104

### § 4(e) Surrender
☐ **XNone.** If "None" is checked, the rest of § 4(e) need not be completed.

(1) Debtor elects to surrender the secured property listed below that secures the creditor's claim.
(2) The automatic stay under 11 U.S.C. § 362(a) and 1301(a) with respect to the secured property terminates upon confirmation of the Plan.
(3) The Trustee shall make no payments to the creditors listed below on their secured claims.

| Creditor | Claim Number | Secured Property |
|---|---|---|
|  |  |  |

### § 4(f) Loan Modification
☐ **XNone.** If "None" is checked, the rest of § 4(f) need not be completed.

(1) Debtor shall pursue a loan modification directly with_____or its successor in interest or its current servicer ("Mortgage Lender"), in an effort to bring the loan current and resolve the secured arrearage claim.

(2) During the modification application process, Debtor shall make adequate protection payments directly to Mortgage Lender in the amount of $        per month, which represents_____*(describe basis of adequate protection payment)*. Debtor shall remit the adequate protection payments directly to the Mortgage Lender.

(3) If the modification is not approved by_____(date), Debtor shall either (A) file an amended Plan to otherwise provide for the allowed claim of the Mortgage Lender; or (B) Mortgage Lender may seek relief from the automatic stay with regard to the collateral and Debtor will not oppose it.

## Part 5: General Unsecured Claims

### § 5(a) Separately classified allowed unsecured non-priority claims
☐ **xNone.** If "None" is checked, the rest of § 5(a) need not be completed.

| Creditor | Claim Number | Basis for Separate Classification | Treatment | Amount to be Paid by Trustee |
|---|---|---|---|---|
|  |  |  |  |  |

### § 5(b) Timely filed unsecured non-priority claims
*(1) Liquidation Test (check one box)*
☐ xII Debtor(s) property is claimed as exempt.
☐ Debtor(s) has non-exempt property valued at $_____for purposes of § 1325(a)(4) and plan provides for distribution of  $                to allowed priority and unsecured general creditors.

*(2) Funding:* § 5(b) claims to be paid as follows *(check one box)*:
☐ xPro
☐ rata
☐ 100%
    Other (Describe)

6

## Part 6: Executory Contracts & Unexpired Leases

☐ **XNone.** If "None" is checked, the rest of § 6 need not be completed.

| Creditor | Claim Number | Nature of Contract or Lease | Treatment by Debtor Pursuant to §365(b) |
|---|---|---|---|
| | | | |
| | | | |

## Part 7: Other Provisions

### § 7(a) General principles applicable to the Plan

*(1)* Vesting of Property of the Estate *(check one box)*
- ☐ xUponconfirmatio
- ☐ Upon discharge

(2) Subject to Bankruptcy Rule 3012 and 11 U.S.C. §1322(a)(4), the amount of a creditor's claim listed in its proof of claim over any contrary amounts listed in Parts 3, 4 or 5 of the Plan.

(3) Post-petition contractual payments under § 1322(b)(5) and adequate protection payments under § 1326(a)(1)(B),(C) shall be disbursed to the creditors by the debtor directly. All other disbursements to creditors shall be made by the Trustee.

(4) ·If Debtor is successful in obtaining a recovery in a personal injury or other litigation in which Debtor is the plaintiff, before the completion of plan payments, any such recovery in excess of any applicable exemption will be paid to the Trustee as a special Plan payment to the extent necessary to pay priority and general unsecured creditors, or as agreed by the Debtor and the Trustee and approved by the court.

### § 7(b) Affirmative duties on holders of claims secured by a security interest in debtor's principal residence

(1) Apply the payments received from the Trustee on the pre-petition arrearage, if any, only to such arrearage.

(2) Apply the post-petition monthly mortgage payments made by the Debtor to the post-petition mortgage obligations as provided for by the terms of the underlying mortgage note.

(3) Treat the pre-petition arrearage as contractually current upon confirmation for the Plan for the sole purpose of precluding the imposition of late payment charges or other default-related fees and services based on the pre-petition default or default(s). Late charges may be assessed on post-petition payments as provided by the terms of the mortgage and note.

(4) If a secured creditor with a security interest in the Debtor's property sent regular statements to the Debtor pre-petition, and the Debtor provides for payments of that claim directly to the creditor in the Plan, the holder of the claims shall resume sending customary monthly statements.

(5) If a secured creditor with a security interest in the Debtor's property provided the Debtor with coupon books for payments prior to the filing of the petition, upon request, the creditor shall forward post-petition coupon book(s) to the Debtor after this case has been filed.

(6) Debtor waives any violation of stay claim arising from the sending of statements and coupon books as set forth above.

106

**§ 7(c) Sale of Real Property**

☐ None. If "None" is checked, the rest of § 7(c) need not be completed.

(1) Closing for the sale of 1122 South 9th St., Philadelphia, PA 19147 (the "Real Property") shall be completed within 12 _____ months of the commencement of this bankruptcy case (the "Sale Deadline"). Unless otherwise agreed by the parties or provided by the Court, each allowed claim secured by the Real Property will be paid in full under §4(b)(1) of the Plan at the closing ("Closing Date").

(2) The Real Property will be marketed for sale in the following manner and on the following terms:

Sale for at least $200,000

(3) Confirmation of this Plan shall constitute an order authorizing the Debtor to pay at settlement all customary closing expenses and all liens and encumbrances, including all § 4(b) claims, as may be necessary to convey good and marketable title to the purchaser. However, nothing in this Plan shall preclude the Debtor from seeking court approval of the sale pursuant to 11 U.S.C. §363; either prior to or after confirmation of the Plan, if, in the Debtor's judgment, such approval is necessary or in order to convey insurable title or is otherwise reasonably necessary under the circumstances to implement this Plan.

(4) At the Closing, it is estimated that the amount of no less than $ 70,000 _____ shall be made payable to the Trustee.

(5) Debtor shall provide the Trustee with a copy of the closing settlement sheet within 24 hours of the Closing Date.

(6) In the event that a sale of the Real Property has not been consummated by the expiration of the Sale Deadline:___.

**The order of distribution of Plan payments will be as follows:**

**Level 1:** Trustee Commissions*
**Level 2:** Domestic Support Obligations
**Level 3:** Adequate Protection Payments
**Level 4:** Debtor's attorney's fees
**Level 5:** Priority claims, pro rata
**Level 6:** Secured claims, pro rata
**Level 7:** Specially classified unsecured claims
**Level 8:** General unsecured claims
**Level 9:** Untimely filed general unsecured non-priority claims to which debtor has not objected

*Percentage fees payable to the standing trustee will be paid at the rate fixed by the United States Trustee not to exceed ten (10) percent.*

107

## Part 9: Non Standard or Additional Plan Provisions

Under Bankruptcy Rule 3015.1(e), Plan provisions set forth below in Part 9 are effective only if the applicable box in Part 1 of this Plan is checked. Nonstandard or additional plan provisions placed elsewhere in the Plan are void.

☐

**XNone. If "None" is checked, the rest of Part 9 need not be completed.**

## Part 10: Signatures

By signing below, attorney for Debtor(s) or unrepresented Debtor(s) certifies that this Plan contains no nonstandard or additional provisions other than those in Part 9 of the Plan, and that the Debtor(s) are aware of, and consent to the terms of this Plan.

Date:  11-5-21_____          s/David A. Scholl_____
                                       Attorney for Debtor(s)

If Debtor(s) are unrepresented, they must sign below.

Date: _____          _____
                                Debtor

Date: _____          _____
                                Joint Debtor

108

# D-30

# CHAPTER 13 PLAN IN CASE#18-15931-MDC

**L.B.F. 3015.1**

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF PENNSYLVANIA

In re:    GABRIEL BRAVO

Case No.:    18-15931
Chapter:    13

Debtor(s)

### Chapter 13 Plan

ι  Original
X  Third Amended

Date:    6-24-20

### THE DEBTOR HAS FILED FOR RELIEF UNDER
### CHAPTER 13 OF THE BANKRUPTCY CODE

### YOUR RIGHTS WILL BE AFFECTED

You should have received from the court a separate Notice of the Hearing on Confirmation of Plan, which contains the date of the confirmation hearing on the Plan proposed by the Debtor. This document is the actual Plan proposed by the Debtor to adjust debts. You should read these papers carefully and discuss them with your attorney. **ANYONE WHO WISHES TO OPPOSE ANY PROVISION OF THIS PLAN MUST FILE A WRITTEN OBJECTION** in accordance with Bankruptcy Rule 3015 and Local Rule 3015-4. **This Plan may be confirmed and become binding, unless a written objection is filed.**

### IN ORDER TO RECEIVE A DISTRIBUTION UNDER THE PLAN, YOU
### MUST FILE A PROOF OF CLAIM BY THE DEADLINE STATED IN THE
### NOTICE OF MEETING OF CREDITORS.

Part 1:  Bankruptcy Rule 3015.1(c) Disclosures

x  Plan contains non-standard or additional provisions – see Part 9
∟  Plan limits the amount of secured claim(s) based on value of collateral – see Part 4
∟  Plan avoids a security interest or lien – see Part 4 and/or Part 9

Part 2:  Plan Payment, Length and Distribution – *PARTS 2(c) & 2(e) MUST BE COMPLETED IN EVERY CASE*

§ 2(a)(1)  Initial Plan:
    **Total Base Amount** to be paid to the Chapter 13 Trustee ("Trustee") $ 6000
    The Debtor shall pay the Trustee $ 100 per month for 60 months; and
    Debtor shall pay the Trustee $ _____ per month for _____ months.
⊏  Other changes in the scheduled plan payment are set forth in § 2(d)

§ 2(a)(2)  Amended Plan:
    **Total Base Amount** to be paid to the Chapter 13 Trustee ("Trustee") $6000
    The Plan payments by Debtor shall consists of the total amount previously paid ($1800) added to the new monthly Plan payments in the amount of $100 beginning June, 2020, and continuing for 42_ months.(But see paragraph 9)
☐  Other changes in the scheduled plan payment are set forth in § 2(d)

**§ 2(b)  Debtor shall make plan payments to the Trustee from the following sources in addition to future wages (Describe source, amount and date when funds are available, if known):**

**§ 2(c)  Alternative treatment of secured claims:**
☐ **None.** If "None" is checked, the rest of § 2(c) need not be completed.

☐ **Sale of real property**
*See § 7(c) below for detailed description*

☐ **Loan modification with respect to mortgage encumbering property:**
*See § 4(f) below for detailed description*

**§ 2(d)  Other information that may be important relating to the payment and length of Plan:**

**§ 2(e) Estimated Distribution:**
A.  Total Priority Claims (Part 3)

| | | |
|---|---|---|
| 1. | Unpaid attorney's fees | $ 5000 |
| 2. | Unpaid attorney's costs | $ |
| 3. | Other priority claims (e.g., priority taxes) | $ (see para. 9 spra0 |
| B. | Total distribution to cure defaults (§ 4(b)) | $ |
| C. | Total distribution on secured claims (§§ 4(c) &(d)) | $ |
| D. | Total distribution on unsecured claims (Part 5) | $ |
| | Subtotal | $ |
| E. | Estimated Trustee's Commission | $500 |
| F. | Base Amount | $6000 |

**Part 3:  Priority Claims (Including Administrative Expenses & Debtor's Counsel Fees)**

**§ 3(a) Except as provided in § 3(b) below, all allowed priority claims will be paid in full unless the creditor agrees otherwise:**

| Creditor | Type of Priority | Estimated Amount to be Paid |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

2

**§ 3(b)  Domestic Support obligations assigned or owed to a governmental unit and paid less than full amount.**

    **X** None. If "None" is checked, the rest of § 3(b) need not be completed.

    ☐ The allowed priority claims listed below are based on a domestic support obligation that has been assigned to or is owed to a governmental unit and will be paid less than the full amount of the claim. *This plan provision requires that payments in § 2(a) be for a term of 60 months; see 11 U.S.C. § 1322(a)(4).*

| Name of Creditor | Amount of claim to be paid |
|---|---|
|  |  |
|  |  |

---

**Part 4:  Secured Claims**

**§ 4(a) Secured claims not provided for by the Plan:**

    **X** None. If "None" is checked, the rest of § 4(a) need not be completed.

| Creditor City of Philadelphia | Secured Property 1168 S. 9th St., Phila. 19147 |
|---|---|
| **X** If checked, debtor will pay the creditor(s) listed above directly in accordance with the contract terms or otherwise by agreement. |  |
| ☐ If checked, debtor will pay the creditor(s) listed below directly in accordance with the contract terms or otherwise by agreement. |  |

**§ 4(b)  Curing default and maintaining payments**

    **x** None. If "None" is checked, the rest of § 4(b) need not be completed.

The Trustee shall distribute an amount sufficient to pay allowed claims for prepetition arrearages; and, Debtor shall pay directly to creditor monthly obligations falling due after the bankruptcy filing in accordance with the parties' contract.

| Creditor | Description of Secured Property and Address, If real property | Current Monthly Payment to be paid directly to creditor by Debtor | Estimated Arrearage | Interest Rate on Arrearage, if applicable (%) | Amount to be Paid to Creditor by the Trustee |
|---|---|---|---|---|---|
|  |  |  |  |  |  |

3

112

### § 4(c)  Allowed secured claims to be paid in full:  based on proof of claim or pre-confirmation determination of the amount, extent or validity of the claim
    ☐ **None.** If "None" is checked, the rest of § 4(c) need not be completed.

      (1) Allowed secured claims listed below shall be paid in full and their liens retained until completion of payments under the plan.

      (2) If necessary, a motion, objection and/or adversary proceeding, as appropriate, will be filed to determine the amount, extent or validity of the allowed secured claim and the court will make its determination prior to the confirmation hearing.

      (3) Any amounts determined to be allowed unsecured claims will be treated either: (A) as a general unsecured claim under Part 5 of the Plan or (B) as a priority claim under Part 3, as determined by the court.

      (4) In addition to payment of the allowed secured claim, "present value" interest pursuant to 11 U.S.C. § 1325(a)(5)(B)(ii) will be paid at the rate and in the amount listed below.  *If the claimant included a different interest rate or amount for "present value" interest in its proof of claim or otherwise disputes the amount provided for "present value" interest, the claimant must file an objection to confirmation.*

      (5) Upon completion of the Plan, payments made under this section satisfy the allowed secured claim and release the corresponding lien.

| Name of Creditor | Description of Secured Property and Address, if real property | Allowed Secured Claim | Present Value Interest Rate | Dollar Amount of Present Value Interest | Total Amount to be paid |
|---|---|---|---|---|---|
| E-Z Cashing, LLC | 1122 S. 9th St., Phila. | (under advisement) | | | (under advisement) |

### § 4(d)  Allowed secured claims to be paid in full that are excluded from 11 U.S.C. § 506
**x None.** If "None" is checked, the rest of § 4(d) need not be completed.

The claims below were either (1) incurred within 910 days before the petition date and secured by a purchase money security interest in a motor vehicle acquired for the personal use of the debtor(s), or (2) incurred within 1 year of the petition date and secured by a purchase money security interest in any other thing of value.

      (1) The allowed secured claims listed below shall be paid in full and their liens retained until completion of payments under the plan.

      (2) In addition to payment of the allowed secured claim, "present value" interest pursuant to 11 U.S.C. § 1325(a)(5)(B)(ii) will be paid at the rate and in the amount listed below.  If the claimant included a different interest rate or amount for "present value" interest in its proof of claim, the court will determine the present value interest rate and amount at the confirmation hearing.

| Name of Creditor | Collateral | Amount of Claim | Present Value Interest | Estimated total payments |
|---|---|---|---|---|
| _____ | _____ | _____ | _____ % | $ _____ |
| _____ | _____ | _____ | _____ % | $ _____ |

4

113

### § 4(e)  Surrender

**x None.** If "None" is checked, the rest of § 4(e) need not be completed.

(1) Debtor elects to surrender the secured property listed below that secures the creditor's claim.
(2) The automatic stay under 11 U.S.C. § 362(a) and 1301(a) with respect to the secured property terminates upon confirmation of the Plan.
(3) The Trustee shall make no payments to the creditors listed below on their secured claims.

| Creditor | Secured Property |
|---|---|
|  |  |

### § 4(f)  Loan Modification

**x None.** If "None" is checked, the rest of § 4(f) need not be completed.

(1) Debtor shall pursue a loan modification directly with _____ or its successor in interest or its current servicer ("Mortgage Lender"), in an effort to bring the loan current and resolve the secured arrearage claim.

(2) During the modification application process, Debtor shall make adequate protection payments directly to Mortgage Lender in the amount of $_____ per month, which represents _____ (**describe basis of adequate protection payment**). Debtor shall remit the adequate protection payments directly to the Mortgage Lender.

(3) If the modification is not approved by _____(date), Debtor shall either (A) file an amended Plan to otherwise provide for the allowed claim of the Mortgage Lender; or (B) Mortgage Lender may seek relief from the automatic stay with regard to the collateral and Debtor will not oppose it.

## Part 5:  General Unsecured Claims

### § 5(a)  Separately classified allowed unsecured non-priority claims

**x None.** If "None" is checked, the rest of § 5(a) need not be completed.

| Creditor | Basis for Separate Classification | Treatment | Amount of Claim | Amount to be paid |
|---|---|---|---|---|
|  |  |  |  |  |

### § 5(b)  Timely filed unsecured non-priority claims

(1) Liquidation Test (**check one box**)

    **x** All Debtor(s) property is claimed as exempt.

    ☐ Debtor(s) has non-exempt property valued at $_____ for purposes of § 1325(a)(4) and plan provides for distribution of $_____ to allowed priority and unsecured general creditors.

(2) Funding: § 5(b) claims to be paid as follows (**check one box**):

    **x** Pro rata

    ☐ 100%

    ☐ Other (Describe)

114

---

## Part 6: Executory Contracts & Unexpired Leases

x **None.** If "None" is checked, the rest of § 6 need not be completed.

| Creditor | Nature of Contract or Lease | Treatment by Debtor Pursuant to §365(b) |
|---|---|---|
|  |  |  |
|  |  |  |

---

## Part 7: Other Provisions

### § 7(a) General principles applicable to the Plan

(1) Vesting of Property of the Estate *(check one box)*

    x Upon confirmation

    ☐ Upon discharge

(2) Subject to Bankruptcy Rule 3012, the amount of a creditor's claim listed in its proof of claim controls over any contrary amounts listed in Parts 3, 4 or 5 of the Plan.

(3) Post-petition contractual payments under § 1322(b)(5) and adequate protection payments under § 1326(a)(1)(B),(C) shall be disbursed to the creditors by the debtor directly. All other disbursements to creditors shall be made by the Trustee.

(4) If Debtor is successful in obtaining a recovery in a personal injury or other litigation in which Debtor is the plaintiff, before the completion of plan payments, any such recovery in excess of any applicable exemption will be paid to the Trustee as a special Plan payment to the extent necessary to pay priority and general unsecured creditors, or as agreed by the Debtor and the Trustee and approved by the court.

### § 7(b) Affirmative duties on holders of claims secured by a security interest in debtor's principal residence

(1) Apply the payments received from the Trustee on the pre-petition arrearage, if any, only to such arrearage.

(2) Apply the post-petition monthly mortgage payments made by the Debtor to the post-petition mortgage obligations as provided for by the terms of the underlying mortgage note.

(3) Treat the pre-petition arrearage as contractually current upon confirmation for the Plan for the sole purpose of precluding the imposition of late payment charges or other default-related fees and services based on the pre-petition default or default(s). Late charges may be assessed on post-petition payments as provided by the terms of the mortgage and note.

(4) If a secured creditor with a security interest in the Debtor's property sent regular statements to the Debtor pre-petition, and the Debtor provides for payments of that claim directly to the creditor in the Plan, the holder of the claims shall resume sending customary monthly statements.

(5) If a secured creditor with a security interest in the Debtor's property provided the Debtor with coupon books for payments prior to the filing of the petition, upon request, the creditor shall forward post-petition coupon book(s) to the Debtor after this case has been filed.

(6) Debtor waives any violation of stay claim arising from the sending of statements and coupon books as set forth above.

### § 7(c)  Sale of Real Property
x **None.**  If "None" is checked, the rest of § 7(c) need not be completed.

(1)  Closing for the sale of _____ (the "Real Property") shall be completed within _____ months of the commencement of this bankruptcy case (the "Sale Deadline"). Unless otherwise agreed by the parties or provided by the Court, each allowed claim secured by the Real Property will be paid in full under §4(b)(1) of the Plan at the closing ("Closing Date").

(2)  The Real Property will be marketed for sale in the following manner and on the following terms:

(3)  Confirmation of this Plan shall constitute an order authorizing the Debtor to pay at settlement all customary closing expenses and all liens and encumbrances, including all § 4(b) claims, as may be necessary to convey good and marketable title to the purchaser.  However, nothing in this Plan shall preclude the Debtor from seeking court approval of the sale of the property free and clear of liens and encumbrances pursuant to 11 U.S.C. §363(f), either prior to or after confirmation of the Plan, if, in the Debtor's judgment, such approval is necessary or in order to convey insurable title or is otherwise reasonably necessary under the circumstances to implement this Plan.

(4)  Debtor shall provide the Trustee with a copy of the closing settlement sheet within 24 hours of the Closing Date.

(5)  In the event that a sale of the Real Property has not been consummated by the expiration of the Sale Deadline:

## Part 8:  Order of Distribution

**The order of distribution of Plan payments will be as follows:**

**Level 1:**  Trustee Commissions*
**Level 2:**  Domestic Support Obligations
**Level 3:**  Adequate Protection Payments
**Level 4:**  Debtor's attorney's fees
**Level 5:**  Priority claims, pro rata
**Level 6:**  Secured claims, pro rata
**Level 7:**  Specially classified unsecured claims
**Level 8:**  General unsecured claims
**Level 9:**  Untimely filed general unsecured non-priority claims to which debtor has not objected

*Percentage fees payable to the standing trustee will be paid at the rate fixed by the United States Trustee not to exceed ten (10) percent.*

### Part 9: Non Standard or Additional Plan Provisions

Under Bankruptcy Rule 3015.1(e), Plan provisions set forth below in Part 9 are effective only if the applicable box in Part 1 of this Plan is checked. Nonstandard or additional plan provisions placed elsewhere in the Plan are void.

☐ **None. The Debtor has and will remain current on his home mortgage at 1168 S. 9th St., Philadelphia, PA. 19147, owed to United Bank by maintaining his regular payments. The Debtor has filed an Objection to the proof of claim of E-Z Cashing, LLC which is under advisement. There have been exchanges of proposed resolutions, but no final Stipulation has been finalized. The Debtor has filed Objections to the priority claim of ed by the Commonwealth of Pennsylvania Department of Revenue and the priority and secured portions of the claims of the City of Philadelphia. If no favorable resolutions to the objections to the claims are attained,, the Debtor will not be able to oppose dismissal of this case. Also, the Debtor's restaurant business was mostly closed due to the pandemic. He may be required to move to amend and extend his plan under the CARES Act provisions.**

### Part 10: Signatures

By signing below, attorney for Debtor(s) or unrepresented Debtor(s) certifies that this Plan contains no nonstandard or additional provisions other than those in Part 9 of the Plan.

Date:  __6-24-20__                                  ___/s/ David A. Scholl___
                                                   Attorney for Debtor(s)


If Debtor(s) are unrepresented, they must sign below.

Date: _____                          _____
                                                   Debtor

Date: _____                          _____
                                                   Joint Debtor

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

IN RE:                                          : CHAPTER 13
                                                : NO: 18-15931-mdc
      GABRIEL BRAVO                           :
            Debtor,                     :
                                                :
---------------------------------------------------:

## PRE-TRIAL STATEMENT OF CREDITOR, E-Z CASHING LLC

Pursuant to this Honorable Court's Order dated January 23, 2022, governing procedures at evidentiary hearing conducted remotely by video conference, Creditor, E-Z Cashing LLC, by its counsel, submits the following:

1.    Remote Witness List

    a.   Joel Weiser, as Member of Creditor, E-Z Cashing LLC
        i.   Summary of anticipated testimony: Mr. Weiser will testify as to the amount of the creditor's claim, payments made thereon following the State Court's reassessment of damages on 6/21/21.  Mr. Weiser may testify in defense of Debtor's claims of stay relief violation.  Mr. Weiser may testify as to any and all matters concerning the debt, underlying judgment, execution proceedings, and status of the Creditor's rights.
        ii.   Email address: weislk77@gmail.com
        iii.   Location: Lakewood, NJ USA
        iv.   Place from which testimony will take place:  Office
        v.   Person(s) present during testimony: None other than named witness
        vi.   Access to documents other than exhibits on Exhibit List: No.  Witness reserves the right to access all documents and exhibits offered or introduced by Debtor.

    b.   Gabriel Bravo, Debtor herein.
        i.   Summary of anticipated testimony: Unknown.  See Debtor's Pre-Trial Statement.
        ii.   Email address:  gabrielbravo007@gmail.com
        iii.   Location:  Philadelphia, PA USA
        iv.   Place from which testimony will take place:   Unknown
        v.   Person(s) present during testimony: Potentially Guadalupe Bravo, Debtor's spouse and tenant-by-the-entirety in ownership of the subject property with Debtor.
        vi.   Access to documents other than exhibits on Exhibit List: Unknown.

  c. Other attendees to trial:
    i. Diana Thompson (non-speaker), Paralegal to Justin L. Krik, Esquire.
    ii. Email address:  dthompson@kriklaw.com
    iii. Location:  Williamstown, NJ USA
    iv. Place from which testimony will take place:  N/A
    v. Person(s) present during testimony: N/A
    vi. Access to documents other than exhibits on Exhibit List: No

  d. Creditor reserves the right to call on cross-examination any witnesses called
    by Debtor in its case in chief for rebuttal purposes.

2.  Documents

  a. All filings and docket entries, including, but not limited to, Debtor's Chapter

    13 Petition and Schedules, as amended, as well as various pleadings filed in

    the matter of <u>In Re: Gabriel Bravo</u>, 21-12926-mdc.  Namely:

    i. C-1 - Debtor's Chapter 13 Petition filed on 10/28/21 [Docket #1];
    ii. C-2 - Debtor's Motion to Extend Stay filed on 10/29/21 [Docket # 6];
    iii. C-3 - Creditor's Response to Motion to Extend filed on 11/5/21
     [Docket #11];
    iv. C-4 - Debtor's Schedules A/B-J filed on 11/5/21 [Docket #12], as
     amended on 12/21/21 [Docket #31];
    v. C-5 - Debtor's Objection to Claim filed on 11/19/21 [Docket #18];
    vi. C-6 - Creditor's Response to Objection filed on 12/13/21 [Docket
     #29]; and
    vii. C-7 - Debtor's Amended Chapter 13 Plan filed on 12/21/21 [Docket
     #30].

     The above items have not been served in accordance with footnote 5 of
     the Order Governing Procedures.

  b. Proof of Claim [Claim Number 1] filed on 11/1/21 in the instant case;

  c. All filings and docket entries, including, but not limited to, pleadings and

    orders filed in the matter of <u>E-Z Cashing LLC v. Gabriel Bravo, et al.</u>,

    Philadelphia County Court of Common Pleas June Term, 2015; No.: 00453.

    Namely:

    i. C-8 - Creditor's Motion to Reassess Damages filed on 2/23/21;
    ii. C-9 - Debtor's Response to Motion to Reassess filed on 3/11/21;

   iii. C-10 - Order reassessing damages entered by the Honorable Paula
     Patrick dated June 2, 2021; and
   iv. C-11 - Civil Docket in the matter of <u>E-Z Cashing LLC v. Gabriel</u>
     <u>Bravo, et al.</u>, Philadelphia County Court of Common Pleas June Term,
     2015; No.: 00453.

 d. All filings and docket entries, including, but not limited to, Debtor's Chapter

   13 Petition and Schedules, as amended, as well as various pleadings filed in

   the matter of <u>In Re: Gabriel Bravo</u>, 18-15931-mdc.  Namely:

    i. C-12 - Debtor's Chapter 13 Petition filed on 9/7/18 [Docket #1];
    ii. C-13 - Debtor's Schedules A/B-J filed on 9/15/18 [Docket #9];
    iii. C-14 - Debtor's Objection to Claim of E-Z Cashing filed on 9/14/19
     [Docket #58];
    iv. C-15 - Debtor's Third Amended Chapter 13 Plan file on 6/24/20
     [Docket #111];
    v. C-16 - Debtor's Supporting Brief field on 8/17/20 [Docket #127];
    vi. C-17 - Creditor's Response to Objection to Claim filed on 8/25/20
     [Docket #128]; and
    vii. C-18 - Order dismissing Chapter 13 bankruptcy filed on 11/5/20
     [Docket #149].

    The above items have not been served in accordance with footnote 5 of
    the Order Governing Procedures.

 e. All filings and docket entries, including, but not limited to, various pleadings

   filed in the adversary matter of <u>Bravo v. E-Z Cashing</u> LLC, 19-00001-mdc.

   Namely:

    i. C-19 - Debtor's Adversary Complaint filed on 1/1/19 [Docket #1];
    ii. C-20 - Creditor's Answer to Complaint filed on 3/8/19 [Docket #5];
    iii. C-21 - Creditor's Motion to Take Judicial Notice filed on 3/8/19
     [Docket #15]; and
    iv. C-22 - Order granting Motion to Take Judicial Notice filed on
     10/10/19 [Docket #27].

    The above items have not been served in accordance with footnote 5 of
    the Order Governing Procedures.

 f. C-23 – Sheriff's Sale schedule for the Office of the Sheriff of Philadelphia

   County for the 2022 calendar year.

g. C-24 - The public records of the Office of Property Assessment of the City of Philadelphia for the property located at1122 South 9th Street, Philadelphia, PA 19147.

h. C-25 - The public records of the Office of Property Assessment of the City of Philadelphia for the property located at 1124 South 9th Street, Philadelphia, PA 19147.

i. C-26 - Creditor's Proof of Claim filed on 11/1/21 in <u>In Re: Gabriel Bravo</u>, 21-12926-mdc.

j. C-27 - Receipt for Post Reassessment of Damages payment on 10-28-21.

Creditor reserves the right to introduce any documents or evidence utilized or intended to be utilized by Debtor in its case in chief for rebuttal purposes.

*Respectfully submitted,*

BY: __*/s/ Justin L. Krik*_____
    **JUSTIN L. KRIK, ESQUIRE**
    **ATTORNEY FOR CREDITOR**
    **E-Z CASHING, LLC**

**DATE:  February 10, 2022**

In Re: Gabriel Bravo, 21-12926-mdc.

> C-1 - Debtor's Chapter 13 Petition filed on 10/28/21 [Docket #1];
> C-2 - Debtor's Motion to Extend Stay filed on 10/29/21 [Docket # 6];
> C-3 - Creditor's Response to Motion to Extend filed on 11/5/21 [Docket #11];
> C-4 - Debtor's Schedules A/B-J filed on 11/5/21 [Docket #12], as amended on 12/21/21 [Docket #31];
> C-5 - Debtor's Objection to Claim filed on 11/19/21 [Docket #18];
> C-6 - Creditor's Response to Objection filed on 12/13/21 [Docket #29]; and
> C-7 - Debtor's Amended Chapter 13 Plan filed on 12/21/21 [Docket #30].

> The above items have not been served in accordance with footnote 5 of the Order Governing Procedures.

# C-8 - Creditor's Motion to Reassess Damages filed on 2/23/21

Case 2:19-cv-04820-KSM Document 1 Filed 10/23/22 Page 175 of 388 Main
23 Document 7 of 174
FILED
Civil Administration
23 DEC 2021 03:26 pm
F. HEWITT

KRIK LAW
BY: JUSTIN L. KRIK, ESQUIRE
ATTORNEY ID NO: 203006
1500 JOHN F. KENNEDY BLVD., STE. 630          ATTORNEY FOR PLAINTIFF
PHILADELPHIA, PA 19102                        E-Z CASHING, LLC
PHONE: (267) 831-3180
FAX: (215) 309-5502

| | | |
|---|---|---|
| E-Z CASHING, LLC | : | COURT OF COMMON PLEAS |
| Plaintiff, | : | PHILADELPHIA COUNTY |
| | : | |
| | : | |
| | : | JUNE TERM, 2015 |
| | : | |
| v. | : | NO.:  00453 |
| | : | |
| GABRIEL BRAVO, ET AL | : | |
| Defendants. | : | |

## CERTIFICATION OF SERVICE

    I hereby certify that a true and correct copy of the foregoing Motion to Reassess Damages, attached Exhibits, Brief in Support thereof, proposed Order, and Certificate of Service were sent via regular mail to the persons listed below on the date indicated:

| | | |
|---|---|---|
| Bank, Minehart & D'Angelo<br>John J. D'Angelo, Esquire<br>Attorney for Defendants<br>Gabriel Bravo and<br>Guadalupe Bravo<br>540 South 11th Street<br>Philadelphia, PA 19147 | Gabriel Bravo<br>1168 South 9th Street<br>Philadelphia, PA 19147<br>and<br>1122 South 9th Street<br>Philadelphia, PA 19147 | Guadalupe Bravo<br>1168 South 9th Street<br>Philadelphia, PA 19147<br>and<br>1122 South 9th Street<br>Philadelphia, PA 19147 |

<div align="center">

KRIK LAW


BY:   */s/ Justin L. Krik*
        **JUSTIN L. KRIK, ESQUIRE**
        **ATTORNEY FOR PLAINTIFF**

</div>

**DATE: February 23, 2021**

| E-Z CASHING, LLC | : | COURT OF COMMON PLEAS |
| Plaintiff, | : | PHILADELPHIA COUNTY |
| | : | |
| | : | |
| | : | JUNE TERM, 2015 |
| | : | |
| v. | : | NO.: 00453 |
| | : | |
| GABRIEL BRAVO, ET AL | : | |
| Defendants. | : | |

# **O R D E R**

AND NOW, this _____ day of _____, 2021, upon consideration of Plaintiff's Motion to Reassess Damages and any response thereto, it is hereby:

ORDERED and DECREED that the Office of Judicial Records is shall amend the in rem judgment and the Sheriff is ORDERED to amend the writ *nunc pro tunc* in the amount of $153,035.25, plus interest from February 23, 2021 and other costs and charges collectible under the mortgage, fore foreclosure and sale of the mortgaged property.

BY THE COURT:

_____
J.

KRIK LAW
BY: JUSTIN L. KRIK, ESQUIRE
ATTORNEY ID NO: 203006
1500 JOHN F. KENNEDY BLVD., STE. 630  ATTORNEY FOR PLAINTIFF
PHILADELPHIA, PA 19102    E-Z CASHING, LLC
PHONE: (267) 831-3180
FAX: (215) 309-5502

| | | |
|---|---|---|
| E-Z CASHING, LLC | : | COURT OF COMMON PLEAS |
|   Plaintiff, | : | PHILADELPHIA COUNTY |
| | : | |
| | : | |
| | : | JUNE TERM, 2015 |
| | : | |
|   v. | : | NO.:  00453 |
| | : | |
| GABRIEL BRAVO, ET AL | : | |
|   Defendants. | : | |

## PLAINTIFF'S MOTION TO REASSESS DAMAGES

COMES NOW Plaintiff E-Z CASHING, LLC ("Plaintiff"), by and through its
undersigned counsel, and hereby moves this Honorable Court to direct the Office of Judicial
Records to amend the judgment in this matter, *nunc pro tunc*, and avers as follows:

1.  This is a straight forward *in rem* mortgage foreclosure action.

2.  Plaintiff's predecessor in interest initiated this civil action by the filing of a
Complaint in Foreclosure on June 3, 2015.  The Complaint is incorporated herein by reference in
accordance with Pa. R.C.P. 1019(g).  A true and correct copy of the Mortgage, recorded February
17, 2006 in Document Id: 51382000, redacted to remove confidential account information, is
attached hereto, made part hereof, and marked as Exhibit A.  A redacted copy of the Promissory
Note is attached hereto, made part hereof, and marked as Exhibit B.

3.  An *in rem* judgment was entered by Agreement on November 29, 2016 in favor of
the Plaintiff and against the Defendants in the amount of $105,613.62.  A true and correct copy
of the Judgment is attached hereto, made part hereof, and marked as Exhibit B.

Case ID: 150600453
Control No.: 21020688

4.      A Praecipe for Writ of Execution was filed and a Sheriff's sale was initially scheduled for June 6, 2017.  The Praecipe for Writ of Execution is incorporated herein by reference in accordance with Pa. R.C.P. 1019(g).

5.      The property was sold at the Sheriff's sale held on June 6, 2017; however, on August 15, 2017, Third Party Purchaser filed a Motion to Set Aside Sheriff's Sale file while was ultimately resolved by way of a stipulation to vacate the Sheriff's sale and to relist the property for another Sheriff's sale.  The Motion to Set Aside Sheriff's sale and Stipulation to Vacate and Relist are incorporated herein by reference in accordance with Pa. R.C.P. 1019(g).

6.      The property was subsequently listed for the Sheriff's sale scheduled for sale to be held on January 9, 2018 which sale was continuously postponed September 11, 2018.

7.      On September 7, 2018, four days before the scheduled Sheriff's sale, Defendant Gabriel Bravo filed a Chapter 13 Bankruptcy Petition in the United States Bankruptcy Court for the Eastern District of Pennsylvania at Bankruptcy Case Number 18-159310-mdc.

8.      The Sheriff's sale scheduled for September 11, 2018 was stayed as a result of the automatic bankruptcy stay.

9.      On November 5, 2020, the Honorable Magdeline D. Coleman entered an order dismissing the Chapter 13 Bankruptcy case.  Plaintiff's Suggestion of Bankruptcy Dismissal, docketed January 14, 2021, is incorporated herein by reference in accordance with Pa. R.C.P. 1019(g).

10.     Additional sums have been incurred or expended on Defendant's behalf since the Complaint was filed and Defendant has been given credit for any payments that have been made since the judgment.

11.     Plaintiff seeks amendment of the judgment to reflect the following updated amounts:

Case ID: 150600453
Control No.: 21027388

| Consent Judgment | $105,613.62 |
| Interest on Consent Judgment (11/1/16) | $ 31,252.08 |
| ($19.83 per diem) | |
| **Sub-Total** | **$136,865.70** |

Post-Consent Judgment Charges

| Advance of 2017 Real Estate Taxes (1/31/17) | $ 2,488.89 |
| Interest at $0.466 per diem | $ 272.14 |
| Forced Place Insurance (3/3/17) | $ 4,339.00 |
| Interest at $0.814 | $ 450.14 |
| Attorney Fees | $ 7,823.78 |
| Inspection Fees | $ 600.00 |
| Misc. Fees (title, Sheriff/foreclosure, BPO) | $ 3,075.60 |
| **Sub-Total** | **$ 19,049.55** |

| **SUB-TOTAL** | **$155,915.25** |

Less Payments Received

| 4 payments of $720.00 each | ($ 2,880.00) |

| **TOTAL** | **$153,035.25** |

12.    The judgment formerly entered is insufficient to satisfy the amounts due on the Mortgage.

13.    Under the terms of the Mortgage, Note and Pennsylvania law, Plaintiff is entitled to the amendment of its judgment as set forth above.

14.    Citations to the terms of the Mortgage and Note and legal authority in support of the specific charges above are contained in Plaintiff's attached brief.

15.    Pennsylvania Rule of Civil Procedure 208.2(b) provides that a motion need not be verified unless verification is required by general rule governing the particular motion or by order of court.  There is no state or local rule requiring verification for a Motion to Reassess Damages.

16.    Plaintiff now files this Motion to Reassess Damages.

WHEREFORE,  Plaintiff  respectfully  requests  that  this  Honorable  Court  amend  the

Judgment as requested.

<div style="text-align:center"><strong>KRIK LAW</strong></div>

BY:     <u>*/s/ Justin L. Krik*</u>
             **JUSTIN L. KRIK, ESQUIRE**
             **ATTORNEY FOR PLAINTIFF**

**DATE: February 23, 2021**

Case ID: 150600453
Control No.: 21022888

KRIK LAW
BY: JUSTIN L. KRIK, ESQUIRE
ATTORNEY ID NO: 203006
1500 JOHN F. KENNEDY BLVD., STE. 630           ATTORNEY FOR PLAINTIFF
PHILADELPHIA, PA 19102                         E-Z CASHING, LLC
PHONE: (267) 831-3180
FAX: (215) 309-5502

| | | |
|---|---|---|
| E-Z CASHING, LLC | : | COURT OF COMMON PLEAS |
| Plaintiff, | : | PHILADELPHIA COUNTY |
| | : | |
| | : | |
| | : | JUNE TERM, 2015 |
| | : | |
| v. | : | NO.:  00453 |
| | : | |
| GABRIEL BRAVO, ET AL | : | |
| Defendants. | : | |

### BRIEF IN SUPPORT OF PLAINTIFF'S MOTION TO REASSESS DAMAGES

COMES NOW Plaintiff E-Z CASHING, LLC ("Plaintiff"), by and through its undersigned counsel, and hereby moves this Honorable Court to direct the Office of Judicial Records to amend the judgment in this matter, *nunc pro tunc*, and in support thereof avers as follows:

### I.    STATEMENT OF QUESTION INVOLVED

**ISSUE:**  Whether, under well-settled Pennsylvania law, Plaintiff is entitled to amend its *in rem* judgment?

**ANSWER:**  Yes.

### II.    PROCEDURAL AND FACTUAL HISTORY

This is a straight-forward *in rem* mortgage foreclosure action.  Plaintiff's predecessor in interest initiated this civil action by the filing of a Complaint in Foreclosure on June 3, 2015. The Complaint is incorporated herein by reference in accordance with Pa. R.C.P. 1019(g).  An *in rem* judgment was entered by Agreement on November 29, 2016 in favor of the Plaintiff and

against the Defendants in the amount of $105,613.62.  A true and correct copy of the Judgment is attached hereto, made part hereof, and marked as Exhibit A.  A Praecipe for Writ of Execution was filed and a Sheriff's sale was initially scheduled for June 6, 2017.  The Praecipe for Writ of Execution is incorporated herein by reference in accordance with Pa. R.C.P. 1019(g).  The property was sold at the Sheriff's sale held on June 6, 2017; however, on August 15, 2017, Third Party Purchaser filed a Motion to Set Aside Sheriff's Sale file while was ultimately resolved by way of a stipulation to vacate the Sheriff's sale and to relist the property for another Sheriff's sale.  The Motion to Set Aside Sheriff's sale and Stipulation to Vacate and Relist are incorporated herein by reference in accordance with Pa. R.C.P. 1019(g).

The property was subsequently listed for the Sheriff's sale scheduled for sale to be held on January 9, 2018 which sale was continuously postponed September 11, 2018.  On September 7, 2018, four days before the scheduled Sheriff's sale, Defendant Gabriel Bravo filed a Chapter 13 Bankruptcy Petition in the United States Bankruptcy Court for the Eastern District of Pennsylvania at Bankruptcy Case Number 18-159310-mdc.  The Sheriff's sale scheduled for September 11, 2018 was stayed as a result of the automatic bankruptcy stay.  On November 5, 2020, the Honorable Magdeline D. Coleman entered an order dismissing the Chapter 13 Bankruptcy case.  Plaintiff's Suggestion of Bankruptcy Dismissal, docketed January 14, 2021, is incorporated herein by reference in accordance with Pa. R.C.P. 1019(g).  Additional sums have been incurred or expended on Defendant's behalf since the Complaint was filed and Defendant has been given credit for any payments that have been made since the judgment.  Plaintiff seeks amendment of the judgment and now files this Motion to Reassess Damages.

## III.   **LEGAL ANALYSIS**

### A.   **Pennsylvania Law Permits Plaintiff to Amend its *In Rem* Judgment**

It is well-settled law in Pennsylvania that the Court may exercise its equitable powers to control the enforcement of a judgment and to grant any relief until that judgment is satisfied.  20 P.L.E., Judgments § 191; <u>Stephenson v. Butts</u>, 187 Pa.Super. 55, 59, 142 A.2d 319, 321 (1958); <u>Chase Home Mortg. Corp. of the Soutwest v. Good</u>, 537 A.2d 22, 24 (Pa.Super. 1988).   The Pennsylvania Superior Court has repeatedly cited t he right of a foreclosing creditor to amend its judgment prior to the Sheriff's sale.  <u>EMC Mortgage, LLC v. Biddle</u>, 114 A.3d 1057 (2015); <u>Nationsbanc Mortg. Corp. v. Grillo</u>, 827 A.2d 489 (Pa.Super. 2003); <u>Morgan Guaranty Trust Co. of N.Y. v. Mowl</u>, 705 A.2d 923 (Pa.Super. 1998); <u>Union National Bank of Pittsburgh v. Ciongoli</u>, 595 A.2d 179 (1991).

The Supreme Court of Pennsylvania recognized in <u>Landau v. Western Pa. Nat. Bank</u>, 282 A.2d 335 (1971), that the debt owed on a Mortgage is subject to change and, in fact, can be expected to change from day to day because the bank must advance sums in order to protect its collateral.  Plaintiff must protect its collateral up until the date of sale because a Mortgage lien is not extinguished until the debt is paid.  <u>Beckman v. Altoona Trust Co.</u>, 332 Pa. 545, 2 A.2d 826 (1939).  It is critical that the judgment reflect those amounts expended by the Plaintiff in protecting the property because a judgment in mortgage foreclosure is strictly *in rem*.  <u>Meco Reality Company v. Burns</u>, 414 Pa. 495, 200 A.2d 335 (1971).  Plaintiff submits that if it goes to sale without the requested amended judgment, and if there is competitive bidding for the Property, Plaintiff will suffer a significant loss in that it would not be able to recoup monies it advances to protect its interests.

In <u>B.C.Y. v. Bukovich</u>, the Pennsylvania Superior Court reiterated its long standing rule

Case ID: 150600453
Control No.: 21013288

3

that a Court has the inherent power to correct a judgment to conform to the facts of a case. 257 Pa.Super. 157, 390 A.2d 276 (1978). In the within case, the amount of the original judgment does not adequately reflect the additional sums due on the Mortgage due to Defendants' failure to tender payments during the foreclosure proceedings and the advances made by the Plaintiff. The Mortgage plainly requires the mortgagor to tender to the mortgagee monthly payments of principal and interest until the Promissory Note accompanying the Mortgage is paid in full. The mortgagor is also required to remit to the mortgagee sufficient sums to pay monthly mortgage insurance premiums, fire insurance premiums, taxes and other assessments relating to the property. The mortgagor has breached the terms of the Mortgage and Plaintiff has been forced to incur significant unjust financial losses as a result. Plaintiff will be severely prejudiced unless Plaintiff's *in rem* judgment is amended.

**B.   The Foreclosure Judgment is *In Rem* Only**

The within case is a mortgage foreclosure action, the sole purpose of which is to take the mortgaged property to Sheriff's sale. Pennsylvania law makes clear that an action in mortgage foreclosure is strictly *in rem* and does not include any personal liability. Newtown Village Partnership v. Kimmel, 621 A.2d 1036, 1037 (1993); Signal Consumer Discount Company v. Babuscio, 390 A.2d 266, 270 (1978); Pa. R.C.P. 1141(a).

Nevertheless, Pennsylvania law requires that the foreclosure action demand judgment for the amount due. See Pa. R.C.P. 1147(6). The primary purpose of the dollar amount in the *in rem* judgment is for bidding at the Sheriff's sale. In the event that the third party real estate speculator were to bid on the mortgaged property at the Sheriff's sale and become the successful purchaser, Plaintiff would receive the amount of the *in rem* judgment from the Sheriff.

### C. **Interest**

The Mortgage clearly requires that the Defendants shall promptly pay when due the principal and interest due on the outstanding debt. <u>See</u> Ex. A. In addition, paragraph one of the Note specifies the rate of interest to be charged until the debt is paid in full or otherwise satisfied. <u>See</u> Ex. B. Paragraph 5 of the Note provides for the interest to accrue at the default rate, or the maximum rate allowed by law, after the entry of the judgment. <u>See</u> Ex. B.

### D. **Attorney's Fees**

The Plaintiff's foreclosure fees are very modest. The foreclosure fees cover all of the legal work performed throughout the course of the foreclosure action to date, including reviewing breach notices, loan documents, account records, title reports and supporting documents, preparing and reviewing the mortgage foreclosure complaint, filing and service of the complaint, entry of judgment, the writ of execution process, lien holder notices, and all of the additional legal work attributed to prosecuting a mortgage foreclosure lawsuit.

Section 16.2 of the Mortgage specifically provides for Plaintiff's recovery of its attorney fees. The Mortgage states that Plaintiff is entitled to collect all expenses incurred in pursing this mortgage foreclosure action. This includes attorney fees incurred both before and after judgment. If the parties had intended to limited Plaintiff's recovery of attorney fees, the parties would not have used the word "all". <u>See</u> Ex. A. The Pennsylvania Superior Court has interpreted this type of clause and concluded that it survived the judgment and that the lender is entitled to amend its judgment to include post-judgment attorney fees and costs of suit. <u>EMC Mortgage, LLC v. Biddle</u>, 2015 Pa.Super. 79, 114 A.3d 1057 (2015).

The amount of attorney's fees requested in the Motion to Reassess Damages is in accordance with the loan documents and Pennsylvania law. Pennsylvania Courts have long and

Case ID: 150600453
Control No.: 21013888

repeatedly concluded that a request of five percent of the outstanding principal balance is
reasonable and enforceable as an attorney's fees. Robinson v. Loomis, 51 Pa. 78 (1865); First
Federal Savings and Bank of Baltimore v. Fetner, the Superior Court held that an attorney's fee
of ten percent of the original mortgage amount is not unconscionable. 410 A.2d 344 (Pa. Super.
1979). The Superior Court cited Fetner in confirming that an attorney's fee of ten percent
included in the judgment in a mortgage foreclosure action was reasonable. Citicorp v.
Morrisville Hampton Realty, 662 A.2d 1120 (Pa. Super. 1995). Plaintiff's legal fees are not a
percentage, but are significantly less than what is permitted by Pennsylvania law.

### E.  Cost of Suit and Title

 Pursuant to section 16.2 of the Mortgage, Plaintiff is entitled to recover all expenses
incurred in the foreclosure action. See Ex. A. This includes the costs of suit and title incurred
both before and after judgment. If the parties had intended to limited Plaintiff's recovery of
costs of suit and title, the parties would not have used the word "all". See Ex. A. The amount
claimed for the costs of suit and title are the expenses Plaintiff paid to date as a result of the
mortgage default. The Pennsylvania Superior Court has interpreted this type of clause and
concluded that it survives the entry of judgment and that the lender is entitled to amend its
judgment to include post-judgment attorney fees and costs of suit. EMC Mortgage, LLC v.
Biddle, 2015 Pa.Super. 79, 114 A3d 1057 (2015).

The title report is necessary to determine the record owners of the property, as
Pennsylvania Rule of Civil Procedure 1144 requires all record owners to be named as
Defendants in the foreclosure action. It is also necessary to determine whether there are any
prior liens to be cleared, so that the Sheriff's sale purchaser acquires clear title to the property. It
is necessary to determine whether there are any federal tax liens on the property, whether the

Case ID: 150600453
Control No.: 21035588

Defendants are divorced (which could affect service of the complaint), and numerous other legal issues.  The title bring down is necessary to identify any new liens on the property or new owners between the time of filing the complaint and the filing of the operative writ of execution.

Accordingly, the modest sums Plaintiff has incurred for the costs of suit and title were necessary pursuant to Pennsylvania law.  The amounts were reasonable and actually incurred. The mortgage and Pennsylvania law permit Plaintiff to recover these sums through its foreclosure action; therefore, Plaintiff is entitled to recover the costs of suit and title in their entirety.

IV.    **RELIEF**

Plaintiff respectfully submits that if the enforcement of its rights is delayed by legal proceedings, and such delays require the mortgagee to expend additional sums provided for by the Mortgage, then the expenses necessarily become part of the mortgagee's lien and should be included in the judgment.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court amend the Judgment as requested.

**KRIK LAW**


**BY:    /s/ Justin L. Krik          **
**JUSTIN L. KRIK, ESQUIRE**
**ATTORNEY FOR PLAINTIFF**

**DATE: February 23, 2021**

Case ID: 150600453
Control No.: 21036888

# EXHIBIT A

Case ID: 150600453
Control No.: 21013788

UPON RECORDING RETURN TO:

Bayview Loan Servicing
4425 Ponce de Leon Blvd., 5th Fl.
Coral Gables, Florida 33146
Attention: Collateral Department

# OPEN-END MORTGAGE & SECURITY AGREEMENT

### { PENNSYLVANIA }

### [This Mortgage Secures Future Advances]

### Gabriel Bravo and Guadalupe Bravo

#### as mortgagor
#### (Borrower)

#### To

### InterBay Funding, LLC, a Delaware Limited
### Liability Company

#### as mortgagee
#### (Lender)

1

6.B    -B

Case ID: 150600453
Control No.: 21038888

51382000
Page: 1 of 34
02/17/2006 11:40AM

This Document Recorded                    Doc Id: 51382000
02/17/2006                                Receipt #: 477427
11:40AM                                   Rec Fee: 126.50
Doc Code: M      Commissioner of Records, City of Philadelphia

**THIS MORTGAGE AND SECURITY AGREEMENT** (the "Security Instrument") is made as of January 31, 2006, by Gabriel Bravo and Guadalupe Bravo whose address is 836 Federal Street, Phialdelphin, PA 19147, as mortgagor ("Borrower") to InterBay Funding, LLC, a Delaware Limited Liability Company, whose address is 1301 Virginia Drive, Ste #403, Fort Washington, PA 19034, as mortgagee ("Lender").

## R E C I T A L S :

Borrower by its Promissory Note of even date herewith given to Lender is indebted to Lender in the principal sum of Seventy-One Thousand Two Hundred Fifty and No/100 Dollars ($71,250.00) in lawful money of the United States of America (the Note together with all extensions, renewals, modifications, substitutions and amendments thereof shall collectively be referred to as the "Note"), with interest from the date thereof at the rates set forth in the Note, principal and interest to be payable in accordance with the terms and conditions provided in the Note and with a maturity date of March 1, 2036.

By its execution hereof, Borrower desires to secure the payment of the Debt (hereinafter defined) and the performance of all of its obligations under the Note and the Other Obligations (hereinafter defined) and any and all other indebtedness now or hereafter owing by Borrower to Lender.

## ARTICLE 1. - GRANTS OF SECURITY

Section 1.1.      PROPERTY MORTGAGED. Borrower does hereby irrevocably mortgage, grant, bargain, sell, pledge, assign, warrant, transfer and convey to Lender with mortgage covenants upon the Statutory Condition and, as provided and/or authorized by applicable law, with the STATUTORY POWER OF SALE, and grant a security interest to Lender in, the following property, rights, interests and estates now owned, or hereafter acquired by Borrower to the fullest extent permitted by applicable law (collectively, the "Property"):

(a)      Land. The real property described in *Exhibit "A"* attached hereto and made a part hereof (the "Land");

(b)      Additional Land. All additional lands, estates and development rights hereafter acquired by Borrower for use in connection with the Land and the development of the Land and all additional lands and estates therein which may, from time to time, by supplemental mortgage or otherwise be expressly made subject to the lien of this Security Instrument;

(c)      Improvements. The buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter erected or located on the Land (the "Improvements");

(d)      Easements. All easements, servitudes rights-of-way or use, rights, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, and all estates, rights, titles, interests, privileges, liberties, servitudes, tenements, hereditaments and appurtenances of any nature whatsoever, in any way now or hereafter belonging, relating or pertaining to the Land and the Improvements and the reversion and reversions, remainder and remainders, and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Land, to the center line thereof and all the estates, rights, titles, interests, dower and rights of dower, courtesy and rights of courtesy, property, possession, claim and demand whatsoever, both at law and in equity, of Borrower of, in and to the Land and the Improvements and every part and parcel thereof, with the appurtenances thereto;

(e)      Fixtures and Personal Property. All machinery, equipment, fixtures (including, but not limited to, all heating, air conditioning, plumbing, lighting, communications and elevator fixtures) trade fixtures and other property of every kind and nature whatsoever owned by Borrower, or in which Borrower has or shall have an interest, including without limitation, letter of credit rights, deposit accounts, payment intangibles, investment property, electronic chattel paper, timber to be cut and farm animals and, now or hereafter located upon the Land and the Improvements, or appurtenant thereto, and usable in connection with the present or future operation and occupancy of the Land and the Improvements and all building equipment, materials and supplies of any nature whatsoever owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located upon the Land and the Improvements, or appurtenant thereto, or usable in connection with the present or future operation and occupancy of the Land and the Improvements (collectively, the "Personal Property"), and the right, title and interest of Borrower in and to any of the

1

6 B        6 B

Case ID: 150600453
Control No.: 21039388

Personal Property which may be subject to any security interests, as defined in the Uniform Commercial Code, as adopted and enacted by the state or states where any of the Property is located (the "Uniform Commercial Code"), superior in lien to the lien of this Security Instrument, and all proceeds and products of all of the above;

(f)     Leases and Rents. All leases, subleases and other agreements affecting the use, enjoyment or occupancy of the Land and/or the Improvements heretofore or hereafter entered into and all extensions, amendments and modifications thereto, whether before or after the filing by or against Borrower of any petition for relief under Creditors Rights Laws (hereinafter defined) (the "Leases") and all right, title and interest of Borrower, its successors and assigns therein and thereunder, including, without limitation, any guaranties of the lessees' obligations thereunder, cash or securities deposited thereunder to secure the performance by the lessees of their obligations thereunder and all rents, additional rents, revenues, room revenues, accounts, accounts receivable, issues and profits (including all oil and gas or other mineral royalties and bonuses) from the Land and the Improvements whether paid or accruing before or after the filing by or against Borrower of any petition for relief under the Creditors Rights Laws (the "Rents") and all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Debt;

(g)     Insurance Proceeds. All proceeds of and any unearned premiums on any insurance policies covering the Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Property;

(h)     Condemnation Awards. All awards or payments, including interest thereon, which may heretofore and hereafter be made with respect to the Property, whether from the exercise of the right of eminent domain (including, but not limited to any transfer made in lieu of or in anticipation of the exercise of the right), or for a change of grade, or for any other injury to or decrease in the value of the Property;

(i)     Tax Certiorari. All refunds, rebates or credits in connection with a reduction in real estate taxes and assessments charged against the Property as a result of tax certiorari or any applications or proceedings for reduction;

(j)     Conversion. All proceeds of the conversion, voluntary or involuntary, of any of the foregoing including, without limitation, proceeds of insurance and condemnation awards, into cash or liquidation claims;

(k)     .  Rights. The right, in the name and on behalf of Borrower, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Lender in the Property;

(l)     Agreements. All agreements, contracts, certificates, instruments, franchises, permits, licenses, plans, specifications and other documents, now or hereafter entered into, and all rights therein and thereto, respecting or pertaining to the use, occupation, construction, management or operation of the Land and any part thereof and any Improvements or respecting any business or activity conducted on the Land and any part thereof and all right, title and interest of Borrower therein and thereunder, including, without limitation, the right, upon the occurrence and during the continuance of an Event of Default (hereinafter defined), to receive and collect any sums payable to Borrower thereunder;

(m)     Intangibles. All trade names, trademarks, servicemarks, logos, copyrights, goodwill, books and records and all other intellectual property rights and general intangibles relating to or used in connection with the operation of the Property;

(n)     Cash and Accounts. Cash and Accounts. All cash funds, deposit accounts and other rights and evidence of rights to cash, all present and future funds, accounts, instruments, accounts receivable, documents, causes of action, or claims now or hereafter held, created or otherwise capable of credit to the Debtor/Borrower; and

(o)     Other Rights. Any and all other rights of Borrower in and to the items set forth in Subsections (a) through (n) above.

Section 1.2.     ASSIGNMENT OF LEASES AND RENTS. Borrower hereby absolutely and unconditionally assigns to Lender Borrower's right, title and interest in and to all current and future Leases and Rents; it being intended by Borrower that this assignment constitutes a present, absolute assignment and not an assignment for additional security only. Notwithstanding the foregoing, Lender grants to Borrower a revocable license to collect and receive the Rents, Borrower shall hold a portion of the Rents sufficient to discharge all current sums due on the Debt, for use in the payment of such sums.

2

Case ID: 150600453
Control No.: 21040088

Section 1.3.    SECURITY AGREEMENT. This Security Instrument is both a real property mortgage and a "security agreement" within the meaning of the Uniform Commercial Code. The Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of Borrower in the Property. By executing and delivering this Security Instrument, Borrower hereby grants to Lender, as security for the Obligations (hereinafter defined), a security interest in the Personal Property as well as all other property and interests set forth in Section 1.1 herein, to the full extent that the same may be subject to the Uniform Commercial Code. If required by Lender, Borrower shall execute UCC-1 Financing Statements covering said property for filing with the appropriate county and/or state filing offices. In any event, Lender is permitted to unilaterally file a UCC-1 Financing Statement covering all of the Property.

Section 1.4.    PLEDGE OF MONIES HELD. Borrower hereby pledges to and grants a continuing security interest in favor of Lender any and all monies now or hereafter held by Lender, including, without limitation, any sums deposited in the Escrow Fund (hereinafter defined), Net Proceeds (hereinafter defined) and condemnation awards or payments (hereinafter described) as additional security for the Obligations until expended or applied as provided in this Security Instrument.

## CONDITIONS TO GRANT

TO HAVE AND TO HOLD the above granted and described Property to the use and benefit of Lender, and the successors and assigns of Lender, forever;

PROVIDED, HOWEVER, these presents are upon the express condition that, if Borrower shall well and truly pay to Lender the Debt at the time and in the manner provided in the Note and this Security Instrument, shall perform the Other Obligations as set forth in this Security Instrument and shall abide by and comply with each and every covenant and condition set forth herein and in the Note, these presents and the estate hereby granted shall cease, terminate and be void, except to the extent any provision herein provides that it shall survive the repayment of the obligations.

## ARTICLE 2. - DEBT AND OBLIGATIONS SECURED

Section 2.1.    DEBT. This Security Instrument and the grants, assignments and transfers made pursuant to the terms hereafter are given for the purpose of securing the payment of the following, in such order of priority as Lender may determine in its sole discretion (the "Debt"):

(a)    the indebtedness evidenced by the Note in lawful money of the United States of America;

(b)    interest, default interest, late charges and other sums, as provided in the Note, this Security Instrument or the Other Security Documents (hereinafter defined);

(c)    the Prepayment Consideration (defined in the Note), if any;

(d)    all other monies agreed or provided to be paid by Borrower in the Note, this Security Instrument or the Other Security Documents (hereinafter defined);

(e)    all sums advanced pursuant to this Security Instrument to protect and preserve the Property and the lien and the security interest created hereby; and

(f)    all sums advanced and costs and expenses incurred by Lender in connection with the Debt or any part thereof, any renewal, extension, or change of or substitution for the Debt or any part thereof, or the acquisition or perfection of the security therefor, whether made or incurred at the request of Borrower or Lender; and

(g)    any and all additional advances made by Lender to complete Improvements or to preserve or protect the Property, or for taxes, assessments or insurance premiums, or for the performance of any of Borrower's obligations hereunder or under the Other Security Documents (hereinafter defined).

Section 2.2.    OTHER OBLIGATIONS. This Security Instrument and the grants, assignments and transfers made pursuant to the terms hereof are also given for the purpose of securing the performance of the following (the "Other Obligations"):

(a)    all other obligations of Borrower contained herein;

3

Case ID: 150600453
Control No.: 21012388

Case 23-150262 mc 04820 KGH Filed 08/00/21 13 Filed 01/07/22 2:16:29 33 of 388 Main
Case 14-15593 mc Claim 71 Part 04/00/10/21 13 Filed 04/07/22 Document 1-93 Page 22 of 501
Document     Page 25 of 174

(b)     each obligation of Borrower contained in the Note and in the Other Security Documents; and

(c)     each obligation of Borrower contained in any renewal, extension, amendment, modification, consolidation, change of, or substitution or replacement for, all or any part of the Note, this Security Instrument or the Other Security Documents.

(d)     any and all other indebtedness now or hereafter owing by Borrower to Lender.

Section 2.3.     DEBT AND OTHER OBLIGATIONS.  Borrower's obligations for the payment of the Debt and the performance of the Other Obligations shall be referred to collectively as the "Obligations."

Section 2.4.     PAYMENTS.  Unless payments are made in the required amount in immediately available funds at the place where the Note is payable, remittances in payment of all or any part of the Debt shall not, regardless of any receipt or credit issued therefor, constitute payment until the required amount is actually received by Lender in funds immediately available at the place where the Note is payable (or any other place as Lender, in Lender's sole discretion, may have established by delivery of written notice thereof to Borrower) and shall be made and accepted subject to the condition that any check or draft may be handled for collection in accordance with the practice of the collecting bank or banks; provided, however, Lender shall not be required to accept payment for any Obligation in cash.  Acceptance by Lender of any payment in an amount less than the amount then due shall be deemed an acceptance on account only, and the failure to pay the entire amount then due shall be and continue to be an Event of Default.

## ARTICLE 3. - BORROWER COVENANTS

Borrower covenants and agrees that:

Section 3.1.     PAYMENT OF DEBT AND PERFORMANCE OF OBLIGATIONS.  Borrower will pay the Debt at the time and in the manner provided in the Note and in this Security Instrument; without relief from valuation or appraisement laws, and shall promptly and fully perform all of the Obligations in this Security Agreement and the Other Security Documents (hereinafter defined).

Section 3.2.     INCORPORATION BY REFERENCE.  All the covenants, conditions and agreements contained in (a) the Note and (b) all and any of the documents other than the Note or this Security Instrument now or hereafter executed by Borrower and/or others and by or in favor of Lender, which wholly or partially secure or guaranty payment of the Note or are otherwise executed and delivered in connection with the Loan (the "Other Security Documents") are hereby made a part of this Security Instrument to the same extent and with the same force as if fully set forth herein.

Section 3.3.     INSURANCE.  Borrower shall maintain with respect to the Property at all times, insurance against loss or damage by fire and other casualties and hazards by insurance written on an "all risks" basis including specifically windstorm and/or hail damage, in an amount not less than the replacement cost thereof, naming Lender as loss payee and additional insured; (ii) if the Property is required to be insured pursuant to the National Flood Reform Act of 1994, and the regulations promulgated there under, flood insurance is required in the amount equal to the lesser of the loan amount or the maximum available under the National Flood Insurance Program, but in no event should the amount of coverage be less than the value of the improved structure, naming Lender as additional insured and loss payee; and (iii) liability insurance providing coverage in such amount as Lender may require but in no event less than $500,000.00 naming Lender as an additional insured; and (iv) such other insurances as Lender may reasonably require from time to time.

All casualty insurance policies shall contain an endorsement or agreement by the insurer in form satisfactory to Lender that any loss shall be payable in accordance with the terms of such policy notwithstanding any act of negligence of Borrower and the further agreement of the insurer waiving rights of subrogation against Lender, and rights of set-off, counterclaim or deductions against Borrower.

All insurance policies shall be in form, provide coverages, be issued by companies and be in amounts satisfactory to Lender.  At least 30 days prior to the expiration of such policy, Borrower shall furnish Lender with evidence satisfactory to Lender that such policy has been renewed or replaced.  All such policies shall provide that the policy will not be canceled or materially amended without at least 30 days prior written notice to Lender.  In the event Borrower fails to provide, maintain, keep in force and furnish to Lender the policies of insurance in such amounts, at such premium, for such risks and by such means as Lender chooses, then Lender may procure such insurance at Borrower's sole cost and expense, provided Lender shall have no responsibility to obtain any insurance, but if Lender does obtain insurance, Lender shall have no responsibility to assure that the insurance obtained shall be adequate or provide any

Case ID: 150600453
Control No.: 210142388

protection to Borrower.

In the event of a foreclosure of the Security Instrument or other transfer of title to the Property in extinguishment in whole or in part of the Debt, all right, title and interest of Borrower in and to the Policies then in force concerning the Property, to the extent assignable, and all proceeds payable thereunder shall thereupon vest in Lender or the purchaser at such foreclosure or other transferee in the event of such other transfer of title.

Section 3.4.    PAYMENT OF TAXES, ETC.

(a)    Borrower shall promptly pay by the date same are initially payable all taxes, assessments, impact fees, levies, inspection and license fees, water rates, sewer rents and other governmental impositions, including, without limitation, vault and meter charges and license fees for the use of vaults, chutes and similar areas adjoining the Land, now or hereafter levied or assessed or imposed against the Property or any part thereof (the "Taxes") not paid from the Escrow Fund (hereinafter defined), all ground rents, maintenance charges and similar charges, now or hereafter levied or assessed or imposed against the Property or any part thereof (the "Other Charges") and all charges for utility services provided to the Property as same become due and payable. Borrower will deliver to Lender, receipts or other, evidence satisfactory to Lender that the Taxes, Other Charges and utility service charges have been so paid or are not then delinquent. Borrower shall not suffer and shall promptly cause to be paid and discharged any lien or charge whatsoever, which may be or become a lien or charge against the Property, except to the extent sums sufficient to pay all Taxes and Other Charges have been deposited with Lender in accordance with the terms of this Security Instrument.

(b)    After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any of the Taxes, provided that (i) no Event of Default has occurred and is continuing under the Note, this Security Instrument or any of the Other Security Documents, (ii) Borrower is permitted to do so under the provisions of any other mortgage, deed of trust or deed to secure debt affecting the Property, (iii) such proceeding shall suspend the collection of the Taxes from Borrower and from the Property or Borrower shall have paid all of the Taxes under protest, (iv) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder, (v) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, canceled or lost and (vi) Borrower shall have deposited with Lender adequate reserves (determined by Lender in its sole discretion) for the payment of the Taxes, together with all interest and penalties thereon, unless Borrower has paid all of the Taxes under protest, and Borrower shall have furnished such other security as may be required in the proceeding, or as may be reasonably requested by Lender to insure the payment of any contested Taxes, together with all interest and penalties thereon, taking into consideration the amount in the Escrow Fund available for payment of Taxes.

Section 3.5.    ESCROW FUND. In addition to the initial deposits with respect to Taxes and Insurance Premiums made by Borrower to Lender on the date hereof to be held by Lender in escrow, Borrower shall pay to Lender on the first day of each calendar month (a) one-twelfth of an amount which would be sufficient to cover the payment of the Taxes payable, or estimated by Lender to be payable, during the next ensuing twelve (12) months and (b) one-twelfth of an amount which would be sufficient to pay the Insurance Premiums due for the renewal of the coverage afforded by the Policies upon the expiration thereof (the amounts in (a) and (b) above shall be called the "Escrow Fund"). Borrower agrees to notify Lender immediately of any changes to the amounts, schedules and instructions for payment of any Taxes and Insurance Premiums of which it has or obtains knowledge and authorizes Lender or its agent to obtain the bills for Taxes directly from the appropriate taxing authority. The Escrow Fund and the payments of interest or principal or both, payable pursuant to the Note shall be added together and shall be paid as an aggregate sum by Borrower to Lender. Provided there are sufficient amounts in the Escrow Fund and no Event of Default exists, Lender shall be obligated to pay the Taxes and Insurance Premiums as they become due on their respective due dates on behalf of Borrower by applying the Escrow Fund to the payments of such Taxes and Insurance Premiums required to be made by Borrower. If the amount of the Escrow Fund shall exceed the amounts reasonably necessary for the payment of Taxes and Insurance Premiums, Lender shall, in its discretion, return any excess to Borrower or credit such excess against future payments to be made to the Escrow Fund. In allocating such excess, Lender may deal with the person shown on the records of Lender to be the owner of the Property. If the Escrow Fund is not sufficient to pay the items set forth in (a) and (b) above as and when they are due, Borrower shall promptly pay to Lender, upon demand, an amount which Lender shall reasonably estimate as sufficient to make up the deficiency. Unless otherwise required by applicable state or federal law, the Escrow Fund shall not constitute a trust fund and may be commingled with other monies held by Lender. Unless otherwise required by applicable state or federal law, no earnings or interest on the Escrow Fund shall be payable to Borrower.

5

Case ID: 150600453
Control No.: 21012388

Upon payment in full of the Debt, and full performance of the Obligations, the funds remaining in the Escrow Fund, if any, shall be paid to the record owner of the Land encumbered by the lien of this Security Instrument within a reasonable time following the date of such full payment and performance.

Section 3.6.    CONDEMNATION. Borrower shall promptly give Lender notice of the actual or threatened commencement of any condemnation or eminent domain proceeding and shall deliver to Lender copies of any and all papers, documents, surveys and correspondence served or received in connection with such proceedings. Notwithstanding any taking by any public or quasi-public authority through eminent domain or otherwise (including, but not limited to any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Security Instrument and the Debt shall not be reduced until any award or payment therefor shall have been actually received and applied by Lender, after the deduction of expenses of collection, to the reduction or discharge of the Debt. Lender shall not be limited to the interest paid on the award by the condemning authority but shall be entitled to receive out of the award interest at the rate or rates provided in the Note. Borrower hereby assigns and shall cause all awards and payments made in any condemnation or eminent domain proceeding, to be paid directly to Lender. Lender may apply any award or payment to the reduction or discharge of the Debt whether or not then due and payable. If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the award or payment, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the award or payment, or a portion thereof sufficient to pay the Debt. In addition, Borrower authorizes Lender, at Lender's option but without any obligation, as attorney-in-fact for Borrower to commence, appear in and prosecute, in Borrower's or Lender's name, any action or proceeding relating to any condemnation (which term for purposes hereunder shall mean any action regarding damage or taking by any governmental authority, quasi-governmental authority, any party having power of condemnation, or any transfer by private sale in lieu thereof) or other taking of the Property and to settle or compromise any claim in connection with such condemnation or other taking. Notwithstanding any application of condemnation proceeds by Lender to the Debt, Borrower shall repair, restore and rebuild the Property affected by the condemnation to a condition as close to that existing prior to such condemnation as is reasonable practicable, and otherwise sufficient for the use and enjoyment thereof as determined by Lender.

Section 3.7.    RESTORATION AFTER CASUALTY.

(a)    In the event of loss, Borrower shall give immediate written notice to the insurance carrier and to Lender. Borrower hereby authorizes and appoints Lender as attorney-in-fact for Borrower to make proof of loss, to adjust and compromise any claims under policies of property damage insurance, to appear in and prosecute any action arising from such property damage insurance policies, to collect and receive the proceeds of property damage insurance, and to deduct from such proceeds Lender's expenses incurred in the collection of such proceeds. This power of attorney is coupled with an interest and therefore is irrevocable. However, nothing contained in this Section 3.7 shall require Lender to incur any expense or take any action. Lender may, at Lender's option, (1) hold the balance of such proceeds to be used to reimburse Borrower for the cost of restoring and repairing the Property to the equivalent of its original condition or to a condition approved by Lender (the "Restoration"), or (2) apply the balance of such proceeds to the payment of the Debt, whether or not then due. To the extent Lender determines to apply insurance proceeds to Restoration, Lender shall do so in accordance with Lender's then-current policies relating to the restoration of casualty damage on similar properties.

(b)    Lender shall not exercise its option to apply insurance proceeds to the payment of the Debt if all of the following conditions are met: (1) no Event of Default (or any event which, with the giving of notice or the passage of time, or both, would constitute an Event of Default) has occurred and is continuing; (2) Lender determines, in its discretion, that there will be sufficient funds to complete the Restoration; (3) Lender determines, in its discretion, that the net cash flow from the Property after completion of the Restoration will be sufficient to meet all operating costs and other expenses, deposits to the Escrow Fund, deposits to reserves and loan repayment obligations relating to the Property; (4) Lender determines, in its discretion, that the Restoration will be completed before the earlier of (A) one year before the maturity date of the Note or (B) one year after the date of the loss or casualty; and (5) upon Lender's request, Borrower provides Lender evidence of the availability during and after the Restoration of the insurance required to be maintained by Borrower pursuant to Section 3.3.

Section 3.8.    LEASES AND RENTS. Borrower shall maintain, enforce and cause to be performed all of the terms and conditions under any Lease or sublease, which may constitute a portion of the Property. Borrower shall not, without the consent of Lender enter into any new Lease of all or any portion of the Property, agree to the cancellation or surrender under any Lease of all or any portion of the Property, agree to prepayment of Rents, issues or profits (other than Rent paid at the signing of a lease or sublease), modify any such Lease so as to shorten the term, decrease the Rent, accelerate the payment of Rent, or change the terms of any renewal option, provided that such action (taking into account, in the case of

6

Case ID: 150600453
Control No.: 210124888

a termination, reduction in rent, surrender of space or shortening of term, the planned alternative use of the affected space) does not have a materially adverse effect on the value of the Property taken as a whole, and provided that such Lease, as amended, modified or waived, is otherwise in compliance with the requirements of this Security Instrument and any subordination agreement binding upon Lender with respect to such Lease. Any such purported new Lease, cancellation surrender, prepayment or modification made without the written consent of Lender shall be void as against Lender.

Section 3.9. MAINTENANCE AND USE OF PROPERTY. Borrower shall cause the Property to be maintained in a good and safe condition and repair. The Improvements and the Personal Property shall not be removed, demolished or materially altered (except for normal replacement of the Personal Property with replacement property of equal or greater value) without the consent of Lender. Borrower shall promptly repair, replace or rebuild any part of the Property which may be destroyed by any casualty, or become damaged, worn or dilapidated or which may be affected by any condemnation or taking proceeding and shall complete and pay for any structure at any time in the process of construction or repair on the Land. Borrower shall not initiate, join in, acquiesce in, or consent to any change in any private restrictive covenant, zoning law or other public or private restriction, limiting, defining or changing the uses which may be made of the Property or any part thereof. If under applicable zoning provisions the use of all or any portion of the Property is or shall become a nonconforming use, Borrower will not cause or permit the nonconforming use to be discontinued or the nonconforming Improvement to be abandoned without the express written consent of Lender, and Borrower shall take such other steps as Lender may require to establish the legality of such non-conforming use.

Section 3.10. WASTE. Borrower shall not commit or suffer any waste of the Property or make any change in the use of the Property which will in any way materially increase the risk of fire or other hazard arising out of the operation of the Property, or take any action that might invalidate or give cause for cancellation of any Policy, or substantially increase the rates thereunder, or do or permit to be done thereon anything that may in any way impair the value of the Property or the security of this Security Instrument. Borrower will not, without the prior written consent of Lender, permit any drilling or exploration for or extraction, removal, or production of any minerals from the surface or the subsurface of the Land, regardless of the depth thereof or the method of mining or extraction thereof.

Section 3.11. COMPLIANCE WITH LAWS.

(a) Borrower shall promptly comply with all existing and future federal, state and local laws, orders, ordinances, governmental rules and regulations or court orders affecting the Property, and the use thereof, including any Environmental Law (hereinafter defined) ("Applicable Laws").

(b) Borrower shall from time to time, upon Lender's request, provide Lender with evidence reasonably satisfactory to Lender that the Property complies with all Applicable Laws or is exempt from compliance with Applicable Laws.

(c) Notwithstanding any provisions set forth herein or in any document regarding Lender's approval of alterations of the Property, Borrower shall not alter the Property in any manner which would materially increase Borrower's responsibilities for compliance with Applicable Laws without the prior written approval of Lender. Lender's approval of the plans, specifications, or working drawings for alterations of the Property shall create no responsibility or liability on behalf of Lender for their completeness, design, sufficiency or their compliance with Applicable Laws. The foregoing shall apply to tenant improvements constructed by Borrower or by any of its tenants. Lender may condition any such approval upon receipt of a certificate of compliance with Applicable Laws from an independent architect, engineer, or other person acceptable to Lender.

(d) Borrower shall give prompt notice to Lender of the receipt by Borrower of any notice related to a violation or threatened violation of any Applicable Laws and of the commencement or threatened commencement of any proceedings or investigations which relate to compliance with Applicable Laws.

(e) After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceedings, promptly initiated and conducted in good faith and with due diligence, the Applicable Laws affecting the Property, provided that (i) no Event of Default has occurred and is continuing under the Note, this Security Instrument or any of the Other Security Documents; (ii) Borrower is permitted to do so under the provisions of any other mortgage, deed of trust or deed to secure debt affecting the Property; (iii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower or the Property is subject and shall not constitute a default thereunder; (iv) neither the Property, any part thereof or interest therein, any of the tenants or occupants thereof, Borrower, nor Lender shall be affected in any material adverse way as a result of such proceeding; (v)

G.B GB

Case ID: 150600453
Control No.: 21012388

non-compliance with the Applicable Laws shall not impose civil or criminal liability on Borrower or Lender; and (vi) Borrower shall have furnished to Lender all other items reasonably requested by Lender.

Section 3.12.    BOOKS AND RECORDS

(a)    Borrower shall keep and maintain at all times at the Property or the management agent's offices, and upon Lender's request shall make available at the Property, complete and accurate books of account and records (including copies of supporting bills and invoices) adequate to reflect correctly the operation of the Property, and copies of all written contracts, Leases, and other instruments which affect the Property. Following a default by Borrower, the books, records, contracts, Leases and other instruments shall be subject to examination and inspection at any reasonable time by Lender.

(b)    Following a default by Borrower, Borrower shall furnish to Lender all of the following:

(1)    within ten (10) days following Lender's written request and thereafter annually within 120 days after the end of each fiscal year of Borrower, a statement of income and expenses for Borrower's operation of the Property for that fiscal year, a statement of changes in financial position of Borrower relating to the Property for that fiscal year and, when requested by Lender, a balance sheet showing all assets and liabilities of Borrower relating to the Property as of the end of that fiscal year;

(2)    within ten (10) days following Lender's written request and thereafter annually within 120 days after the end of each fiscal year of Borrower, and at any other time upon Lender's request, a rent schedule for the Property showing the name of each tenant, and for each tenant, the space occupied, the lease expiration date, the rent payable for the current month, the date through which rent has been paid, and any related information requested by Lender;

(3)    within ten (10) days following Lender's written request and thereafter annually within 120 days after the end of each fiscal year of Borrower, and at any other time upon Lender's request, an accounting of all security deposits held pursuant to all Leases, including the name of the institution (if any) and the names and identification numbers of the accounts (if any) in which such security deposits are held and the name of the person to contact at such financial institution, along with any authority or release necessary for Lender to access information regarding such accounts;

(4)    within ten (10) days following Lender's written request and thereafter annually within 120 days after the end of each fiscal year of Borrower, and at any other time upon Lender's request, a statement that identifies all owners of any interest in Borrower and the interest held by each, if Borrower is a corporation, all officers and directors of Borrower, and if Borrower is a limited liability company, all managers who are not members;

(5)    within ten (10) days following Lender's written request and thereafter monthly a property management report for the Property, showing the number of inquiries made and rental applications received from tenants or prospective tenants and deposits received from tenants and any other information requested by Lender;

(6)    within ten (10) days following Lender's written request and thereafter monthly a balance sheet, a statement of income and expenses for Borrower and a statement of changes in financial position of Borrower for Borrower's most recent fiscal year; and

(7)    within ten (10) days following Lender's written request and thereafter monthly a statement of income and expense for the Property for the prior month or quarter.

(c)    Each of the statements, schedules and reports required hereunder shall be certified to be complete and accurate by an individual having authority to bind Borrower, and shall be in such form and contain such detail as Lender may reasonably require; provided that Lender, in Lender's sole discretion, may require that any statements, schedules or reports be audited at Borrower's expense by independent certified public accountants acceptable to Lender.

(d)    If Borrower fails to provide in a timely manner the statements, schedules and reports required hereunder, Lender shall have the right to have Borrower's books and records audited, at Borrower's expense, by independent certified public accountants selected by Lender in order to obtain such statements, schedules and reports, and all related costs and expenses of Lender shall become immediately due and payable and shall become an additional part of the Debt.

(e)    If an Event of Default has occurred and is continuing, Borrower shall deliver to Lender upon written demand all books and records relating to the Property or its operation.

8

Case ID: 150600453
Control No.: 21016888

(f)    Borrower authorizes Lender to obtain a credit report on Borrower at any time.

(g)    Borrower, any Guarantor and any Indemnitor shall furnish Lender with such other additional financial or management information (including State and Federal tax returns) as may, from time to time, be reasonably required by Lender in form and substance satisfactory to Lender.

(h)    Borrower, any Guarantor and any Indemnitor shall furnish to Lender and its agents convenient facilities for the examination and audit of any such books and records.

**Section 3.13.    PAYMENT FOR LABOR AND MATERIALS.** Borrower will promptly pay when due all bills and costs for labor, materials, and specifically fabricated materials incurred in connection with the Property and never permit to exist in respect of the Property or any part thereof any lien or security interest, even though inferior to the liens and the security interests hereof, and in any event never permit to be created or exist in respect of the Property or any part thereof any other or additional lien or security interest other than the liens or security interests hereof, except for the Permitted Exceptions (defined below).

**Section 3.14.    PERFORMANCE OF OTHER AGREEMENTS.** Borrower shall observe and perform each and every term to be observed or performed by Borrower pursuant to the terms of any agreement or recorded instrument affecting or pertaining to the Property, or given by Borrower to Lender for the purpose of further securing an Obligation and any amendments, modifications or changes thereto.

**Section 3.15.    CHANGE OF NAME, IDENTITY OR STRUCTURE.** Borrower shall not change Borrower's name, identity (including its trade name or names) or, if not an individual, Borrower's corporate, partnership or other structure or jurisdiction where the Borrower is organized without notifying the Lender of such change in writing at least thirty (30) days prior to the effective date of such change and, in the case of a change in Borrower's structure or the jurisdiction where Borrower is organized, without first obtaining the prior written consent of the Lender.

**Section 3.16.    EXISTENCE.** Borrower will continuously maintain (a) its existence and shall not dissolve or permit its dissolution, (b) its rights to do business in the state where the Property is located and (c) its franchises and trade names.

**Section 3.17.    MANAGEMENT.** The Property shall be managed by either: (a) Borrower or an entity affiliated with Borrower and approved by Lender for so long as Borrower or said affiliated entity is managing the Property in a first class manner; or (b) a professional property management company approved by Lender. Management by an affiliated entity or a professional property management company shall be pursuant to a written agreement approved by Lender which shall be in all respects subordinate to this Security Instrument. Following a default by Borrower, no manager shall be removed or replaced or the terms of any management agreement modified or amended without the prior written consent of Lender. In the event (x) of default hereunder or under any management contract then in effect, which default is not cured within any applicable grace or cure period or (y) of the bankruptcy or insolvency of the manager, Lender shall have the right to immediately terminate, or to direct Borrower to immediately terminate, such management contract and to retain, or to direct Borrower to retain, a new management agent approved by Lender. All Rents generated by or derived from the Property shall first be utilized solely for current expenses directly attributable to the ownership and operation of the Property, including, without limitation, current expenses relating to Borrower's liabilities and obligations with respect to the Note, this Security Instrument and the Other Security Documents, and none of the Rents generated by or derived from the Property shall be diverted by Borrower and utilized for any other purpose unless all such current expenses attributable to the ownership and operation of the Property have been fully paid and satisfied.

**Section 3.18.    PRINCIPAL PLACE OF BUSINESS.** In the event that Borrower shall change the principal place of business or chief executive office, or, in the event Borrower is one or more natural persons, the location of its permanent residence, all as set forth in Subsection 4.18 below, Borrower shall immediately notify Lender in writing. Borrower shall execute and deliver such additional financing statements, security agreements and other instruments which may be necessary to effectively evidence or perfect Lender's security interest in the Property as a result of such change of principal place of business or residence.

## ARTICLE 4. - REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to Lender that:

**Section 4.1.    WARRANTY OF TITLE.** Borrower has good and marketable title to the Property and has the right to

Case ID: 150600453
Control No.: 21012388

mortgage, grant, bargain, sell, pledge, assign, warrant, transfer and convey the same and that Borrower possesses an unencumbered fee simple absolute estate in the Land and the Improvements and that it owns the Property free and clear of all liens, encumbrances and charges whatsoever except for those exceptions shown in the title insurance policy insuring the lien of this Security Instrument (the "Permitted Exceptions"). Borrower shall forever warrant, defend and preserve the title and the validity and priority of the lien of this Security Instrument and shall forever warrant and defend the same to Lender against the claims of all persons whomsoever, and shall make such further assurances to perfect fee simple title to the Property as Lender may reasonably require.

Section 4.2. **LEGAL STATUS AND AUTHORITY.** Borrower (a) is duly organized, validly existing and in good standing under the laws of its state of organization or incorporation; (b) is duly qualified to transact business and is in good standing in the state where the Property is located; and (c) has all necessary approvals, governmental and otherwise, and full power and authority to own, operate and lease the Property. Borrower (and the undersigned representative of Borrower, if any) has full power, authority and legal right to execute this Security Instrument, and to mortgage, grant, bargain, sell, pledge, assign, warrant, transfer and convey the Property pursuant to the terms hereof and to keep and observe all of the terms of this Security Instrument on Borrower's part to be performed.

Section 4.3. **VALIDITY OF DOCUMENTS.** (a) The execution, delivery and performance of the Note, this Security Instrument and the Other Security Documents and the borrowing evidenced by the Note (i) are within the power and authority of Borrower; (ii) have been authorized by all requisite organizational action; (iii) have received all necessary approvals and consents, corporate, governmental or otherwise; (iv) will not violate, conflict with, result in a breach of or constitute (with notice or lapse of time, or both) a default under any provision of law, any order or judgment of any court or governmental authority, the articles of incorporation, by-laws, partnership or trust agreement, articles of organization, operating agreement, or other governing instrument of Borrower, or any instrument, agreement or other instrument to which Borrower is a party or by which it or any of its assets or the Property is or may be bound or affected; (v) will not result in the creation or imposition of any lien, charge or encumbrance whatsoever upon any of its assets, except the lien and security interest created hereby; and (vi) will not require any authorization or license from, or any filing with, any governmental or other body (except for the recordation of this Security Instrument in appropriate land records in the State where the Property is located and except for Uniform Commercial Code filings relating to the security interest created hereby), and (b) the Note, this Security Instrument and the Other Security Documents constitute the legal, valid and binding obligations of Borrower, enforceable in accordance with their terms.

Section 4.4. **LITIGATION.** There is no action, suit or proceeding, judicial, administrative or otherwise (including any condemnation or similar proceeding), pending or, to the best of Borrower's knowledge, threatened or contemplated against Borrower, a Guarantor, if any, an Indemnitor, if any, or against or affecting the Property that has not been disclosed to Lender by Borrower in writing.

Section 4.5. **STATUS OF PROPERTY.**

(a)     Borrower has obtained all necessary certificates, licenses and other approvals, governmental and otherwise, necessary for the operation of the Property and the conduct of its business and all required zoning, building code, land use, environmental and other similar permits or approvals, all of which are in full force and effect as of the date hereof and not subject to revocation, suspension, forfeiture or modification.

(b)     The Property and the present and contemplated use and occupancy thereof are in full compliance with all applicable zoning ordinances, building codes, land use laws, Environmental Laws and other similar laws.

(c)     The Property is served by all utilities required for the current or contemplated use thereof. All utility service is provided by public utilities and the Property has accepted or is equipped to accept such utility service.

(d)     All public roads and streets necessary for service of and access to the Property for the current or contemplated use thereof have been completed, are serviceable and all-weather and are physically and legally open for use by the public, and have been dedicated to and accepted for public maintenance by the applicable municipal or county authorities.

(e)     The Property is served by public water and sewer systems.

(f)     The Property is free from damage caused by fire or other casualty.

(g)     All costs and expenses of any and all labor, materials, supplies and equipment used in the

10

Case ID: 150600453
Control No.: 21048888

construction of the Improvements have been paid in full.

(h)    Borrower has paid in full for, and is the owner of, all furnishings, fixtures and equipment (other than tenants' property) used in connection with the operation of the Property, free and clear of any and all security interests, liens or encumbrances, except the lien and security interest created hereby.

(i)    All liquid and solid waste disposal, septic and sewer systems located on the Property are in a good and safe condition and repair and in compliance with all Applicable Laws.

(j)    No portion of the Improvements is located in an area identified by the Federal Emergency Management Agency or any successor thereto as an area having special flood hazards pursuant to the Flood Insurance Acts or, if any portion of the Improvements is located within such area, Borrower has obtained and will maintain the insurance required pursuant to the terms hereof.

(k)    All the Improvements lie within the boundaries of the Land.

Section 4.6.    NO FOREIGN PERSON. Borrower is not a "foreign person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code of 1986, as amended and the related Treasury Department regulations.

Section 4.7.    SEPARATE TAX LOT. The Property is assessed for real estate tax purposes as one or more wholly independent tax lot or lots, separate from any adjoining land or improvements not constituting a part of such lot or lots, and no other land or improvements is assessed and taxed together with the Property or any portion thereof.

Section 4.8.    LEASES. Except as disclosed in the rent roll for the Property delivered to and approved by Lender, (a) Borrower is the sole owner of the entire lessor's interest in the Leases; (b) the Leases are valid and enforceable and in full force and effect; (c) all of the Leases are arms-length agreements with bona fide, independent third parties; (d) no party under any Lease is in default; (e) all Rents due have been paid in full; (f) the terms of all alterations, modifications and amendments to the Leases are reflected in the certified occupancy statement delivered to and approved by Lender; (g) none of the Rents reserved in the Leases have been assigned or otherwise pledged or hypothecated; (h) none of the Rents have been collected for more than one (1) month in advance (except a security deposit shall not be deemed rent collected in advance); (i) the premises demised under the Leases have been completed in accordance with the Leases, and the tenants under the Leases have accepted the same and have taken possession of the same on a rent-paying basis; (j) there exist no offsets or defenses to the payment of any portion of the Rents and Borrower has no monetary obligation to any tenant under any Lease; (k) Borrower has received no notice from any tenant challenging the validity or enforceability of any Lease; (l) there are no agreements with the tenants under the Leases other than expressly set forth in each Lease; (m) the Leases are valid and enforceable against Borrower and the tenants set forth therein; (n) no Lease contains an option to purchase, right of first refusal to purchase, right of first refusal to relet, or any other similar provision; (o) no person or entity has any possessory interest in, or right to occupy, the Property except under and pursuant to a Lease; (p) each Lease is subordinate to this Security Instrument, either pursuant to its terms or a recordable subordination agreement; (q) no Lease has the benefit of a non-disturbance agreement that would be considered unacceptable to prudent institutional lenders; (r) all security deposits relating to the Leases reflected on the certified rent roll delivered to Lender have been collected by Borrower; and (s) no brokerage commissions or finders fees are due and payable regarding any Lease.

Section 4.9.    FINANCIAL CONDITION.

(a)    (i) Borrower is solvent and no proceeding under Creditors Rights Laws (hereinafter defined) with respect to Borrower has been initiated, and (ii) Borrower has received reasonably equivalent value for the granting of this Security Instrument.

(b)    No petition in bankruptcy has been filed by or against Borrower, any Guarantor, any Indemnitor or any related entity, or any principal, general partner or member thereof, in the last seven (7) years, and neither Borrower, any Guarantor, any Indemnitor nor any related entity, or any principal, general partner or member thereof, in the last seven (7) years has ever made any assignment for the benefit of creditors or taken advantage of any Creditors Rights Laws.

Section 4.10.    BUSINESS PURPOSES. The loan evidenced by the Note secured by the Security Instrument and the Other Security Documents (the "Loan") is solely for the business purpose of Borrower, and is not for personal, family, household, or agricultural purposes.

Section 4.11.    TAXES. Borrower, any Guarantor and any Indemnitor have filed all federal, state, county, municipal,

11

Case ID: 150600453
Control No.: 21024388

and city income, personal property and other tax returns required to have been filed by them and have paid all taxes and related liabilities which have become due pursuant to such returns or pursuant to any assessments received by them. Neither Borrower, any Guarantor nor any Indemnitor knows of any basis for any additional assessment in respect of any such taxes and related liabilities for prior years.

Section 4.12.    MAILING ADDRESS.  Borrower's mailing address, as set forth in the opening paragraph hereof or as changed in accordance with the provisions hereof, is true and correct.

Section 4.13.    NO CHANGE IN FACTS OR CIRCUMSTANCES.  All information in the application for the Loan submitted to Lender and in all financial statements, rent rolls, reports, certificates and other documents submitted in connection with the application or in satisfaction of the terms thereof, are accurate, complete and correct in all respects. There has been no adverse change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise misleading.

Section 4.14.    DISCLOSURE.  Borrower has disclosed to Lender all material facts and has not failed to disclose any material fact that could cause any representation or warranty made herein to be materially misleading.

Section 4.15.    THIRD PARTY REPRESENTATIONS.  Each of the representations and the warranties made by each Guarantor and Indemnitor in any Other Security Document(s) is true and correct in all material respects.

Section 4.16.    ILLEGAL ACTIVITY.  No portion of the Property has been or will be purchased, improved, equipped or furnished with proceeds of any illegal activity and to the best of Borrower's knowledge, there are no illegal activities or activities relating to controlled substances at the Property.

Section 4.17.    PERMITTED EXCEPTIONS.  None of the Permitted Exceptions, individually or in the aggregate, materially interfere with the benefits of the security intended to be provided by the Security Instrument, the Note, and the Other Security Documents, materially and adversely affect the value of the Property, impair the use or the operation of the Property or impair Borrower's ability to pay its obligations in a timely manner.

Section 4.18.    PRINCIPAL PLACE OF BUSINESS.  Borrower's principal place of business is as set forth in the opening paragraph to this Security Instrument.

Section 4.19.    PROPERTY USE.  The Property shall continue to be used in accordance with its present use, and for no other use without the prior written consent of Lender.

## ARTICLE 5. – OBLIGATIONS AND RELIANCE

Section 5.1.    RELATIONSHIP OF BORROWER AND LENDER.  The relationship between Borrower and Lender is solely that of debtor and creditor, and Lender has no fiduciary or other special relationship with Borrower, and no term or condition of any of the Note, this Security Instrument and the Other Security Documents shall be construed so as to deem the relationship between Borrower and Lender to be other than that of debtor and creditor.

Section 5.2.    NO RELIANCE.  The members, general partners, principals and (if Borrower is a trust) beneficial owners of Borrower are experienced in the ownership and operation of properties similar to the Property, and Borrower and Lender are relying solely upon such expertise in connection with the ownership and operation of the Property.  Borrower is not relying on Lender's expertise, business acumen or advice in connection with the Property.

Section 5.3.    NO LENDER OBLIGATIONS.  Notwithstanding anything to the contrary contained herein, Lender is not undertaking the performance of (a) any obligations under the Leases; or (b) any obligations with respect to such agreements, contracts, certificates, instruments, franchises, permits, trademarks, licenses and other documents.  By accepting or approving anything required to be observed, performed or fulfilled or to be given to Lender pursuant to this Security Instrument, the Note or the Other Security Documents, including without limitation, any officer's certificate, balance sheet, statement of profit and loss or other financial statement, survey, appraisal, or insurance policy, Lender shall not be deemed to have warranted, consented to, or affirmed the sufficiency, the legality or effectiveness of same, and such acceptance or approval thereof shall not constitute any warranty or affirmation with respect thereto by Lender.

Section 5.4.    RELIANCE.  Borrower recognizes and acknowledges that in accepting the Note, this Security Instrument and the Other Security Documents, Lender is expressly and primarily relying on the truth and accuracy of the warranties and representations set forth herein without any obligation to investigate the Property and notwithstanding any

12

Case ID: 150600453
Control No.: 21050088

investigation of the Property by Lender; that such reliance existed on the part of Lender prior to the date hereof; that the warranties and representations are a material inducement to Lender in accepting the Note, this Security Instrument and the Other Security Documents; and that Lender would not be willing to make the Loan and accept this Security Instrument in the absence of the warranties and representations as set forth herein.

## ARTICLE 6. - FURTHER ASSURANCES

**Section 6.1.**     <u>RECORDING OF SECURITY INSTRUMENT, ETC.</u> Borrower forthwith upon the execution and delivery of this Security Instrument and thereafter, from time to time, will cause this Security Instrument and any of the Other Security Documents creating a lien or security interest or evidencing the lien hereof upon the Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect and perfect the lien or security interest hereof upon, and the interest of Lender in, the Property. Borrower will pay all taxes, filing, registration or recording fees, and all expenses incident to the preparation, execution, acknowledgment and/or recording of the Note, this Security Instrument, the Other Security Documents, any note or mortgage supplemental hereto, any security instrument with respect to the Property and any instrument of further assurance, and any modification or amendment of the foregoing documents, and all federal, state, county and municipal taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of this Security Instrument, any mortgage supplemental hereto, any security instrument with respect to the Property or any instrument of further assurance, and any modification or amendment of the foregoing documents, except where prohibited by law so to do.

**Section 6.2.**     <u>FURTHER ACTS, ETC.</u> Borrower will, at the cost of Borrower, and without expense to Lender, do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, mortgages, assignments, notices of assignments, transfers and assurances as Lender shall, from time to time, reasonably require, for the better assuring, conveying, assigning, transferring, and confirming unto Lender the Property and rights hereby mortgaged, granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted and transferred or intended now or hereafter so to be, or which Borrower may be or may hereafter become bound to convey or assign to Lender, or for carrying out the intention or facilitating the performance of the terms of this Security Instrument or for filing, registering or recording this Security Instrument, or for complying with all applicable state or federal law. Borrower, on demand, will execute and deliver and hereby authorizes Lender, following 10 days' notice to Borrower, to execute in the name of Borrower or without the signature of Borrower to the extent Lender may lawfully do so, one or more financing statements, chattel mortgages or other instruments, to evidence or perfect more effectively the security interest of Lender in the Property. Borrower grants to Lender an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Lender hereunder.

**Section 6.3.**     <u>CHANGES IN TAX, DEBT CREDIT AND DOCUMENTARY STAMP LAWS.</u>

      (a)     If any law is enacted or adopted or amended after the date of this Security Instrument which deducts the Debt from the value of the Property for the purpose of taxation or which imposes a tax, either directly or indirectly, on the Debt or Lender's interest in the Property, Borrower will pay the tax, with interest and penalties thereon, if any. If Lender is advised by counsel chosen by it that the payment of tax by Borrower would be unlawful or taxable to Lender or unenforceable or provide the basis for a defense of usury, then Lender shall have the option, exercisable by written notice of not less than ninety (90) days, to declare the Debt immediately due and payable.

      (b)     Borrower will not claim or demand or be entitled to any credit or credits on account of the Debt for any part of the Taxes or Other Charges assessed against the Property, or any part thereof.

      (c)     If at any time the United States of America, any State thereof or any subdivision of any such State shall require revenue or other stamps to be affixed to the Note, this Security Instrument, or any of the Other Security Documents or impose any other tax or charge on the same, Borrower will pay for the same, with interest and penalties thereon, if any.

**Section 6.4.**     <u>ESTOPPEL CERTIFICATES.</u>

      (a)     After request by Lender, Borrower, within ten (10) days, shall furnish Lender or any proposed assignee with a statement, duly acknowledged and certified, setting forth (i) the original principal amount of the Note, (ii) the unpaid principal amount of the Note, (iii) the rate of interest of the Note, (iv) the terms of payment and maturity date of the Note, (v) the date installments of interest and/or principal were last paid, (vi) that, except as provided in such statement, there are no defaults or events which with the passage of time or the giving of notice or both, would constitute

13

6.13

6.13

Case No: 150600453
Control No.: 210151388

an event of default under the Note or the Security Instrument, (vii) that the Note and this Security Instrument are valid, legal and binding obligations and have not been modified or if modified, giving particulars of such modification, (viii) whether any offsets or defenses exist against the obligations secured hereby and, if any are alleged to exist, a detailed description thereof, (ix) that all Leases are in full force and effect and (provided the Property is not a residential multifamily property) have not been modified (or if modified, setting forth all modifications), (x) the date to which the Rents thereunder have been paid pursuant to the Leases, (xi) whether or not, to the best knowledge of Borrower, any of the lessees under the Leases are in default under the Leases, and, if any of the lessees are in default, setting forth the specific nature of all such defaults, (xii) the amount of security deposits held by Borrower under each Lease and that such amounts are consistent with the amounts required under each Lease, and (xiii) as to any other matters reasonably requested by Lender and reasonably related to the Leases, the obligations secured hereby, the Property or this Security Instrument.

(b)        Borrower shall use its best efforts to deliver to Lender, promptly upon request, duly executed estoppel certificates from any one or more lessees as required by Lender attesting to such facts regarding the Lease as Lender may require, including, but not limited to attestations that each Lease covered thereby is in full force and effect with no defaults thereunder on the part of any party, that none of the Rents have been paid more than one month in advance, except as security, and that the lessee claims no defense or offset against the full and timely performance of its obligations under the Lease.

(c)        Upon any transfer or proposed transfer of the Property at Lender's request, Borrower, any Guarantors and any Indemnitor(s) shall provide an estoppel certificate in such form, substance and detail as Lender may require.

Section 6.5.        FLOOD INSURANCE. After Lender's request, Borrower shall deliver evidence satisfactory to Lender that no portion of the Improvements is situated in a federally designated "special flood hazard area" or, if it is, that Borrower has obtained insurance meeting the requirements hereof.

Section 6.6.        REPLACEMENT DOCUMENTS. Upon receipt of an affidavit of an officer of Lender as to the loss, theft, destruction or mutilation of the Note or any Other Security Document which is not of public record, and, in the case of any such mutilation, upon surrender and cancellation of such Note or Other Security Document, Borrower will issue, in lieu thereof, a replacement Note or Other Security Document, dated the date of such lost, stolen, destroyed or mutilated Note or Other Security Document in the same principal amount thereof and otherwise of like tenor.

## ARTICLE 7. - DUE ON SALE/ENCUMBRANCE

Section 7.1.        TRANSFER DEFINITIONS. For purposes of this Article, an "Affiliated Manager" shall mean any managing agent in which Borrower, any Guarantor or Indemnitor has, directly or indirectly, any legal, beneficial or economic interest; a "Restricted Party" shall mean Borrower, any Guarantor, any Indemnitor, or any Affiliated Manager or any shareholder, partner, member or non-member manager, or any direct or indirect legal or beneficial owner of Borrower, any Guarantor, any Indemnitor, any Affiliated Manager or any non-member manager; and a "Sale" shall mean a voluntary or involuntary sale, conveyance, transfer or pledge of a legal or beneficial interest.

Section 7.2.        NO SALE/ENCUMBRANCE

(a)        Borrower shall not sell, convey, mortgage, grant, bargain, encumber, pledge, assign, grant options with respect to, or otherwise transfer or dispose of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) the Property or any part thereof or any legal or beneficial interest therein (collectively a "Transfer"), other than pursuant to Leases of space in the Improvements to tenants in accordance with the provisions hereof without the prior written consent of Lender.

(b)        A Transfer shall include, but not be limited to, (i) an installment sales agreement wherein Borrower agrees to sell the Property or any part thereof for a price to be paid in installments; (ii) an agreement by Borrower leasing all or a substantial part of the Property for other than actual occupancy by a space tenant thereunder or a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any Leases or any Rents; (iii) if a Restricted Party is a corporation, any merger, consolidation or Sale or Pledge of such corporation's stock or the creation or issuance of new stock in one or a series of transactions, by which such corporation's stock shall be vested in a party or parties who are not now shareholders; (iv) if a Restricted Party is a limited or general partnership or joint venture, any merger or consolidation or the change, removal, resignation or addition of a general

14

Case ID: 150600453
Control No.: 21012388

partner or the Sale or Pledge of the partnership interest of any general partner or any profits or proceeds relating to such partnership interest, or the Sale or Pledge of limited partnership interests or the creation or issuance of new limited partnership interests in one or a series of transactions, by which such limited partnership interests shall be vested in a party or parties who are not now limited partners; (v) if a Restricted Party is a limited liability company, any merger or consolidation or the change, removal, resignation or addition of a managing member or non-member manager (or if no managing member, any member) or the Sale or Pledge of the membership interest of a managing member (or if no managing member, any member) or any profits or proceeds relating to such membership interest, or the Sale or Pledge of non-managing membership interests or the creation or issuance of new non-managing membership interests in one or a series of transactions, by which such non-managing membership interests shall be vested in a party or parties who are not now non-managing members; (vi) if a Restricted Party is a trust or nominee trust, any merger, consolidation or the Sale or Pledge of the legal or beneficial interest in a Restricted Party or the creation or issuance of new legal or beneficial interests in one or a series of transactions, by which such beneficial or legal interests shall be vested in a party or parties who are not now legal or beneficial owners; or (vii) the removal or the resignation of the managing agent (including, without limitation, an Affiliated Manager) other than in accordance herewith.

Section 7.3.    PERMITTED TRANSFERS. Notwithstanding anything to the contrary contained herein, the following transfers shall not be deemed to be a Transfer: (a) a transfer by devise or descent or by operation of law upon the death of a member, partner or shareholder of a Restricted Party; and (b) the Sale or Pledge of stock or limited partnership or non-managing membership interests in a Restricted Party by which, in one or a series of transactions, in the aggregate, not more than forty-nine percent (49%) of the stock, limited partnership interests or non-managing membership interests (as the case may be) in a Restricted Party, shall be vested in parties not now having an ownership interest; provided, however, no such transfer shall result in the change of voting control in the Restricted Party, and as a condition to each such transfer, Lender shall receive not less than ten (10) days prior written notice of such proposed transfer.

Section 7.4    ASSIGNMENT/ASSUMPTION. Notwithstanding anything to the contrary contained in this Article 7, and in addition to the transfers permitted hereunder, Lender may, in Lender's sole and absolute discretion, permit a sale, assignment, or other transfer of the Property, provided that: (i) Lender receives sixty (60) days prior written notice of the proposed transfer hereunder; (ii) no Event of Default has occurred and is continuing; and (iii) all underwriting requirements deemed necessary by Lender (in its sole and absolute discretion) are satisfied, including but not limited to the following:

(a)    Borrower shall pay any and all fees and out-of-pocket costs incurred in connection with the transfer of the Property (including, without limitation, Lender's counsel fees and disbursements and all recording fees, title insurance premiums and mortgage and intangible taxes);

(b)    The proposed transferee (the "Transferee") or Transferee's principals must have demonstrated expertise in owning and operating properties similar in location, size and operation to the Property, which expertise shall be determined by Lender, in Lender's sole discretion;

(c)    Transferee and Transferee's principals shall, as of the date of such transfer, have an aggregate net worth and liquidity acceptable to Lender, in Lender's sole discretion;

(d)    Transferee shall assume all of the obligations of Borrower under the Loan Documents in all respects, including, without limitation, by entering into an assumption agreement in form and substance satisfactory to Lender (in Lender's sole discretion) and one or more Transferee's principals shall execute in favor of Lender a Guaranty and an Affidavit and Indemnity of Borrower and Guarantor Regarding Hazardous and Toxic Materials;

(e)    No Event of Default or event which, with the giving of notice, passage of time or both, shall constitute an Event of Default, shall otherwise occur as a result of such transfer, and Transferee and Transferee's principals shall deliver (A) all organization documentation requested by Lender, which shall be satisfactory to Lender (in Lender's sole discretion), and (B) all certificates, agreements and covenants required by Lender; and

(f)    Borrower shall deliver, at its sole cost and expense, an endorsement to the existing title policy insuring the Security Instrument, as modified by the assumption agreement, as a valid first lien on the Property and naming the Transferee as owner of the Property, which endorsement shall insure that, as of the date of the recording of the assumption agreement, the Property shall not be subject to any additional exceptions or liens other than those contained in the title policy issued on the date hereof.

15

Case ID: 150600453
Control No.: 21013388

If all Lender requirements have been satisfied (including but not limited to those listed hereinabove) and Lender approves the proposed transfer to the Transferee, then Borrower shall be released from all liability under this Security Instrument, the Note and the Other Loan Documents immediately upon the transfer of the Property to the Transferee.

## ARTICLE 8. – DEFAULT

Section 8.1.       EVENTS OF DEFAULT. The occurrence of any one or more of the following events shall constitute an "Event of Default":

(a)       if any portion of the Debt is not paid on or prior to the date the same is due or if the entire Debt is not paid on or before the Maturity Date;

(b)       if Borrower fails to repay any sum paid or advanced by Lender under the terms of this Security Instrument or any Other Loan Document;

(c)       if Borrower fails to repay any sum owed to Lender or its successor or assignee under the terms of any other Security Instrument, promissory note or other loan document in connection with any other loan; provided that such failure to repay shall constitute an Event of Default hereunder only if the person or entity to which payment is owed under such other Security Instrument, promissory note or other loan document is the holder of the Note;

(d)       if any of the Taxes or Other Charges is not paid when the same is due and payable except to the extent sums sufficient to pay such Taxes and Other Charges have been deposited with Lender in accordance with the terms of this Security Instrument;

(e)       if the Policies are not kept in full force and effect, or if the Policies are not delivered to Lender as provided herein;

(f)       if Borrower violates or does not comply with any of the provisions of this Security Instrument or any Other Loan Document;

(g)       if any representation or warranty of Borrower, any Indemnitor or any person guaranteeing payment of the Debt or any portion thereof or performance by Borrower of any of the terms of this Security Instrument (a "Guarantor"), or any member, general partner, principal or beneficial owner of any of the foregoing, made herein or in any guaranty, or in any certificate, report, financial statement or other instrument or document furnished to Lender shall have been false or misleading in any material respect when made;

(h)       if (i) Borrower or any managing member or general partner of Borrower, or any Guarantor or Indemnitor shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to its debts or debtors ("Creditors Rights Laws"), seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or the Borrower or any managing member or general partner of Borrower, or any Guarantor or Indemnitor shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against Borrower or any managing member or general partner of Borrower or any Guarantor or Indemnitor any case, proceeding or other action of a nature referred to in clause (i) above which (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of sixty (60) days; or (iii) there shall be commenced against the Borrower or any managing member or general partner of Borrower, or any Guarantor or Indemnitor any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets which results in the entry of any order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within sixty (60) days from the entry thereof; or (iv) the Borrower or any managing member or general partner of Borrower or any Guarantor or Indemnitor shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above; or (v) the Borrower or any managing member or general partner of Borrower, or any Guarantor or Indemnitor shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due;

Case ID: 150600453
Control No.: 21054888

(i)         if Borrower shall be in default beyond applicable notice and grace periods under any other mortgage, deed of trust, deed to secure debt or other security agreement covering any part of the Property whether it be superior or junior in lien to this Security Instrument;

(j)         if the Property becomes subject to any mechanic's, materialman's or other lien other than a lien for any Taxes not then due and payable and the lien shall remain undischarged of record (by payment, bonding or otherwise) for a period of thirty (30) days;

(k)         if any federal or state tax lien is filed against Borrower, any member or general partner of Borrower, any Guarantor, any Indemnitor or the Property and same is not discharged of record within thirty (30) days after same is filed;

(l)         if any default occurs under any guaranty or indemnity executed in connection herewith, and such default continues after the expiration of applicable grace periods, if any; or

(m)        if Borrower files of record, without the prior written consent of Lender which Lender may grant or withhold for any reason in its sole and absolute discretion, any notice limiting the maximum principal amount that may be secured hereunder; or

(n)        if Borrower sells, transfers (whether voluntary or by operation of law), pledges, hypothecates or further encumbers all or any part of the Property or any interest therein or any interest in the Borrower (except as otherwise expressly provided herein), or additionally assigns all or any part of the rents, income or profits arising therefrom, in either case without the prior written consent of Lender, which may be withheld for any reason in Lender's sole and absolute discretion; or

(o)        if Borrower or any Guarantor or Indemnitor is dissolved, merges into another entity, or otherwise terminates its existence (other than as specifically allowed pursuant to the terms hereof) or if the person(s) controlling such entity shall take any action authorizing or leading to the same; or

(p)        if for more than ten (10) days after notice from Lender, Borrower shall continue to be in default under any other term, covenant or condition of the Note, this Security Instrument or the Other Security Documents in the case of any default which can be cured by the payment of a sum of money or for thirty (30) days after notice from Lender in the case of any other default, provided that if such default cannot reasonably be cured within such thirty (30) day period and Borrower shall have commenced to cure such default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for so long as it shall require Borrower in the exercise of due diligence to cure such default, it being agreed that no such extension shall be for a period in excess of sixty (60) days.

## ARTICLE 9. - RIGHTS AND REMEDIES

Section 9.1        REMEDIES.  Upon the occurrence of any Event of Default, to the extent permitted by applicable law, Borrower agrees that Lender may take any action available at law, in equity, and as otherwise provided in this Security Instrument, without notice or demand, as it deems advisable to protect and enforce its rights against Borrower in and to the Property, including, but not limited to the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as Lender may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of Lender:

(a)         declare the entire unpaid Debt to be immediately due and payable;

(b)         institute proceedings, judicial or otherwise, for the complete foreclosure of this Security Instrument under any applicable state or federal law in which case the Property or any interest therein may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner;

(c)         with or without entry, to the extent permitted and pursuant to the procedures provided by applicable state or federal law, institute proceedings for the partial foreclosure of this Security Instrument for the portion of the Debt then due and payable, subject to the continuing lien and security interest of this Security Instrument for the balance of the Debt not then due, unimpaired and without loss of priority;

17

Case ID: 150600453
Control No.: 21015588

(d)        sell for cash or upon credit the Property or any part thereof and all estate, claim, demand, right, title and interest of Borrower therein and rights of redemption thereof, pursuant to power of sale or otherwise, at one or more sales, in one or more parcels, at such time and place, upon such terms and after such notice thereof as may be required or permitted by law;

(e)        institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained herein, in the Note or in the Other Security Documents;

(f)        recover judgment on the Note either before, during or after any proceedings for the enforcement of this Security Instrument or the Other Security Documents;

(g)        apply for the appointment of a receiver, trustee, liquidator or conservator of the Property, without notice and without regard for the adequacy of the security for the Debt and without regard for the solvency of Borrower, any Guarantor, Indemnitor or of any person, firm or other entity liable for the payment of the Debt;

(h)        subject to any applicable state or federal law, the license granted to Borrower to collect and receive rents hereunder shall automatically be revoked and Lender may enter into or upon the Property, either personally or by its agents, nominees or attorneys and dispossess Borrower and its agents and servants therefrom, without liability for trespass, damages or otherwise and exclude Borrower and its agents or servants wholly therefrom, and take possession of all rent rolls, leases (including the form lease) and amendments and exhibits, subleases (including the form sublease) and amendments and exhibits and rental and license agreements with the tenants, subtenants and licensees in possession of the Property or any part or parts thereof; tenants', subtenants' and licensees' money deposits or other property (including, without limitation, any letter of credit) given to secure tenants', subtenants' and licensees' obligations under leases, subleases or licenses, together with a list of the foregoing; all lists pertaining to current rent and license fee arrears; any and all architects' plans and specifications, licenses and permits, documents, books, records, accounts, surveys and property which relate to the management, leasing, operation, occupancy, ownership, insurance, maintenance, or service of or construction upon the Property and Borrower agrees to surrender possession thereof and of the Property to Lender upon demand, and thereupon Lender may (i) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with all and every part of the Property and conduct the business thereat; (ii) complete any construction on the Property in such manner and form as Lender deems advisable; (iii) make alterations, additions, renewals, replacements and improvements to or on the Property; (iv) exercise all rights and powers of Borrower with respect to the Property, whether in the name of Borrower or otherwise, including without limitation, the right to make, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive all Rents of the Property and every part thereof; (v) either require Borrower (A) to pay monthly in advance to Lender, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of such part of the Property as may be occupied by Borrower, or (B) to vacate and surrender possession of the Property to Lender or to such receiver and, in default thereof, Borrower may be evicted by summary proceedings or otherwise; and (vi) apply the receipts from the Property to the payment of the Debt, in such order, priority and proportions as Lender shall deem appropriate in its sole discretion after deducting therefrom all expenses (including reasonable attorneys' fees) incurred in connection with the aforesaid operations and all amounts necessary to pay the Taxes, Other Charges, Insurance Premiums and other expenses in connection with the Property, as well as just and reasonable compensation for the services of Lender, its counsel, agents and employees;

(i)        exercise any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code, including, without limiting the generality of the foregoing: (i) the right to take possession of the Personal Property or any part thereof, and to take such other measures as Lender may deem necessary for the care, protection and preservation of the Personal Property, and (ii) request Borrower at its expense to assemble the Personal Property and make it available to Lender at a convenient place acceptable to Lender. Any notice of sale, disposition or other intended action by Lender with respect to the Personal Property sent to Borrower in accordance with the provisions hereof at least five (5) days prior to such action, shall constitute commercially reasonable notice to Borrower;

(j)        apply any sums then deposited in the Escrow Fund and any other sums held in escrow or otherwise by Lender in accordance with the terms of this Security Instrument or any Other Security Document to the payment of the following items in any order in its sole discretion: (i) Taxes and Other Charges; (ii) Insurance Premiums; (iii) interest on the unpaid principal balance of the Note; (iv) amortization of the unpaid principal balance of the Note; and (v) all other sums payable pursuant to the Note, this Security Instrument and the Other Security Documents, including, without limitation, advances made by Lender pursuant to the terms of this Security Instrument;

(k)        surrender the Policies maintained pursuant hereto, collect the unearned Insurance Premiums and apply such sums as a credit on the Debt in such priority and proportion as Lender in its discretion shall deem proper,

18

Case ID: 150600453
Control No.: 21015688

and in connection therewith, Borrower hereby appoints Lender as agent and attorney-in-fact (which is coupled with an interest and is therefore irrevocable) for Borrower to collect such unearned Insurance Premiums;

(l)     apply the undisbursed balance of any net proceeds deficiency deposit, together with interest thereon, to the payment of the Debt in such order, priority and proportions as Lender shall deem to be appropriate in its discretion; or

(m)     pursue such other remedies as Lender may have under applicable state or federal law.

In the event of a sale, by foreclosure, to the extent permitted by applicable law, power of sale, or otherwise, of less than all of the Property, this Security Instrument shall continue as a lien and security interest on the remaining portion of the Property unimpaired and without loss of priority. Notwithstanding the provisions of this Section to the contrary, if any Event of Default shall occur, and the Lender elects to declare the entire unpaid Debt to be automatically due and payable, such remedy may be pursued without any further notice, demand or other action by Lender.

Section 9.2.     APPLICATION OF PROCEEDS. The purchase money, proceeds and avails of any disposition of the Property, or any part thereof, or any other sums collected by Lender pursuant to the Note, this Security Instrument or the Other Security Documents, may be applied by Lender to the payment of the Debt in such priority and proportions as Lender in its discretion shall deem proper and which are in accordance with applicable law or as shall be required by a court of competent jurisdiction.

Section 9.3.     RIGHT TO CURE DEFAULTS. Upon the occurrence of any Event of Default or if Borrower fails to make any payment or to do any act as herein provided, Lender may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder, make or do the same in such manner and to such extent as Lender may deem necessary to protect the security hereof. Lender is authorized to enter upon the Property for such purposes, or appear in, defend, or bring any action or proceeding to protect its interest in the Property or to foreclose this Security Instrument or collect the Debt. The cost and expense of any cure hereunder (including reasonable attorneys' fees to the extent permitted by law), with interest at the Default Rate (defined in the Note), shall constitute a portion of the Debt and shall be due and payable to Lender upon demand. All costs and expenses incurred by Lender in remedying any Event of Default or failed payment or act or in appearing in, defending, or bringing any such action or proceeding shall bear interest at the Default Rate defined in the Note, for the period after notice from Lender that such cost or expense was incurred to the date of payment to Lender. All such costs and expenses incurred by Lender together with interest thereon calculated at the Default Rate shall be deemed to constitute a portion of the Debt and be secured by this Security Instrument and the Other Security Documents and shall be immediately due and payable upon demand by Lender therefor.

Section 9.4.     ACTIONS AND PROCEEDINGS. At any time, Lender has the right to appear in and defend, compromise or settle any action or proceeding brought with respect to the Property, and after the occurrence and during the continuance of an Event of Default, to bring any action or proceeding, in the name and on behalf of Borrower, which Lender, in its discretion, decides should be brought to protect its interest in the Property.

Section 9.5.     RECOVERY OF SUMS REQUIRED TO BE PAID. Lender shall have the right from time to time to take action to recover any sum or sums which constitute a part of the Debt as the same become due, without regard to whether or not the balance of the Debt shall be due, and without prejudice to the right of Lender thereafter to bring an action of foreclosure, or any other action, for a default or defaults by Borrower existing at the time such earlier action was commenced.

Section 9.6.     EXAMINATION OF BOOKS AND RECORDS. Lender, its agents, accountants and attorneys shall have the right upon prior written notice to Borrower (unless an Event of Default exists, in which case no notice shall be required), to examine and audit, during reasonable business hours, the records, books, management and other papers of Borrower and its affiliates or of any Guarantor or Indemnitor which pertain to their financial condition or the income, expenses and operation of the Property, at the Property or at any office regularly maintained by Borrower, its affiliates or any Guarantor or Indemnitor where the books and records are located. Lender and its agents shall have the right upon notice to make copies and extracts from the foregoing records and other papers at no cost to Lender.

Section 9.7.     OTHER RIGHTS, ETC.

(a)     The failure of Lender to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Security Instrument. Borrower shall not be relieved of Borrower's obligations

19

Case ID: 150600453
Control No.: 21015388

hereunder by reason of (i) the failure of Lender to comply with any request of Borrower, any Guarantor or any Indemnitor to take any action to foreclose this Security Instrument or otherwise enforce any of the provisions hereof or of the Note or the Other Security Documents, (ii) the release, regardless of consideration, of the whole or any part of the Property, or of any person liable for the Debt or any portion thereof, or (iii) any agreement or stipulation by Lender extending the time of payment, changing the rate of interest, or otherwise modifying or supplementing the terms of the Note, this Security Instrument or the Other Security Documents.

(b)    It is agreed that the risk of loss or damage to the Property is on Borrower, and Lender shall have no liability whatsoever for decline in value of the Property, for failure to maintain the Policies, or for failure to determine whether insurance in force is adequate as to the amount of risks insured. Possession by Lender shall not be deemed an election of judicial relief, if any such possession is requested or obtained, with respect to any Property or collateral not in Lender's possession.

(c)    Lender may resort for the payment of the Debt to any other security held by or guaranties given to Lender in such order and manner as Lender, in its discretion, may elect. Lender may take action to recover the Debt, or any portion thereof, or to enforce any covenant hereof without prejudice to the right of Lender thereafter to foreclose this Security Instrument. The rights of Lender under this Security Instrument shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others. No act of Lender shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision. Lender shall not be limited exclusively to the rights and remedies herein stated but shall be entitled to every right and remedy now or hereafter afforded at law or in equity.

Section 9.8.    RIGHT TO RELEASE ANY PORTION OF THE PROPERTY. Lender may release any portion of the Property for such consideration as Lender may require without, as to the remainder of the Property, in any way impairing or affecting the lien or priority of this Security Instrument, or improving the position of any subordinate lienholder with respect thereto, except to the extent that the obligations hereunder shall have been reduced by the actual monetary consideration, if any, received by Lender for such release, and may accept by assignment, pledge or otherwise any other property in place thereof as Lender may require without being accountable for so doing to any other lienholder. This Security Instrument shall continue as a lien and security interest in the remaining portion of the Property.

Section 9.9.    VIOLATION OF LAWS. If the Property is not in compliance with Applicable Laws, Lender may impose additional requirements upon Borrower in connection herewith including, without limitation, monetary reserves or financial equivalents.

Section 9.10.    RIGHT OF ENTRY. Lender and its agents shall have the right to enter and inspect the Property at all reasonable times.

Section 9.11.    SUBROGATION. If any or all of the proceeds of the Note have been used to extinguish, extend or renew any indebtedness heretofore existing against the Property, then, to the extent of the funds so used, Lender shall be subrogated to all of the rights, claims, liens, titles, and interests existing against the Property heretofore held by, or in favor of, the holder of such indebtedness and such former rights, claims, liens, titles, and interests, if any, are not waived but rather are continued in full force and effect in favor of Lender and are merged with the lien and security interest created herein as cumulative security for the repayment of the Debt, the performance and discharge of Borrower's obligations hereunder, under the Note and the Other Security Documents and the performance and discharge of the Other Obligations.

ARTICLE 10. - ENVIRONMENTAL HAZARDS

Section 10.1.    ENVIRONMENTAL DEFINITIONS. For the purpose of this Section, "Environmental Law" means any present and future federal, state and local laws, statutes, ordinances, rules, regulations, standards, policies and other government directives or requirements, as well as common law, including but not limited to the Comprehensive Environmental Response, Compensation and Liability Act and the Resource Conservation and Recovery Act, that apply to Borrower or the Property and relate to Hazardous Materials. "Environmental Liens" means all Liens and other encumbrances imposed pursuant to any Environmental Law, whether due to any act or omission of Borrower or any other person or entity. "Environmental Report" means the written reports resulting from the environmental site assessments of the Property delivered to Lender. "Hazardous Materials" shall mean petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives, flammable materials; radioactive materials; polychlorinated biphenyls ("PCBs") and compounds containing them; lead and lead-based paint; asbestos or

20

Case ID: 150600453
Control No.: 21058888

asbestos-containing materials in any form that is or could become friable; underground or above-ground storage tanks, whether empty or containing any substance; any substance the presence of which on the Property is prohibited by any federal, state or local authority; any substance that requires special handling; and any other material or substance now or in the future defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," or "pollutant" within the meaning of any Environmental Law. "Release" of any Hazardous Materials includes but is not limited to any release, deposit, discharge, emission, leaking, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing or other movement of Hazardous Materials.

Section 10.2.        ENVIRONMENTAL REPRESENTATIONS AND WARRANTIES.  Borrower represents and warrants that: (a) there are no Hazardous Materials or underground storage tanks in, on, or under the Property, except those that are both (i) in compliance with Environmental Laws and with permits issued pursuant thereto (if such permits are required), if any, and (ii) either (A) in amounts not in excess of that necessary to operate the Property or (B) fully disclosed to and approved by Lender in writing pursuant to an Environmental Report; (b) there are no past, present or threatened (defined below) Release of Hazardous Materials in violation of any Environmental Law and which would require remediation by a governmental authority in, on, under or from the Property except as described in the Environmental Report; (c) there is no threat of any Release of any Hazardous Materials migrating to the Property except as described in the Environmental Report; (d) there is no past or present non-compliance with Environmental Laws, or with permits issued pursuant thereto, in connection with the Property except as described in the Environmental Report; (e) Borrower does not know of, and has not received, any written or oral notice or other communication from any person or entity (including but not limited to a governmental entity) relating to Hazardous Materials in, on, under or from the Property; and (f) Borrower has truthfully and fully provided to Lender, in writing, any and all information relating to environmental conditions in, on, under or from the Property known to Borrower or contained in Borrower's files and records, including but not limited to any reports relating to Hazardous Materials in, on, under or migrating to or from the Property and/or to the environmental condition of the Property.

Section 10.3.        ENVIRONMENTAL COVENANTS.  Borrower covenants and agrees that so long as Borrower owns, manages, is in possession of, or otherwise controls the operation of the Property: (a) all uses and operations on or of the Property, whether by Borrower or any other person or entity, shall be in compliance with all Environmental Laws and permits issued pursuant thereto; (b) there shall be no Releases of Hazardous Materials in, on, under or from the Property; (c) there shall be no Hazardous Materials in, on, or under the Property, except those that are both (i) in compliance with all Environmental Laws and with permits issued pursuant thereto, if and to the extent required, and (ii) (A) in amounts not in excess of that necessary to operate the Property or (B) fully disclosed to and approved by Lender in writing; (d) Borrower shall keep the Property free and clear of all Environmental Liens; (e) Borrower shall, at its sole cost and expense, fully and expeditiously cooperate in all activities pursuant to this Section, including but not limited to providing all relevant information and making knowledgeable persons available for interviews; (f) Borrower shall, at its sole cost and expense, perform any environmental site assessment or other investigation of environmental conditions in connection with the Property, pursuant to any reasonable written request of Lender, upon Lender's reasonable belief that the Property is not in full compliance with all Environmental Laws, and share with Lender the reports and other results thereof, and Lender and other Indemnified Parties (hereinafter defined) shall be entitled to rely on such reports and other results thereof; (g) Borrower shall, at its sole cost and expense, comply with all reasonable written requests of Lender to (i) reasonably effectuate remediation of any Hazardous Materials in, on, under or from the Property; and (ii) comply with any Environmental Law; (h) Borrower shall not allow any tenant or other user of the Property to violate any Environmental Law; and (i) Borrower shall immediately notify Lender in writing after it has become aware of (A) any presence or Release or threatened Releases of Hazardous Materials in, on, under, from or migrating towards the Property; (B) any non-compliance with any Environmental Laws related·in any way to the Property; (C) any actual or potential Environmental Lien; (D) any required or proposed remediation of environmental conditions relating to the Property; or (E) any written or oral notice or other communication of which Borrower becomes aware from any source whatsoever (including but not limited to a governmental entity) relating in any way to Hazardous Materials. Any failure of Borrower to perform its obligations pursuant to this Section 10.3 shall constitute bad faith waste with respect to the Property.

Section 10.4.        LENDER'S RIGHTS.  Lender and any other person or entity designated by Lender, including but not limited to any representative of a governmental entity, and any environmental consultant, and any receiver appointed by any court of competent jurisdiction, shall have the right, but not the obligation, to enter upon the Property at all reasonable times to assess any and all aspects of the environmental condition of the Property and its use, including but not limited to conducting any environmental assessment or audit at Borrower's expense (the scope of which shall be determined in Lender's sole discretion) and taking samples of soil, groundwater or other water, air, or building materials, and conducting other invasive testing. Borrower shall cooperate with and provide access to Lender and any such person or entity designated by Lender.

Case B-B
Control No.: 21059388

150600453

**Section 10.5.**     OPERATIONS AND MAINTENANCE PROGRAMS. If recommended by the Environmental Report or any other environmental assessment or audit of the Property, Borrower shall establish and comply with an operations and maintenance program with respect to the Property, in form and substance reasonably acceptable to Lender, prepared by an environmental consultant reasonably acceptable to Lender, which program shall address any asbestos containing material or lead based paint that may now or in the future be detected at or on the Property. Without limiting the generality of the preceding sentence, Lender may require (a) periodic notices or reports to Lender in form, substance and at such intervals as Lender may specify, (b) an amendment to such operations and maintenance program to address changing circumstances, laws or other matters, (c) at Borrower's sole expense, supplemental examination of the Property by consultants specified by Lender, (d) access to the Property by Lender, its agents or servicer, to review and assess the environmental condition of the Property and Borrower's compliance with any operations and maintenance program, and (e) variation of the operations and maintenance program in response to the reports provided by any such consultants.

## ARTICLE 11. - INDEMNIFICATION

**Section 11.1.**     GENERAL INDEMNIFICATION. Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties (defined below) from and against any and all Losses (defined below) imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any one or more of the following (a) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (b) any use, nonuse or condition in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (c) performance of any labor or services or the furnishing of any materials or other property in respect of the Property or any part thereof; (d) any failure of the Property to be in compliance with any Applicable Laws; (e) any and all claims and demands whatsoever which may be asserted against Lender by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants, or agreements contained in any Lease; (f) Borrower's breach of any term, covenant, condition, representation or warranty contained herein; or (g) the payment of any commission, charge or brokerage fee to anyone which may be payable in connection with the funding of the Loan evidenced by the Note and secured by this Security Instrument. Any amounts payable to Lender by reason of the application of this Section shall become immediately due and payable and shall bear interest at the Default Rate from the date loss or damage is sustained by Lender until paid. The term "Losses" shall mean any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, fines, penalties, charges, fees, judgments, awards, amounts paid in settlement of whatever kind or nature (including but not limited to attorneys' fees and other costs of defense). The term "Indemnified Parties" shall mean (a) Lender, (b) any prior owner or holder of the Note, (c) any servicer or prior servicer of the Loan, (d) any Investor (defined below) or any prior Investor in any Participations (defined below), (e) any trustees, custodians or other fiduciaries who hold or who have held a full or partial interest in the Loan for the benefit of any Investor or other third party, (f) any receiver or other fiduciary appointed in a foreclosure or other Creditors Rights Laws proceeding, (g) any officers, directors, shareholders, partners, members, employees, agents, servants, representatives, contractors, subcontractors, affiliates or subsidiaries of any and all of the foregoing, and (h) the heirs, legal representatives, successors and assigns of any and all of the foregoing (including, without limitation, any successors by merger, consolidation or acquisition of all or a substantial portion of the Indemnified Parties' assets and business), in all cases whether during the term of the Loan or as part of or following a foreclosure of the Loan.

**Section 11.2.**     MORTGAGE, DOCUMENTARY STAMPS AND/OR INTANGIBLE TAX. Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any tax or fee on the making and/or recording of this Security Instrument, the Note or any of the Other Security Documents.

**Section 11.3.**     DUTY TO DEFEND: ATTORNEYS' FEES AND OTHER FEES AND EXPENSES. Upon written request by any Indemnified Party, Borrower shall defend such Indemnified Party (if requested by any Indemnified Party, in the name of the Indemnified Party) by attorneys and other professionals approved by the Indemnified Parties. Notwithstanding the foregoing, any Indemnified Parties may, in their sole discretion, engage their own attorneys and other professionals to defend or assist them, and, at the option of Indemnified Parties, their attorneys shall control the resolution of any claim or proceeding. Upon demand, Borrower shall pay or, in the sole discretion of the Indemnified Parties, reimburse, the Indemnified Parties for the payment of reasonable fees and disbursements of attorneys, engineers, environmental consultants, laboratories, surveyors, title searches and other professionals in connection therewith, which any Indemnified Parties may engage as a result of any Losses.

**Section 11.4.**     ENVIRONMENTAL INDEMNITY. As between Borrower and Lender, all risk of loss

22

Case ID: 150600453
Control No.: 210160088

associated with non-compliance with Environmental Laws, or with the presence of any Hazardous Material at, upon, within, contiguous to or otherwise affecting the Property, shall lie solely with Borrower. Accordingly, Borrower shall bear all risks and costs associated with any loss (including any loss in value attributable to Hazardous Materials), damage or liability therefrom, including all costs of removal of Hazardous Materials or other remediation required by Lender or by law. Borrower shall indemnify, defend and hold Lender harmless from and against all loss, liabilities, damages, claims, costs and expenses (including reasonable costs of defense) arising out of or associated, in any way, with the non-compliance with Environmental Laws, or the existence of Hazardous Materials in, on, or about the Property, or a breach of any representation, warranty or covenant contained in Article 10 hereof, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute or common law, including those arising from the joint, concurrent, or comparative negligence of Lender; however, Borrower shall not be liable under such indemnification to the extent such loss, liability, damage, claim, cost or expense results solely from Lender's gross negligence or willful misconduct. Borrower's obligations hereunder shall arise upon the discovery of the presence of any Hazardous Material, whether or not any governmental authority has taken or threatened any action in connection with the presence of any Hazardous Material, and whether or not the existence of any such Hazardous Material or potential liability on account thereof is disclosed in any site assessment and shall continue notwithstanding the repayment of the Note or any transfer or sale of any right, title and interest in the Property (by foreclosure, deed in lieu of foreclosure or otherwise). Of even date herewith, Borrower and other persons or entities (collectively, Borrower and such other parties, the "Indemnitors") may as circumstances require execute and deliver a certain environmental indemnity agreement in favor of the Lender incorporating the environmental indemnities set forth herein as well as additional provisions and requirements with respect to environmental matters (the "Environmental Indemnity"). In the event an Environmental Indemnity is executed, it shall be included in the definition of "Other Security Documents".

### ARTICLE 12. - WAIVERS

Section 12.1.    WAIVER OF COUNTERCLAIM. Borrower hereby waives the right to assert a counterclaim, other than a mandatory or compulsory counterclaim, in any action or proceeding brought against it by Lender arising out of or in any way connected with this Security Instrument, the Note, any of the Other Security Documents, or the Obligations.

Section 12.2.    MARSHALLING AND OTHER MATTERS. Borrower hereby waives, to the extent permitted by law, the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale hereunder of the Property or any part thereof or any interest therein. Further, Borrower hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of this Security Instrument on behalf of Borrower, and on behalf of each and every person acquiring any interest in or title to the Property subsequent to the date of this Security Instrument and on behalf of all persons to the extent permitted by applicable state or federal law.

Section 12.3.    WAIVER OF NOTICE. Borrower shall not be entitled to any notices of any nature whatsoever from Lender except (a) with respect to matters for which this Security Instrument specifically and expressly provides for the giving of notice by Lender to Borrower and (b) with respect to matters for which Lender is required by applicable state or federal law to give notice, and Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Security Instrument does not specifically and expressly provide for the giving of notice by Lender to Borrower.

Section 12.4.    WAIVER OF STATUTE OF LIMITATIONS. Borrower hereby expressly waives and releases to the fullest extent permitted by law, the pleading of any statute of limitations as a defense to payment of the Debt or performance of its Other Obligations.

Section 12.5.    SOLE DISCRETION OF LENDER. Wherever pursuant to this Security Instrument (a) Lender exercises any right given to it to approve or disapprove, (b) any arrangement or term is to be satisfactory to Lender, or (c) any other decision or determination is to be made by Lender, the decision to approve or disapprove all decisions that arrangements or terms are satisfactory or not satisfactory, and all other decisions and determinations made by Lender, shall be in the sole discretion of Lender, except as may be otherwise expressly and specifically provided herein.

Section 12.6.    WAIVER OF FORECLOSURE DEFENSE. Borrower hereby waives any defense Borrower might assert or have by reason of Lender's failure to make any tenant or lessee of the Property a party defendant in any foreclosure proceeding or action instituted by Lender.

Case No.: 150600453
Control No.: 210161388

## ARTICLE 13. - NOTICES

Section 13.1.        NOTICES. All notices or other written communications hereunder shall be deemed to have been properly given (a) upon delivery, if delivered in person with receipt acknowledged by the recipient thereof, (b) one (1) Business Day (defined below) after having been deposited for overnight delivery with any reputable overnight courier service, or (c) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, addressed to Borrower or Lender, as the case may be, at the addresses set forth on the first page of this Security Instrument or addressed as such party may from time to time designate by written notice to the other parties.

Either party by notice to the other may designate additional or different addresses for subsequent notices or communications. For purposes of this Subsection, "Business Day" shall mean a day on which commercial banks are not authorized or required by law to close in New York, New York.

## ARTICLE 14. - CHOICE OF LAW

Section 14.1.        CHOICE OF LAW. This Security Instrument and any determination of deficiency judgments shall be governed, construed, applied and enforced in accordance with the laws of the state in which the Property is located and applicable federal law.

Section 14.2.        PROVISIONS SUBJECT TO LAW. All rights, powers and remedies provided in this Security Instrument may be exercised only to the extent that the exercise thereof does not violate any applicable state or federal law and are intended to be limited to the extent necessary so that they will not render this Security Instrument invalid, unenforceable or not entitled to be recorded, registered or filed under any applicable state or federal law.

## ARTICLE 15. - SECONDARY MARKET

Section 15.1.        TRANSFER OF LOAN. Lender may, at any time, sell, transfer or assign the Note, this Security Instrument and the Other Security Documents, and any or all servicing rights with respect thereto, or grant participations therein (the "Participations") or issue mortgage passthrough certificates or other securities evidencing a beneficial interest in a rated or unrated public offering or private placement (the "Securities"). Lender may forward to each purchaser, transferee, assignee, servicer, participant, or investor in such Participations or Securities (collectively, the "Investor") or any Rating Agency rating such Securities, each prospective Investor, and any organization maintaining databases on the underwriting and performance of commercial mortgage loans, all documents and information which Lender now has or may hereafter acquire relating to the Debt and to Borrower, any Guarantor, any Indemnitor(s) and the Property, whether furnished by Borrower, any Guarantor, any Indemnitor(s) or otherwise, as Lender determines necessary or desirable. Borrower irrevocably waives any and all rights it may have under applicable state or federal law to prohibit such disclosure, including but not limited to any right of privacy.

Section 15.2.        COOPERATION. Borrower, any Guarantor and any Indemnitor agree to cooperate with Lender in connection with any transfer made pursuant to this Section, including, without limitation, the delivery of an estoppel certificate required pursuant to the terms hereof and such other documents as may be reasonably requested by Lender. Borrower shall also furnish and Borrower, any Guarantor and any Indemnitor consent to Lender furnishing to such Investors or such prospective Investors or such Rating Agency any and all information concerning the Property, the Leases, the financial condition of Borrower, any Guarantor and any Indemnitor as may be requested by Lender, any Investor or any prospective Investor or any Rating Agency in connection with any sale, transfer or Participations or Securities.

## ARTICLE 16. - COSTS

Section 16.1.        PERFORMANCE AT BORROWER'S EXPENSE. Borrower acknowledges and confirms that Lender shall impose certain administrative processing and/or commitment fees in connection with (a) the extension, renewal, modification, amendment and termination of the Loan, (b) the release or substitution of collateral therefor, (c) obtaining certain consents, waivers and approvals with respect to the Property, or (d) the review of any Lease or proposed Lease or the preparation or review of any subordination, non-disturbance agreement (the occurrence of any of the above

24

Case ID: 150600453
Control No.: 21062388

shall be called an "Event"). Borrower further acknowledges and confirms that it shall be responsible for the payment of all costs of reappraisal of the Property or any part thereof, whether required by law, regulation, Lender or any governmental or quasi-governmental authority. Borrower hereby acknowledges and agrees to pay, immediately, with or without demand, all such fees (as the same may be increased or decreased from time to time), and any additional fees of a similar type or nature which may be imposed by Lender from time to time, upon the occurrence of any Event or otherwise. Wherever it is provided for herein that Borrower pay any costs and expenses, such costs and expenses shall include, but not be limited to, all reasonable counsel fees of Lender.

Section 16.2.          COUNSEL FEES FOR ENFORCEMENT. (a) Borrower shall pay all reasonable counsel fees incurred by Lender in connection with (i) the preparation of the Note, this Security Instrument and the Other Security Documents; and (ii) the items set forth in this Article, and (b) Borrower shall pay to Lender on demand any and all expenses, including legal fees incurred or paid by Lender in protecting its interest in the Property or in collecting any amount payable under the Note, this Security Instrument or the Other Security Documents, or in enforcing its rights hereunder with respect to the Property, whether or not any legal proceeding is commenced hereunder or thereunder, together with interest thereon at the Default Rate from the date paid or incurred by Lender until such expenses are paid by Borrower.

## ARTICLE 17. - DEFINITIONS

Section 17.1.          GENERAL DEFINITIONS. Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Security Instrument may be used interchangeably in singular or plural form and the word "Borrower" shall mean "each Borrower and any subsequent owner or owners of the Property or any part thereof or any interest therein," the word "Lender" shall mean "Lender and any subsequent holder of the Note," the word "Note" shall mean "the Note and any other evidence of indebtedness secured by this Security Instrument," the word "person" shall include an individual, corporation, limited liability company, partnership, trust, unincorporated association, government, governmental authority, and any other entity, the word "Property" shall include any portion of the Property and any interest therein, and the phrases "counsel fees" shall include any and all attorneys", paralegal and law clerk fees and disbursements, including, but not limited to fees and disbursements at the pre-trial, trial and appellate levels incurred or paid by Lender in protecting its interest in the Property, the Leases and the Rents and enforcing its rights hereunder, whether with respect to retained firms, the reimbursement for the expenses of in-house staff or otherwise.

Section 17.2.          HEADINGS, ETC. The headings and captions of various Articles and Sections of this Security Instrument are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

## ARTICLE 18. - MISCELLANEOUS PROVISIONS

Section 18.1.          NO ORAL CHANGE. This Security Instrument, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

Section 18.2.          LIABILITY. If Borrower consists of more than one person, the obligations and liabilities of each such person hereunder shall be joint and several. This Security Instrument shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors, assigns, heirs, personal representatives, executors and administrators forever.

Section 18.3.          INAPPLICABLE PROVISIONS. If any term, covenant or condition of the Note or this Security Instrument is held to be invalid, illegal or unenforceable in any respect, the Note and this Security Instrument shall be construed without such provision.

Section 18.4.          DUPLICATE ORIGINALS: COUNTERPARTS. This Security Instrument may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original. This Security Instrument may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Security Instrument. The failure of any party hereto to execute this

· 25

Case ID: 150600453
Control No.: 21061388

Security Instrument, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

Section 18.5.          NUMBER AND GENDER.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

Section 18.6.          LEGAL DESCRIPTION.  Borrower represents to Lender that it has reviewed and delivered to Lender a copy of the legal description set forth in Exhibit "A"; that such legal description is the accurate and proper legal description of the Land; and Borrower further acknowledges that neither Lender nor Lender's counsel prepared or reviewed such legal description.  Borrower shall indemnify, defend and hold Lender harmless from and against any and all losses, liabilities, claims, damages, expenses, obligations, penalties, actions, judgments, suits, costs or disbursements of any kind or nature whatsoever, including the reasonable fees and actual expenses of Lender's counsel, in connection with any claim that title to the Property is impaired due to or based upon an inaccurate or improper legal description set forth herein.

Section 18.7.          INCONSISTENCIES.  In the event of any inconsistencies between the terms and conditions of this Article and the other provisions of this Security Instrument, the terms and conditions of this Article shall control and be binding.

Section 18.8.          WAIVER OF TRIAL BY JURY.  BORROWER BY ACCEPTANCE OF THIS SECURITY INSTRUMENT, HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THE LOAN, THE APPLICATION FOR THE LOAN, THE NOTE, THIS SECURITY INSTRUMENT OR THE OTHER SECURITY DOCUMENTS OR ANY ACTS OR OMISSIONS OF LENDER OR BORROWER.

[NO FURTHER TEXT - SIGNATURES APPEAR ON NEXT PAGE]

26

Case ID: 150600453
Control No.: 21064388

**IN WITNESS WHEREOF,** this Security Instrument has been executed by borrower the day and year first above written.

Signed, sealed and delivered
in the presence of:

Borrower(s):

Print Name:_____

Gabriel Bravo

Print Name:_____

Signed, sealed and delivered
in the presence of:

Borrower(s):

Print Name:_____

Guadalupe Bravo

Print Name:_____

This Instrument prepared by:
Upon recording return to:

Antonio Chimienti, Esq.
Bayview Loan Servicing
4425 Ponce de Leon Blvd., 5th Fl.
Coral Gables, Florida 33146
Attention: Collateral Department

27

Case ID: 150600453
Control No.: 21065388

ACKNOWLEDGMENT

COMMONWEALTH OF )
PENNSYLVANIA ) ss.:
COUNTY OF *Philadelphia* )

The foregoing instrument was acknowledged before me on January 31, 2006 by Gabriel Bravo and Guadalupe Bravo. He/she is personally known to me or produced _____ as identification, and did/did not take an oath.

[Official Notary Seal]

Notary Public, Commonwealth of Pennsylvania
Print or Type Name: _____
My Commission Expires: _____

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
WENDY FALLON KERSCH, Notary Public
Upper Southampton Twp., Bucks County
My Commission Expires June 14, 2009

28

Case ID: 150600453
Control No.: 21060088

JAN. 19. 2006  3:57PM    C ~ ZENS' ABSTRACT                        NO. 2034   P. 6



**OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY**

**SCHEDULE C**
**Legal Description**

File Number:

ALL THAT CERTAIN LOT OR PIECE OF GROUND WITH THE BUILDINGS AND IMPROVEMENTS THEREON
ERECTED, DESCRIBED ACCORDING TO A SURVEY THEREOF MADE BY BEN H. JOSEPH, SURVEYOR
AND REGULATOR OF THE SECOND DISTRICT ON NOVEMBER 16, 1948, AS FOLLOWS, TO WIT:

SITUATE ON THE WEST SIDE OF NINTH STREET AT THE DISTANCE OF ONE HUNDRED FIFTY-THREE
FEET TWO INCHES (153'2') NORTHWARD FROM THE NORTH SIDE OF ELLSWORTH STREET IN SAID
WARD AND CITY, THENCE EXTENDING NORTH SEVENTY-EIGHT DEGREES ONE MINUTE, FORTY-TWO
SECONDS WEST FIFTY TWO FEET (N. 78 DEGREES 1' 42" W 52') TO A POINT, THENCE NORTH ELEVEN
DEGREES, SEVENTEEN MINUTES, EIGHTEEN SECONDS EAST ON A LINE PARALLEL WITH SAID NINTH
STREET FOURTEEN FEET SIX AND FIVE-EIGHTHS INCHES (N 11 DEGREES 17' 19" E 14' 6-5/8") TO A
POINT, TGEBCE SOUTH SEVENTY-SEVEN DEGREES, THIRTY MINUTES FORTY-TWO SECONDS EAST
FIFTY-TWO FEET, ONE-EIGHTH OF AN INCH (S 77 DEGREES 30' 42" E 52' 0-1/8") TO THE WEST SIDE OF
NINTH STREET, THENCE SOUTH ELEVEN DEGREES, SEVENTEEN MINUTES, EIGHTEEN SECONDS
WEST ALONG THE SAID NINTH STREET FOURTEEN FEET ONE INCH (S 11 DEGREES 17' 18" W 14' 1") TO
THE POINT AND PLACE OF BEGINNING.

BEING NO. 1122 SOUTH 9TH STREET.

BEING THE SAME PROPERTY CONVEYED UNTO GABRIEL BRAVO AND GUADALUPE BRAVO BY DEED
FROM VINCENT ALESTRA DATED JUNE 6, 2005 AND RECORDED JUNE 13, 2005 AMONG THE DEED
BOOKS OF PHILADELPHIA COUNTY, PA IN DOCUMENT ID 61198158.

ALSO BEING THE SAME  PROPERTY CONVEYED UNTO VINCENT ALESTRA BY DEED FROM FRANK
RAFFAELE, III, DATED JULY 7, 2003 AND RECORDED JULY 14, 2003 AMONG THE DEED BOOKS OF
PHILADELPHIA COUNTY, PA IN DOCUMENT ID 50710820.

Parcel No:

Case ID: 150600453
Control No.: 21067388

## RIDER TO MORTGAGE AND SECURITY AGREEMENT
{ PENNSYLVANIA }

THIS RIDER is made January 31, 2006, and is incorporated into and shall be deemed to amend and supplement the Mortgage and Security Agreement (the "Security Instrument") of the same date hereof, given by Gabriel Bravo and Guadalupe Bravo (the "Borrower") to secure that certain Promissory Note in the amount of Seventy-One Thousand Two Hundred Fifty and No/100 Dollars ($71,250.00) (the "Note") given to InterBay Funding, LLC, a Delaware Limited Liability Company, (the "Lender"), on the same date hereof and covering the Property described in the Security Instrument and located at 1122 South 9th Street, Philadelphia, PA 19147 (the "Property Address").

In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

1. The Security Instrument is also known as an Open End Mortgage and Security Agreement.

2. The following sentence is added at the end of Section 4.5 (g): All contractors have filed a "no lien stipulation" in the Prothonotary's office in the county where the Property is located.

3. Section 9.12 CONFESSION OF JUDGMENT IN EJECTMENT is added to the Security Instrument and reads as follows: BORROWER HEREBY IRREVOCABLY AUTHORIZES AND EMPOWERS THE PROTHONOTARY, CLERK OR ANY ATTORNEY OF ANY COURT OF RECORD OF THE COMMONWEALTH OF PENNSYLVANIA OR ELSEWHERE, UPON THE OCCURRENCE OF AN EVENT OF DEFAULT, TO APPEAR FOR AND CONFESS JUDGMENT AGAINST BORROWER, AS WELL AS AGAINST ALL PERSONS CLAIMING UNDER, BY OR THROUGH BORROWER, AND IN FAVOR OF LENDER, ITS SUCCESSORS OR ASSIGNS, AS OF ANY TERM, PAST, PRESENT OR FUTURE, WITH OR WITHOUT DECLARATION, FOR POSSESSION, CONTROL OR BOTH OF THE PREMISES, IMPROVEMENTS AND BUILDING EQUIPMENT, WITHOUT THE NECESSITY OF FILING ANY BOND AND WITHOUT ANY STAY OF EXECUTION OR APPEAL. THIS INSTRUMENT, OR A COPY HEREOF VERIFIED BY AFFIDAVIT, SHALL BE SUFFICIENT WARRANT THEREFOR; WHEREUPON, APPROPRIATE PROCESS TO OBTAIN POSSESSION, CONTROL OR BOTH OF THE PREMISES, IMPROVEMENTS AND BUILDING EQUIPMENT, INCLUDING LEVY AND EXECUTION, MAY BE ISSUED FORTHWITH, WITHOUT ANY PRIOR WRIT OR PROCEEDING WHATSOEVER. BORROWER HEREBY RELEASES AND AGREES TO RELEASE LENDER AND SAID ATTORNEYS FROM ALL PROCEDURAL ERRORS AND DEFECTS WHATSOEVER IN ENTERING SUCH JUDGMENT OR JUDGMENTS OR IN CAUSING SUCH WRITS OR PROCESS TO BE ISSUED OR IN ANY PROCEEDING THEREON OR CONCERNING THE SAME, PROVIDED THAT LENDER SHALL HAVE FILED IN SUCH ACTION OR ACTIONS AN AFFIDAVIT OR AFFIDAVITS MADE BY SOMEONE ON LENDER'S BEHALF SETTING FORTH THE FACTS NECESSARY TO AUTHORIZE THE ENTRY OF SUCH JUDGMENT OR JUDGMENTS ACCORDING TO THE TERMS OF THIS INSTRUMENT, OF WHICH FACTS SUCH AFFIDAVIT OR AFFIDAVITS SHALL BE PRIMA FACIE EVIDENCE. IT IS HEREBY EXPRESSLY AGREED THAT IF FOR ANY REASON AFTER ANY SUCH ACTION OR ACTIONS HAVE BEEN COMMENCED THE SAME SHALL BE DISCONTINUED, MARKED SATISFIED OF RECORD OR BE TERMINATED, OR POSSESSION OF THE PREMISES, IMPROVEMENTS OR BUILDING EQUIPMENT REMAINS IN OR IS RESTORED TO BORROWER OR ANYONE CLAIMING



1

Case ID: 150600453
Control No.: 21018888

UNDER, BY OR THROUGH BORROWER, LENDER MAY, WHENEVER AND AS OFTEN AS LENDER SHALL HAVE THE RIGHT TO AGAIN TAKE POSSESSION OF THE PREMISES, IMPROVEMENTS AND BUILDING EQUIPMENT, BRING ONE OR MORE FURTHER CONFESSIONS IN THE MANNER SET FORTH HEREIN TO RECOVER POSSESSION OF THE PREMISES, IMPROVEMENTS AND BUILDING EQUIPMENT. THE AUTHORITY AND POWER ABOVE GIVEN SHALL CONTINUE FROM TIME TO TIME AND AT ALL TIMES UNTIL FINAL PAYMENT IN FULL OF ALL SECURED INDEBTEDNESS.

4. Article 19 Special Pennsylvania Provisions is added to the Security Instrument and reads as follows:

FUTURE ADVANCES: The Security Instrument secures such future or additional advances (in addition to the principal amount of the Note) as may be made by Lender or the holder hereof, at its exclusive option, to Borrower or its successors or assigns in title, for any purpose, provided that all such advances are made within 20 years from the date of the Security Instrument or within such lesser period of time as may be provided by law as a prerequisite for the sufficiency of actual notice or record notice of such optional future or additional advances as against the rights of creditors or subsequent purchasers for valuable consideration to the same extent as if such future or additional advances were made on the date of the execution of the Security Instrument. The total amount of indebtedness secured by the Security Instrument may be increased or decreased from time to time, but the total unpaid balance so secured at any one time shall not exceed a maximum principal amount equal to two times the amount first set forth in the Security Instrument, plus interest thereon and any disbursements made under the Security Instrument for the payment of impositions, taxes, assessments, levies, insurance, or otherwise with interest on such disbursements. It is the intent of the parties that the Security Instrument shall secure the payment of the Note and any additional advances made from time to time pursuant to any additional promissory notes or otherwise contemplated under the Loan Documents, all of said indebtedness being equally secured hereby and having the same priority as any amounts advanced as of the date of the Security Instrument. It is agreed that any additional sum or sums advanced by Lender shall be equally secured with, and have the same priority as, the original indebtedness evidenced by the Note and shall be subject to all of the terms, provisions and conditions of the Security Instrument, whether or not such additional loans or advances are evidenced by other promissory notes of Borrower and whether or not identified by a recital that it or they are secured by the Security Instrument. It is further agreed that any additional promissory note or promissory notes executed and delivered pursuant to this paragraph shall automatically be deemed to be included in the term "Note" wherever it appears in the context of the Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Rider to Pennsylvania Mortgage and Security Agreement and agrees that the terms hereof are hereby incorporated into and with the terms of the Security Instrument as if both the Security Instrument and this instrument are one and the same document. Nothing contained herein shall invalidate or change any terms of the Security Instrument except to the extent as maybe explicitly set forth herein.

Signed, sealed and delivered
in the presence of:

Borrower(s):

2

Case No.: 150600453
Control No.: 210169388

Print Name: _Gabriel Bravo_

Gabriel Bravo

Print Name:_____

Signed, sealed and delivered
in the presence of:                          Borrower(s):

_GUADALUPE BRAVO_        _Guadalupe Bravo_
Print Name:_____    Guadalupe Bravo

_GUADALUPE BRAVO_
Print Name:_____

3

GB

Case ID: 150600453
Control No.: 21070888

ACKNOWLEDGMENT

COMMONWEALTH OF                    )
PENNSYLVANIA                       ) ss.:
COUNTY OF *Philadelphia*           )

The foregoing instrument was acknowledged before me on January 31, 2006 by Gabriel Bravo and
Guadalupe Bravo. He/she is personally known to me or produced
_____ *he* _____ as identification, and did/did not take an oath.

[Official Notary Seal]

Notary Public, Commonwealth of Pennsylvania
Print or Type Name: Wendy Fallon Kersch
My Commission Expires: _____

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
WENDY FALLON KERSCH, Notary Public
Upper Southampton Twp., Bucks County
My Commission Expires June 14, 2009

4

Case ID: 150600453
Control No.: 21012388

Assignment 1

**51637499**
Page: 1 of 4
02/22/2007 04.06PM

Assignor Ln#:

This Document Recorded
02/22/2007
04:06PM
Doc Code: A

Doc Id: 51637499
Receipt #: 576709
Rec Fee: 124.50
Commissioner of Records, City of Philadelphia

Page 1

### ASSIGNMENT OF MORTGAGE

**FOR GOOD AND VALUABLE CONSIDERATION**, the sufficiency of which
is hereby acknowledged, the undersigned,
**INTERBAY FUNDING, LLC, A DELAWARE LIMITED LIABILITY COMPANY**,
WHOSE ADDRESS IS 4425 PONCE DE LEON BLVD., 4TH FL , CORAL
GABLES, FL 33146, (ASSIGNOR),
by these presents does convey, grant, sell, assign, transfer and
set over the described mortgage together with the certain note(s)
described therein together with all interest secured thereby, all
liens, and any rights due or to become due thereon to
**BAYVIEW LOAN SERVICING, LLC, A DELAWARE LIMITED LIABILITY
COMPANY**, WHOSE ADDRESS IS 4425 PONCE DE LEON BLVD., 5TH FL ,
CORAL GABLES, FL 33146, ITS SUCCESSORS OR ASSIGNS, (ASSIGNEE).
Said mortgage dated 01/31/2006 in the amount of $71,250.00
made by
**GABRIEL BRAVO AND GUADALUPE BRAVO**
to INTERBAY FUNDING, LLC
recorded on 02/17/2006 , in the Office of the Recorder of Deeds
of PHILADELPHIA County, Pennsylvania, in Book ,
Page (or Document No. 51382000 )

Mortgage Premise: 1122 S. 9TH STREET
PHIALEDELPHIA, PA 19147

In Witness whereof, the said Corporation has caused this
instrument
to be executed in its corporate name by ROBERT G. HALL its VICE
PRESIDENT
and authorized signer,
THIS 30TH DAY OF AUGUST IN THE YEAR 2006
**INTERBAY FUNDING, LLC**

BY:
ROBERT G. HALL
VICE PRESIDENT

(onn5/FRMPH1)

Case ID: 150600453
Control No.: 21012388

Case 23-15923-mdc Doc 04320 KC1 Filed 08/30/23 Filed 01/27/22 Pg 56 of 561 Main
Case 1:15-cv-03923 Main Claim 71 Filed 01/07/23 Filed 01/27/22 Document 24 Page 56 of 561
Document     Page 56 of 174

Assignor Ln#:

ASSIGNMENT OF MORTGAGE                          Page 2

STATE OF FLORIDA              COUNTY OF Dade
On 08/30/2006 , before me, Jason James (#DD428371)  the
Undersigned, Notary Public, personally appeared ROBERT G. HALL ,
who acknowledged him/herself to be the VICE PRESIDENT  of
INTERBAY FUNDING, LLC  a corporation, and that s/he as such,
being authorized so to do, executed the foregoing instrument for
the purposes therein contained, by signing the name of the
corporation by themselves as such corporate officers.
IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                                        JASON JAMES
                                   NOTARY PUBLIC - STATE OF FLORIDA
                                        Commission #
Jason James (#1                          Expires: MAY 11, 2009
My commission expires: 05/11/2009

      I _____, do certify that the address of the above assignee is:
BAYVIEW LOAN SERVICING, LLC, A DELAWARE LIMITED LIABILITY COMPANY, WHOSE
ADDRESS IS 4425 PONCE DE LEON BLVD., 5TH FL , CORAL GABLES, FL 33146, ITS SUCCESSORS OR
ASSIGNS, (ASSIGNEE).

      Prepared by:
      J. Lesinski/NTC,2100 Alt. 19 North, Palm Harbor, FL 34683 (800)346-9152
Return To:
Nationwide Title Clearing
2100 Alt. 19 North
Palm Harbor, FL 34683

                                                                    form5/FRMPH1

Case ID: 150600453
Control No.: 21023388

```
Loan Number  .                                          Page 3
Assignment of Mortgage from:
INTERBAY FUNDING, LLC, A DELAWARE LIMITED LIABILITY COMPANY, WHOSE
ADDRESS IS 4425 PONCE DE LEON BLVD., 4TH FL , CORAL GABLES, FL 33146,
(ASSIGNOR),
to:
BAYVIEW LOAN SERVICING, LLC, A DELAWARE LIMITED LIABILITY COMPANY,
WHOSE ADDRESS IS 4425 PONCE DE LEON BLVD., 5TH FL , CORAL GABLES, FL
33146, ITS SUCCESSORS OR ASSIGNS, (ASSIGNEE).

Mortgagor: GABRIEL BRAVO AND GUADALUPE BRAVO

When Recorded Return To:
Nationwide Title Clearing
2100 Alt. 19 North
Palm Harbor, FL 34683

All that certain lot or piece of ground situated in
Mortgage Premise: 1122 S. 9TH STREET
                  PHIALEDELPHIA, PA 19147

PHILADELPHIA
(Borough or Township, if stated), Commonwealth of Pennsylvania.
Being more particularly described in said mortgage.


SEE ATTACHED EXHIBIT A
```

form5/FRMPH1

Case ID: 150600453
Control No.: 21012888

## Legal Description

ALL THAT CERTAIN LOT OR PIECE OF GROUND WITH THE BUILDINGS AND IMPROVEMENTS THEREON ERECTED, DESCRIBED ACCORDING TO A SURVEY THEREOF MADE BY BEN H. JOSEPH, SURVEYOR AND REGULATOR OF THE SECOND DISTRICT ON NOVEMBER 18, 1946, AS FOLLOWS, TO WIT:

SITUATE ON THE WEST SIDE OF NINTH STREET AT THE DISTANCE OF ONE HUNDRED FIFTY-THREE FEET TWO INCHES (153'2") NORTHWARD FROM THE NORTH SIDE OF ELLSWORTH STREET IN SAID WARD AND CITY, THENCE EXTENDING NORTH SEVENTY-EIGHT DEGREES ONE MINUTE, FORTY-TWO SECONDS WEST FIFTY TWO FEET (N. 78 DEGREES 1' 42" W 52') TO A POINT, THENCE NORTH ELEVEN DEGREES, SEVENTEEN MINUTES, EIGHTEEN SECONDS EAST ON A LINE PARALLEL WITH SAID NINTH STREET FOURTEEN FEET SIX AND FIVE-EIGHTHS INCHES (N 11 DEGREES 17' 19" E 14' 6-5/8") TO A POINT, TGEBCE SOUTH SEVENTY-SEVEN DEGREES, THIRTY MINUTES FORTY-TWO SECONDS EAST FIFTY-TWO FEET, ONE-EIGHTH OF AN INCH (S 77 DEGREES 30' 42" E 52' 0-1/8") TO THE WEST SIDE OF NINTH STREET, THENCE SOUTH ELEVEN DEGREES, SEVENTEEN MINUTES, EIGHTEEN SECONDS WEST ALONG THE SAID NINTH STREET FOURTEEN FEET ONE INCH (S 11 DEGREES 17' 18" W 14' 1") TO THE POINT AND PLACE OF BEGINNING.

BEING NO. 1122 SOUTH 9TH STREET.

BEING THE SAME PROPERTY CONVEYED UNTO GABRIEL BRAVO AND GUADALUPE BRAVO BY DEED FROM VINCENT ALESTRA DATED JUNE 8, 2005 AND RECORDED JUNE 13, 2005 AMONG THE DEED BOOKS OF PHILADELPHIA COUNTY, PA IN DOCUMENT ID 51198158.

ALSO BEING THE SAME PROPERTY CONVEYED UNTO VINCENT ALESTRA BY DEED FROM FRANK RAFFAELE, III, DATED JULY 7, 2003 AND RECORDED JULY 14, 2003 AMONG THE DEED BOOKS OF PHILADELPHIA COUNTY, PA IN DOCUMENT ID 50710820.

Parcel No:

Case ID: 150600453
Control No.: 21075388

# EXHIBIT B

Case ID: 150600453
Control No.: 21076888

# ADJUSTABLE RATE PROMISSORY NOTE

## (PENNSYLVANIA)

**$71,250.00**

DATE: January 31, 2006

MATURES: March 1, 2036

**FOR VALUE RECEIVED,** Gabriel Bravo, as maker, whose address is 836 Federal Street, Phialdelphia, PA 19147 (the "Borrower"), hereby unconditionally, jointly and severally (if more than one), promises to pay to the order of InterBay Funding, LLC, a Delaware Limited Liability Company as payee, having an address at 1301 Virginia Drive, Ste #403, Fort Washington, PA 19034 (the "Lender"), or at such other place as the holder hereof may from time to time designate in writing, the principal sum of Seventy-One Thousand Two Hundred Fifty and No/100 Dollars ($71,250.00), in lawful money of the United States of America with interest thereon to be computed from the date of this Promissory Note ("Note") at the Applicable Interest Rate (defined below) in accordance with the terms of this Note.

1.  ADJUSTABLE INTEREST. Interest on the unpaid principal balance due hereunder shall accrue at an initial interest rate equal to Nine And Ninety-Nine One-Hundredths Of One Percent (9.99%) per annum (the "Applicable Interest Rate"). Thereafter the Applicable Interest Rate will be adjusted as follows: on a date which is twelve (12) months from the first day of the first calendar month preceding the initial Payment Date (defined below), and thereafter on a date twelve (12) months from the previous change date (each, a "Change Date"), the Applicable Interest Rate will adjust to reflect the then current "Prime Rate" plus Four And Twenty-Four One-Hundredths Of One Percent (4.24%). The Applicable Interest Rate will not be increased or decreased on any single Change Date by more than two percent (2%). During the term of this Note, the Applicable Interest Rate shall not be lower than the Applicable Interest Rate on the date hereof and shall, provided no Event of Default (defined below) has occurred (in such an event the "Default Rate", as hereinafter defined, will apply), not exceed the Applicable Interest Rate on the date hereof plus six percent (6%). For purposes hereof, the "Prime Rate" shall mean, at any time, the rate of interest quoted in the Wall Street Journal, Money Rates Section as the "Prime Rate" (currently defined as the base rate on corporate loans posted by at least 75% of the nation's thirty largest banks). In the event that the Wall Street Journal quotes more than one rate, or a range of rates as the Prime Rate, then the Prime Rate shall mean the average of the quoted rates. In the event that the Wall Street Journal ceases to publish the Prime Rate, then the Prime Rate shall be the average Prime Rate of the three largest U.S. money center commercial banks, as determined by Lender. Interest shall be computed on the actual number of days elapsed and an assumed year of 360 days.

2.  PAYMENT TERMS. Borrower agrees to pay sums due under this Note in payments of principal and interest. The initial monthly payment shall be in the amount of Six Hundred Thirty-Two and 60/100 Dollars ($632.60). However, monthly payment amounts may change if there is a change in the Applicable Interest Rate. At the time of a change of the Applicable Interest Rate the new monthly payment shall be calculated based upon the principal balance of this Note on the applicable Change Date through the remaining term of the original thirty (30) year amortization schedule, and the Applicable Interest Rate then in effect. The first installment of principal and interest shall be due on April 1, 2006, and additional payments shall be due on the 1st day of each calendar month thereafter (each, a "Payment Date"). The entire principal balance and all accrued

1

Case ID: 150600453
Control No.: 21027388

and unpaid interest thereon shall be due and payable on March 1, 2036 (the "Maturity Date"). Each installment payment shall be applied as follows: (i) first, to the payment of late charges and interest computed at the Default Rate (defined below), if applicable; (ii) second, to the payment of interest at the Applicable Interest Rate; and (iii) third, the balance toward the reduction of the principal balance.

3. SECURITY. This Note is secured by that certain Mortgage and Security Agreement, Deed of Trust and Security Agreement, or Deed to Secure Debt and Security Agreement, Assignment of Leases and Rents, and Security Agreement and Fixture Filing (the "Security Instrument") of even date herewith given by Borrower to Lender encumbering certain premises located in Philadelphia County, Parish or Judicial District of the Commonwealth or State of PENNSYLVANIA, (the "Real Property") and the Other Security Documents (as defined in the Security Instrument) encumbering other property ("Other Property"), as more particularly described therein (the Real Property and the Other Property are hereinafter collectively referred to as the "Property").

4. DEFAULT AND ACCELERATION. If any payment required in this Note is not paid (a) prior to the fifth (5th) day after a Payment Date, (b) on the Maturity Date or (c) on the happening of any other default, after the expiration of any applicable notice and grace periods, herein or under the terms of the Security Instrument or any of the Other Security Documents (collectively, an "Event of Default"), and Lender declares an Event of Default, then, at the option of Lender (i) the whole of the principal sum of this Note; (ii) interest, default interest, late charges and other sums, as provided in this Note, the Security Instrument or the Other Security Documents; (iii) all other monies agreed or provided to be paid by Borrower in this Note, the Security Instrument or the Other Security Documents; (iv) all sums advanced pursuant to the Security Instrument to protect and preserve the Property and any lien and security interest created thereby; (v) all sums advanced and costs and expenses incurred by Lender in connection with the Debt (defined below) or any part thereof, any renewal, extension, or change of or substitution for the Debt or any part thereof, or the acquisition or perfection of the security therefor, whether made or incurred at the request of Borrower or Lender; (vi) the Prepayment Consideration (defined below), if any; and (vii) any and all additional advances made by Lender to complete Improvements (as defined in the Security Instrument) or to preserve or protect the Property, or for taxes, assessments or insurance premiums, or for the performance of any of Borrower's obligations hereunder or under the Security Instrument and the Other Security Documents (all the sums referred to in (i) through (vii) above shall collectively be referred to as the "Debt") shall without notice become immediately due and payable.

5. DEFAULT INTEREST. Borrower agrees that upon the occurrence (and Lender's declaration) of an Event of Default, Lender shall be entitled to receive and Borrower shall pay interest on the entire unpaid principal sum at a per annum rate equal to the lesser of (i) ten percent (10%), or (ii) the maximum interest rate which Borrower may by law pay (the "Default Rate"), and shall be due and payable ON DEMAND. The Default Rate shall be computed from the occurrence of the Event of Default. Interest calculated at the Default Rate shall be deemed secured by the Security Instrument and the Other Security Documents. Any judgment obtained by Lender against Borrower as to any amounts due under this Note shall also bear interest at the Default Rate. This clause, however, shall not be construed as an agreement or privilege to extend the date of the payment of the Debt, nor as a waiver of any other right or remedy accruing to Lender by reason of the occurrence of any Event of Default.

6. LATE CHARGE. If any monthly installment payable under this Note is not paid prior to the fifth

2

*G-13*

Case ID: 150600453
Control No.: 21012888

(5th) day after the applicable Payment Date, Borrower shall pay to Lender upon demand an amount equal to the lesser of (a) five percent (5%) of such unpaid sum or (b) the maximum amount permitted by applicable law to defray the expenses incurred by Lender in handling and processing the delinquent payment and to compensate Lender for the loss of the use of the delinquent payment; and this amount shall be secured by the Security Instrument and the Other Security Documents. This clause, however, shall not be construed as an agreement or privilege to extend the date of the payment of the Debt, nor as a waiver of any other right or remedy accruing to Lender by reason of the occurrence of any Event of Default.

7. PREPAYMENT.

a. Lockout Period : Borrower shall not be permitted to make any full or partial prepayment of the principal balance of this Note (a "Prepayment") prior to that date that is forty-eight (48) months after the date of this Note (the "Lockout Period"). If, for any reason, a Prepayment is made during the Lockout Period (a "Lockout Prepayment"), Borrower shall, simultaneously therewith, be obligated to pay: (i) the aggregate amount of interest which would have accrued on the unpaid principal balance of this Note from the date of such Lockout Prepayment through the expiration date of the Lockout Period (the "Lockout Fee"), plus (ii) all amounts specified in Section 7(b) below).

b. Prepayment Period: At any time during the Prepayment Period (as defined below), the principal balance of this Note may be prepaid in whole, but not in part, pursuant to the terms contained in this Section 7. If Borrower makes any Prepayment within the first Seven years after the date of this Note (the "Prepayment Period"), the Borrower shall be obligated to pay to Lender the following amounts:

(i)    an amount equal to Five percent (5%) of the then outstanding unpaid principal balance of this Note (the "Prepayment Consideration"); and

(ii)   all accrued interest on the outstanding principal balance to and including date on which the Prepayment is made; and

(iii)  all other sums due under this Note, the Security Instrument and all Other Security Documents.

c. Prepayments Without Consideration: No Prepayment Consideration or Lockout Fee (if any) shall be due or payable with respect to any full or partial Prepayment made by Borrower after the expiration of the Prepayment Period.

d. Notice of Prepayment: Prior to making any Prepayment, Borrower must provide Lender with not less than sixty (60) days advance written notice of Borrower's intent to make such Prepayment. Such notice must specify: (i) the date on which Prepayment is to be made, and (ii) the principal amount of such Prepayment. Lender shall not be obligated to accept any Prepayment unless it is accompanied by all other amounts due in connection therewith.

e. Permitted Prepayment Date : Borrower may only make a Prepayment on a regularly scheduled Payment Date (as defined in Section 2 of this Note). Lender shall not be required to accept any Prepayment made on a date other than a regularly scheduled

3

Case ID: 150600453
Control No.: 21012988

Payment Date. If Borrower submits a Prepayment on any date other than a regularly scheduled Payment Date, then Borrower shall be required to pay all interest that would have accrued through the next scheduled Payment Date.

f.    Insurance/Condemnation Prepayments: Notwithstanding anything to the contrary contained herein, and provided no Event of Default exists, no Prepayment Consideration shall be due in connection with any Prepayment resulting from the application of insurance proceeds or condemnation awards pursuant to the terms of the Security Instrument or changes in tax and debt credit pursuant to the terms of the Security Instrument.

For purposes of this Section 7, the terms "Lockout Prepayment" and "Prepayment" shall include, without limitation, any prepayment of principal that occurs as a result of any Event of Default in any of the Loan Documents or an acceleration of the Maturity Date under any circumstances, any prepayment of principal occurring in connection with foreclosure proceedings or exercise of any applicable power of sale, any statutory right of redemption exercised by Borrower or any other party having a statutory right to redeem or prevent foreclosure, any sale in foreclosure or under exercise of any applicable power of sale, deed in lieu of foreclosure or otherwise, and any other voluntary or involuntary prepayment of principal made by Borrower.

8.  LOAN CHARGES. Borrower agrees to an effective rate of interest that is the rate stated in this Note, plus any additional rate of interest resulting from any other sums, amounts, and charges in the nature of interest paid or to be paid by or on behalf of Borrower, or any benefit or value received or to be received by the holder of this Note, in connection with this Note. Without limiting the foregoing, this Note, the Security Instrument and the Other Security Documents are subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the principal balance due hereunder at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the maximum interest rate which Borrower is permitted by applicable law to contract or agree to pay. If by the terms of this Note, the Security Instrument and the Other Security Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of such maximum rate, the Applicable Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to such maximum rate and all previous payments in excess of the maximum rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder, and any excess remaining shall be refunded to Borrower. All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the Debt, shall, to the maximum extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated period until payment in full of the principal (including the period of any renewal or extension hereof) so that the rate or amount of interest on account of the Debt does not exceed the maximum lawful rate of interest from time to time in effect and applicable to the Debt for so long as the Debt is outstanding. In determining whether or not the interest paid or payable hereunder exceeds the maximum lawful rate, the Lender may utilize any law, rule or regulation in effect from time to time and available to the Lender.

9.  WAIVERS. Borrower and all others who may become liable for the payment of all or any part of the Debt do hereby severally waive, to the extent allowed by law, (a) presentment and demand for payment, notice of dishonor, protest and notice of protest and non-payment and all other notices of any kind, except for notices expressly provided for in this Note, the Security Instrument or the Other Security Documents and (b) any defense of the statute of limitations in any action hereunder or for the collection of the Debt. No release of any security for the Debt or extension of

4

*G-B*

Case ID: 150600453
Control No.: 21080088

time for payment of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of this Note, the Security Instrument or the Other Security Documents made by agreement between Lender or any other person or party shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrower, and any other person or entity who may become liable for the payment of all or any part of the Debt, under this Note, the Security Instrument or the Other Security Documents. No notice to or demand on Borrower shall be deemed to be a waiver of the obligation of Borrower or of the right of Lender to take further action without further notice or demand as provided for in this Note, the Security Instrument or the Other Security Documents. If Borrower is a partnership, corporation or limited liability company, the agreements contained herein shall remain in full force and effect, notwithstanding any changes in the individuals or entities comprising the Borrower, and the term "Borrower," as used herein, shall include any alternate or successor entity, but any predecessor entity, and its partners or members, as the case may be, shall not thereby be released from any liability. (Nothing in the foregoing sentence shall be construed as a consent to, or a waiver of, any prohibition or restriction on transfers of interests in Borrower which may be set forth in the Security Instrument or any Other Security Document).

10. AUTHORITY. Borrower (and the undersigned representative of Borrower, if any) represents that Borrower has full power, authority and legal right to execute and deliver this Note, the Security Instrument and the Other Security Documents and that this Note, the Security Instrument and the Other Security Documents constitute legal, valid and binding obligations of Borrower, enforceable in accordance with their respective terms.

11. GOVERNING LAW. This Note shall be governed, construed, applied and enforced in accordance with the laws of the State in which the Real Property is located, without regard to principles of conflicts of law.

12. NOTICES. All notices required or permitted hereunder shall be given as provided in the Security Instrument.

13. INCORPORATION BY REFERENCE. All of the terms, covenants and conditions contained in the Security Instrument and the Other Security Documents are hereby made part of this Note to the same extent and with the same force as if they were fully set forth herein. In the event of any conflict in terms, the terms of the Note, Security Instrument and Other Security Documents (in that order) shall control.

14. MISCELLANEOUS.

a.   To the extent permitted by law, wherever pursuant to this Note it is provided that Borrower pay any costs and expenses, such costs and expenses shall include, but not be limited to, reasonable legal fees and disbursements of Lender, whether with respect to retained firms, the reimbursement for the expenses of in-house staff, or otherwise. To the extent permitted by law, Borrower shall pay to Lender on demand any and all expenses, including legal expenses and reasonable attorneys fees (at all levels including appeals), incurred or paid by Lender in enforcing this Note, whether or not any legal proceeding is commenced hereunder, together with interest thereon at the Default Rate from the date paid or incurred by Lender until such expenses are paid by Borrower.

b.   This Note may not be modified, amended, waived, extended, changed, discharged or

5

*G-B*

Case ID: 150600453
Control No.: 21018388

terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

c.  If Borrower consists of more than one person or party, the obligations and liabilities of each person or party shall be joint and several.

d.  Whenever used, the singular number shall include the plural, the plural number shall include the singular, and the words "Lender" and "Borrower" shall include their respective successors, assigns, heirs, personal representatives, executors and administrators.

e.  The headings of this Note are for convenience only and are not to affect the construction of or to be taken into account in interpreting the substance of this Note.

f.  Time is of the essence hereunder.

g.  A determination that any provision of this Note is unenforceable or invalid shall not affect the enforceability or validity of any other provision and a determination that the application of any provision of this Note to any person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to other persons or circumstances. The remaining provisions of this Note shall remain operative and in full force and effect and shall in no way be affected, prejudiced or disturbed thereby.

15. DOCUMENTARY STAMPS. All documentary stamps or taxes required to be affixed hereto have been paid in connection with this Note at the time of recordation of the Security Instrument.

16. FINAL AGREEMENT. This Note, the Security Instrument and the Other Security Documents, represent the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements. There are no unwritten oral agreements between the parties. All prior or contemporaneous agreements, understandings, representations and statements, oral or written, are merged into this Note, the Security Instrument and the Other Security Documents.

17. POWER OF ATTORNEY. To the extent permitted by applicable law, Borrower hereby irrevocably authorizes any attorney at law elected by Lender to appear for it in any action on this Note in any court of record in the State of PENNSYLVANIA or any other state or territory of the United States, or at any time after the indebtedness evidenced by this Note, or any part thereof becomes due (by acceleration or otherwise), to waive the issuance and service of process, and confess a judgment in favor of Lender or any subsequent holder of this Note against Borrower, for the amount that may then be due, together with the costs of suit and interest, and to waive and release all errors and all rights to second trial, appeal, and stay of execution. The foregoing warrant of attorney shall survive any judgment, and if any judgment be vacated for any reason, the holder hereof nevertheless may thereafter use the foregoing warrant of attorney to obtain an additional judgment or judgments against Borrower.

18. WAIVER OF TRIAL BY JURY. BORROWER AND LENDER, BY ITS ACCEPTANCE HEREOF, EACH HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR

Case ID: 150600453
Control No.: 21082388

INDIRECTLY TO THE LOAN EVIDENCED BY THIS NOTE, THE APPLICATION FOR THE LOAN EVIDENCED BY THIS NOTE, THIS NOTE, THE SECURITY INSTRUMENT OR THE OTHER SECURITY DOCUMENTS OR ANY ACTS OR OMISSIONS OF ANY PARTY OR ANY OF THEIR RESPECTIVE OFFICERS, EMPLOYEES, DIRECTORS OR AGENTS IN CONNECTION THEREWITH. THIS WAIVER OF THE RIGHT TO TRIAL BY JURY IS A MATERIAL INDUCEMENT TO THE LENDER FOR THE LENDER TO MAKE THE LOAN.

READ ALL CREDIT AGREEMENTS BEFORE SIGNING. THE TERMS OF ALL CREDIT AGREEMENTS SHOULD BE READ CAREFULLY BECAUSE ONLY THOSE TERMS IN WRITING ARE ENFORCEABLE. NO OTHER TERMS OR ORAL PROMISES NOT CONTAINED OR SPECIFICALLY INCORPORATED BY WRITING IN THIS WRITTEN CREDIT AGREEMENT MAY BE LEGALLY ENFORCED. YOU MAY CHANGE THE TERMS OF THIS NOTE ONLY BY OTHER WRITTEN CREDIT AGREEMENTS.

[NO FURTHER TEXT - SIGNATURES APPEAR ON NEXT PAGE]

Case ID: 150600453
Control No.: 21013888

IN WITNESS WHEREOF, Borrower has duly executed this Note as of the day and date first above written.

Signed, sealed and delivered
in the presence of:

Print Name: _Gabriel Bravo_

Print Name: _____

Borrower(s):

_[signature]_
Gabriel Bravo

8

Case ID: 150600453
Control No.: 21084888

ACKNOWLEDGMENT

COMMONWEALTH OF )
PENNSYLVANIA ) ss.:
COUNTY OF _Philadelphia_ )

The foregoing instrument was acknowledged before me on January 31, 2006 by Gabriel Bravo. He/she is personally known to me or produced _lic ._____ as identification, and did/did not take an oath.

[Official Notary Seal]

Notary Public, Commonwealth of Pennsylvania
Print or Type Name: _____
My Commission Expires: _____

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
WENDY FALLON KERSCH, Notary Public
Upper Southampton Twp., Bucks County
My Commission Expires June 14, 2009

9

Case ID: 150600453
Control No.: 21058588

## ALLONGE TO NOTE

FOR PURPOSES OF FURTHER ENDORSEMENT OF THE NOTE
REFERRED TO BELOW:

BORROWER:                    Gabriel Bravo

LENDER:                      InterBay Funding, LLC, a Delaware Limited
Liability Company

DATED:                      January 31, 2006

ORIGINAL PRINCIPAL BALANCE:      $71,250.00

PAY TO THE ORDER OF:

_____

_____

_____

WITHOUT RECOURSE:

InterBay Funding, LLC, a Delaware Limited Liability Company

By:_____

Print Name:_____

Title:_____
               Sue Sailor
               Vice President

1

Case ID: 150600453
Control No.: 21086688

BV#

## NOTE ALLONGE

FOR PURPOSES OF FURTHER ENDORSEMENT OF THE NOTE REFERRED TO BELOW:
(AS THE SAME MAY HAVE BEEN MODIFIED OR AMENDED, THE "NOTE")

NOTE DATED: JANUARY 31, 2006

BORROWER: GABRIEL BRAVO AND GUADALUPE BRAVO

ORIGINAL PRINCIPAL BALANCE: $71,250.00

PAY TO THE ORDER OF: E-Z CASHING, LLC

WITHOUT RECOURSE.

BAYVIEW LOAN SERVICING, LLC.

BY: ROBERT G. HALL, VICE PRESIDENT

Case ID: 150600453
Control No.: 21087388

# C-9 - Debtor's Response to Motion to Reassess filed on 3/11/21

FILED
Civil Administration
E. MEENAN
11 MAR 2021 10:44 am

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY, PENNSYLVANIA**
**TRIAL DIVISION-CIVIL**

| | | |
|---|---|---|
| E-Z CASHING, LLC, | : | |
| **Plaintiff** | : | |
| | : | |
| v. | | |
| | : | **JUNE TERM, 2015, NO. 00453** |
| GABRIEL BRAVO AND | | |
| GUADALUPE BRAVO, | | |
| : | | |
| **Defendants** | | |

## ORDER GRANTING PLAINTIFF'S MOTION TO REASSESS DAMAGES IN PART

AND NOW, this _____ day of _____, 2021, upon consideration of the

Plaintiff's Motion to Reassess Damages, and the Defendants' Answer and New Matter

In response thereto, the amount of the Plaintiff's damages, as of April 1, 2021, are

Assessed at $105,681.70.

_____

Case ID: 150600453
Control No.: 21031888

David A. Scholl, Esquire
512 Hoffman Street
Philadelphia, PA. 19148
Attorney No. 02498
610-550-1765
Attorney for Defendants

## IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY, PENNSYLVANIA
### TRIAL DIVISION-CIVIL

E-Z CASHING, LLC,

      Plaintiff

          v.

GABRIEL BRAVO AND
GUADALUPE BRAVO,

:      Defendants

:
:
:

:   JUNE TERM, 2015, NO. 00453

## ANSWER OF DEFENDANTS TO PLAINTIFF'S MOTION TO REASSESS DAMAGES, WITH NEW MATTER

1. Denied. This is a somewhat complex commercial matter.

2. through 9. Admitted.

10. Denied. The entry of the judgment resulted in a merger of all claims under the documents in issue with the amount of the judgment entered. This precludes the addition of all of the charges set forth herein in addition to post-judgment interest. Furthermore, certain of the additional alleged costs were not expended, and many of them were not reasonable, and therefore they are not properly chargeable to the Defendants. The Plaintiff has failed to credit

2

Case ID: 150600453
Control No.: 21090388

many post-judgment payments made by the Defendants to the Plaintiff, as set forth in /new Matter hereinafter.

11. Denied. The additional sums sought by the Plaintiff merged with the judgment and are for that reason not chargeable to the Defendants, and further the alleged amounts claimed are in large part unreasonable and therefore not chargeable. The Debtor paid for all taxes and insurance in 2017. The attorneys' fees requested are not supported by any time records and are grossly excessive. The inspection fees were not actually incurred and are unreasonable. No additional fees have been established to have been incurred. As set forth hereinafter, the Defendants have made numerous payments to the Plaintiff which are not credited.

12. Denied that the amount set forth herein is a reasonable measure of the reasonable balance of the amount due at present.

13. It is denied that the Plaintiff is due to the amount set forth in the Motion.

14. The documents referenced do not support the unreasonable and excessive amounts requested.

15. It is denied that the Motion need not be verified.

16. It is admitted that the Motion has been filed, but the sum sought is excessive and unreasonable.

Case ID: 150600453
Control No.: 21091388

## NEW MATTER

17.  During his initial bankruptcy the Debtor made six payments of $720 to

the Plaintiff, not only four.


18.  During his most recent bankruptcy, the Debtor remitted $1288/month to

the Plaintiff each month from October, 2018, through March, 2020, a total of

$23,184, plus an additional $1000/month from April through November, 2020,

an additional $8000, for a grand total of $31,184 for which the Plaintiff has

not credited the Defendants.


WHEREFORE, The Defendants respectfully request that the Plaintiff's

judgment should be reassessed in an amount of not more than $105,681.70..




Respectfully submitted,


David A. Scholl, Esquire
512 Hoffman Street
Philadelphia, PA.  19148
Attorney No.  02498
610-550-1765
Attorney for Defendants

4

Case ID: 150600453
Control No.: 21012388

## VERIFICATION

Due to the short period of time provided to file this Answer to the Motion, which was not served on the Defendants until on or about March 4, 2021, the Defendants' counsel was unable to obtain a verification from the Defendants, and therefore this pleading is verified by their counsel, David A. Scholl, Esquire, who declares, under penalty of perjury for any false statements, that the Statements in the foregoing Answer to Plaintiff's Motion to Reassess Damages are true and correct to the best of his knowledge, information, and belief.

DAVID A. SCHOLL, ESQUIRE

Dated: 3-11-21

David A. Scholl, Esquire
512 Hoffman Street
Philadelphia, PA. 19148
Attorney No. 02498
610-550-1765
Attorney for Defendants

## IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY, PENNSYLVANIA
## TRIAL DIVISION-CIVIL

E-Z CASHING, LLC,                               :

    Plaintiff                               :

                        :

      v.                                    :    JUNE TERM, 2015, NO. 00453

GABRIEL BRAVO AND
GUADALUPE BRAVO,

    Defendants

## DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION TO REASSESS
## DAMAGES

        GABRIEL and GUADALUPE BRAVO ("the Defendants") are husband and

wife Mexican immigrants who have owned and operated several Mexican restaurants in

South Philadelphia for about twenty years.  For the past ten years, they have operated Festiva

Acapulco Restaurant at 1122-24 South 9th St., Philadelphia, PA. 19147.  The 1122 half is owned

by a third party and rented by the Defendants.  The 1124 half is owned by the Defendants, and is

subject to the Plaintiff's mortgage.  In the past year, the restaurant has been limited to take-out

services on account of the pandemic, which has greatly temporarily diminished the Defendants'

income and ability to make mortgage payments to the Plaintiff.

        The history of this case from the date of its filing on June 3, 2015, through the

date of the entry of a consent judgment on November 16, 2016, is accurately stated in the

Case ID: 150600453
Control No.: 21010488

Plaintiff's Brief in support of the Motion. Also accurately stated are the events leading to the

filing of a second bankruptcy case by the Defendant Husband, although the correct number of the

case was Bankr. No. 18-15931.

Where the parties differ in their respective positions is, first, the legal

ramifications of the entry of the consent judgment. Under the controlling tenets of <u>In re</u>

<u>Stendardo</u>, 991 F.2d 1009 (3d Cir. 1999), since there are no provisions in the loan documents

stating otherwise, none of the post-judgment costs asserted by the Plaintiff can be collected

except for post-judgment interest at the Pennsylvania statutory rate. Consequently, all of the

"Post-Consent Judgment Charges" set forth in paragraph 11 of the Motion cannot be collected.

Although the Plaintiff is well-aware of this issue, which was noted by the bankruptcy court in

the briefing of the Defendants' Objection to the Plaintiff's proof of claim in the second case, the

Plaintiff studiously avoids even mentioning this issue.

Moreover, these charges are not otherwise collectable. The Defendants paid the

2017 real estate taxes and insurance themselves. Also, the amount of any attorneys' fees

demanded is not supported by any statements of the tasks performed and hourly rates of the

professionals performing the services has not been set forth, as required by <u>In re Gordon-Brown</u>,

340 B.R. 751 (Bankr. E.D. Pa. 2006). The "inspection fees" are in no sense described and are

grossly excessive. There are no receipts or descriptions of the "Misc. Fees" sought.

The other main issue of difference is the Plaintiff's failure to give the Defendants

credit for most of their post-judgment payments made by the Defendants to the Plaintiff. During

the Defendant-Husband's first bankruptcy case, the Defendants presented evidence that they

submitted six post-petition payments of $720 each, not just four payments as the Plaintiff recites.

However, most egregious is the Plaintiff's failure to make any reference to the substantial

payments made by the Defendants to the Plaintiff during the second bankruptcy case of the

Husband-Debtor. Although it was ultimately established that the post-petition regular mortgage

2

Case ID: 150600453
Control No.: 21019588

Payments should have been less than $500/month, the Defendants, in an abundance of caution, remitted $1288 monthly to the Plaintiff from October, 2018, through March, 2020, which amounted to a total of $23,184, and then remitted $1000/month from Arpil, 2020, through November, 2020, an additional $8000. Thus, the Plaintiff understates the credit to which the Defendants are entitled by s total of $31,184.

The result is that the Plaintiff has significantly misstated the amount of the debt which it is owed by the Defendants. Without consideration of the Defendants' post-petition payments, the amount of the consent judgment and interest is no more than the amount of the judgment plus interest of $136,865.70. Deducting the Defendants' post-judgment payments of $31,284 reduces the accurate amount of the Plaintiff's debt balance to no more than $105,681.70.

Dated: March 12, 2021

/s/ DAVID A. SCHOLL

512 Hoffman Street

Philadelphia, PA 19148

610-550-1765

Attorney for Defendants

3

Case 2:19-cv-04763-KBH Document 40-22 Filed 01/23/22 Page 248 of 368
Case 21-19226-amc Doc 48-6 Filed 02/10/21 Entered 02/10/21 Page 80 of 174 Desc Main
Document    Page 80 of 174

C-10 - Order reassessing damages entered by the Honorable Paula Patrick dated June 2, 2021

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL**

| | | |
|---|---|---|
| **E-Z CASHING, LLC** | : | **JUNE TERM, 2015** |
| | : | |
| v. | : | **NO. 00453** |
| | : | |
| **GABRIEL BRAVO,** *et al.* | : | **Control No. 21022388** |

## ORDER

**AND NOW**, this 2^nd^ day of June 2021,

upon consideration of Plaintiff's Motion to Reassess Damages filed under Control

Number 21022388, and the response, it is hereby **ORDERED** and **DECREED** that the

motion is **GRANTED** and Plaintiff's November 29, 2016, *in rem* judgment by agreement

is reassessed at $136,865.70.

**BY THE COURT:**

_____ **J.**

15060453-Bayview Loan Servicing, Llc Vs Bravo

15060045300102

198

C-11 - Civil Docket in the matter of E-Z
Cashing LLC v. Gabriel Bravo, et al.,
Philadelphia County Court of Common
Pleas June Term, 2015; No.: 00453

2/10/22, 1:21 PM                    Case 21-12926-mdc      Doc 46   Filed 02/10/22  Entered 02/10/22 16:29:13      Desc Main

The Philadelphia Courts
**Civil Docket Access**

Document      Page 83 of 174

jkrik
**LOGOUT**

No Items in Cart

**Civil Docket Report**

A $5 Convenience fee will be added to the transaction at checkout.

## Case Description

**Case ID:**        150600453
**Case Caption:**   BAYVIEW LOAN SERVICING, LLC VS BRAVO
**Filing Date:**    Wednesday, June 03rd, 2015
**Court:**          City Hall
**Location:**       City Hall
**Jury:**           NON JURY
**Case Type:**      NOT RESIDENTIAL OWNER OCCUP-MR
**Status:**         DEFERRED - BANKRUPTCY

## Related Cases

*No related cases were found.*

## Case Event Schedule

*No case events were found.*

## Case motions

*No case motions were found.*

## Case Parties

| Seq # | Assoc | Expn Date | Type | Name |
|-------|-------|-----------|------|------|
| 1 | | | ATTORNEY FOR PLAINTIFF | WILLIAMS, ROBERT W |
| **Address:** | MATTLEMAN, WEINROTH & MILLER<br>401 ROUTE 70 EAST - SUITE 100<br>CHERRY HILL NJ 08034 | | **Aliases:** *none* | |

https://fjdefile.phila.gov/efsfid/zk_fjd_public_qry_03.zp_dktrpt_frames

209

2/10/22, 1:21 PM

Case 21-12926-mdc   Doc 46   Filed 02/10/22   Entered 02/10/22 16:29:13   Desc Main
Document   Page 84 of 174

| # | Name | Role | Date | Aliases |
|---|------|------|------|---------|
| 2 | BAYVIEW LOAN SERVICING LLC A DELAWARE LLC | PLAINTIFF | 17-AUG-2017 | none |
| | Address: 4425 PONCE DE LEON BOULEVARD 5TH FLOOR CORAL GABLES FL 33134 (856)429-5507 rwilliams@mwm-law.com | | | |
| 3 | BRAVO, GABRIEL | DEFENDANT | 6 | none |
| | Address: 1168 S 9TH ST PHILADELPHIA PA 19147 | | | |
| 4 | BRAVO, GUADALUPE | DEFENDANT | 6 | none |
| | Address: 1168 S 9TH ST PHILADELPHIA PA 19147 | | | |
| 5 | FOX, IDEE C | TEAM LEADER | 03-JUL-2016 | none |
| | Address: 386 CITY HALL PHILADELPHIA PA 19107 (215)686-4222 | | | |
| 6 | DANGELO ESQ, JOHN J | ATTORNEY FOR DEFENDANT | | none |
| | Address: 540 S. 11TH STREET PHILADELPHIA PA 19147 (215)627-2430 dangelolaw@aol.com | | | |

Case 21-12926-mdc   Doc 46   Filed 02/10/22   Entered 02/10/22 16:29:13   Desc Main
Document   Page 85 of 174

| 7 | 1 | | WESNER, PATRICK J | ATTORNEY FOR PLAINTIFF |
| | **Address:** | 9000 MIDLANTIC DRIVE SUITE 300 MOUNT LAUREL NJ 08054 (856)596-8900 pwesner@parkermccay.com | **Aliases:** *none* | |
| 8 | | | PADILLA, NINA W | JUDGE |
| | **Address:** | 360 CITY HALL PHILADELPHIA PA 19107 | **Aliases:** *none* | |
| 9 | | | SHIRDAN-HARRIS, LISETTE | TEAM LEADER |
| | **Address:** | 516 CITY HALL PHILADELPHIA PA 19107 | **Aliases:** *none* | |
| 10 | 06-DEC-2019 | | FAY, ROGER | ATTORNEY FOR PLAINTIFF |
| | **Address:** | SKLAR LAW LLC 20 BRACE ROAD, SUITE 205 CHERRY HILL NJ 08034 (856)258-4050 roger@sklarlaw.com | **Aliases:** *none* | |
| 11 | | | FLETMAN, ABBE F | JUDGE |
| | **Address:** | 229A CITY HALL PHILADELPHIA PA 19107 (215)686-2636 | **Aliases:** *none* | |
| 12 | | | CHAMBERS, HOWARD | JUDGE PRO TEMPORE |
| | **Address:** | 622 CITY HALL | **Aliases:** *none* | |

2/10/22, 1:21 PM

Case 21-12926-mdc   Doc 46   Filed 02/10/22   Entered 02/10/22 16:29:13   Desc Main
Document   Page 86 of 174

PHILADELPHIA PA 19107

| 13 | | | KRIK, JUSTIN L |
| | | ATTORNEY FOR PETITIONER | |
| | **Address:** 1500 JOHN F KENNEDY BLVD SUITE 630 PHILADELPHIA PA 19102 (267)831-3180 jkrik@kriklaw.com | **Aliases:** *none* | |
| 14 | | JUDGE | EMERGENCY JUDGE, JUDGE |
| | **Address:** ROOM 280 CITY HALL PHILADELPHIA PA 19107 | **Aliases:** *none* | |
| 15 | 13 | INTERVENOR | SAJCO PHILI PROPERTIES LLC |
| | **Address:** P.O. BOX 1090 WOODBRIDGE NJ 07095 | **Aliases:** *none* | |
| 16 | 13 | USE PLAINTIFF | E-Z CASHING LLC |
| | **Address:** 110 AVIS AVENUE LAKEWOOD NJ 08701 | **Aliases:** *none* | |
| 17 | 6 | ATTORNEY FOR DEFENDANT | SCHOLL, DAVID A |
| | **Address:** 512 HOFFMAN STREET PHILADELPHIA PA 19148 (610)550-1765 judgescholl@gmail.com | **Aliases:** *none* | |
| 18 | | JUDGE | PATRICK, PAULA |

https://fjdefile.phila.gov/efsfjd/zk_fjd_public_qry_03.zp_dktrpt_frames

2/10/22, 1:21 PM   Case 21-12926-mdc   Doc 46   Filed 02/10/22   Entered 02/10/22 16:29:13   Desc Main Document   Page 87 of 174

| | | | |
|---|---|---|---|
| **Address:** | CITY HALL ROOM 481 PHILADELPHIA PA 19107 (215)686-8338 | | **Aliases:** none |
| 19 | 18-JAN-2022 | MOTION ASSIGMENT JUDGE | YOUNGE, LYRIS |
| **Address:** | 1207 STOUT CENTER FOR CJ 1301 FILBERT ST PHILADELPHIA PA 19107 | | **Aliases:** none |
| 20 | | MOTION ASSIGMENT JUDGE | THOMAS-STREET, SIERRA |
| **Address:** | 1212 STOUT CENTER FOR CJ PHILADELPHIA PA 19107 | | **Aliases:** none |

**Docket Entries**

| Filing Date/Time | Docket Type | Filing Party | Disposition Amount | Approval/ Entry Date |
|---|---|---|---|---|
| 03-JUN-2015 11:54 AM | ACTIVE CASE | | | 03-JUN-2015 01:27 PM |
| **Docket Entry:** E-Filing Number: 1506006947 | | | | |
| 03-JUN-2015 11:54 AM | COMMENCEMENT OF CIVIL ACTION | WILLIAMS, ROBERT W | | 03-JUN-2015 01:27 PM |
| **Documents:** Final Cover MR Notice | | | | |
| **Docket Entry:** none. | | | | |

2/10/22, 1:21 PM

Case 21-12926-mdc   Doc 46   Filed 02/10/22   Entered 02/10/22 16:29:13   Desc Main Document   Page 255 of 385

| | | |
|---|---|---|
| 03-JUN-2015 11:54 AM | COMPLAINT FILED NOTICE GIVEN   WILLIAMS, ROBERT W   $83,855.28 | 03-JUN-2015 01:27 PM |
| **Documents:** | 02388991.PDF | |
| **Docket Entry:** | COMPLAINT WITH NOTICE TO DEFEND WITHIN TWENTY (20) DAYS AFTER SERVICE IN ACCORDANCE WITH RULE 1018.1 FILED. NOTICE OF INTENT UNDER ACT 6 HAS BEEN SENT TO THE DEFENDANT. | |
| 03-JUN-2015 11:54 AM | SHERIFF'S SURCHARGE 2 DEFTS   WILLIAMS, ROBERT W | 03-JUN-2015 01:27 PM |
| **Docket Entry:** | none. | |
| 09-JUN-2015 04:16 PM | WAITING TO LIST CASE MGMT CONF | 09-JUN-2015 04:16 PM |
| **Docket Entry:** | none. | |
| 18-JUN-2015 12:14 PM | ATTEMPTED SERVICE - NOT FOUND | 18-JUN-2015 12:35 PM |
| **Documents:** | Affidavit of Service | |
| **Docket Entry:** | GUADALUPE BRAVO NOT FOUND ON 06/09/2015. | |
| 18-JUN-2015 12:18 PM | ATTEMPTED SERVICE - NOT FOUND | 18-JUN-2015 12:35 PM |
| **Documents:** | Affidavit of Service | |
| **Docket Entry:** | GABRIEL BRAVO NOT FOUND ON 06/09/2015. | |
| 27-AUG-2015 10:55 AM | LISTED FOR CASE MGMT CONF | 27-AUG-2015 10:55 AM |
| **Docket Entry:** | none. | |

2/10/22, 1:21 PM

Case 21-12926-mdc   Doc 46   Filed 02/10/22   Entered 02/10/22 16:29:13   Desc Main
Document   Page 89 of 174

| Date | Entry | | Timestamp |
|---|---|---|---|
| 27-AUG-2015 10:55 AM | ORDER ENTERED/236 NOTICE GIVEN | | 27-AUG-2015 10:55 AM |
| **Documents:** | ORDER_9.pdf | | |
| **Docket Entry:** | AND NOW, THIS 27TH DAY OF AUGUST, 2015, IT IS HEREBY ORDERED THAT: 1. A CASE MANAGEMENT CONFERENCE IS SCHEDULED ON OCTOBER 2, 2015, AT 9:30 A.M., IN COURTROOM 243, CITY HALL, PHILADELPHIA, PA 19107. 2. COUNSEL FOR PLAINTIFF IS DIRECTED TO SERVE A COPY OF THIS ORDER ON ANY UNREPRESENTED PARTY OR ANY ATTORNEY ENTERING AN APPEARANCE SUBSEQUENT TO THE ISSUANCE OF THIS ORDER. ATTENDANCE BY ALL COUNSEL OF RECORD IS MANDATORY. PLAINTIFF'S FAILURE TO APPEAR WILL RESULT IN A JUDGMENT OF NON PROS ENTERED BY THE COURT. 3. THE CONFERENCE WILL BE CONDUCTED BY A JUDGE OR CASE MANAGER ASSIGNED BY THE COURT. 4. AT THE CONFERENCE COUNSEL MUST BE PREPARED TO ADDRESS ALL RELEVANT ISSUES REGARDING VENUE, SERVICE OF PROCESS, PLEADINGS, DISCOVERY, POSSIBLE JOINDER OF ADDITIONAL PARTIES, THEORIES OF LIABILITY OR DEFENSES AND DAMAGES CLAIMED. 5. AT THE CONCLUSION OF THE CONFERENCE A CASE MANAGEMENT ORDER SHALL BE ENTERED WHICH WILL GOVERN THIS CASE. 6. ALL APPLICABLE PARTS OF THE ENCLOSED CONFERENCE MEMORANDUM SHALL BE COMPLETED AND BROUGHT TO THE CASE MANAGEMENT CONFERENCE. 7. IF THE CASE SETTLES PRIOR TO THE CONFERENCE, PLEASE FAX A NOTICE TO SEAN MACGREGOR AT 215-686-5137. BY THE COURT: FOX, J. 8/27/15. | | |
| 27-AUG-2015 10:55 AM | NOTICE GIVEN UNDER RULE 236 | | 27-AUG-2015 12:24 PM |
| **Docket Entry:** | NOTICE GIVEN ON 27-AUG-2015 OF ORDER ENTERED/236 NOTICE GIVEN ENTERED ON 27-AUG-2015. | | |
| 01-SEP-2015 11:08 AM | PRAECIPE TO REINSTATE CMPLT | WILLIAMS, ROBERT W | 01-SEP-2015 11:11 AM |
| **Documents:** | praecipe (executed) (02752256xA9477).pdf<br>Complaint (FILED) (02393496xA9477).pdf | | |
| **Docket Entry:** | COMPLAINT WITH NOTICE TO DEFEND WITHIN TWENTY (20) DAYS AFTER SERVICE IN ACCORDANCE WITH RULE 1018.1 REINSTATED. (FILED ON BEHALF OF BAYVIEW LOAN SERVICING, LLC, A DELAWARE LIMITED LIABILITY CO) | | |
| 29-SEP-2015 | AFFIDAVIT OF SERVICE FILED | | 29-SEP-2015 |

2/10/22, 1:21 PM

| | | |
|---|---|---|
| 03:46 PM | | 04:05 PM |
| **Documents:** | Affidavit of Service | |
| **Docket Entry:** | AFFIDAVIT OF SERVICE OF PRA. 2 REIN, MORT. FORE. COMP., DEF. CERT. THAT PREM. R RES. & OWN. OCC. & REQ. 4 CON. CONF.,IMP N. UPON GABRIEL BRAVO BY ON 09/21/2015 FILED. | |
| 29-SEP-2015 04:06 PM | AFFIDAVIT OF SERVICE FILED | 30-SEP-2015 09:13 AM |
| **Documents:** | Affidavit of Service | |
| **Docket Entry:** | AFFIDAVIT OF SERVICE OF PRA. 2 REIN, MORT. FORE. COMP., DEF. CERT. THAT PREM. R RES. & OWN. OCC. & REQ. 4 CON. CONF.,IM. N. UPON GUADALUPE BRAVO BY PERSONAL SERVICE ON 09/21/2015 FILED. | |
| 02-OCT-2015 02:31 PM | WAITING TO LIST PRE-TRIAL CONF | FOX, IDEE C | 02-OCT-2015 02:31 PM |
| **Documents:** | CLWPR_14.pdf | |
| **Docket Entry:** | IT IS HEREBY ORDERED THAT THE ABOVE CAPTIONED MATTER IS ASSIGNED TO THE NOVEMBER 2016 TRIAL POOL. THIS MATTER IS SUBJECT TO "NEXT-DAY" CALL TO TRIAL EFFECTIVE THE FIRST MONDAY OF TRIAL POOL MONTH. ALL COUNSEL AND PARTIES MUST NOTIFY THE COURT IN WRITING OF ANY SCHEDULING CONFLICTS, INCLUDING TRIAL ATTACHMENTS AND PRE-PAID VACATIONS, NO LESS THAN FIVE (5) DAYS BEFORE THE POOL MONTH, AND ARE UNDER A CONTINUING OBLIGATION TO NOTIFY THE COURT OF ANY SUBSEQUENT TRIAL ATTACHMENTS DURING THE TRIAL POOL MONTH. THE COURT WILL NOT RECOGNIZE ANY UNTIMELY CONFLICT NOTIFICATIONS. FAILURE TO NOTIFY THE COURT OF ANY SCHEDULING CONFLICTS WILL RESULT IN THE ISSUANCE OF APPROPRIATE SANCTIONS. AND NOW, THIS 2ND DAY OF OCTOBER, 2015, IT IS ORDERED THAT: 1. THE CASE MANAGEMENT AND TIME STANDARDS ADOPTED FOR EXPEDITED TRACK CASES SHALL BE APPLICABLE TO THIS CASE AND ARE HEREBY INCORPORATED INTO THIS ORDER. 2. ALL DISCOVERY IN THE ABOVE MATTER SHALL BE COMPLETED NO LATER THAN AUGUST 1, 2016. 3. DISPOSITIVE MOTIONS MUST BE FILED NO LATER THAN SEPTEMBER 6, 2016. 4. A MANDATORY PRE-TRIAL CONFERENCE SHALL BE SCHEDULED ANY TIME AFTER OCTOBER 3, 2016. TEN (10) DAYS PRIOR TO THE CONFERENCE, ALL COUNSEL SHALL SERVE UPON ALL OPPOSING COUNSEL AND/OR OPPOSING PARTIES AND FILE WITH THE COURT, A PRE-TRIAL SETTLEMENT MEMORANDUM CONTAINING THE FOLLOWING: (a) A CONCISE SUMMARY OF THE NATURE OF THE CASE IF PLAINTIFF OR THE DEFENSE IF DEFENDANT OR ADDITIONAL DEFENDANT. (b) A LIST OF ALL WITNESSES WHO MAY BE CALLED TO TESTIFY AT TRIAL BY NAME AND ADDRESS. (c) A LIST OF ALL EXHIBITS THE PARTY INTENDS TO OFFER INTO EVIDENCE. COUNSEL SHOULD EXPECT ANY EXHIBIT NOT LISTED TO BE PRECLUDED AT TRIAL; (d) EACH COUNSEL SHALL PROVIDE AN ESTIMATE OF THE ANTICIPATED LENGTH | |

Case 21-12926-mdc    Doc 46    Filed 02/10/22    Entered 02/10/22 16:29:13    Desc Main

| Date | | Docket Entry |
|---|---|---|
| 02-OCT-2015 02:31 PM | 02-OCT-2015 04:49 PM | NOTICE GIVEN UNDER RULE 236 |
| **Docket Entry:** | | NOTICE GIVEN ON 02-OCT-2015 OF WAITING TO LIST PRE-TRIAL CONF ENTERED ON 02-OCT-2015. |
| 02-OCT-2015 02:31 PM | 02-OCT-2015 02:31 PM | LISTED FOR PRE-TRIAL CONF |
| **Docket Entry:** | | *none.* |
| 02-OCT-2015 02:32 PM | 02-OCT-2015 02:32 PM | LISTED IN TRIAL READY POOL |
| **Docket Entry:** | | *none.* |
| 02-NOV-2015 11:23 AM | 02-NOV-2015 11:32 AM | ENTRY OF APPEARANCE                           DANGELO ESQ, JOHN J |
| **Documents:** | | Bravo Entry of Appearance.pdf |
| **Docket Entry:** | | ENTRY OF APPEARANCE OF JOHN J D'ANGELO FILED. (FILED ON BEHALF OF GUADALUPE BRAVO AND GABRIEL BRAVO) |

OF TRIAL. FAILURE TO TIMELY FILE A PRE-TRIAL SETTLEMENT CONFERENCE MEMORANDUM MAY RESULT IN THE IMPOSITION OF MONETARY SANCTIONS. ALL MOTIONS IN LIMINE SHALL BE FILED IN ACCORDANCE WITH ELECTRONIC FILING PROCEDURES NOT LATER THAN TWENTY (20) DAYS PRIOR TO THE START OF TRIAL. RESPONDING COUNSEL SHALL HAVE TEN (10) DAYS THEREAFTER TO FILE ANY RESPONSE. THE START OF THE TRIAL IS DEFINED AS THE FIRST DAY OF THE TRIAL POOL LISTING. REQUESTS TO EXTEND ANY CASE MANAGEMENT DEADLINE OR FOR TRIAL CONTINUANCE MUST BE SUBMITTED BY FILING A MOTION FOR EXTRAORDINARY RELIEF AND FILED PRIOR TO THE EXPIRATION OF THE DEADLINE IN QUESTION. ANY REQUESTS FOR A DATE-CERTAIN TRIAL LISTING MUST BE SUBMITTED IN WRITING WITH SPECIFICITY, WITH A COPY TO OPPOSING PARTY, AND DIRECTED TO THE HONORABLE IDEE C. FOX, COORDINATING JUDGE, VIA FACSIMILE (215-686-5137) OR US MAIL (622 CITY HALL, PHILADELPHIA, PA 19107). HOWEVER, SAID REQUESTS MAY BE MADE ONLY UNDER EXIGENT CIRCUMSTANCES. ALL COUNSEL ARE UNDER A CONTINUING OBLIGATION AND ARE HEREBY ORDERED TO SERVE A COPY OF THIS ORDER UPON ALL UNREPRESENTED PARTIES AND UPON ALL COUNSEL ENTERING AN APPEARANCE SUBSEQUENT TO THE ENTRY OF THIS ORDER. BY THE COURT: FOX, J. 10/2/15.

Case 21-12926-mdc   Doc 46   Filed 02/10/22   Entered 02/10/22 16:29:13   Desc Main
Document      Page 92 of 174

| Date | Entry | Party | Entered |
|---|---|---|---|
| 04-NOV-2015 01:07 PM | ANSWER TO COMPLAINT FILED | DANGELO ESQ, JOHN J | 04-NOV-2015 02:09 PM |
| Documents: | Answer, New Matter and Counterclaim.pdf | | |
| Docket Entry: | ANSWER WITH NEW MATTER AND COUNTERCLAIM TO PLAINTIFF'S COMPLAINT FILED. (FILED ON BEHALF OF GUADALUPE BRAVO AND GABRIEL BRAVO) | | |
| 18-NOV-2015 03:53 PM | PRELIMINARY OBJECTIONS | WESNER, PATRICK J | 18-NOV-2015 04:39 PM |
| Documents: | Plaintiffs Preliminary Objections to defendants New Matter and Counterclaims (02970307xA94TT).pdf | | |
| Docket Entry: | 17-15112617 PRELIMINARY OBJECTIONS TO DEFENDANTS' NEW MATTER AND COUNTERCLAIMS FILED. RESPONSE DATE: 12/08/2015 (FILED ON BEHALF OF BAYVIEW LOAN SERVICING, LLC, A DELAWARE LIMITED LIABILITY CO) | | |
| 10-DEC-2015 10:41 AM | PRELIM OBJECTIONS ASSIGNED | | 10-DEC-2015 10:41 AM |
| Docket Entry: | 17-15112617 PRELIMINARY OBJECTIONS ASSIGNED TO JUDGE: WRIGHT PADILLA, NINA . ON DATE: DECEMBER 10, 2015 | | |
| 22-DEC-2015 12:09 PM | ORDER ENTERED/236 NOTICE GIVEN | PADILLA, NINA W | 22-DEC-2015 12:09 PM |
| Documents: | ORDER_22.pdf | | |
| Docket Entry: | 17-15112617 AND NOW, THIS 14TH DAY OF DECEMBER 2015, UPON CONSIDERATION OF THE PRELIMINARY OBJECTIONS ARE GRANTED AND DEFENDANTS' NEW MATTER AND COUNTERCLAIMS ARE DISMISSED. ...BY THE COURT: WRIGHT PADILLA, J. | | |
| 22-DEC-2015 12:09 PM | NOTICE GIVEN UNDER RULE 236 | | 23-DEC-2015 08:50 AM |
| Docket Entry: | NOTICE GIVEN ON 23-DEC-2015 OF ORDER ENTERED/236 NOTICE GIVEN ENTERED ON 22-DEC-2015. | | |

2/10/22, 1:21 PM

Case 21-12926-mdc   Doc 46   Filed 02/10/22   Entered 02/10/22 16:29:13   Desc Main
Document   Page 93 of 174

| Date/Time | Event | Party | Date/Time |
|---|---|---|---|
| 11-JUL-2016 10:10 AM | MOTION FOR SUMMARY JUDGMENT | FAY, ROGER | 11-JUL-2016 10:56 AM |
| **Documents:** | Motion for Summary Judgment - Bravo.pdf<br>Motion CoverSheet Form | | |
| **Docket Entry:** | 12-16071112 RESPONSE DATE 08/10/2016. (FILED ON BEHALF OF BAYVIEW LOAN SERVICING, LLC, A DELAWARE LIMITED LIABILITY CO) | | |
| 08-AUG-2016 10:46 AM | ANSWER (MOTION/PETITION) FILED | DANGELO ESQ, JOHN J | 08-AUG-2016 10:50 AM |
| **Documents:** | Bravo Ans. to SJM.pdf<br>Motion CoverSheet Form | | |
| **Docket Entry:** | 12-16071112 ANSWER IN OPPOSITION OF MOTION FOR SUMMARY JUDGMENT FILED. (FILED ON BEHALF OF GUADALUPE BRAVO AND GABRIEL BRAVO) | | |
| 12-AUG-2016 09:10 AM | MOTION ASSIGNED | | 12-AUG-2016 09:10 AM |
| **Docket Entry:** | 12-16071112 MOTION FOR SUMMARY JUDGMENT ASSIGNED TO JUDGE: FLETMAN, ABBE F. ON DATE: AUGUST 12, 2016 | | |
| 12-AUG-2016 03:41 PM | MOTION/PETITION REPLY FILED | FAY, ROGER | 12-AUG-2016 04:12 PM |
| **Documents:** | Pltf Response in Further Support of SJ.pdf<br>Motion CoverSheet Form | | |
| **Docket Entry:** | 12-16071112 REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT FILED. (FILED ON BEHALF OF BAYVIEW LOAN SERVICING, LLC, A DELAWARE LIMITED LIABILITY CO) | | |
| 06-SEP-2016 01:08 PM | CONFERENCE DATE SET | SHIRDAN-HARRIS, LISETTE | 06-SEP-2016 01:08 PM |
| **Docket Entry:** | none. | | |

| Date | Entry | | |
|---|---|---|---|
| 06-SEP-2016 01:08 PM | LISTED FOR PRE-TRIAL CONF | | 06-SEP-2016 01:08 PM |
| **Docket Entry:** | *none.* | | |
| 08-SEP-2016 12:30 AM | NOTICE GIVEN | | 08-SEP-2016 12:30 AM |
| **Docket Entry:** | *none.* | | |
| 19-SEP-2016 04:24 PM | ORDER ENTERED/236 NOTICE GIVEN | FLETMAN, ABBE F | 19-SEP-2016 04:24 PM |
| **Documents:** | ORDER_31.pdf | | |
| **Docket Entry:** | 12-16071112 IT IS HEREBY ORDERED THAT THE MOTION IS DENIED.......BY THE COURT: FLETMAN, J. 09/19/2016 | | |
| 19-SEP-2016 04:24 PM | NOTICE GIVEN UNDER RULE 236 | | 20-SEP-2016 10:36 AM |
| **Docket Entry:** | NOTICE GIVEN ON 20-SEP-2016 OF ORDER ENTERED/236 NOTICE GIVEN ENTERED ON 19-SEP-2016. | | |
| 06-OCT-2016 03:02 PM | SETTLEMENT CONF COMPLETED | CHAMBERS, HOWARD | 06-OCT-2016 03:02 PM |
| **Docket Entry:** | *none.* | | |
| 29-NOV-2016 02:49 PM | JUDGMENT ENTERED BY AGREEMENT | COLINS, MARY D | $136,865.70 | 29-NOV-2016 02:51 PM |
| **Documents:** | WSJDA_34.pdf | | |
| **Docket Entry:** | IN REM JUDGMENT IN MORTGAGE FORECLOSURE IS ENTERED IN FAVOR OF PLTF AND AGAINST DEFT IN THE AMOUNT OF $105,613.62 TOGETHER WITH INTEREST ACCRUING AT A PER DIEM OF $19.83 FROM | | |

Case 21-12926-mdc    Doc 46    Filed 02/10/22    Entered 02/10/22 16:29:13    Desc Main
Document    Page 63 of 141

| Date | Docket Entry | | |
|---|---|---|---|
| | 11/1/16 UNTIL THE DATE OF SHERIFF'S SALE, PLUS ANY OTHER FEES AND COSTS LEGALLY RECOVERABLE. BY THE COURT ...COLINS,J 11/29/16 ***CORRECTION TO JUDGMENT INDEX: MOTION TO REASSESS DAMAGES GRANTED. DAMAGES REASSESSED FROM $105,613.62 TO $136,865.70. INDEX UPDATED 06-08-2021. | | 29-NOV-2016 04:50 PM |
| 29-NOV-2016 02:49 PM | NOTICE GIVEN UNDER RULE 236 | | |
| **Docket Entry:** | NOTICE GIVEN ON 29-NOV-2016 OF JUDGMENT ENTERED BY AGREEMENT ENTERED ON 29-NOV-2016. | | |
| 08-MAR-2017 03:09 PM | PRAECIPE TO ISSUE WRIT FILED | WILLIAMS, ROBERT W | 09-MAR-2017 04:07 PM |
| **Documents:** | Writ of Execution Package (6).pdf | | |
| **Docket Entry:** | PRAECIPE FOR WRIT OF EXECUTION (RE) FILED. WRIT OF EXECUTION (RE) ISSUED. SUBJECT PREMISES: 1122 S 09TH ST PHILADELPHIA. (FILED ON BEHALF OF BAYVIEW LOAN SERVICING, LLC, A DELAWARE LIMITED LIABILITY CO) | | |
| 23-MAY-2017 09:24 AM | NOTICE - CONTINUED SALE DATE | FAY, ROGER | 23-MAY-2017 10:53 AM |
| **Documents:** | Notice of Continued Sheriffs Sale (4).pdf | | |
| **Docket Entry:** | THE SHERIFF'S SALE SCHEDULED FOR 06/06/2017 HAS BEEN CONTINUED UNTIL 07/11/2017. (FILED ON BEHALF OF BAYVIEW LOAN SERVICING, LLC, A DELAWARE LIMITED LIABILITY CO) | | |
| 08-JUN-2017 02:57 PM | WRIT RETURN FILED | | 09-JUN-2017 11:08 AM |
| **Docket Entry:** | SALE POSTPONED - WRIT NUMBER 1706-472 | | |
| 21-JUN-2017 03:24 PM | AFFIDAVIT OF SERVICE FILED | FAY, ROGER | 22-JUN-2017 12:15 PM |
| **Documents:** | Executed 3129.2 (4).pdf | | |

2/10/22, 1:21 PM

Case 21-12926-mdc   Doc 46   Filed 02/10/22   Entered 02/10/22 16:29:13   Desc Main
Document   Civil Docket Report   Page 06 of 23

2/10/22, 1:21 PM

| Docket Entry | | | |
|---|---|---|---|
| **Docket Entry:** 12-JUL-2017 11:35 AM | AFFIDAVIT OF SERVICE OF AFFIDAVIT PURSUANT TO PA R.C.P. 3129 UPON GUADALUPE BRAVO AND GABRIEL BRAVO BY PERSONAL SERVICE,FIRST CLASS REGULAR MAIL ON 05/22/2017 FILED. (FILED ON BEHALF OF BAYVIEW LOAN SERVICING, LLC, A DELAWARE LIMITED LIABILITY CO) | | |
| **Docket Entry:** 12-JUL-2017 11:35 AM | SHERIFF'S SALE (R.E. WRITS) | | 12-JUL-2017 11:35 AM |
| | PROPERTY SOLD TO SAJCO PHILI PROPERTIES LLC FOR THE SUM OF $200,000.00 ON 07/11/2017. - WRIT NUMBER 1706-472 | | |
| **Docket Entry:** 07-AUG-2017 02:24 PM | PETITION TO INTERVENE | KRIK, JUSTIN L | 07-AUG-2017 04:01 PM |
| **Documents:** | 20170807131922.pdf Motion CoverSheet Form | | |
| **Docket Entry:** | 34-17080934 EMERGENCY PETITION TO INTERVENE (FILED ON BEHALF OF SAJCO PHILI PROPERTIES, LLC) | | |
| **Docket Entry:** 07-AUG-2017 04:02 PM | MOTION ASSIGNED | | 07-AUG-2017 04:02 PM |
| **Docket Entry:** | 34-17080934 PETITION TO INTERVENE ASSIGNED TO JUDGE: JUDGE, EMERGENCY . ON DATE: AUGUST 07, 2017 | | |
| **Docket Entry:** 08-AUG-2017 04:44 PM | RULE ISSUED | ANDERS, DANIEL J | 08-AUG-2017 04:50 PM |
| **Documents:** | RLFIS_43.pdf | | |
| **Docket Entry:** | 34-17080934 IT IS HEREBY ORDERED THAT A RULE IS ISSUED UPON PLAINTIFF AND DEFENDANT TO SHOW CAUSE WHY THE COURT SHOULD NOT GRANT THE RELIEF REQUESTED. A HEARING SHALL BE HELD ON AUGUST 9, 2017 AT 2:00 PM ON COURTROOM 285 CITY HALL. SEE ORDER FOR COMPLETE TERMS. ...BY THE COURT: ANDERS, J. 8/8/2017 | | |
| **Docket Entry:** 08-AUG-2017 04:44 PM | NOTICE GIVEN UNDER RULE 236 | | 09-AUG-2017 08:22 AM |

Case 21-12926-mdc    Doc 46    Filed 02/10/22    Entered 02/10/22 16:29:13    Desc Main

**Docket Entry:** NOTICE GIVEN ON 09-AUG-2017 OF RULE ISSUED ON 08-AUG-2017. / RULE ISSUED ON 08-AUG-2017.

| Date | Entry | Person | Date Entered |
|---|---|---|---|
| 09-AUG-2017 09:44 AM | AFFIDAVIT OF SERVICE FILED | KRIK, JUSTIN L | 09-AUG-2017 11:19 AM |

**Documents:** 2017080982509.pdf

**Docket Entry:** AFFIDAVIT OF SERVICE OF PETITION TO INTERVENE AND RULE UPON ROGER FAY AND JOHN J DANGELO BY ON 08/08/2017 FILED. (FILED ON BEHALF OF SAJCO PHILI PROPERTIES, LLC)

| | | | |
|---|---|---|---|
| 09-AUG-2017 04:01 PM | ORDER ENTERED/236 NOTICE GIVEN | EMERGENCY JUDGE, JUDGE | 09-AUG-2017 04:01 PM |

**Documents:** ORDER_46.pdf

**Docket Entry:** 34-17080934 AND NOW, THIS 9TH DAY OF AUGUST, 2017, UPON CONSIDERATION OF THE EMERGENCY PETITION TO INTERVENE AND STAY PAYMENT TO SHERIFF OF THE PROPERTY KNOWN AS 1122 SOUTH 9TH STREET, PHILADELPHIA, PA SOLD ON JULY 11TH, 2017, UNDER BOOK 1706, WRIT 472, AND ANY RESPONSE THERETO, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED AS FOLLOWS: 1. THE PETITION TO INTERVENE IS HEREBY GRANTED AND SAJCO PHILI PROPERTIES LLC SHALL BE DOCKETED AS A PARTY TO THIS ACTION FOR THE LIMITED PURPOSE OF FILING AND ADJUDICATING A MOTION TO SET ASIDE SHERIFF'S SALEI AND 2. THE HERIFF OF PHILADELPHIA COUNTY IS HEREBY DIRECTED TO STAY PAYMENT BY SAJCO PHILI PROPERTIES LLC UNTIL THIRTY (30) DAYS AFTER FINAL ORDER OF THE COURT ADJUDICATING THE MOTION TO SET ASIDE. ...BY THE COURT: ANDERS, J., 8/9/17

| | | | |
|---|---|---|---|
| 09-AUG-2017 04:01 PM | NOTICE GIVEN UNDER RULE 236 | | 10-AUG-2017 09:40 AM |

**Docket Entry:** NOTICE GIVEN ON 10-AUG-2017 OF ORDER ENTERED/236 NOTICE GIVEN ENTERED ON 09-AUG-2017.

| | | | |
|---|---|---|---|
| 15-AUG-2017 03:49 PM | MOTION SET ASIDE SHERIFF SALE | KRIK, JUSTIN L | 16-AUG-2017 10:31 AM |

**Documents:** 2017081514422.pdf
Motion CoverSheet Form

**Docket Entry:** 91-17081891 RESPONSE DATE 09/05/2017. (FILED ON BEHALF OF SAJCO PHILI PROPERTIES LLC)

2/10/22, 1:21 PM

| Date/Time | Docket Entry | Name | Entered |
|---|---|---|---|
| 17-AUG-2017 10:48 AM | JUDGMENT MARKED TO THE USE OF | FAY, ROGER | 17-AUG-2017 11:12 AM |
| **Documents:** | Pra to Mark Judgment-executed (03515764xA9477).pdf | | |
| **Docket Entry:** | PRAECIPE TO MARK JUDGMENT TO THE USE OF E-Z CASHING, LLC FILED. (FILED ON BEHALF OF BAYVIEW LOAN SERVICING, LLC, A DELAWARE LIMITED LIABILITY CO) | | |
| | | | |
| 21-AUG-2017 11:24 AM | STIPULATION FILED | FAY, ROGER | 21-AUG-2017 01:35 PM |
| **Documents:** | Consent Order - Sheriff Sale.pdf | | |
| **Docket Entry:** | 93-17082593 STIPULATION TO VACATE SHERIFF SALE AND RELIST PROPERTY FOR SALE FILED. AWAITING JUDICIAL APPROVAL (FILED ON BEHALF OF E-Z CASHING, LLC) | | |
| | | | |
| 21-AUG-2017 01:40 PM | STIPULATION ASSIGNED | | 21-AUG-2017 01:40 PM |
| **Docket Entry:** | 93-17082593 STIPULATION FILED ASSIGNED TO JUDGE: FLETMAN, ABBE F. ON DATE: AUGUST 21, 2017 | | |
| | | | |
| 21-AUG-2017 02:52 PM | WRIT RETURN FILED | | 21-AUG-2017 02:52 PM |
| **Docket Entry:** | TERMS OF SALE NOT COMPLIED WITH - WRIT NUMBER 1706-472 | | |
| | | | |
| 21-AUG-2017 03:13 PM | PRAECIPE TO ISSUE WRIT FILED | FAY, ROGER | 21-AUG-2017 03:30 PM |
| **Documents:** | Writ of Execution Package.pdf | | |
| **Docket Entry:** | PRAECIPE FOR WRIT OF EXECUTION (RE) FILED. WRIT OF EXECUTION (RE) ISSUED. SUBJECT PREMISES: 1122 S 09TH ST PHILADELPHIA. (FILED ON BEHALF OF E-Z CASHING, LLC) | | |
| | | | |
| 21-AUG-2017 | CORRECTIVE ENTRY | | 21-AUG-2017 |

2/10/22, 1:21 PM

03:29 PM

Case 21-12926-mdc   Doc 46   Filed 02/10/22   Entered 02/10/22 16:29:13   Desc Main
Document   Page 99 of 174

| | | | |
|---|---|---|---|
| **Docket Entry:** | PLEASE DISREGARD THE DOCKET ENTRY INDICATION WRIT RETURN FILED ON 8-21-17 AS IT WAS ENTERED IN ERROR. ...SJW-OJR | | 12:00 AM |
| 23-AUG-2017 10:48 AM | ORDER ENTERED/236 NOTICE GIVEN | FLETMAN, ABBE F | 23-AUG-2017 10:48 AM |
| **Documents:** | ORDER_55.pdf | | |
| **Docket Entry:** | 93-17082593 AND NOW, THIS 21ST DAY OF AUGUST, 2017, UPON CONSIDERATION OF THE CONSENT OF THE BELOW PARTIES: IT IS HEREBY ORDERED THAT THE SHERIFF'S SALE HELD ON JULY 11TH, 2017, OF THE REAL PROPERTY KNOWN AS 1122 SOUTH 9TH STREET, PHILADELPHIA, PA 19147, IS VACATED AND THE PROPERTY MAY BE RE-LISTED FOR SALE. IT IS FURTHER ORDERED THAT THE MOTION TO SET ASIDE THE SHERIFF'S SALE FILED AUGUST 16TH, 2017, ON BEHALF OF SAJCO PHILI PROPERTIES LLC IS HEREBY WITHDRAWN. ...BY THE COURT: FLETMAN, J., 8/23/17 | | |
| 23-AUG-2017 10:48 AM | NOTICE GIVEN UNDER RULE 236 | | 24-AUG-2017 09:12 AM |
| **Docket Entry:** | NOTICE GIVEN ON 24-AUG-2017 OF ORDER ENTERED/236 NOTICE GIVEN ENTERED ON 23-AUG-2017. | | |
| 07-SEP-2017 11:33 AM | MOTION ASSIGNED | | 07-SEP-2017 11:33 AM |
| **Docket Entry:** | 91-17081891 MOTION SET ASIDE SHERIFF SALE ASSIGNED TO JUDGE: FLETMAN, ABBE F. ON DATE: SEPTEMBER 07, 2017 | | |
| 10-OCT-2017 11:42 AM | AFFIDAVIT OF SERVICE FILED | FAY, ROGER | 10-OCT-2017 01:12 PM |
| **Documents:** | Executed 3129.2 (5).pdf | | |
| **Docket Entry:** | AFFIDAVIT OF SERVICE OF AFFIDAVIT PURSUANT TO PARCP 3129 UPON GUADALUPE BRAVO AND GABRIEL BRAVO BY PERSONAL SERVICE,FIRST CLASS REGULAR MAIL ON 10/03/2017 FILED. (FILED ON BEHALF OF E-Z CASHING, LLC) | | |

2/10/22, 1:21 PM

Case 21-12926-mdc    Doc 46    Filed 02/10/22 Entered 02/10/22 16:29:13    Desc Main
Document    Page 180 of 174

| Date | Docket Entry | Attorney/Judge | Date |
|---|---|---|---|
| 13-NOV-2017 10:57 AM | NOTICE - CONTINUED SALE DATE | FAY, ROGER | 15-NOV-2017 09:14 AM |
| **Documents:** | Notice of Continued Sheriffs Sale (1).pdf | | |
| **Docket Entry:** | THE SHERIFF'S SALE SCHEDULED FOR 11/07/2017 HAS BEEN CONTINUED UNTIL 01/09/2018. (FILED ON BEHALF OF E-Z CASHING, LLC) | | |
| 14-NOV-2017 03:33 PM | ORDER ENTERED/236 NOTICE GIVEN | FLETMAN, ABBE F | 14-NOV-2017 03:34 PM |
| **Documents:** | ORDER_59.pdf | | |
| **Docket Entry:** | 91-17081891 IT IS HEREBY ORDERED THAT A HEARING IN THE ABOVE-CAPTIONED MATTER IS SCHEDULED FOR 12/07/2017 AT 1:30PM IN COURTROOM 426 CITY HALL. SEE ORDER FOR COMPLETE TERMS... BY THE COURT: FLETMAN, J. 11/14/2017 | | |
| 14-NOV-2017 03:33 PM | NOTICE GIVEN UNDER RULE 236 | | 15-NOV-2017 08:34 AM |
| **Docket Entry:** | NOTICE GIVEN ON 15-NOV-2017 OF ORDER ENTERED/236 NOTICE GIVEN ENTERED ON 14-NOV-2017. | | |
| 14-NOV-2017 03:34 PM | MOTION HEARING SCHEDULED | | 14-NOV-2017 03:34 PM |
| **Docket Entry:** | 91-17081891 IT IS HEREBY ORDERED THAT A HEARING IN THE ABOVE-CAPTIONED MATTER IS SCHEDULED FOR 12/07/2017 AT 1:30PM IN COURTROOM 426 CITY HALL. SEE ORDER FOR COMPLETE TERMS... BY THE COURT: FLETMAN, J. 11/14/2017 | | |
| 16-NOV-2017 12:30 AM | NOTICE GIVEN | | 16-NOV-2017 12:30 AM |
| **Docket Entry:** | none. | | |
| 08-DEC-2017 03:20 PM | ORDER ENTERED/236 NOTICE GIVEN | FLETMAN, ABBE F | 08-DEC-2017 03:20 PM |

2/10/22, 1:21 PM

| | | | |
|---|---|---|---|
| **Documents:** | ORDER_64.pdf | | |
| **Docket Entry:** | 91-17081891 IT IS HEREBY ORDERED THAT THE MOTION IS DISMISSED FOR LACK OF PROSECUTION. ...BY THE COURT: FLETMAN, J., 12/7/2017 | | |
| 08-DEC-2017 03:20 PM | NOTICE GIVEN UNDER RULE 236 | | 11-DEC-2017 08:52 AM |
| **Docket Entry:** | NOTICE GIVEN ON 11-DEC-2017 OF ORDER ENTERED/236 NOTICE GIVEN ENTERED ON 08-DEC-2017. | | |
| 12-JAN-2018 08:24 AM | WRIT RETURN FILED | | 12-JAN-2018 08:24 AM |
| **Docket Entry:** | SALE POSTPONED - WRIT NUMBER 1711-598 | | |
| 16-JAN-2018 01:52 PM | NOTICE - CONTINUED SALE DATE | FAY, ROGER | 16-JAN-2018 02:58 PM |
| **Documents:** | Notice of Continued Sheriffs Sale (1).pdf | | |
| **Docket Entry:** | THE SHERIFF'S SALE SCHEDULED FOR 01/09/2018 HAS BEEN CONTINUED UNTIL 03/06/2018. (FILED ON BEHALF OF E-Z CASHING, LLC) | | |
| 05-MAR-2018 09:43 AM | MOT-POSTPONE SHERIFF SALE | FAY, ROGER | 05-MAR-2018 09:54 AM |
| **Documents:** | Cert of Service (03904045xA947T).pdf<br>memo (03904039xA947T).pdf<br>Proposed order (03904046xA947T).pdf<br>Verification (03904041xA947T).pdf<br>Motion (03904036xA947T).pdf<br>Motion CoverSheet Form | | |
| **Docket Entry:** | 40-18030440 PLAINTIFF'S EMERGENCY MOT-POSTPONE SHERIFF SALE (FILED ON BEHALF OF E-Z CASHING, LLC) | | |
| 05-MAR-2018 | MOTION ASSIGNED | | 05-MAR-2018 |

2/10/22, 1:21 PM

Case 21-12926-mdc   Doc 46   Filed 02/10/22   Entered 02/10/22 16:29:13   Desc Main
Document   Page 102 of 174

| Date/Time | Docket Entry | Party/Judge |
|---|---|---|
| 09:55 AM | | 09:55 AM |
| **Docket Entry:** | 40-18030440 MOT-POSTPONE SHERIFF SALE ASSIGNED TO JUDGE: JUDGE, EMERGENCY . ON DATE: MARCH 05, 2018 | |
| 05-MAR-2018 04:06 PM | ORDER ENTERED/236 NOTICE GIVEN | EMERGENCY JUDGE, JUDGE | 05-MAR-2018 04:06 PM |
| **Documents:** | ORDER_70.pdf | |
| **Docket Entry:** | 40-18030440 IT IS HEREBY ORDERED AND DECREED THAT PLAINTIFF'S SPECIAL MOTION FOR CONTINUANCE OF SHERIFF'S SALE WITHOUT NEW NOTICE IS GRANTED, AND SAID SHERIFF'S SALE OF THE REAL PROPERTY COMMONLY KNOWN AS 1122 S 9TH STREET, PHILADELPHIA, PA 19147 IS RESCHEDULED FOR MAY 01, 2018. NO FURTHER NOTICE TO THE DEFENDANTS AND LIEN HOLDERS AND NO FURTHER ADVERTISING ARE REQUIRED. ... BY THE COURT: ANDERS, J. 03/05/18 | |
| 05-MAR-2018 04:06 PM | NOTICE GIVEN UNDER RULE 236 | | 06-MAR-2018 09:11 AM |
| **Docket Entry:** | NOTICE GIVEN ON 06-MAR-2018 OF ORDER ENTERED/236 NOTICE GIVEN ENTERED ON 05-MAR-2018. | |
| 06-MAR-2018 12:08 PM | NOTICE - CONTINUED SALE DATE | FAY, ROGER | 06-MAR-2018 01:13 PM |
| **Documents:** | Notice of Continued Sheriffs Sale (4) (03907898xA9477).PDF | |
| **Docket Entry:** | THE SHERIFF'S SALE SCHEDULED FOR 03/06/2018 HAS BEEN CONTINUED UNTIL 05/01/2018. (FILED ON BEHALF OF E-Z CASHING, LLC) | |
| 08-MAR-2018 12:30 PM | WRIT RETURN FILED | | 08-MAR-2018 12:30 PM |
| **Docket Entry:** | SALE POSTPONED - WRIT NUMBER 1711-598 | |
| 27-APR-2018 12:42 PM | MOT-POSTPONE SHERIFF SALE | FAY, ROGER | 27-APR-2018 12:47 PM |

https://fjdefile.phila.gov/efsfd/zk_fjd_public_qry_03.zp_dktrpt_frames

2/10/22, 1:21 PM

Case 21-12926-mdc   Doc 46   Filed 02/10/22   Entered 02/10/22 16:29:13   Desc Main
Document   Page 103 of 174

**Documents:**
Cert of Service (04006649xA947T).pdf
Proposed order (04006650xA947T).pdf
Memo (04006643xA947T).pdf
Verification (04006647xA947T).pdf
Motion (04006642xA947T).pdf
Motion CoverSheet Form

**Docket Entry:** 01-18043901 MOT-POSTPONE SHERIFF SALE (FILED ON BEHALF OF E-Z CASHING, LLC)

| 27-APR-2018 12:48 PM | MOTION ASSIGNED | | 27-APR-2018 12:48 PM |

**Docket Entry:** 01-18043901 MOT-POSTPONE SHERIFF SALE ASSIGNED TO JUDGE: JUDGE, EMERGENCY . ON DATE: APRIL 27, 2018

| 27-APR-2018 04:11 PM | ORDER ENTERED/236 NOTICE GIVEN | FLETMAN, ABBE F | 27-APR-2018 04:11 PM |

**Documents:** ORDER_76.pdf

**Docket Entry:** 01-18043901 AND NOW, ON THIS 27TH DAY OF APRIL, 2018, UPON CONSIDERATION OF PLAINTIFF FOR A MOTION FOR SPECIAL ORDER POSTPONING SHERIFF'S SALE SCHEDULED FOR MAY 1ST, 2018, WITHOUT NEW NOTICE, IT IS HEREBY ORDERED AND DECREED THAT PLAINTIFF'S SPECIAL MOTION FOR CONTINUANCE OF SHERIFF'S SALE WITHOUT NEW NOTICE IS GRANTED, AND SAID SHERIFF'S SALE OF THE REAL PROPERTY IS RESCHEDULED FOR JULY 10TH, 2018. NO FURTHER NOTICE TO THE DEFENDANT AND LIEN HOLDERS AND NO FURTHER ADVERTISING ARE REQUIRED. ...BY THE COURT: FLETMAN, J., 4/27/18

| 27-APR-2018 04:11 PM | NOTICE GIVEN UNDER RULE 236 | | 30-APR-2018 08:50 AM |

**Docket Entry:** NOTICE GIVEN ON 30-APR-2018 OF ORDER ENTERED/236 NOTICE GIVEN ENTERED ON 27-APR-2018.

| 02-MAY-2018 10:47 AM | WRIT RETURN FILED | | 02-MAY-2018 10:47 AM |

**Docket Entry:** SALE POSTPONED - WRIT NUMBER 1711-598

Case 21-12926-mdc   Doc 46   Filed 02/10/22   Entered 02/10/22 16:29:13   Desc Main
Document   Page 194 of 174

| Date | Docket | FAY, ROGER |
|---|---|---|
| 02-MAY-2018 01:52 PM | NOTICE - CONTINUED SALE DATE | 02-MAY-2018 01:56 PM |
| Documents: | Notice of Continued Sheriffs Sale (6).pdf | |
| Docket Entry: | THE SHERIFF'S SALE SCHEDULED FOR 05/01/2018 HAS BEEN CONTINUED UNTIL 07/10/2018. (FILED ON BEHALF OF E-Z CASHING, LLC) | |
| 09-JUL-2018 11:45 AM | MOT-POSTPONE SHERIFF SALE | FAY, ROGER 09-JUL-2018 11:58 AM |
| Documents: | Executed MPP (04118973xxA9477).pdf Motion CoverSheet Form | |
| Docket Entry: | 13-18070813 MOT-POSTPONE SHERIFF SALE (FILED ON BEHALF OF E-Z CASHING, LLC) | |
| 09-JUL-2018 11:59 AM | MOTION ASSIGNED | 09-JUL-2018 11:59 AM |
| Docket Entry: | 13-18070813 MOT-POSTPONE SHERIFF SALE ASSIGNED TO JUDGE: JUDGE, EMERGENCY . ON DATE: JULY 09, 2018 | |
| 09-JUL-2018 03:50 PM | ORDER ENTERED/236 NOTICE GIVEN | ANDERS, DANIEL J 09-JUL-2018 03:50 PM |
| Documents: | ORDER_82.pdf | |
| Docket Entry: | 13-18070813 IT IS HEREBY ORDERED AND DECREED THAT PLAINTIFF'S SPECIAL MOTION FOR CONTINUANCE OF SHERIFF'S SALE WITHOUT NEW NOTICE IS GRANTED, AND SAID SHERIFF'S SALE OF REAL PROPERTY COMMONLY KNOWN AS 1122 S. 9TH ST, PHILADELPHIA, PA 19147 IS RESCHEDULED FOR SEPTEMBER 11, 2018. NO FURTHER NOTICE TO THE DEFENDANTS AND LIEN HOLDERS AND NO FURTHER ADVERTISING ARE REQUIRED. ... BY THE COURT: ANDERS, J. 07/09/18 | |
| 09-JUL-2018 03:50 PM | NOTICE GIVEN UNDER RULE 236 | 10-JUL-2018 08:39 AM |
| Docket Entry: | NOTICE GIVEN ON 10-JUL-2018 OF ORDER ENTERED/236 NOTICE GIVEN ENTERED ON 09-JUL-2018. | |

2/10/22, 1:21 PM

| Date | Action | Judge/Attorney | Date |
|------|--------|----------------|------|
| 11-JUL-2018 11:01 AM | WRIT RETURN FILED | | 11-JUL-2018 11:01 AM |
| **Docket Entry:** | SALE POSTPONED - WRIT NUMBER 1711-598 | | |
| 20-JUL-2018 02:10 PM | NOTICE - CONTINUED SALE DATE | FAY, ROGER | 20-JUL-2018 02:12 PM |
| **Documents:** | Notice of Continued Sheriffs Sale (3).pdf | | |
| **Docket Entry:** | THE SHERIFF'S SALE SCHEDULED FOR 07/10/2018 HAS BEEN CONTINUED UNTIL 09/11/2018. (FILED ON BEHALF OF E-Z CASHING, LLC) | | |
| 12-SEP-2018 09:22 AM | WRIT RETURN FILED | | 12-SEP-2018 09:22 AM |
| **Docket Entry:** | STAYED BY PLAINTIFF'S ATTORNEY - WRIT NUMBER 1711-598 | | |
| 12-SEP-2019 11:37 AM | MISCELLANEOUS MOTION/PETITION | FAY, ROGER | 12-SEP-2019 11:37 AM |
| **Documents:** | Petition to Withdraw as Counsel of Record.pdf<br>Motion CoverSheet Form | | |
| **Docket Entry:** | 41-19091641 RESPONSE DATE 10/02/2019. PETITION TO WITHDRAW AS COUNSEL OF RECORD (FILED ON BEHALF OF E-Z CASHING, LLC) | | |
| 04-OCT-2019 09:34 AM | MOTION ASSIGNED | | 04-OCT-2019 09:34 AM |
| **Docket Entry:** | 41-19091641 MISCELLANEOUS MOTION/PETITION ASSIGNED TO JUDGE: SHIRDAN-HARRIS, LISETTE . ON DATE: OCTOBER 04, 2019 | | |
| 28-OCT-2019 11:31 AM | ORDER ENTERED/236 NOTICE GIVEN | SHIRDAN-HARRIS, LISETTE | 28-OCT-2019 11:39 AM |
| **Documents:** | ORDER_89.pdf | | |

2/10/22, 1:21 PM

Case 21-12926-mdc    Doc 46    Filed 02/10/22    Entered 02/10/22 16:29:13    Desc Main
Document    Page 106 of 174

| Date | | Docket Entry |
|---|---|---|
| **Docket Entry:** | | 41-19091641 AND NOW, THIS 25TH DAY OF OCTOBER, 2019, A RULE IS ENTERED AGAINST ALL PARTIES OF INTEREST TO SHOW CAUSE WHY MILSTEAD AND ASSOCIATES, LLC, AND ROGER FAY, ESQ., SHOULD NOT WITHDRAW AS COUNSEL OF RECORD FOR PLAINTIFF, E-Z CASHING, LLC , IN THE ABOVE-CAPTIONED MATTER. RULE RETURNABLE THE 26TH DAY OF NOVEMBER, 2019 AT 9:30 AM IN COURTROOM 253, CITY HALL. IT IS FURTHER ORDERED THAT MOVANT SHALL NOTIFY ALL PARTIES OF INTEREST OF THE RULE HEARING AND SHALL NOTIFY THE CLIENT OF THE MOTION AND RULE HEARING BY CERTIFIED AND REGULAR MAIL. BY THE COURT: SHIRDAN-HARRIS, J. |
| 28-OCT-2019 11:31 AM | | NOTICE GIVEN UNDER RULE 236 |
| | | 28-OCT-2019 04:16 PM |
| **Docket Entry:** | | NOTICE GIVEN ON 28-OCT-2019 OF ORDER ENTERED/236 NOTICE GIVEN ENTERED ON 28-OCT-2019. |
| 28-OCT-2019 11:41 AM | | RULE RETURNABLE SCHEDULED |
| | | 28-OCT-2019 11:41 AM |
| **Docket Entry:** | | 41-19091641 RULE HEARING NOVEMBER 26, 2019 AT 9:30 IN COURTROOM 253, CITY HALL, PHILA., PA. |
| 11-NOV-2019 02:34 PM | | AFFIDAVIT OF SERVICE FILED    FAY, ROGER |
| | | 12-NOV-2019 10:44 AM |
| **Documents:** | | Afft of Service of RR - Bravo.pdf |
| **Docket Entry:** | | AFFIDAVIT OF SERVICE OF RULE TO FILE UPON GABRIEL BRAVO AND E-Z CASHING, LLC BY CERTIFIED MAIL,FIRST CLASS REGULAR MAIL ON 11/11/2019 FILED. (FILED ON BEHALF OF E-Z CASHING, LLC) |
| 27-NOV-2019 12:05 PM | | ORDER ENTERED/236 NOTICE GIVEN    SHIRDAN-HARRIS, LISETTE |
| | | 27-NOV-2019 12:05 PM |
| **Documents:** | | ORDER_93.pdf |
| **Docket Entry:** | | 41-19091641 IT IS HEREBY ORDERED AND DECREED THAT THE PETITION OF COUNSEL FOR LEAVE TO WITHDRAW AS COUNSEL IS GRANTED. COUNSEL IS GRANTED LEAVE TO WITHDRAW FROM REPRESENTING PLAINTIFF, E-Z CASHING, LLC. WITHIN TEN (10) DAYS OF THE ENTRY OF THIS ORDER COUNSEL SHALL FILE A PRAECIPE TO WITHDRAW AS COUNSEL WITH THE OFFICE OF JUDICIAL RECORDS, ATTACHING AN AFFIDAVIT OF SERVICE CERTIFYING THAT THIS ORDER HAS BEEN SENT TO THE CLIENT AND ALSO UPDATING THE OFFICE OF JUDICIAL RECORDS WITH THE ADDRESS UPON WHICH ALL |

Case 21-12926-mdc   Doc 46   Filed 02/10/22   Entered 02/10/22 16:29:13   Desc Main
Document   Page 274 of 174

FURTHER NOTICES FROM THE COURT SHALL BE SENT TO THE CLIENT. ALL DEADLINES REMAIN IN EFFECT. BY THE COURT: SHIRDAN-HARRIS, J. 11/26/19

| | | | |
|---|---|---|---|
| 27-NOV-2019 12:05 PM | NOTICE GIVEN UNDER RULE 236 | | 03-DEC-2019 09:22 AM |
| **Docket Entry:** NOTICE GIVEN ON 03-DEC-2019 OF ORDER ENTERED/236 NOTICE GIVEN ENTERED ON 27-NOV-2019. | | | |
| 04-DEC-2019 10:53 AM | ENTRY OF APPEARANCE | KRIK, JUSTIN L | 04-DEC-2019 10:58 AM |
| **Documents:** Entry of Appearance – EZ Cashing.pdf | | | |
| **Docket Entry:** ENTRY OF APPEARANCE OF JUSTIN L KRIK FILED. (FILED ON BEHALF OF E-Z CASHING, LLC) | | | |
| 04-DEC-2019 12:06 PM | AFFIDAVIT OF SERVICE FILED | FAY, ROGER | 04-DEC-2019 12:09 PM |
| **Documents:** Afft of Service - Bravo.pdf | | | |
| **Docket Entry:** AFFIDAVIT OF SERVICE OF ORDER UPON SAJCO PHILI PROPERTIES LLC, JUSTIN L KRIK, GUADALUPE BRAVO, GABRIEL BRAVO AND E-Z CASHING, LLC BY CERTIFIED MAIL,FIRST CLASS REGULAR MAIL ON 12/04/2019 FILED. (FILED ON BEHALF OF E-Z CASHING, LLC) | | | |
| 06-DEC-2019 10:00 AM | WITHDRAWAL OF APPEARANCE | FAY, ROGER | 06-DEC-2019 10:03 AM |
| **Documents:** Withdrawal of appearance - Bravo.pdf | | | |
| **Docket Entry:** WITHDRAWAL OF APPEARANCE OF ROGER FAY FILED. (FILED ON BEHALF OF E-Z CASHING, LLC) | | | |
| 14-JAN-2021 08:43 PM | BANKRUPTCY DISMISSAL/MODIF. | KRIK, JUSTIN L | 15-JAN-2021 10:32 AM |
| **Documents:** Suggestion of Termination of BKY.pdf | | | |
| **Docket Entry:** NOTICE OF BANKRUPTCY DISMISSAL FILED. (FILED ON BEHALF OF E-Z CASHING, LLC) | | | |

https://fjdefile.phila.gov/efsfid/zk_fjd_public_qry_03.zp_dktrpt_frames

Case 21-12926-mdc    Doc 46    Filed 02/10/22   Entered 02/10/22 16:29:13    Desc Main
Document    Page 108 of 174

| Date/Time | Type | Party |
|---|---|---|
| 23-FEB-2021 03:56 PM | MOTION TO REASSESS DAMAGES | KRIK, JUSTIN L |
| | | 23-FEB-2021 04:14 PM |
| **Documents:** | Motion to Reassess Damages - filing copy.pdf<br>Motion CoverSheet Form | |
| **Docket Entry:** | 88-21022388 RESPONSE DATE 03/15/2021. (FILED ON BEHALF OF E-Z CASHING, LLC) | |
| 11-MAR-2021 11:14 AM | ANSWER (MOTION/PETITION) FILED | SCHOLL, DAVID A |
| | | 11-MAR-2021 11:15 AM |
| **Documents:** | 20210312105205.pdf<br>Motion CoverSheet Form | |
| **Docket Entry:** | 88-21022388 ANSWER IN OPPOSITION OF MOTION TO REASSESS DAMAGES FILED. (FILED ON BEHALF OF GUADALUPE BRAVO AND GABRIEL BRAVO) | |
| 17-MAR-2021 10:44 AM | MOTION ASSIGNED | |
| | | 17-MAR-2021 10:44 AM |
| **Docket Entry:** | 88-21022388 MOTION TO REASSESS DAMAGES ASSIGNED TO JUDGE: PATRICK, PAULA . ON DATE: MARCH 17, 2021 | |
| 02-JUN-2021 03:20 PM | ORDER ENTERED/236 NOTICE GIVEN | PATRICK, PAULA |
| | | 02-JUN-2021 03:20 PM |
| **Documents:** | ORDER_102.pdf | |
| **Docket Entry:** | 88-21022388 UPON CONSIDERATION OF PLAINTIFF'S MOTION TO REASSESS DAMAGES FILED UNDER CONTROL NUMBER 21022388, AND THE RESPONSE, IT IS HEREBY ORDERED AND DECREED THAT THE MOTION IS GRANTED AND PLAINTIFF'S NOVEMBER 29, 2016, IN REM JUDGEMENT BY AGREEMENT IS REASSESSED AT $136,865.70. BY THE COURT: PATRICK, J. 06/02/2021 | |
| 02-JUN-2021 03:20 PM | NOTICE GIVEN UNDER RULE 236 | |
| | | 02-JUN-2021 03:40 PM |

Case 21-12926-mdc   Doc 46   Filed 02/10/22   Entered 02/10/22 16:29:13   Desc Main
Document   Page 69 of 146

| | Docket Entry: | NOTICE GIVEN ON 02-JUN-2021 OF ORDER ENTERED 06-MAY-2021. NOTICE GIVEN ENTERED ON 02-JUN-2021. | |
|---|---|---|---|
| 08-JUN-2021 02:25 PM | Docket Entry: | CORRECTION TO JUDGMENT INDEX | 08-JUN-2021 12:00 AM |
| | Docket Entry: | ***CORRECTION TO JUDGMENT INDEX: MOTION TO REASSESS DAMAGES GRANTED. DAMAGES REASSESSED FROM $105,613.62 TO $136+,865.70. INDEX UPDATED 06-08-2021. | |
| 13-AUG-2021 04:45 PM | Docket Entry: | PRAECIPE TO ISSUE WRIT FILED | KRIK, JUSTIN L | 16-AUG-2021 09:30 AM |
| | Documents: | Writ of Execution – filing copy – EZ Cashing.pdf | |
| | Docket Entry: | PRAECIPE FOR WRIT OF EXECUTION (RE) FILED. WRIT OF EXECUTION (RE) ISSUED. SUBJECT PREMISES: 1122 S 09TH STREET PHILADELPHIA. (FILED ON BEHALF OF E-Z CASHING LLC) | |
| 16-AUG-2021 11:07 AM | Docket Entry: | PRAECIPE TO ISSUE WRIT FILED | KRIK, JUSTIN L | 16-AUG-2021 11:08 AM |
| | Documents: | Writ of Ex Package – filing copy 816.pdf | |
| | Docket Entry: | PRAECIPE FOR WRIT OF EXECUTION (RE) FILED. WRIT OF EXECUTION (RE) ISSUED. SUBJECT PREMISES: 1122 S 09TH STREET PHILADELPHIA. (FILED ON BEHALF OF E-Z CASHING LLC) | |
| 29-SEP-2021 10:37 AM | Docket Entry: | AFFIDAVIT OF SERVICE FILED | 29-SEP-2021 10:44 AM |
| | Documents: | 182076.01_AFFIDAVIT_FBECC08F-4B84-4F4D-BD16-4B1AEB49D2B9.pdf | |
| | Docket Entry: | AFFIDAVIT OF SERVICE OF NOTICE OF SHERIFF SALE UPON GABRIEL BRAVO BY PERSONAL SERVICE ON 09/25/2021 FILED. | |
| 29-SEP-2021 10:39 AM | Docket Entry: | AFFIDAVIT OF SERVICE FILED | 29-SEP-2021 10:54 AM |
| | Documents: | 182076.02_AFFIDAVIT_3EEDFECA-97E0-0142-9088-C4D102958985.pdf | |

2/10/22, 1:21 PM

Case 21-12926-mdc   Doc 46   Filed 02/10/22 Entered 02/10/22 16:29:13   Desc Main
Document   Page 119 of 174

| Docket Entry: | AFFIDAVIT OF SERVICE OF NOTICE OF SHERIFF SALE UPON GUADALUPE BRAVO BY PERSONAL SERVICE ON 09/25/2021 FILED. | |
|---|---|---|
| 29-SEP-2021 10:50 AM | AFFIDAVIT OF SERVICE FILED | 29-SEP-2021 11:02 AM |
| Documents: | 182076.03_AFFIDAVIT_6ACC2367-DB4E-E048-A25A-72CAE63C378F.pdf | |
| Docket Entry: | AFFIDAVIT OF SERVICE OF NOTICE OF SHERIFF SALE UPON GABRIEL BRAVO BY PERSONAL SERVICE ON 09/25/2021 FILED. | |
| 29-SEP-2021 10:52 AM | AFFIDAVIT OF SERVICE FILED | 29-SEP-2021 11:07 AM |
| Documents: | 182076.04_AFFIDAVIT_90E0052C-163C-1440-905A-270E49A334EF.pdf | |
| Docket Entry: | AFFIDAVIT OF SERVICE OF NOTICE OF SHERIFF SALE UPON GUADALUPE BRAVO BY PERSONAL SERVICE ON 09/25/2021 FILED. | |
| 26-OCT-2021 03:49 PM | AFFIDAVIT OF SERVICE FILED | KRIK, JUSTIN L |
| Documents: | 3129.2 Cert of Service - Bravo.pdf | |
| Docket Entry: | AFFIDAVIT OF SERVICE OF AFFIDAVIT PURSUANT TO PARCP 3129 UPON GUADALUPE BRAVO AND GABRIEL BRAVO BY PERSONAL SERVICE,CERTIFIED MAIL,FIRST CLASS REGULAR MAIL ON 09/28/2021 FILED. (FILED ON BEHALF OF E-Z CASHING LLC) | |
| 29-OCT-2021 04:07 PM | DEFERRED - BANKRUPTCY | SCHOLL, DAVID A |
| Documents: | 20211030151043.pdf | |
| Docket Entry: | PRAECIPE TO DEFER CASE DUE TO PENDING BANKRUPTCY ACTION UNDER CASE NUMBER: NONE (FILED ON BEHALF OF GABRIEL BRAVO) | 01-NOV-2021 09:31 AM |

2/10/22, 1:21 PM

Case 21-12926-mdc   Doc 46   Filed 02/10/22   Entered 02/10/22 16:29:13   Desc Main
Document   Page 30 of 174

KRIK, JUSTIN

| Date | Description | Entered |
|---|---|---|
| 01-NOV-2021 03:33 PM | NOTICE - CONTINUED SALE DATE | 01-NOV-2021 03:36 PM |
| **Documents:** | Notice of Continued Sheriff Sale - EZ Cashing.pdf | |
| **Docket Entry:** | THE SHERIFF'S SALE SCHEDULED FOR 11/02/2021 HAS BEEN CONTINUED UNTIL 01/11/2022. (FILED ON BEHALF OF E-Z CASHING LLC) | |
| 30-NOV-2021 11:03 AM | WRIT RETURN FILED | 30-NOV-2021 11:03 AM |
| **Docket Entry:** | SALE POSTPONED - WRIT NUMBER 2111-312 | |
| 31-JAN-2022 12:38 PM | WRIT RETURN FILED | 31-JAN-2022 12:38 PM |
| **Docket Entry:** | SALE POSTPONED - WRIT NUMBER 2111-312 | |

▶ Case Description   ▶ Related Cases   ▶ Event Schedule   ▶ Case Parties   ▶ Docket Entries

E-Filing System   Search Home

In Re: Gabriel Bravo, 18-15931-mdc.

> C-12 - Debtor's Chapter 13 Petition filed on 9/7/18 [Docket #1];
> C-13 - Debtor's Schedules A/B-J filed on 9/15/18 [Docket #9];
> C-14 - Debtor's Objection to Claim of E-Z Cashing filed on 9/14/19 [Docket #58];
> C-15 - Debtor's Third Amended Chapter 13 Plan file on 6/24/20 [Docket #111];
> C-16 - Debtor's Supporting Brief field on 8/17/20 [Docket #127];
> C-17 - Creditor's Response to Objection to Claim filed on 8/25/20 [Docket #128]; and
> C-18 - Order dismissing Chapter 13 bankruptcy filed on 11/5/20 [Docket #149].

The above items have not been served in accordance with footnote 5 of the Order Governing Procedures.

Bravo v. E-Z Cashing LLC, 19-00001-mdc.  Namely:

> C-19 - Debtor's Adversary Complaint filed on 1/1/19 [Docket #1];
> C-20 - Creditor's Answer to Complaint filed on 3/8/19 [Docket #5];
> C-21 - Creditor's Motion to Take Judicial Notice filed on 3/8/19 [Docket #15]; and
> C-22 - Order granting Motion to Take Judicial Notice filed on 10/10/19 [Docket #27].

The above items have not been served in accordance with footnote 5 of the Order Governing Procedures.

C-23 – Sheriff's Sale schedule for the Office of the Sheriff of Philadelphia County for the 2022 calendar year





# OFFICE OF THE SHERIFF

*City and County of Philadelphia*

## REAL ESTATE DIVISION

| Mortgage Sale Date | Filing Date |
|---|---|
| January 11, 2022 | October 18, 2021 |
| February 1, 2022 | November 15, 2021 |
| March 1, 2022 | December 20, 2021 |
| April 5, 2022 | January 18, 2022 |
| May 3, 2022 | February 14, 2022 |
| June 7, 2022 | March 14, 2022 |
| July 12, 2022 | April 18, 2022 |
| August 2, 2022 | May 16, 2022 |
| September 13, 2022 | June 13, 2022 |
| October 4, 2022 | July 18, 2022 |
| November 1, 2022 | August 15, 2022 |
| December 6, 2022 | September 19, 2022 |

C-24 - The public records of the Office of
Property Assessment of the City of
Philadelphia for the property located at1122
South 9th Street, Philadelphia, PA 19147



# City of PHILADELPHIA | Property

📍 1122 S 9TH ST

PHILADELPHIA, PA 19147-4610

**Owner**

# BRAVO GAGRIEL
# BRAVO GUADALUPE

**OPA Account Number**

# 882917141

**Mailing Address**
836 Federal St
Philadelphia PA 19147

## Property assessment and sale information

| | |
|---|---|
| Assessed Value | $166,800 |
| Sale Date | 06/05/2005 |
| Sale Price | $90,000 |

Office of Property Assessment (OPA) was formerly part of the Board of Revision of Taxes (BRT) and some City records may still use that name. Source: Office of Property Assessment (OPA). (https://www.phila.gov/opa/pages/default.aspx)

## Valuation History (8)

Taxable and exempt land values can represent the contributory value of land in relation to the total market value, or were no structure is present, the value of vacant land. (Consistent with International Association of Assessing Officers (IAAO) standards, the value of an improved parcel is separated into the portion of value attributed to the improvement and the portion of value attributed to the land.)

| Year | Market Value | Taxable Land | Taxable Improvement | Exempt Land | Exempt Improvement |
|---|---|---|---|---|---|
| 2022 | $166,800 | $50,040 | $116,760 | $0 | $0 |
| 2021 | $166,800 | $50,040 | $116,760 | $0 | $0 |
| 2020 | $166,800 | $50,040 | $116,760 | $0 | $0 |
| 2019 | $166,800 | $50,040 | $116,760 | $0 | $0 |
| 2018 | $166,800 | $33,360 | $133,440 | $0 | $0 |
| 2017 | $179,600 | $18,300 | $161,300 | $0 | $0 |
| 2016 | $179,600 | $18,300 | $161,300 | $0 | $0 |
| 2015 | $179,600 | $18,300 | $161,300 | $0 | $0 |

Sales History (2)

| Date | Adjusted Total | Grantees | Grantors | Doc Id |
|------|----------------|----------|----------|--------|
| 06/05/2005 | $90,000 | BRAVO GAGRIEL; BRAVO GUADALUPE | ALESTRA VINCENT | 51198158 |
| 07/06/2003 | $45,000 | ALESTRA VINCENT | RAFFAELE FRANK III | 50710820 |

## Property Details

Property characteristics described below are included for convenience, but may not reflect the most recent conditions at the property. Corrections to or questions about this property?

**Submit an Official Inquiry** [↗] (https://opainquiry.phila.gov/opa.apps/help/PropInq.aspx?acct_num=882917141 )



Please note that the OPA is currently upgrading its computer systems. This implementation may cause delays in updating internal records and displaying current information in this section. We apologize for any delays you may experience.

You may contact the OPA at 215-686-4334 (tel:+12156864334) for information on a property, or submit an official inquiry above.

| | |
|---|---|
| Year Built | 1915 (estimated) |
| Building Description | REST'RNT W/O BAR MASONRY |
| Building Condition | Average |
| Number of Stories | 1 story |
| Number of Rooms | Not Available |
| Features | No basement<br>No fireplace<br>No garage |
| Heating and Utilities | Heater type n/a<br>No central air<br>Sewer type n/a |
| Lot Size | 732.62 sq ft |
| Improvement Area | 532 sq ft |
| Frontage | 14 ft |
| Beginning Point | 175'4 1/2" S WASH AVE |
| Zoning | **CMX2-Neighborhood Commercial Mixed-Use-2** [↗]<br>(https://atlas.phila.gov/1122%20S%209TH%20ST/zoning ) |
| OPA Account Number | 882917141 |
| OPA Address | 1122 S 9th St |
| Homestead Exemption | No |
| Political Divisions | Ward: 2nd \| Council District: 1st [↗]<br>(http://atlas.phila.gov/1122%20S%209TH%20ST/voting) |

| School Catchment | Elementary: Jackson \| Middle: Jackson \| HS: Furness HS \| ☑ (https://webapps1.philasd.org/school_finder/) |
| Police District | 3rd District ☑ (https://www.phillypolice.com/districts/3rd/index.html) |

## Local Details

| Political Divisions | Ward: 2nd \| Council District: 1st ☑ (http://atlas.phila.gov/1122 S 9TH ST/voting) |
| School Catchment | Elementary: Jackson \| Middle: Jackson \| HS: Furness HS \| ☑ (https://webapps1.philasd.org/school_finder/) |
| Police District | 3rd District ☑ (https://www.phillypolice.com/districts/3rd/index.html) |
| Trash Day | Thursday ☑ (https://www.phila.gov/services/trash-recycling-city-upkeep/residential-trash-and-recycling/find-your-trash-and-recycling-collection-day/#/) |
| L&I District | CENTRAL EAST |
| Census Tract | 002400 |

You can download the property assessment dataset in bulk, and get more information about this data at **metadata.phila.gov** ☑ (https://metadata.phila.gov)

Note: Taxable and exempt land values can represent the contributory value of land in relation to the total market value, or were no structure is present, the value of vacant land. (Consistent with International Association of Assessing Officers (IAAO) standards, the value of an improved parcel is separated into the portion of value attributed to the improvement and the portion of value attributed to the land.)

C-25 - The public records of the Office of Property Assessment of the City of Philadelphia for the property located at 1124 South 9th Street, Philadelphia, PA 19147

# City of
## PHILADELPHIA | Property

📍 1124 S 9TH ST

PHILADELPHIA, PA 19147-4610

**Owner**

## WASHINGTON PLAZA GROUP LL

**OPA Account Number**

# 882917146

**Mailing Address**
1118 S 12th St, 1st FL
Philadelphia PA 19147

## Property assessment and sale information

| | |
|---|---|
| Assessed Value | $123,400 |
| Sale Date | 04/24/2019 |
| Sale Price | $200,000 |

Office of Property Assessment (OPA) was formerly part of the Board of Revision of Taxes (BRT) and some City records may still use that name. Source: Office of Property Assessment (OPA). (https://www.phila.gov/opa/pages/default.aspx)

## Valuation History (8)

Taxable and exempt land values can represent the contributory value of land in relation to the total market value, or were no structure is present, the value of vacant land. (Consistent with International Association of Assessing Officers (IAAO) standards, the value of an improved parcel is separated into the portion of value attributed to the improvement and the portion of value attributed to the land.)

| Year | Market Value | Taxable Land | Taxable Improvement | Exempt Land | Exempt Improvement |
|---|---|---|---|---|---|
| 2022 | $123,400 | $24,680 | $98,720 | $0 | $0 |
| 2021 | $123,400 | $24,680 | $98,720 | $0 | $0 |
| 2020 | $123,400 | $24,680 | $98,720 | $0 | $0 |
| 2019 | $122,500 | $24,500 | $98,000 | $0 | $0 |
| 2018 | $166,800 | $33,360 | $133,440 | $0 | $0 |
| 2017 | $179,600 | $20,000 | $159,600 | $0 | $0 |
| 2016 | $179,600 | $20,000 | $159,600 | $0 | $0 |
| 2015 | $179,600 | $20,000 | $159,600 | $0 | $0 |

239

Sales History (5)

| Date | Adjusted Total | Grantees | Grantors | Doc Id |
|---|---|---|---|---|
| 04/24/2019 | $200,000 | WASHINGTON PLAZA GROUP LLC | PLC 17 LLC | 53506815 |
| 02/20/2017 | $120,000 | PLC 17 LLC | YU BAO CHIUNG | 53220795 |
| 02/08/2007 | $110,000 | YU BAO CHIUNG | ATALLAH SAMAR M; STEPHAN FOUAD M | 51633722 |
| 07/14/2003 | $42,500 | ATALLAH SAMAR M; STEPHAN FOUAD M | 941 S 9TH STREET REAL ESTATE ADVISORS L | 50718968 |
| 04/22/2002 | $25,000 | 941 S 9TH STREET REAL ESTATE ADVISORS | LAROSE LUCY | 50446621 |

## Property Details

Property characteristics described below are included for convenience, but may not reflect the most recent conditions at the property. Corrections to or questions about this property?

**Submit an Official Inquiry** ⧉ (https://opainquiry.phila.gov/opa.apps/help/PropInq.aspx?acct_num=882917146 )



Please note that the OPA is currently upgrading its computer systems. This implementation may cause delays in updating internal records and displaying current information in this section. We apologize for any delays you may experience.

You may contact the OPA at 215-686-4334 (tel:+12156864334) for information on a property, or submit an official inquiry above.

| | |
|---|---|
| Year Built | 1915 |
| Building Description | STORE 1 STY MASONRY |
| Building Condition | Average |
| Number of Stories | 1 story |
| Number of Rooms | Not Available |
| Features | No basement<br>No fireplace<br>No garage |
| Heating and Utilities | Heater type n/a<br>No central air<br>Sewer type n/a |
| Lot Size | 801.32 sq ft |
| Improvement Area | 532 sq ft |
| Frontage | 15 ft |
| Beginning Point | 189'5 1/2"S WASH AVE |
| Zoning | **CMX2-Neighborhood Commercial Mixed-Use-2** ⧉<br>(https://atlas.phila.gov/1124%20S%209TH%20ST/zoning ) |
| OPA Account Number | 882917146 |
| OPA Address | 1124 S 9th St |
| Homestead Exemption | No |
| Political Divisions | Ward: 2nd \| Council District: 1st ⧉<br>(http://atlas.phila.gov/1124%20S%209TH%20ST/voting) |

| School Catchment | Elementary: Jackson \| Middle: Jackson \| HS: Furness HS \| ⬀ (https://webapps1.philasd.org/school_finder/) |
| Police District | 3rd District ⬀ (https://www.phillypolice.com/districts/3rd/index.html) |

## Local Details

| Political Divisions | Ward: 2nd \| Council District: 1st ⬀ (http://atlas.phila.gov/1124 S 9TH ST/voting) |
| School Catchment | Elementary: Jackson \| Middle: Jackson \| HS: Furness HS \| ⬀ (https://webapps1.philasd.org/school_finder/) |
| Police District | 3rd District ⬀ (https://www.phillypolice.com/districts/3rd/index.html) |
| Trash Day | Thursday ⬀ (https://www.phila.gov/services/trash-recycling-city-upkeep/residential-trash-and-recycling/find-your-trash-and-recycling-collection-day/#/) |
| L&I District | CENTRAL EAST |
| Census Tract | 002400 |

You can download the property assessment dataset in bulk, and get more information about this data at **metadata.phila.gov** ⬀ (https://metadata.phila.gov)

Note: Taxable and exempt land values can represent the contributory value of land in relation to the total market value, or were no structure is present, the value of vacant land. (Consistent with International Association of Assessing Officers (IAAO) standards, the value of an improved parcel is separated into the portion of value attributed to the improvement and the portion of value attributed to the land.)

C-26 - Creditor's Proof of Claim filed on
11/1/21 in In Re: Gabriel Bravo, 21-12926-
mdc

<table>
<tr><td colspan="2"><strong>Fill in this information to identify the case:</strong></td></tr>
</table>

| | |
|---|---|
| Debtor 1 | Gabriel Bravo |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | Eastern District of Pennsylvania |
| Case number | 21-12926-mdc |

## Official Form 410

# Proof of Claim

04/19

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

---

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

E-Z Cashing, LLC
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes.  From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| Justin L. Krik, Esquire<br>Name | E-Z Cashing, LLC<br>Name |
| 1500 JFK Blvd., Ste. 630<br>Number     Street | 110 Avis Avenue<br>Number     Street |
| Philadelphia          PA          19102<br>City          State          ZIP Code | Lakewood          NJ          08701<br>City          State          ZIP Code |
| Contact phone  267-831-3180 | Contact phone  c/o 267-831-3180 |
| Contact email  jkrik@kriklaw.com | Contact email  c/o jkrik@kriklaw.com |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.  Claim number on court claims registry (if known) _____          Filed on _____
                                                                              MM  /  DD  / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes.  Who made the earlier filing? _____

---

Official Form 410                              **Proof of Claim**                              page 1

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**  $ _____ 139,800.54 . **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

_Money loaned and Consent Judgment_

**9. Is all or part of the claim secured?**

☐ No

☑ Yes.  The claim is secured by a lien on property.

**Nature of property:**

☑ Real estate. If the claim is secured by the debtor's principal residence, file a _Mortgage Proof of Claim Attachment_ (Official Form 410-A) with this _Proof of Claim._

☐ Motor vehicle

☐ Other. Describe:  1122 South 9th Street, Philadelphia, PA 19147

**Basis for perfection:**  Consent Judgment on Mortgage

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**  $ _____ 166,800.00

**Amount of the claim that is secured:**  $ _____ 139,800.54

**Amount of the claim that is unsecured:**  $ _____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**  $ _____

**Annual Interest Rate** (when case was filed) _6.75_ %

☑ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**  $ _____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).  $_____

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).  $_____

☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).  $_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).  $_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).  $_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies.  $_____

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

---

**Part 3:    Sign Below**

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    11/01/2021
                     MM / DD / YYYY

/s/ Justin L. Krik
_____
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Justin | Lee | Krik |
|---|---|---|---|
| | First name | Middle name | Last name |

Title    Attorney for E-Z Cashing, LLC

Company    JLK Law PLLC d/b/a Krik Law
           Identify the corporate servicer as the company if the authorized agent is a servicer.

Address    1500 JFK Blvd., Ste. 630
           Number        Street

           Philadelphia                    PA          19102
           City                            State       ZIP Code

Contact phone    267-831-3180              Email    jkrik@kriklaw.com

---

**In re: Bravo – 21-12926-mdc**

<u>Pre-Petition</u> – all charges through 10/27/21

| | |
|---|---|
| Consent Judgment | $136,865.70 |
| (with Reassessed Damages per 6/2/21 Order) | |
| Interest on Consent Judgment (6/2/21 – 10/27/21) | $ 2,934.84 |
| (148 days x $19.83 per diem) | |
| | |
| **TOTAL (PRE-PETITION)** | **$139,800.54** |

# IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
## FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
### TRIAL DIVISION – CIVIL

| | | |
|---|---|---|
| **E-Z CASHING, LLC** | : | **JUNE TERM, 2015** |
| | : | |
| **v.** | : | **NO. 00453** |
| | : | |
| **GABRIEL BRAVO,** *et al.* | : | **Control No. 21022388** |

## ORDER

**AND NOW**, this 2ⁿᵈ day of June 2021,

upon consideration of Plaintiff's Motion to Reassess Damages filed under Control

Number 21022388, and the response, it is hereby **ORDERED** and **DECREED** that the

motion is **GRANTED** and Plaintiff's November 29, 2016, *in rem* judgment by agreement

is reassessed at $136,865.70.

**BY THE COURT:**

_____ J.

15060453-Bayview Loan Servicing, Llc Vs Bravo

15060045300102

COMMON PLEAS COURT OF PHILADELPHIA
TRIAL DIVISION - CIVIL
TRIAL WORKSHEET

| Event: | , at __/__/__ __:__ in _____ |
| Scheduled: __/__/__ , NON-JURY   MR - MORTGAGE FORECLOSURE |

| Judge's Name: | | Signature: X _Mary D Johns_ |

| Caption: | | Case Type: |
| BAYVIEW LOAN SERVICING, LLC VS BRAVO | | 3N - NOT RESIDENTIA OWNER OCCUP-M |

| Term and Number: | If Consolidated: |
| #1506-00453 | Term and Number(s) |

| TRIAL DATE 11/29/16 | ACTUAL: ( ) JURY (X) NON-JURY | TOTAL AMOUNT | NUMBER OF DAYS | DATE SHEET PREPARED 11/29/16 |

Disposition Date: 11/29/16

FULL DESCRIPTION OF DISPOSITION (To Be Entered VERBATIM On The Docket):

_Case Settled after assignment for trial._

Bayview Loan Servicing,-WSJDA

15060045300034

( ) DEFAULT JUDGMENT/COURT ORDERED      ( ) JURY VERDICT FOR PLAINTIFF
( ) DIRECTED VERDICT                     ( ) JURY VERDICT FOR DEFENDANT       **DOCKETED COMPLEX LIT CENTER**
( ) DISCONTINUANCE ORDERED               ( ) MISTRIAL
( ) TRANSFER TO BINDING                  ( ) HUNG JURY                        NOV 29 2016
    ARBITRATION
                                         ( ) NON-PROS ENTERED
( ) FINDING FOR DEFENDANT (NON-JURY)     ( ) NON-SUIT ENTERED                 **J. STEWART**
( ) FINDING FOR PLAINTIFF (NON-JURY)     ( ) SETTLED PRIOR TO ASSIGNMENT FOR
                                             TRIAL   (TEAM LEADERS,only)
( ) DAMAGES ASSESSED
                                         (X) SETTLED AFTER ASSIGNMENT FOR TRIAL
( ) JUDGMENT ENTERED BY AGREEMENT            ( )PRIOR TO JURY SELECTION
( ) JUDGMENT ENTERED                         ( )AFTER JURY SWORN
( ) JUDGMENT SATISFIED
                                         ( ) OTHER (EXPLAIN)_____

(CONTINUED NEXT PAGE)

## COURT OF COMMON PLEAS PHILADELPHIA COUNTY, PENNSYLVANIA

| Bayview Loan Servicing, LLC, a Delaware Limited Liability Company, Plaintiff, vs. Gabriel Bravo and Guadalupe Bravo, Defendants | No.: 150600453 CIVIL ACTION MORTGAGE FORECLOSURE |
| --- | --- |

### CONSENT ORDER

**AND NOW**, this 29th day of November, 2016, it is hereby:

**ORDERED AND DECREED** that an *in rem* judgment in mortgage foreclosure is entered in favor of Plaintiff and against Defendant in the amount of $105,613.62, together with interest accruing at a per diem of $19.83, from November 1, 2016 until the date of Sheriff Sale, plus any other fees and costs legally recoverable.

**IT IS FURTHER ORDERED** that this Order will not be entered until the 90th day from the date it is filed.

**IT IS FURTHER ORDERED** that a facsimile version of signatures on this document shall be treated for all purposes as the equivalent of the original signatures.

*Agreed to by:*

Roger Fay, Esquire
Milstead & Associates, LLC
Counsel for Plaintiff

Date: 11-29-16

John J. D'Angelo, Esquire
Attorney for Defendants

Date: 11-8-16

BY THE COURT:

_____ J.

250

UPON RECORDING RETURN TO:

Bayview Loan Servicing
4425 Ponce de Leon Blvd., 5th Fl.
Coral Gables, Florida 33146
Attention: Collateral Department

# OPEN-END MORTGAGE & SECURITY AGREEMENT

## { PENNSYLVANIA }

[This Mortgage Secures Future Advances]

**Gabriel Bravo and Guadalupe Bravo**

as mortgagor
(Borrower)

To

**InterBay Funding, LLC, a Delaware Limited
Liability Company**

as mortgagee
(Lender)

1

51382000
Page: 1 of 34
02/17/2006 11:40AM

This Document Recorded                              Doc Id: 51382000
02/17/2006                                          Receipt #: 477427
11:40AM                                             Rec Fees: 126.50
Doc Code: M    Commissioner of Records, City of Philadelphia

THIS MORTGAGE AND SECURITY AGREEMENT (the "Security Instrument") is made as of January 31, 2006, by Gabriel Bravo and Guadalupe Bravo whose address is 836 Federal Street, Philadelphia, PA 19147, as mortgagor ("Borrower") to InterBay Funding, LLC, a Delaware Limited Liability Company, whose address is 1301 Virginia Drive, Ste #403, Fort Washington, PA 19034, as mortgagee ("Lender").

R E C I T A L S:

Borrower by its Promissory Note of even date herewith given to Lender is indebted to Lender in the principal sum of Seventy-One Thousand Two Hundred Fifty and No/100 Dollars ($71,250.00) in lawful money of the United States of America (the Note together with all extensions, renewals, modifications, substitutions and amendments thereof shall collectively be referred to as the "Note"), with interest from the date thereof at the rates set forth in the Note, principal and interest to be payable in accordance with the terms and conditions provided in the Note and with a maturity date of March 1, 2036.

By its execution hereof, Borrower desires to secure the payment of the Debt (hereinafter defined) and the performance of all of its obligations under the Note and the Other Obligations (hereinafter defined) and any and all other indebtedness now or hereafter owing by Borrower to Lender.

ARTICLE 1. - GRANTS OF SECURITY

Section 1.1.      PROPERTY MORTGAGED. Borrower does hereby irrevocably mortgage, grant, bargain, sell, pledge, assign, warrant, transfer and convey to Lender with mortgage covenants upon the Statutory Condition and, as provided and/or authorized by applicable law, with the STATUTORY POWER OF SALE, and grant a security interest to Lender in, the following property, rights, interests and estates now owned, or hereafter acquired by Borrower to the fullest extent permitted by applicable law (collectively, the "Property"):

(a)      Land. The real property described in *Exhibit "A"* attached hereto and made a part hereof (the "Land");

(b)      Additional Land. All additional lands, estates and development rights hereafter acquired by Borrower for use in connection with the Land and the development of the Land and all additional lands and estates therein which may, from time to time, by supplemental mortgage or otherwise be expressly made subject to the lien of this Security Instrument;

(c)      Improvements. The buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter erected or located on the Land (the "Improvements");

(d)      Easements. All easements, servitudes rights-of-way or use, rights, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, and all estates, rights, titles, interests, privileges, liberties, servitudes, tenements, hereditaments and appurtenances of any nature whatsoever, in any way now or hereafter belonging, relating or pertaining to the Land and the Improvements and the reversion and reversions, remainder and remainders, and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Land, to the center line thereof and all the estates, rights, titles, interests, dower and rights of dower, courtesy and rights of courtesy, property, possession, claim and demand whatsoever, both at law and in equity, of Borrower of, in and to the Land and the Improvements and every part and parcel thereof, with the appurtenances thereto;

(e)      Fixtures and Personal Property. All machinery, equipment, fixtures (including, but not limited to, all heating, air conditioning, plumbing, lighting, communications and elevator fixtures) trade fixtures and other property of every kind and nature whatsoever owned by Borrower, or in which Borrower has or shall have an interest, including without limitation, letter of credit rights, deposit accounts, payment intangibles, investment property, electronic chattel paper, timber to be cut and farm animals and, now or hereafter located upon the Land and the Improvements, or appurtenant thereto, and usable in connection with the present or future operation and occupancy of the Land and the Improvements and all building equipment, materials and supplies of any nature whatsoever owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located upon the Land and the Improvements, or appurtenant thereto, or usable in connection with the present or future operation and occupancy of the Land and the Improvements (collectively, the "Personal Property"), and the right, title and interest of Borrower in and to any of the

1

*G.B*      *G.B*

Personal Property which may be subject to any security interests, as defined in the Uniform Commercial Code, as adopted and enacted by the state or states where any of the Property is located (the "Uniform Commercial Code"), superior in lien to the lien of this Security Instrument, and all proceeds and products of all of the above;

(f)      Leases and Rents. All leases, subleases and other agreements affecting the use, enjoyment or occupancy of the Land and/or the Improvements heretofore or hereafter entered into and all extensions, amendments and modifications thereto, whether before or after the filing by or against Borrower of any petition for relief under Creditors Rights Laws (hereinafter defined) (the "Leases") and all right, title and interest of Borrower, its successors and assigns therein and thereunder, including, without limitation, any guaranties of the lessees' obligations thereunder, cash or securities deposited thereunder to secure the performance by the lessees of their obligations thereunder and all rents, additional rents, revenues, room revenues, accounts, accounts receivable, issues and profits (including all oil and gas or other mineral royalties and bonuses) from the Land and the Improvements whether paid or accruing before or after the filing by or against Borrower of any petition for relief under the Creditors Rights Laws (the "Rents") and all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Debt;

(g)      Insurance Proceeds. All proceeds of and any unearned premiums on any insurance policies covering the Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Property;

(h)      Condemnation Awards. All awards or payments, including interest thereon, which may heretofore and hereafter be made with respect to the Property, whether from the exercise of the right of eminent domain (including, but not limited to any transfer made in lieu of or in anticipation of the exercise of the right), or for a change of grade, or for any other injury to or decrease in the value of the Property;

(i)      Tax Certiorari. All refunds, rebates or credits in connection with a reduction in real estate taxes and assessments charged against the Property as a result of tax certiorari or any applications or proceedings for reduction;

(j)      Conversion. All proceeds of the conversion, voluntary or involuntary, of any of the foregoing including, without limitation, proceeds of insurance and condemnation awards, into cash or liquidation claims;

(k)   ,  Rights. The right, in the name and on behalf of Borrower, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Lender in the Property;

(l)      Agreements. All agreements, contracts, certificates, instruments, franchises, permits, licenses, plans, specifications and other documents, now or hereafter entered into, and all rights therein and thereto, respecting or pertaining to the use, occupation, construction, management or operation of the Land and any part thereof and any Improvements or respecting any business or activity conducted on the Land and any part thereof and all right, title and interest of Borrower therein and thereunder, including, without limitation, the right, upon the occurrence and during the continuance of an Event of Default (hereinafter defined), to receive and collect any sums payable to Borrower thereunder;

(m)      Intangibles. All trade names, trademarks, servicemarks, logos, copyrights, goodwill, books and records and all other intellectual property rights and general intangibles relating to or used in connection with the operation of the Property;

(n)      Cash and Accounts. Cash and Accounts. All cash funds, deposit accounts and other rights and evidence of rights to cash, all present and future funds, accounts, instruments, accounts receivable, documents, causes of action, or claims now or hereafter held, created or otherwise capable of credit to the Debtor/Borrower; and

(o)      Other Rights. Any and all other rights of Borrower in and to the items set forth in Subsections (a) through (n) above.

Section 1.2.      ASSIGNMENT OF LEASES AND RENTS. Borrower hereby absolutely and unconditionally assigns to Lender Borrower's right, title and interest in and to all current and future Leases and Rents; it being intended by Borrower that this assignment constitutes a present, absolute assignment and not an assignment for additional security only. Notwithstanding the foregoing, Lender grants to Borrower a revocable license to collect and receive the Rents. Borrower shall hold a portion of the Rents sufficient to discharge all current sums due on the Debt, for use in the payment of such sums.

2

Section 1.3.    SECURITY AGREEMENT. This Security Instrument is both a real property mortgage and a "security agreement" within the meaning of the Uniform Commercial Code. The Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of Borrower in the Property. By executing and delivering this Security Instrument, Borrower hereby grants to Lender, as security for the Obligations (hereinafter defined), a security interest in the Personal Property as well as all other property and interests set forth in Section 1.1 herein, to the full extent that the same may be subject to the Uniform Commercial Code. If required by Lender, Borrower shall execute UCC-1 Financing Statements covering said property for filing with the appropriate county and/or state filing offices. In any event, Lender is permitted to unilaterally file a UCC-1 Financing Statement covering all of the Property.

Section 1.4.    PLEDGE OF MONIES HELD. Borrower hereby pledges to and grants a continuing security interest in favor of Lender any and all monies now or hereafter held by Lender, including, without limitation, any sums deposited in the Escrow Fund (hereinafter defined), Net Proceeds (hereinafter defined) and condemnation awards or payments (hereinafter described) as additional security for the Obligations until expended or applied as provided in this Security Instrument.

<center>CONDITIONS TO GRANT</center>

TO HAVE AND TO HOLD the above granted and described Property to the use and benefit of Lender, and the successors and assigns of Lender, forever;

PROVIDED, HOWEVER, these presents are upon the express condition that, if Borrower shall well and truly pay to Lender the Debt at the time and in the manner provided in the Note and this Security Instrument, shall perform the Other Obligations as set forth in this Security Instrument and shall abide by and comply with each and every covenant and condition set forth herein and in the Note, these presents and the estate hereby granted shall cease, terminate and be void, except to the extent any provision herein provides that it shall survive the repayment of the obligations.

<center>ARTICLE 2. - DEBT AND OBLIGATIONS SECURED</center>

Section 2.1.    DEBT. This Security Instrument and the grants, assignments and transfers made pursuant to the terms hereafter are given for the purpose of securing the payment of the following, in such order of priority as Lender may determine in its sole discretion (the "Debt"):

(a)     the indebtedness evidenced by the Note in lawful money of the United States of America;

(b)     interest, default interest, late charges and other sums, as provided in the Note, this Security Instrument or the Other Security Documents (hereinafter defined);

(c)     the Prepayment Consideration (defined in the Note), if any;

(d)     all other monies agreed or provided to be paid by Borrower in the Note, this Security Instrument or the Other Security Documents (hereinafter defined);

(e)     all sums advanced pursuant to this Security Instrument to protect and preserve the Property and the lien and the security interest created hereby; and

(f)     all sums advanced and costs and expenses incurred by Lender in connection with the Debt or any part thereof, any renewal, extension, or change of or substitution for the Debt or any part thereof, or the acquisition or perfection of the security therefor, whether made or incurred at the request of Borrower or Lender; and

(g)     any and all additional advances made by Lender to complete Improvements or to preserve or protect the Property, or for taxes, assessments or insurance premiums, or for the performance of any of Borrower's obligations hereunder or under the Other Security Documents (hereinafter defined).

Section 2.2.    OTHER OBLIGATIONS. This Security Instrument and the grants, assignments and transfers made pursuant to the terms hereof are also given for the purpose of securing the performance of the following (the "Other Obligations"):

(a)     all other obligations of Borrower contained herein;

<center>3</center>

<center>254</center>

(b)    each obligation of Borrower contained in the Note and in the Other Security Documents; and

(c)    each obligation of Borrower contained in any renewal, extension, amendment, modification, consolidation, change of, or substitution or replacement for, all or any part of the Note, this Security Instrument or the Other Security Documents.

(d)    any and all other indebtedness now or hereafter owing by Borrower to Lender.

Section 2.3.    DEBT AND OTHER OBLIGATIONS. Borrower's obligations for the payment of the Debt and the performance of the Other Obligations shall be referred to collectively as the "Obligations."

Section 2.4.    PAYMENTS. Unless payments are made in the required amount in immediately available funds at the place where the Note is payable, remittances in payment of all or any part of the Debt shall not, regardless of any receipt or credit issued therefor, constitute payment until the required amount is actually received by Lender in funds immediately available at the place where the Note is payable (or any other place as Lender, in Lender's sole discretion, may have established by delivery of written notice thereof to Borrower) and shall be made and accepted subject to the condition that any check or draft may be handled for collection in accordance with the practice of the collecting bank or banks; provided, however, Lender shall not be required to accept payment for any Obligation in cash. Acceptance by Lender of any payment in an amount less than the amount then due shall be deemed an acceptance on account only, and the failure to pay the entire amount then due shall be and continue to be an Event of Default.

## ARTICLE 3. - BORROWER COVENANTS

Borrower covenants and agrees that:

Section 3.1.    PAYMENT OF DEBT AND PERFORMANCE OF OBLIGATIONS. Borrower will pay the Debt at the time and in the manner provided in the Note and in this Security Instrument; without relief from valuation or appraisement laws, and shall promptly and fully perform all of the Obligations in this Security Agreement and the Other Security Documents (hereinafter defined).

Section 3.2.    INCORPORATION BY REFERENCE. All the covenants, conditions and agreements contained in (a) the Note and (b) all and any of the documents other than the Note or this Security Instrument now or hereafter executed by Borrower and/or others and by or in favor of Lender, which wholly or partially secure or guaranty payment of the Note or are otherwise executed and delivered in connection with the Loan (the "Other Security Documents") are hereby made a part of this Security Instrument to the same extent and with the same force as if fully set forth herein.

Section 3.3.    INSURANCE. Borrower shall maintain with respect to the Property at all times, insurance against loss or damage by fire and other casualties and hazards by insurance written on an "all risks" basis including specifically windstorm and/or hail damage, in an amount not less than the replacement cost thereof, naming Lender as loss payee and additional insured; (ii) if the Property is required to be insured pursuant to the National Flood Reform Act of 1994, and the regulations promulgated there under, flood insurance is required in the amount equal to the lesser of the loan amount or the maximum available under the National Flood Insurance Program, but in no event should the amount of coverage be less than the value of the improved structure, naming Lender as additional insured and loss payee; and (iii) liability insurance providing coverage in such amount as Lender may require but in no event less than $500,000.00 naming Lender as an additional insured; and (iv) such other insurances as Lender may reasonably require from time to time.

All casualty insurance policies shall contain an endorsement or agreement by the insurer in form satisfactory to Lender that any loss shall be payable in accordance with the terms of such policy notwithstanding any act of negligence of Borrower and the further agreement of the insurer waiving rights of subrogation against Lender, and rights of set-off, counterclaim or deductions against Borrower.

All insurance policies shall be in form, provide coverages, be issued by companies and be in amounts satisfactory to Lender. At least 30 days prior to the expiration of such policy, Borrower shall furnish Lender with evidence satisfactory to Lender that such policy has been renewed or replaced. All such policies shall provide that the policy will not be canceled or materially amended without at least 30 days prior written notice to Lender. In the event Borrower fails to provide, maintain, keep in force and furnish to Lender the policies of insurance in such amounts, at such premium, for such risks and by such means as Lender chooses, then Lender may procure such insurance at Borrower's sole cost and expense, provided Lender shall have no responsibility to obtain any insurance, but if Lender does obtain insurance, Lender shall have no responsibility to assure that the insurance obtained shall be adequate or provide any

4

protection to Borrower.

In the event of a foreclosure of the Security Instrument or other transfer of title to the Property in extinguishment in whole or in part of the Debt, all right, title and interest of Borrower in and to the Policies then in force concerning the Property, to the extent assignable, and all proceeds payable thereunder shall thereupon vest in Lender or the purchaser at such foreclosure or other transferee in the event of such other transfer of title.

Section 3.4.    PAYMENT OF TAXES, ETC.

(a)    Borrower shall promptly pay by the date same are initially payable all taxes, assessments, impact fees, levies, inspection and license fees, water rates, sewer rents and other governmental impositions, including, without limitation, vault and meter charges and license fees for the use of vaults, chutes and similar areas adjoining the Land, now or hereafter levied or assessed or imposed against the Property or any part thereof (the "Taxes") not paid from the Escrow Fund (hereinafter defined), all ground rents, maintenance charges and similar charges, now or hereafter levied or assessed or imposed against the Property or any part thereof (the "Other Charges"), and all charges for utility services provided to the Property as same become due and payable. Borrower will deliver to Lender, receipts or other, evidence satisfactory to Lender that the Taxes, Other Charges and utility service charges have been so paid or are not then delinquent. Borrower shall not suffer and shall promptly cause to be paid and discharged any lien or charge whatsoever, which may be or become a lien or charge against the Property, except to the extent sums sufficient to pay all Taxes and Other Charges have been deposited with Lender in accordance with the terms of this Security Instrument.

(b)    After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any of the Taxes, provided that (i) no Event of Default has occurred and is continuing under the Note, this Security Instrument or any of the Other Security Documents, (ii) Borrower is permitted to do so under the provisions of any other mortgage, deed of trust or deed to secure debt affecting the Property, (iii) such proceeding shall suspend the collection of the Taxes from Borrower and from the Property or Borrower shall have paid all of the Taxes under protest, (iv) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder, (v) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, canceled or lost and (vi) Borrower shall have deposited with Lender adequate reserves (determined by Lender in its sole discretion) for the payment of the Taxes, together with all interest and penalties thereon, unless Borrower has paid all of the Taxes under protest, and Borrower shall have furnished such other security as may be required in the proceeding, or as may be reasonably requested by Lender to insure the payment of any contested Taxes, together with all interest and penalties thereon, taking into consideration the amount in the Escrow Fund available for payment of Taxes.

Section 3.5.    ESCROW FUND. In addition to the initial deposits with respect to Taxes and Insurance Premiums made by Borrower to Lender on the date hereof to be held by Lender in escrow, Borrower shall pay to Lender on the first day of each calendar month (a) one-twelfth of an amount which would be sufficient to cover the payment of the Taxes payable, or estimated by Lender to be payable, during the next ensuing twelve (12) months and (b) one-twelfth of an amount which would be sufficient to pay the Insurance Premiums due for the renewal of the coverage afforded by the Policies upon the expiration thereof (the amounts in (a) and (b) above shall be called the "Escrow Fund"). Borrower agrees to notify Lender immediately of any changes to the amounts, schedules and instructions for payment of any Taxes and Insurance Premiums of which it has or obtains knowledge and authorizes Lender or its agent to obtain the bills for Taxes directly from the appropriate taxing authority. The Escrow Fund and the payments of interest or principal or both, payable pursuant to the Note shall be added together and shall be paid as an aggregate sum by Borrower to Lender. Provided there are sufficient amounts in the Escrow Fund and no Event of Default exists, Lender shall be obligated to pay the Taxes and Insurance Premiums as they become due on their respective due dates on behalf of Borrower by applying the Escrow Fund to the payments of such Taxes and Insurance Premiums required to be made by Borrower. If the amount of the Escrow Fund shall exceed the amounts reasonably necessary for the payment of Taxes and Insurance Premiums, Lender shall, in its discretion, return any excess to Borrower or credit such excess against future payments to be made to the Escrow Fund. In allocating such excess, Lender may deal with the person shown on the records of Lender to be the owner of the Property. If the Escrow Fund is not sufficient to pay the items set forth in (a) and (b) above as and when they are due, Borrower shall promptly pay to Lender, upon demand, an amount which Lender shall reasonably estimate as sufficient to make up the deficiency. Unless otherwise required by applicable state or federal law, the Escrow Fund shall not constitute a trust fund and may be commingled with other monies held by Lender. Unless otherwise required by applicable state or federal law, no earnings or interest on the Escrow Fund shall be payable to Borrower.

5

Upon payment in full of the Debt, and full performance of the Obligations, the funds remaining in the Escrow Fund, if any, shall be paid to the record owner of the Land encumbered by the lien of this Security Instrument within a reasonable time following the date of such full payment and performance.

Section 3.6.     CONDEMNATION. Borrower shall promptly give Lender notice of the actual or threatened commencement of any condemnation or eminent domain proceeding and shall deliver to Lender copies of any and all papers, documents, surveys and correspondence served or received in connection with such proceedings. Notwithstanding any taking by any public or quasi-public authority through eminent domain or otherwise (including, but not limited to any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Security Instrument and the Debt shall not be reduced until any award or payment therefor shall have been actually received and applied by Lender, after the deduction of expenses of collection, to the reduction or discharge of the Debt. Lender shall not be limited to the interest paid on the award by the condemning authority but shall be entitled to receive out of the award interest at the rate or rates provided in the Note. Borrower hereby assigns and shall cause all awards and payments made in any condemnation or eminent domain proceeding, to be paid directly to Lender. Lender may apply any award or payment to the reduction or discharge of the Debt whether or not then due and payable. If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the award or payment, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the award or payment, or a portion thereof sufficient to pay the Debt. In addition, Borrower authorizes Lender, at Lender's option but without any obligation, as attorney-in-fact for Borrower to commence, appear in and prosecute, in Borrower's or Lender's name, any action or proceeding relating to any condemnation (which term for purposes hereunder shall mean any action regarding damage or taking by any governmental authority, quasi-governmental authority, any party having power of condemnation, or any transfer by private sale in lieu thereof) or other taking of the Property and to settle or compromise any claim in connection with such condemnation or other taking. Notwithstanding any application of condemnation proceeds by Lender to the Debt, Borrower shall repair, restore and rebuild the Property affected by the condemnation to a condition as close to that existing prior to such condemnation as is reasonable practicable, and otherwise sufficient for the use and enjoyment thereof as determined by Lender.

Section 3.7.     RESTORATION AFTER CASUALTY.

    (a)     In the event of loss, Borrower shall give immediate written notice to the insurance carrier and to Lender. Borrower hereby authorizes and appoints Lender as attorney-in-fact for Borrower to make proof of loss, to adjust and compromise any claims under policies of property damage insurance, to appear in and prosecute any action arising from such property damage insurance policies, to collect and receive the proceeds of property damage insurance, and to deduct from such proceeds Lender's expenses incurred in the collection of such proceeds. This power of attorney is coupled with an interest and therefore is irrevocable. However, nothing contained in this Section 3.7 shall require Lender to incur any expense or take any action. Lender may, at Lender's option, (1) hold the balance of such proceeds to be used to reimburse Borrower for the cost of restoring and repairing the Property to the equivalent of its original condition or to a condition approved by Lender (the "Restoration"), or (2) apply the balance of such proceeds to the payment of the Debt, whether or not then due. To the extent Lender determines to apply insurance proceeds to Restoration, Lender shall do so in accordance with Lender's then-current policies relating to the restoration of casualty damage on similar properties.

    (b)     Lender shall not exercise its option to apply insurance proceeds to the payment of the Debt if all of the following conditions are met: (1) no Event of Default (or any event which, with the giving of notice or the passage of time, or both, would constitute an Event of Default) has occurred and is continuing; (2) Lender determines, in its discretion, that there will be sufficient funds to complete the Restoration; (3) Lender determines, in its discretion, that the net cash flow from the Property after completion of the Restoration will be sufficient to meet all operating costs and other expenses, deposits to the Escrow Fund, deposits to reserves and loan repayment obligations relating to the Property; (4) Lender determines, in its discretion, that the Restoration will be completed before the earlier of (A) one year before the maturity date of the Note or (B) one year after the date of the loss or casualty; and (5) upon Lender's request, Borrower provides Lender evidence of the availability during and after the Restoration of the insurance required to be maintained by Borrower pursuant to Section 3.3.

Section 3.8.     LEASES AND RENTS. Borrower shall maintain, enforce and cause to be performed all of the terms and conditions under any Lease or sublease, which may constitute a portion of the Property. Borrower shall not, without the consent of Lender enter into any new Lease of all or any portion of the Property, agree to the cancellation or surrender under any Lease of all or any portion of the Property, agree to prepayment of Rents, issues or profits (other than Rent paid at the signing of a lease or sublease), modify any such Lease so as to shorten the term, decrease the Rent, accelerate the payment of Rent, or change the terms of any renewal option, provided that such action (taking into account, in the case of

6

257

a termination, reduction in rent, surrender of space or shortening of term, the planned alternative use of the affected space) does not have a materially adverse effect on the value of the Property taken as a whole, and provided that such Lease, as amended, modified or waived, is otherwise in compliance with the requirements of this Security Instrument and any subordination agreement binding upon Lender with respect to such Lease. Any such purported new Lease, cancellation surrender, prepayment or modification made without the written consent of Lender shall be void as against Lender.

Section 3.9.   MAINTENANCE AND USE OF PROPERTY.   Borrower shall cause the Property to be maintained in a good and safe condition and repair. The Improvements and the Personal Property shall not be removed, demolished or materially altered (except for normal replacement of the Personal Property with replacement property of equal or greater value) without the consent of Lender. Borrower shall promptly repair, replace or rebuild any part of the Property which may be destroyed by any casualty, or become damaged, worn or dilapidated or which may be affected by any condemnation or taking proceeding and shall complete and pay for any structure at any time in the process of construction or repair on the Land. Borrower shall not initiate, join in, acquiesce in, or consent to any change in any private restrictive covenant, zoning law or other public or private restriction, limiting, defining or changing the uses which may be made of the Property or any part thereof. If under applicable zoning provisions the use of all or any portion of the Property is or shall become a nonconforming use, Borrower will not cause or permit the nonconforming use to be discontinued or the nonconforming Improvement to be abandoned without the express written consent of Lender, and Borrower shall take such other steps as Lender may require to establish the legality of such non-conforming use.

Section 3.10.   WASTE.   Borrower shall not commit or suffer any waste of the Property or make any change in the use of the Property which will in any way materially increase the risk of fire or other hazard arising out of the operation of the Property, or take any action that might invalidate or give cause for cancellation of any Policy, or substantially increase the rates thereunder, or do or permit to be done thereon anything that may in any way impair the value of the Property or the security of this Security Instrument. Borrower will not, without the prior written consent of Lender, permit any drilling or exploration for or extraction, removal, or production of any minerals from the surface or the subsurface of the Land, regardless of the depth thereof or the method of mining or extraction thereof.

Section 3.11.   COMPLIANCE WITH LAWS.

(a)      Borrower shall promptly comply with all existing and future federal, state and local laws, orders, ordinances, governmental rules and regulations or court orders affecting the Property, and the use thereof, including any Environmental Law (hereinafter defined) ("Applicable Laws").

(b)      Borrower shall from time to time, upon Lender's request, provide Lender with evidence reasonably satisfactory to Lender that the Property complies with all Applicable Laws or is exempt from compliance with Applicable Laws.

(c)      Notwithstanding any provisions set forth herein or in any document regarding Lender's approval of alterations of the Property, Borrower shall not alter the Property in any manner which would materially increase Borrower's responsibilities for compliance with Applicable Laws without the prior written approval of Lender. Lender's approval of the plans, specifications, or working drawings for alterations of the Property shall create no responsibility or liability on behalf of Lender for their completeness, design, sufficiency or their compliance with Applicable Laws. The foregoing shall apply to tenant improvements constructed by Borrower or by any of its tenants. Lender may condition any such approval upon receipt of a certificate of compliance with Applicable Laws from an independent architect, engineer, or other person acceptable to Lender.

(d)      Borrower shall give prompt notice to Lender of the receipt by Borrower of any notice related to a violation or threatened violation of any Applicable Laws and of the commencement or threatened commencement of any proceedings or investigations which relate to compliance with Applicable Laws.

(e)      After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceedings, promptly initiated and conducted in good faith and with due diligence, the Applicable Laws affecting the Property, provided that (i) no Event of Default has occurred and is continuing under the Note, this Security Instrument or any of the Other Security Documents; (ii) Borrower is permitted to do so under the provisions of any other mortgage, deed of trust or deed to secure debt affecting the Property; (iii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower or the Property is subject and shall not constitute a default thereunder; (iv) neither the Property, any part thereof or interest therein, any of the tenants or occupants thereof, Borrower, nor Lender shall be affected in any material adverse way as a result of such proceeding; (v)

7

non-compliance with the Applicable Laws shall not impose civil or criminal liability on Borrower or Lender; and (vi) Borrower shall have furnished to Lender all other items reasonably requested by Lender.

Section 3.12.    BOOKS AND RECORDS

(a)    Borrower shall keep and maintain at all times at the Property or the management agent's offices, and upon Lender's request shall make available at the Property, complete and accurate books of account and records (including copies of supporting bills and invoices) adequate to reflect correctly the operation of the Property, and copies of all written contracts, Leases, and other instruments which affect the Property. Following a default by Borrower, the books, records, contracts, Leases and other instruments shall be subject to examination and inspection at any reasonable time by Lender.

(b)    Following a default by Borrower, Borrower shall furnish to Lender all of the following:

(1)    within ten (10) days following Lender's written request and thereafter annually within 120 days after the end of each fiscal year of Borrower, a statement of income and expenses for Borrower's operation of the Property for that fiscal year, a statement of changes in financial position of Borrower relating to the Property for that fiscal year and, when requested by Lender, a balance sheet showing all assets and liabilities of Borrower relating to the Property as of the end of that fiscal year;

(2)    within ten (10) days following Lender's written request and thereafter annually within 120 days after the end of each fiscal year of Borrower, and at any other time upon Lender's request, a rent schedule for the Property showing the name of each tenant, and for each tenant, the space occupied, the lease expiration date, the rent payable for the current month, the date through which rent has been paid, and any related information requested by Lender;

(3)    within ten (10) days following Lender's written request and thereafter annually within 120 days after the end of each fiscal year of Borrower, and at any other time upon Lender's request, an accounting of all security deposits held pursuant to all Leases, including the name of the institution (if any) and the names and identification numbers of the accounts (if any) in which such security deposits are held and the name of the person to contact at such financial institution, along with any authority or release necessary for Lender to access information regarding such accounts;

(4)    within ten (10) days following Lender's written request and thereafter annually within 120 days after the end of each fiscal year of Borrower, and at any other time upon Lender's request, a statement that identifies all owners of any interest in Borrower and the interest held by each, if Borrower is a corporation, all officers and directors of Borrower, and if Borrower is a limited liability company, all managers who are not members;

(5)    within ten (10) days following Lender's written request and thereafter monthly a property management report for the Property, showing the number of inquiries made and rental applications received from tenants or prospective tenants and deposits received from tenants and any other information requested by Lender;

(6)    within ten (10) days following Lender's written request and thereafter monthly a balance sheet, a statement of income and expenses for Borrower and a statement of changes in financial position of Borrower for Borrower's most recent fiscal year; and

(7)    within ten (10) days following Lender's written request and thereafter monthly a statement of income and expense for the Property for the prior month or quarter.

(c)    Each of the statements, schedules and reports required hereunder shall be certified to be complete and accurate by an individual having authority to bind Borrower, and shall be in such form and contain such detail as Lender may reasonably require; provided that Lender, in Lender's sole discretion, may require that any statements, schedules or reports be audited at Borrower's expense by independent certified public accountants acceptable to Lender.

(d)    If Borrower fails to provide in a timely manner the statements, schedules and reports required hereunder, Lender shall have the right to have Borrower's books and records audited, at Borrower's expense, by independent certified public accountants selected by Lender in order to obtain such statements, schedules and reports, and all related costs and expenses of Lender shall become immediately due and payable and shall become an additional part of the Debt.

(e)    If an Event of Default has occurred and is continuing, Borrower shall deliver to Lender upon written demand all books and records relating to the Property or its operation.

8

(f)     Borrower authorizes Lender to obtain a credit report on Borrower at any time.

(g)     Borrower, any Guarantor and any Indemnitor shall furnish Lender with such other additional financial or management information (including State and Federal tax returns) as may, from time to time, be reasonably required by Lender in form and substance satisfactory to Lender.

(h)     Borrower, any Guarantor and any Indemnitor shall furnish to Lender and its agents convenient facilities for the examination and audit of any such books and records.

Section 3.13.     PAYMENT FOR LABOR AND MATERIALS. Borrower will promptly pay when due all bills and costs for labor, materials, and specifically fabricated materials incurred in connection with the Property and never permit to exist in respect of the Property or any part thereof any lien or security interest, even though inferior to the liens and the security interests hereof, and in any event never permit to be created or exist in respect of the Property or any part thereof any other or additional lien or security interest other than the liens or security interests hereof, except for the Permitted Exceptions (defined below).

Section 3.14.     PERFORMANCE OF OTHER AGREEMENTS. Borrower shall observe and perform each and every term to be observed or performed by Borrower pursuant to the terms of any agreement or recorded instrument affecting or pertaining to the Property, or given by Borrower to Lender for the purpose of further securing an Obligation and any amendments, modifications or changes thereto.

Section 3.15.     CHANGE OF NAME, IDENTITY OR STRUCTURE. Borrower shall not change Borrower's name, identity (including its trade name or names) or, if not an individual, Borrower's corporate, partnership or other structure or jurisdiction where the Borrower is organized without notifying the Lender of such change in writing at least thirty (30) days prior to the effective date of such change and, in the case of a change in Borrower's structure or the jurisdiction where Borrower is organized, without first obtaining the prior written consent of the Lender.

Section 3.16.     EXISTENCE. Borrower will continuously maintain (a) its existence and shall not dissolve or permit its dissolution, (b) its rights to do business in the state where the Property is located and (c) its franchises and trade names.

Section 3.17.     MANAGEMENT. The Property shall be managed by either: (a) Borrower or an entity affiliated with Borrower and approved by Lender for so long as Borrower or said affiliated entity is managing the Property in a first class manner; or (b) a professional property management company approved by Lender. Management by an affiliated entity or a professional property management company shall be pursuant to a written agreement approved by Lender which shall be in all respects subordinate to this Security Instrument. Following a default by Borrower, no manager shall be removed or replaced or the terms of any management agreement modified or amended without the prior written consent of Lender. In the event (x) of default hereunder or under any management contract then in effect, which default is not cured within any applicable grace or cure period or (y) of the bankruptcy or insolvency of the manager, Lender shall have the right to immediately terminate, or to direct Borrower to immediately terminate, such management contract and to retain, or to direct Borrower to retain, a new management agent approved by Lender. All Rents generated by or derived from the Property shall first be utilized solely for current expenses directly attributable to the ownership and operation of the Property, including, without limitation, current expenses relating to Borrower's liabilities and obligations with respect to the Note, this Security Instrument and the Other Security Documents, and none of the Rents generated by or derived from the Property shall be diverted by Borrower and utilized for any other purpose unless all such current expenses attributable to the ownership and operation of the Property have been fully paid and satisfied.

Section 3.18.     PRINCIPAL PLACE OF BUSINESS. In the event that Borrower shall change the principal place of business or chief executive office, or, in the event Borrower is one or more natural persons, the location of its permanent residence, all as set forth in Subsection 4.18 below, Borrower shall immediately notify Lender in writing. Borrower shall execute and deliver such additional financing statements, security agreements and other instruments which may be necessary to effectively evidence or perfect Lender's security interest in the Property as a result of such change of principal place of business or residence.

ARTICLE 4. - REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to Lender that:

Section 4.1.     WARRANTY OF TITLE. Borrower has good and marketable title to the Property and has the right to

9

mortgage, grant, bargain, sell, pledge, assign, warrant, transfer and convey the same and that Borrower possesses an unencumbered fee simple absolute estate in the Land and the Improvements and that it owns the Property free and clear of all liens, encumbrances and charges whatsoever except for those exceptions shown in the title insurance policy insuring the lien of this Security Instrument (the "Permitted Exceptions"). Borrower shall forever warrant, defend and preserve the title and the validity and priority of the lien of this Security Instrument and shall forever warrant and defend the same to Lender against the claims of all persons whomsoever, and shall make such further assurances to perfect fee simple title to the Property as Lender may reasonably require.

Section 4.2.    LEGAL STATUS AND AUTHORITY.  Borrower (a) is duly organized, validly existing and in good standing under the laws of its state of organization or incorporation; (b) is duly qualified to transact business and is in good standing in the state where the Property is located; and (c) has all necessary approvals, governmental and otherwise, and full power and authority to own, operate and lease the Property. Borrower (and the undersigned representative of Borrower, if any) has full power, authority and legal right to execute this Security Instrument, and to mortgage, grant, bargain, sell, pledge, assign, warrant, transfer and convey the Property pursuant to the terms hereof and to keep and observe all of the terms of this Security Instrument on Borrower's part to be performed.

Section 4.3.    VALIDITY OF DOCUMENTS.  (a) The execution, delivery and performance of the Note, this Security Instrument and the Other Security Documents and the borrowing evidenced by the Note (i) are within the power and authority of Borrower; (ii) have been authorized by all requisite organizational action; (iii) have received all necessary approvals and consents, corporate, governmental or otherwise; (iv) will not violate, conflict with, result in a breach of or constitute (with notice or lapse of time, or both) a default under any provision of law, any order or judgment of any court or governmental authority, the articles of incorporation, by-laws, partnership or trust agreement, articles of organization, operating agreement, or other governing instrument of Borrower, or any indenture, agreement or other instrument to which Borrower is a party or by which it or any of its assets or the Property is or may be bound or affected; (v) will not result in the creation or imposition of any lien, charge or encumbrance whatsoever upon any of its assets, except the lien and security interest created hereby; and (vi) will not require any authorization or license from, or any filing with, any governmental or other body (except for the recordation of this Security Instrument in appropriate land records in the State where the Property is located and except for Uniform Commercial Code filings relating to the security interest created hereby), and (b) the Note, this Security Instrument and the Other Security Documents constitute the legal, valid and binding obligations of Borrower, enforceable in accordance with their terms.

Section 4.4.    LITIGATION.  There is no action, suit or proceeding, judicial, administrative or otherwise (including any condemnation or similar proceeding), pending or, to the best of Borrower's knowledge, threatened or contemplated against Borrower, a Guarantor, if any, an Indemnitor, if any, or against or affecting the Property that has not been disclosed to Lender by Borrower in writing.

Section 4.5.    STATUS OF PROPERTY.

(a)    Borrower has obtained all necessary certificates, licenses and other approvals, governmental and otherwise, necessary for the operation of the Property and the conduct of its business and all required zoning, building code, land use, environmental and other similar permits or approvals, all of which are in full force and effect as of the date hereof and not subject to revocation, suspension, forfeiture or modification.

(b)    The Property and the present and contemplated use and occupancy thereof are in full compliance with all applicable zoning ordinances, building codes, land use laws, Environmental Laws and other similar laws.

(c)    The Property is served by all utilities required for the current or contemplated use thereof. All utility service is provided by public utilities and the Property has accepted or is equipped to accept such utility service.

(d)    All public roads and streets necessary for service of and access to the Property for the current or contemplated use thereof have been completed, are serviceable and all-weather and are physically and legally open for use by the public, and have been dedicated to and accepted for public maintenance by the applicable municipal or county authorities.

(e)    The Property is served by public water and sewer systems.

(f)    The Property is free from damage caused by fire or other casualty.

(g)    All costs and expenses of any and all labor, materials, supplies and equipment used in the

10

construction of the Improvements have been paid in full.

(h)     Borrower has paid in full for, and is the owner of, all furnishings, fixtures and equipment (other than tenants'' property) used in connection with the operation of the Property, free and clear of any and all security interests, liens or encumbrances, except the lien and security interest created hereby.

(i)     All liquid and solid waste disposal, septic and sewer systems located on the Property are in a good and safe condition and repair and in compliance with all Applicable Laws.

(j)     No portion of the Improvements is located in an area identified by the Federal Emergency Management Agency or any successor thereto as an area having special flood hazards pursuant to the Flood Insurance Acts or, if any portion of the Improvements is located within such area, Borrower has obtained and will maintain the insurance required pursuant to the terms hereof.

(k)     All the Improvements lie within the boundaries of the Land.

Section 4.6.     NO FOREIGN PERSON. Borrower is not a "foreign person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code of 1986, as amended and the related Treasury Department regulations.

Section 4.7.     SEPARATE TAX LOT. The Property is assessed for real estate tax purposes as one or more wholly independent tax lot or lots, separate from any adjoining land or improvements not constituting a part of such lot or lots, and no other land or improvements is assessed and taxed together with the Property or any portion thereof.

Section 4.8.     LEASES. Except as disclosed in the rent roll for the Property delivered to and approved by Lender, (a) Borrower is the sole owner of the entire lessor's interest in the Leases; (b) the Leases are valid and enforceable and in full force and effect; (c) all of the Leases are arms-length agreements with bona fide, independent third parties; (d) no party under any Lease is in default; (e) all Rents due have been paid in full; (f) the terms of all alterations, modifications and amendments to the Leases are reflected in the certified occupancy statement delivered to and approved by Lender; (g) none of the Rents reserved in the Leases have been assigned or otherwise pledged or hypothecated; (h) none of the Rents have been collected for more than one (1) month in advance (except a security deposit shall not be deemed rent collected in advance); (i) the premises demised under the Leases have been completed in accordance with the Leases, and the tenants under the Leases have accepted the same and have taken possession of the same on a rent-paying basis; (j) there exist no offsets or defenses to the payment of any portion of the Rents and Borrower has no monetary obligation to any tenant under any Lease; (k) Borrower has received no notice from any tenant challenging the validity or enforceability of any Lease; (l) there are no agreements with the tenants under the Leases other than expressly set forth in each Lease; (m) the Leases are valid and enforceable against Borrower and the tenants set forth therein; (n) no Lease contains an option to purchase, right of first refusal to purchase, right of first refusal to relet, or any other similar provision; (o) no person or entity has any possessory interest in, or right to occupy, the Property except under and pursuant to a Lease; (p) each Lease is subordinate to this Security Instrument, either pursuant to its terms or a recordable subordination agreement; (q) no Lease has the benefit of a non-disturbance agreement that would be considered unacceptable to prudent institutional lenders; (r) all security deposits relating to the Leases reflected on the certified rent roll delivered to Lender have been collected by Borrower; and (s) no brokerage commissions or finders fees are due and payable regarding any Lease.

Section 4.9.     FINANCIAL CONDITION.

(a)     (i) Borrower is solvent and no proceeding under Creditors Rights Laws (hereinafter defined) with respect to Borrower has been initiated, and (ii) Borrower has received reasonably equivalent value for the granting of this Security Instrument.

(b)     No petition in bankruptcy has been filed by or against Borrower, any Guarantor, any Indemnitor or any related entity, or any principal, general partner or member thereof, in the last seven (7) years, and neither Borrower, any Guarantor, any Indemnitor nor any related entity, or any principal, general partner or member thereof, in the last seven (7) years has ever made any assignment for the benefit of creditors or taken advantage of any Creditors Rights Laws.

Section 4.10.     BUSINESS PURPOSES. The loan evidenced by the Note secured by the Security Instrument and the Other Security Documents (the "Loan") is solely for the business purpose of Borrower, and is not for personal, family, household, or agricultural purposes.

Section 4.11.     TAXES. Borrower, any Guarantor and any Indemnitor have filed all federal, state, county, municipal,

11

and city income, personal property and other tax returns required to have been filed by them and have paid all taxes and related liabilities which have become due pursuant to such returns or pursuant to any assessments received by them. Neither Borrower, any Guarantor nor any Indemnitor knows of any basis for any additional assessment in respect of any such taxes and related liabilities for prior years.

**Section 4.12.**   MAILING ADDRESS.  Borrower's mailing address, as set forth in the opening paragraph hereof or as changed in accordance with the provisions hereof, is true and correct.

**Section 4.13.**   NO CHANGE IN FACTS OR CIRCUMSTANCES.  All information in the application for the Loan submitted to Lender and in all financial statements, rent rolls, reports, certificates and other documents submitted in connection with the application or in satisfaction of the terms thereof, are accurate, complete and correct in all respects. There has been no adverse change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise misleading.

**Section 4.14.**   DISCLOSURE.  Borrower has disclosed to Lender all material facts and has not failed to disclose any material fact that could cause any representation or warranty made herein to be materially misleading.

**Section 4.15.**   THIRD PARTY REPRESENTATIONS.  Each of the representations and the warranties made by each Guarantor and Indemnitor in any Other Security Document(s) is true and correct in all material respects.

**Section 4.16.**   ILLEGAL ACTIVITY.  No portion of the Property has been or will be purchased, improved, equipped or furnished with proceeds of any illegal activity and to the best of Borrower's knowledge, there are no illegal activities or activities relating to controlled substances at the Property.

**Section 4.17.**   PERMITTED EXCEPTIONS.  None of the Permitted Exceptions, individually or in the aggregate, materially interfere with the benefits of the security intended to be provided by the Security Instrument, the Note, and the Other Security Documents, materially and adversely affect the value of the Property, impair the use or the operation of the Property or impair Borrower's ability to pay its obligations in a timely manner.

**Section 4.18.**   PRINCIPAL PLACE OF BUSINESS.  Borrower's principal place of business is as set forth in the opening paragraph to this Security Instrument.

**Section 4.19.**   PROPERTY USE.  The Property shall continue to be used in accordance with its present use, and for no other use without the prior written consent of Lender.

## ARTICLE 5. - OBLIGATIONS AND RELIANCE

**Section 5.1.**   RELATIONSHIP OF BORROWER AND LENDER.  The relationship between Borrower and Lender is solely that of debtor and creditor, and Lender has no fiduciary or other special relationship with Borrower, and no term or condition of any of the Note, this Security Instrument and the Other Security Documents shall be construed so as to deem the relationship between Borrower and Lender to be other than that of debtor and creditor.

**Section 5.2.**   NO RELIANCE.  The members, general partners, principals and (if Borrower is a trust) beneficial owners of Borrower are experienced in the ownership and operation of properties similar to the Property, and Borrower and Lender are relying solely upon such expertise in connection with the ownership and operation of the Property. Borrower is not relying on Lender's expertise, business acumen or advice in connection with the Property.

**Section 5.3.**   NO LENDER OBLIGATIONS.  Notwithstanding anything to the contrary contained herein, Lender is not undertaking the performance of (a) any obligations under the Leases; or (b) any obligations with respect to such agreements, contracts, certificates, instruments, franchises, permits, trademarks, licenses and other documents. By accepting or approving anything required to be observed, performed or fulfilled or to be given to Lender pursuant to this Security Instrument, the Note or the Other Security Documents, including without limitation, any officer's certificate, balance sheet, statement of profit and loss or other financial statement, survey, appraisal, or insurance policy, Lender shall not be deemed to have warranted, consented to, or affirmed the sufficiency, the legality or effectiveness of same, and such acceptance or approval thereof shall not constitute any warranty or affirmation with respect thereto by Lender.

**Section 5.4.**   RELIANCE.  Borrower recognizes and acknowledges that in accepting the Note, this Security Instrument and the Other Security Documents, Lender is expressly and primarily relying on the truth and accuracy of the warranties and representations set forth herein without any obligation to investigate the Property and notwithstanding any

12

investigation of the Property by Lender; that such reliance existed on the part of Lender prior to the date hereof; that the warranties and representations are a material inducement to Lender in accepting the Note, this Security Instrument and the Other Security Documents; and that Lender would not be willing to make the Loan and accept this Security Instrument in the absence of the warranties and representations as set forth herein.

## ARTICLE 6. - FURTHER ASSURANCES

**Section 6.1.** **RECORDING OF SECURITY INSTRUMENT, ETC.** Borrower forthwith upon the execution and delivery of this Security Instrument and thereafter, from time to time, will cause this Security Instrument and any of the Other Security Documents creating a lien or security interest or evidencing the lien hereof upon the Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect and perfect the lien or security interest hereof upon, and the interest of Lender in, the Property. Borrower will pay all taxes, filing, registration or recording fees, and all expenses incident to the preparation, execution, acknowledgment and/or recording of the Note, this Security Instrument, the Other Security Documents, any note or mortgage supplemental hereto, any security instrument with respect to the Property and any instrument of further assurance, and any modification or amendment of the foregoing documents, and all federal, state, county and municipal taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of this Security Instrument, any mortgage supplemental hereto, any security instrument with respect to the Property or any instrument of further assurance, and any modification or amendment of the foregoing documents, except where prohibited by law so to do.

**Section 6.2.** **FURTHER ACTS, ETC.** Borrower will, at the cost of Borrower, and without expense to Lender, do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, mortgages, assignments, notices of assignments, transfers and assurances as Lender shall, from time to time, reasonably require, for the better assuring, conveying, assigning, transferring, and confirming unto Lender the Property and rights hereby mortgaged, granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted and transferred or intended now or hereafter so to be, or which Borrower may be or may hereafter become bound to convey or assign to Lender, or for carrying out the intention or facilitating the performance of the terms of this Security Instrument or for filing, registering or recording this Security Instrument, or for complying with all applicable state or federal law. Borrower, on demand, will execute and deliver and hereby authorizes Lender, following 10 days' notice to Borrower, to execute in the name of Borrower or without the signature of Borrower to the extent Lender may lawfully do so, one or more financing statements, chattel mortgages or other instruments, to evidence or perfect more effectively the security interest of Lender in the Property. Borrower grants to Lender an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Lender hereunder.

**Section 6.3.** **CHANGES IN TAX, DEBT CREDIT AND DOCUMENTARY STAMP LAWS.**

(a) If any law is enacted or adopted or amended after the date of this Security Instrument which deducts the Debt from the value of the Property for the purpose of taxation or which imposes a tax, either directly or indirectly, on the Debt or Lender's interest in the Property, Borrower will pay the tax, with interest and penalties thereon, if any. If Lender is advised by counsel chosen by it that the payment of tax by Borrower would be unlawful or taxable to Lender or unenforceable or provide the basis for a defense of usury, then Lender shall have the option, exercisable by written notice of not less than ninety (90) days, to declare the Debt immediately due and payable.

(b) Borrower will not claim or demand or be entitled to any credit or credits on account of the Debt for any part of the Taxes or Other Charges assessed against the Property, or any part thereof.

(c) If at any time the United States of America, any State thereof or any subdivision of any such State shall require revenue or other stamps to be affixed to the Note, this Security Instrument, or any of the Other Security Documents or impose any other tax or charge on the same, Borrower will pay for the same, with interest and penalties thereon, if any.

**Section 6.4.** **ESTOPPEL CERTIFICATES.**

(a) After request by Lender, Borrower, within ten (10) days, shall furnish Lender or any proposed assignee with a statement, duly acknowledged and certified, setting forth (i) the original principal amount of the Note, (ii) the unpaid principal amount of the Note, (iii) the rate of interest of the Note, (iv) the terms of payment and maturity date of the Note, (v) the date installments of interest and/or principal were last paid, (vi) that, except as provided in such statement, there are no defaults or events which with the passage of time or the giving of notice or both, would constitute

13

*6.B*     *G-13*

an event of default under the Note or the Security Instrument, (vii) that the Note and this Security Instrument are valid, legal and binding obligations and have not been modified or if modified, giving particulars of such modification, (viii) whether any offsets or defenses exist against the obligations secured hereby and, if any are alleged to exist, a detailed description thereof, (ix) that all Leases are in full force and effect and (provided the Property is not a residential multifamily property) have not been modified (or if modified, setting forth all modifications), (x) the date to which the Rents thereunder have been paid pursuant to the Leases, (xi) whether or not, to the best knowledge of Borrower, any of the lessees under the Leases are in default under the Leases, and, if any of the lessees are in default, setting forth the specific nature of all such defaults, (xii) the amount of security deposits held by Borrower under each Lease and that such amounts are consistent with the amounts required under each Lease, and (xiii) as to any other matters reasonably requested by Lender and reasonably related to the Leases, the obligations secured hereby, the Property or this Security Instrument.

(b)       Borrower shall use its best efforts to deliver to Lender, promptly upon request, duly executed estoppel certificates from any one or more lessees as required by Lender attesting to such facts regarding the Lease as Lender may require, including, but not limited to attestations that each Lease covered thereby is in full force and effect with no defaults thereunder on the part of any party, that none of the Rents have been paid more than one month in advance, except as security, and that the lessee claims no defense or offset against the full and timely performance of its obligations under the Lease.

(c)       Upon any transfer or proposed transfer of the Property at Lender's request, Borrower, any Guarantors and any Indemnitor(s) shall provide an estoppel certificate in such form, substance and detail as Lender may require.

Section 6.5.       FLOOD INSURANCE. After Lender's request, Borrower shall deliver evidence satisfactory to Lender that no portion of the Improvements is situated in a federally designated "special flood hazard area" or, if it is, that Borrower has obtained insurance meeting the requirements hereof.

Section 6.6.       REPLACEMENT DOCUMENTS. Upon receipt of an affidavit of an officer of Lender as to the loss, theft, destruction or mutilation of the Note or any Other Security Document which is not of public record, and, in the case of any such mutilation, upon surrender and cancellation of such Note or Other Security Document, Borrower will issue, in lieu thereof, a replacement Note or Other Security Document, dated the date of such lost, stolen, destroyed or mutilated Note or Other Security Document in the same principal amount thereof and otherwise of like tenor.

## ARTICLE 7. - DUE ON SALE/ENCUMBRANCE

Section 7.1.       TRANSFER DEFINITIONS. For purposes of this Article, an "Affiliated Manager" shall mean any managing agent in which Borrower, any Guarantor or Indemnitor has, directly or indirectly, any legal, beneficial or economic interest; a "Restricted Party" shall mean Borrower, any Guarantor, any Indemnitor, or any Affiliated Manager or any shareholder, partner, member or non-member manager, or any direct or indirect legal or beneficial owner of Borrower, any Guarantor, any Indemnitor, any Affiliated Manager or any non-member manager; and a "Sale" shall mean a voluntary or involuntary sale, conveyance, transfer or pledge of a legal or beneficial interest.

Section 7.2.       NO SALE/ENCUMBRANCE

(a)       Borrower shall not sell, convey, mortgage, grant, bargain, encumber, pledge, assign, grant options with respect to, or otherwise transfer or dispose of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) the Property or any part thereof or any legal or beneficial interest therein (collectively a "Transfer"), other than pursuant to Leases of space in the Improvements to tenants in accordance with the provisions hereof without the prior written consent of Lender.

(b)       A Transfer shall include, but not be limited to, (i) an installment sales agreement wherein Borrower agrees to sell the Property or any part thereof for a price to be paid in installments; (ii) an agreement by Borrower leasing all or a substantial part of the Property for other than actual occupancy by a space tenant thereunder or a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any Leases or any Rents; (iii) if a Restricted Party is a corporation, any merger, consolidation or Sale or Pledge of such corporation's stock or the creation or issuance of new stock in one or a series of transactions, by which such corporation's stock shall be vested in a party or parties who are not now shareholders; (iv) if a Restricted Party is a limited or general partnership or joint venture, any merger or consolidation or the change, removal, resignation or addition of a general

14

GB          GB

partner or the Sale or Pledge of the partnership interest of any general partner or any profits or proceeds relating to such partnership interest, or the Sale or Pledge of limited partnership interests or the creation or issuance of new limited partnership interests in one or a series of transactions, by which such limited partnership interests shall be vested in a party or parties who are not now limited partners; (v) if a Restricted Party is a limited liability company, any merger or consolidation or the change, removal, resignation or addition of a managing member or non-member manager (or if no managing member, any member) or the Sale or Pledge of the membership interest of a managing member (or if no managing member, any member) or any profits or proceeds relating to such membership interest, or the Sale or Pledge of non-managing membership interests or the creation or issuance of new non-managing membership interests in one or a series of transactions, by which such non-managing membership interests shall be vested in a party or parties who are not now non-managing members; (vi) if a Restricted Party is a trust or nominee trust, any merger, consolidation or the Sale or Pledge of the legal or beneficial interest in a Restricted Party or the creation or issuance of new legal or beneficial interests in one or a series of transactions, by which such beneficial or legal interests shall be vested in a party or parties who are not now legal or beneficial owners; or (vii) the removal or the resignation of the managing agent (including, without limitation, an Affiliated Manager) other than in accordance herewith.

Section 7.3.        PERMITTED TRANSFERS.  Notwithstanding anything to the contrary contained herein, the following transfers shall not be deemed to be a Transfer: (a) a transfer by devise or descent or by operation of law upon the death of a member, partner or shareholder of a Restricted Party; and (b) the Sale or Pledge of stock or limited partnership or non-managing membership interests in a Restricted Party by which, in one or a series of transactions, in the aggregate, not more than forty-nine percent (49%) of the stock, limited partnership interests or non-managing membership interests (as the case may be) in a Restricted Party, shall be vested in parties not now having an ownership interest; provided, however, no such transfer shall result in the change of voting control in the Restricted Party, and as a condition to each such transfer, Lender shall receive not less than ten (10) days prior written notice of such proposed transfer.

Section 7.4        ASSIGNMENT/ASSUMPTION.  Notwithstanding anything to the contrary contained in this Article 7, and in addition to the transfers permitted hereunder, Lender may, in Lender's sole and absolute discretion, permit a sale, assignment, or other transfer of the Property, provided that: (i) Lender receives sixty (60) days prior written notice of the proposed transfer hereunder; (ii) no Event of Default has occurred and is continuing; and (iii) all underwriting requirements deemed necessary by Lender (in its sole and absolute discretion) are satisfied, including but not limited to the following:

(a)  Borrower shall pay any and all fees and out-of-pocket costs incurred in connection with the transfer of the Property (including, without limitation, Lender's counsel fees and disbursements and all recording fees, title insurance premiums and mortgage and intangible taxes);

(b)  The proposed transferee (the "Transferee") or Transferee's principals must have demonstrated expertise in owning and operating properties similar in location, size and operation to the Property, which expertise shall be determined by Lender, in Lender's sole discretion;

(c)  Transferee and Transferee's principals shall, as of the date of such transfer, have an aggregate net worth and liquidity acceptable to Lender, in Lender's sole discretion;

(d)  Transferee shall assume all of the obligations of Borrower under the Loan Documents in all respects, including, without limitation, by entering into an assumption agreement in form and substance satisfactory to Lender (in Lender's sole discretion) and one or more Transferee's principals shall execute in favor of Lender a Guaranty and an Affidavit and Indemnity of Borrower and Guarantor Regarding Hazardous and Toxic Materials;

(e)  No Event of Default or event which, with the giving of notice, passage of time or both, shall constitute an Event of Default, shall otherwise occur as a result of such transfer, and Transferee and Transferee's principals shall deliver (A) all organization documentation requested by Lender, which shall be satisfactory to Lender (in Lender's sole discretion), and (B) all certificates, agreements and covenants required by Lender; and

(f)  Borrower shall deliver, at its sole cost and expense, an endorsement to the existing title policy insuring the Security Instrument, as modified by the assumption agreement, as a valid first lien on the Property and naming the Transferee as owner of the Property, which endorsement shall insure that, as of the date of the recording of the assumption agreement, the Property shall not be subject to any additional exceptions or liens other than those contained in the title policy issued on the date hereof.

15

If all Lender requirements have been satisfied (including but not limited to those listed hereinabove) and Lender approves the proposed transfer to the Transferee, then Borrower shall be released from all liability under this Security Instrument, the Note and the Other Loan Documents immediately upon the transfer of the Property to the Transferee.

## ARTICLE 8. - DEFAULT

Section 8.1.            EVENTS OF DEFAULT. The occurrence of any one or more of the following events shall constitute an "Event of Default":

(a)          if any portion of the Debt is not paid on or prior to the date the same is due or if the entire Debt is not paid on or before the Maturity Date;

(b)          if Borrower fails to repay any sum paid or advanced by Lender under the terms of this Security Instrument or any Other Loan Document;

(c)          if Borrower fails to repay any sum owed to Lender or its successor or assignee under the terms of any other Security Instrument, promissory note or other loan document in connection with any other loan; provided that such failure to repay shall constitute an Event of Default hereunder only if the person or entity to which payment is owed under such other Security Instrument, promissory note or other loan document is the holder of the Note;

(d)          if any of the Taxes or Other Charges is not paid when the same is due and payable except to the extent sums sufficient to pay such Taxes and Other Charges have been deposited with Lender in accordance with the terms of this Security Instrument;

(e)          if the Policies are not kept in full force and effect, or if the Policies are not delivered to Lender as provided herein;

(f)          if Borrower violates or does not comply with any of the provisions of this Security Instrument or any Other Loan Document;

(g)          if any representation or warranty of Borrower, any Indemnitor or any person guaranteeing payment of the Debt or any portion thereof or performance by Borrower of any of the terms of this Security Instrument (a "Guarantor"), or any member, general partner, principal or beneficial owner of any of the foregoing, made herein or in any guaranty, or in any certificate, report, financial statement or other instrument or document furnished to Lender shall have been false or misleading in any material respect when made;

(h)          if (i) Borrower or any managing member or general partner of Borrower, or any Guarantor or Indemnitor shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to its debts or debtors ("Creditors Rights Laws"), seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or the Borrower or any managing member or general partner of Borrower, or any Guarantor or Indemnitor shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against Borrower or any managing member or general partner of Borrower or any Guarantor or Indemnitor any case, proceeding or other action of a nature referred to in clause (i) above which (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of sixty (60) days; or (iii) there shall be commenced against the Borrower or any managing member or general partner of Borrower, or any Guarantor or Indemnitor any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets which results in the entry of any order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within sixty (60) days from the entry thereof; or (iv) the Borrower or any managing member or general partner of Borrower or any Guarantor or Indemnitor shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above; or (v) the Borrower or any managing member or general partner of Borrower, or any Guarantor or Indemnitor shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due;

16

(i)     if Borrower shall be in default beyond applicable notice and grace periods under any other mortgage, deed of trust, deed to secure debt or other security agreement covering any part of the Property whether it be superior or junior in lien to this Security Instrument;

(j)     if the Property becomes subject to any mechanic's, materialman's or other lien other than a lien for any Taxes not then due and payable and the lien shall remain undischarged of record (by payment, bonding or otherwise) for a period of thirty (30) days;

(k)     if any federal or state tax lien is filed against Borrower, any member or general partner of Borrower, any Guarantor, any Indemnitor or the Property and same is not discharged of record within thirty (30) days after same is filed;

(l)     if any default occurs under any guaranty or indemnity executed in connection herewith, and such default continues after the expiration of applicable grace periods, if any; or

(m)     if Borrower files of record, without the prior written consent of Lender which Lender may grant or withhold for any reason in its sole and absolute discretion, any notice limiting the maximum principal amount that may be secured hereunder; or

(n)     if Borrower sells, transfers (whether voluntary or by operation of law), pledges, hypothecates or further encumbers all or any part of the Property or any interest therein or any interest in the Borrower (except as otherwise expressly provided herein), or additionally assigns all or any part of the rents, income or profits arising therefrom, in either case without the prior written consent of Lender, which may be withheld for any reason in Lender's sole and absolute discretion; or

(o)     if Borrower or any Guarantor or Indemnitor is dissolved, merges into another entity, or otherwise terminates its existence (other than as specifically allowed pursuant to the terms hereof) or if the person(s) controlling such entity shall take any action authorizing or leading to the same; or

(p)     if for more than ten (10) days after notice from Lender, Borrower shall continue to be in default under any other term, covenant or condition of the Note, this Security Instrument or the Other Security Documents in the case of any default which can be cured by the payment of a sum of money or for thirty (30) days after notice from Lender in the case of any other default, provided that if such default cannot reasonably be cured within such thirty (30) day period and Borrower shall have commenced to cure such default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for so long as it shall require Borrower in the exercise of due diligence to cure such default, it being agreed that no such extension shall be for a period in excess of sixty (60) days.

## ARTICLE 9. - RIGHTS AND REMEDIES

Section 9.1     **REMEDIES.** Upon the occurrence of any Event of Default, to the extent permitted by applicable law, Borrower agrees that Lender may take any action available at law, in equity, and as otherwise provided in this Security Instrument, without notice or demand, as it deems advisable to protect and enforce its rights against Borrower in and to the Property, including, but not limited to the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as Lender may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of Lender:

(a)     declare the entire unpaid Debt to be immediately due and payable;

(b)     institute proceedings, judicial or otherwise, for the complete foreclosure of this Security Instrument under any applicable state or federal law in which case the Property or any interest therein may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner;

(c)     with or without entry, to the extent permitted and pursuant to the procedures provided by applicable state or federal law, institute proceedings for the partial foreclosure of this Security Instrument for the portion of the Debt then due and payable, subject to the continuing lien and security interest of this Security Instrument for the balance of the Debt not then due, unimpaired and without loss of priority;

17

(d)     sell for cash or upon credit the Property or any part thereof and all estate, claim, demand, right, title and interest of Borrower therein and rights of redemption thereof, pursuant to power of sale or otherwise, at one or more sales, in one or more parcels, at such time and place, upon such terms and after such notice thereof as may be required or permitted by law;

(e)     institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained herein, in the Note or in the Other Security Documents;

(f)     recover judgment on the Note either before, during or after any proceedings for the enforcement of this Security Instrument or the Other Security Documents;

(g)     apply for the appointment of a receiver, trustee, liquidator or conservator of the Property, without notice and without regard for the adequacy of the security for the Debt and without regard for the solvency of Borrower, any Guarantor, Indemnitor or of any person, firm or other entity liable for the payment of the Debt;

(h)     subject to any applicable state or federal law, the license granted to Borrower to collect and receive rents hereunder shall automatically be revoked and Lender may enter into or upon the Property, either personally or by its agents, nominees or attorneys and dispossess Borrower and its agents and servants therefrom, without liability for trespass, damages or otherwise and exclude Borrower and its agents or servants wholly therefrom, and take possession of all rent rolls, leases (including the form lease) and amendments and exhibits, subleases (including the form sublease) and amendments and exhibits and rental and license agreements with the tenants, subtenants and licensees in possession of the Property or any part or parts thereof; tenants', subtenants' and licensees' money deposits or other property (including, without limitation, any letter of credit) given to secure tenants', subtenants' and licensees' obligations under leases, subleases or licenses, together with a list of the foregoing; all lists pertaining to current rent and license fee arrears; any and all architects' plans and specifications, licenses and permits, documents, books, records, accounts, surveys and property which relate to the management, leasing, operation, occupancy, ownership, insurance, maintenance, or service of or construction upon the Property and Borrower agrees to surrender possession thereof and of the Property to Lender upon demand, and thereupon Lender may (i) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with all and every part of the Property and conduct the business thereat; (ii) complete any construction on the Property in such manner and form as Lender deems advisable; (iii) make alterations, additions, renewals, replacements and improvements to or on the Property; (iv) exercise all rights and powers of Borrower with respect to the Property, whether in the name of Borrower or otherwise, including without limitation, the right to make, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive all Rents of the Property and every part thereof; (v) either require Borrower (A) to pay monthly in advance to Lender, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of such part of the Property as may be occupied by Borrower, or (B) to vacate and surrender possession of the Property to Lender or to such receiver and, in default thereof, Borrower may be evicted by summary proceedings or otherwise; and (vi) apply the receipts from the Property to the payment of the Debt, in such order, priority and proportions as Lender shall deem appropriate in its sole discretion after deducting therefrom all expenses (including reasonable attorneys' fees) incurred in connection with the aforesaid operations and all amounts necessary to pay the Taxes, Other Charges, Insurance Premiums and other expenses in connection with the Property, as well as just and reasonable compensation for the services of Lender, its counsel, agents and employees;

(i)     exercise any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code, including, without limiting the generality of the foregoing: (i) the right to take possession of the Personal Property or any part thereof, and to take such other measures as Lender may deem necessary for the care, protection and preservation of the Personal Property, and (ii) request Borrower at its expense to assemble the Personal Property and make it available to Lender at a convenient place acceptable to Lender. Any notice of sale, disposition or other intended action by Lender with respect to the Personal Property sent to Borrower in accordance with the provisions hereof at least five (5) days prior to such action, shall constitute commercially reasonable notice to Borrower;

(j)     apply any sums then deposited in the Escrow Fund and any other sums held in escrow or otherwise by Lender in accordance with the terms of this Security Instrument or any Other Security Document to the payment of the following items in any order in its sole discretion: (i) Taxes and Other Charges; (ii) Insurance Premiums; (iii) interest on the unpaid principal balance of the Note; (iv) amortization of the unpaid principal balance of the Note; and (v) all other sums payable pursuant to the Note, this Security Instrument and the Other Security Documents, including, without limitation, advances made by Lender pursuant to the terms of this Security Instrument;

(k)     surrender the Policies maintained pursuant hereto, collect the unearned Insurance Premiums and apply such sums as a credit on the Debt in such priority and proportion as Lender in its discretion shall deem proper,

18

G.B    B

and in connection therewith, Borrower hereby appoints Lender as agent and attorney-in-fact (which is coupled with an interest and is therefore irrevocable) for Borrower to collect such unearned Insurance Premiums;

(l)      apply the undisbursed balance of any net proceeds deficiency deposit, together with interest thereon, to the payment of the Debt in such order, priority and proportions as Lender shall deem to be appropriate in its discretion; or

(m)      pursue such other remedies as Lender may have under applicable state or federal law.

In the event of a sale, by foreclosure, to the extent permitted by applicable law, power of sale, or otherwise, of less than all of the Property, this Security Instrument shall continue as a lien and security interest on the remaining portion of the Property unimpaired and without loss of priority. Notwithstanding the provisions of this Section to the contrary, if any Event of Default shall occur, and the Lender elects to declare the entire unpaid Debt to be automatically due and payable, such remedy may be pursued without any further notice, demand or other action by Lender.

**Section 9.2.**      APPLICATION OF PROCEEDS. The purchase money, proceeds and avails of any disposition of the Property, or any part thereof, or any other sums collected by Lender pursuant to the Note, this Security Instrument or the Other Security Documents, may be applied by Lender to the payment of the Debt in such priority and proportions as Lender in its discretion shall deem proper and which are in accordance with applicable law or as shall be required by a court of competent jurisdiction.

**Section 9.3.**      RIGHT TO CURE DEFAULTS. Upon the occurrence of any Event of Default or if Borrower fails to make any payment or to do any act as herein provided, Lender may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder, make or do the same in such manner and to such extent as Lender may deem necessary to protect the security hereof. Lender is authorized to enter upon the Property for such purposes, or appear in, defend, or bring any action or proceeding to protect its interest in the Property or to foreclose this Security Instrument or collect the Debt. The cost and expense of any cure hereunder (including reasonable attorneys' fees to the extent permitted by law), with interest at the Default Rate (defined in the Note), shall constitute a portion of the Debt and shall be due and payable to Lender upon demand. All costs and expenses incurred by Lender in remedying any Event of Default or failed payment or act or in appearing in, defending, or bringing any such action or proceeding shall bear interest at the Default Rate defined in the Note, for the period after notice from Lender that such cost or expense was incurred to the date of payment to Lender. All such costs and expenses incurred by Lender together with interest thereon calculated at the Default Rate shall be deemed to constitute a portion of the Debt and be secured by this Security Instrument and the Other Security Documents and shall be immediately due and payable upon demand by Lender therefor.

**Section 9.4.**      ACTIONS AND PROCEEDINGS. At any time, Lender has the right to appear in and defend, compromise or settle any action or proceeding brought with respect to the Property, and after the occurrence and during the continuance of an Event of Default, to bring any action or proceeding, in the name and on behalf of Borrower, which Lender, in its discretion, decides should be brought to protect its interest in the Property.

**Section 9.5.**      RECOVERY OF SUMS REQUIRED TO BE PAID. Lender shall have the right from time to time to take action to recover any sum or sums which constitute a part of the Debt as the same become due, without regard to whether or not the balance of the Debt shall be due, and without prejudice to the right of Lender thereafter to bring an action of foreclosure, or any other action, for a default or defaults by Borrower existing at the time such earlier action was commenced.

**Section 9.6.**      EXAMINATION OF BOOKS AND RECORDS. Lender, its agents, accountants and attorneys shall have the right upon prior written notice to Borrower (unless an Event of Default exists, in which case no notice shall be required), to examine and audit, during reasonable business hours, the records, books, management and other papers of Borrower and its affiliates or of any Guarantor or Indemnitor which pertain to their financial condition or the income, expenses and operation of the Property, at the Property or at any office regularly maintained by Borrower, its affiliates or any Guarantor or Indemnitor where the books and records are located. Lender and its agents shall have the right upon notice to make copies and extracts from the foregoing records and other papers at no cost to Lender.

**Section 9.7.**      OTHER RIGHTS, ETC.

(a)      The failure of Lender to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Security Instrument. Borrower shall not be relieved of Borrower's obligations

19

hereunder by reason of (i) the failure of Lender to comply with any request of Borrower, any Guarantor or any Indemnitor to take any action to foreclose this Security Instrument or otherwise enforce any of the provisions hereof or of the Note or the Other Security Documents, (ii) the release, regardless of consideration, of the whole or any part of the Property, or of any person liable for the Debt or any portion thereof, or (iii) any agreement or stipulation by Lender extending the time of payment, changing the rate of interest, or otherwise modifying or supplementing the terms of the Note, this Security Instrument or the Other Security Documents.

(b)   It is agreed that the risk of loss or damage to the Property is on Borrower, and Lender shall have no liability whatsoever for decline in value of the Property, for failure to maintain the Policies, or for failure to determine whether insurance in force is adequate as to the amount of risks insured. Possession by Lender shall not be deemed an election of judicial relief, if any such possession is requested or obtained, with respect to any Property or collateral not in Lender's possession.

(c)   Lender may resort for the payment of the Debt to any other security held by or guaranties given to Lender in such order and manner as Lender, in its discretion, may elect. Lender may take action to recover the Debt, or any portion thereof, or to enforce any covenant hereof without prejudice to the right of Lender thereafter to foreclose this Security Instrument. The rights of Lender under this Security Instrument shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others. No act of Lender shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision. Lender shall not be limited exclusively to the rights and remedies herein stated but shall be entitled to every right and remedy now or hereafter afforded at law or in equity.

Section 9.8.      RIGHT TO RELEASE ANY PORTION OF THE PROPERTY. Lender may release any portion of the Property for such consideration as Lender may require without, as to the remainder of the Property, in any way impairing or affecting the lien or priority of this Security Instrument, or improving the position of any subordinate lienholder with respect thereto, except to the extent that the obligations hereunder shall have been reduced by the actual monetary consideration, if any, received by Lender for such release, and may accept by assignment, pledge or otherwise any other property in place thereof as Lender may require without being accountable for so doing to any other lienholder. This Security Instrument shall continue as a lien and security interest in the remaining portion of the Property.

Section 9.9.      VIOLATION OF LAWS. If the Property is not in compliance with Applicable Laws, Lender may impose additional requirements upon Borrower in connection herewith including, without limitation, monetary reserves or financial equivalents.

Section 9.10.      RIGHT OF ENTRY. Lender and its agents shall have the right to enter and inspect the Property at all reasonable times.

Section 9.11.      SUBROGATION. If any or all of the proceeds of the Note have been used to extinguish, extend or renew any indebtedness heretofore existing against the Property, then, to the extent of the funds so used, Lender shall be subrogated to all of the rights, claims, liens, titles, and interests existing against the Property heretofore held by, or in favor of, the holder of such indebtedness and such former rights, claims, liens, titles, and interests, if any, are not waived but rather are continued in full force and effect in favor of Lender and are merged with the lien and security interest created herein as cumulative security for the repayment of the Debt, the performance and discharge of Borrower's obligations hereunder, under the Note and the Other Security Documents and the performance and discharge of the Other Obligations.

## ARTICLE 10. - ENVIRONMENTAL HAZARDS

Section 10.1.      ENVIRONMENTAL DEFINITIONS. For the purpose of this Section, "Environmental Law" means any present and future federal, state and local laws, statutes, ordinances, rules, regulations, standards, policies and other government directives or requirements, as well as common law, including but not limited to the Comprehensive Environmental Response, Compensation and Liability Act and the Resource Conservation and Recovery Act, that apply to Borrower or the Property and relate to Hazardous Materials. "Environmental Liens" means all Liens and other encumbrances imposed pursuant to any Environmental Law, whether due to any act or omission of Borrower or any other person or entity. "Environmental Report" means the written reports resulting from the environmental site assessments of the Property delivered to Lender. "Hazardous Materials" shall mean petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives, flammable materials; radioactive materials; polychlorinated biphenyls ("PCBs") and compounds containing them; lead and lead-based paint; asbestos or

20

271

asbestos-containing materials in any form that is or could become friable; underground or above-ground storage tanks, whether empty or containing any substance; any substance the presence of which on the Property is prohibited by any federal, state or local authority; any substance that requires special handling; and any other material or substance now or in the future defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," or "pollutant" within the meaning of any Environmental Law. "Release" of any Hazardous Materials includes but is not limited to any release, deposit, discharge, emission, leaking, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing or other movement of Hazardous Materials.

Section 10.2.          ENVIRONMENTAL REPRESENTATIONS AND WARRANTIES. Borrower represents and warrants that: (a) there are no Hazardous Materials or underground storage tanks in, on, or under the Property, except those that are both (i) in compliance with Environmental Laws and with permits issued pursuant thereto (if such permits are required), if any, and (ii) either (A) in amounts not in excess of that necessary to operate the Property or (B) fully disclosed to and approved by Lender in writing pursuant to an Environmental Report; (b) there are no past, present or threatened (defined below) Release of Hazardous Materials in violation of any Environmental Law and which would require remediation by a governmental authority in, on, under or from the Property except as described in the Environmental Report; (c) there is no threat of any Release of Hazardous Materials migrating to the Property except as described in the Environmental Report; (d) there is no past or present non-compliance with Environmental Laws, or with permits issued pursuant thereto, in connection with the Property except as described in the Environmental Report; (e) Borrower does not know of, and has not received, any written or oral notice or other communication from any person or entity (including but not limited to a governmental entity) relating to Hazardous Materials in, on, under or from the Property; and (f) Borrower has truthfully and fully provided to Lender, in writing, any and all information relating to environmental conditions in, on, under or from the Property known to Borrower or contained in Borrower's files and records, including but not limited to any reports relating to Hazardous Materials in, on, under or migrating to or from the Property and/or to the environmental condition of the Property.

Section 10.3.          ENVIRONMENTAL COVENANTS. Borrower covenants and agrees that so long as Borrower owns, manages, is in possession of, or otherwise controls the operation of the Property: (a) all uses and operations on or of the Property, whether by Borrower or any other person or entity, shall be in compliance with all Environmental Laws and permits issued pursuant thereto; (b) there shall be no Releases of Hazardous Materials in, on, under or from the Property; (c) there shall be no Hazardous Materials in, on, or under the Property, except those that are both (i) in compliance with all Environmental Laws and with permits issued pursuant thereto, if and to the extent required, and (ii) (A) in amounts not in excess of that necessary to operate the Property or (B) fully disclosed to and approved by Lender in writing; (d) Borrower shall keep the Property free and clear of all Environmental Liens; (e) Borrower shall, at its sole cost and expense, fully and expeditiously cooperate in all activities pursuant to this Section, including but not limited to providing all relevant information and making knowledgeable persons available for interviews; (f) Borrower shall, at its sole cost and expense, perform any environmental site assessment or other investigation of environmental conditions in connection with the Property, pursuant to any reasonable written request of Lender, upon Lender's reasonable belief that the Property is not in full compliance with all Environmental Laws, and share with Lender the reports and other results thereof, and Lender and other Indemnified Parties (hereinafter defined) shall be entitled to rely on such reports and other results thereof; (g) Borrower shall, at its sole cost and expense, comply with all reasonable written requests of Lender to (i) reasonably effectuate remediation of any Hazardous Materials in, on, under or from the Property; and (ii) comply with any Environmental Law; (h) Borrower shall not allow any tenant or other user of the Property to violate any Environmental Law; and (i) Borrower shall immediately notify Lender in writing after it has become aware of (A) any presence or Release or threatened Releases of Hazardous Materials in, on, under, from or migrating towards the Property; (B) any non-compliance with any Environmental Laws related in any way to the Property; (C) any actual or potential Environmental Lien; (D) any required or proposed remediation of environmental conditions relating to the Property; or (E) any written or oral notice or other communication of which Borrower becomes aware from any source whatsoever (including but not limited to a governmental entity) relating in any way to Hazardous Materials. Any failure of Borrower to perform its obligations pursuant to this Section 10.3 shall constitute bad faith waste with respect to the Property.

Section 10.4.          LENDER'S RIGHTS. Lender and any other person or entity designated by Lender, including but not limited to any representative of a governmental entity, and any environmental consultant, and any receiver appointed by any court of competent jurisdiction, shall have the right, but not the obligation, to enter upon the Property at all reasonable times to assess any and all aspects of the environmental condition of the Property and its use, including but not limited to conducting any environmental assessment or audit at Borrower's expense (the scope of which shall be determined in Lender's sole discretion) and taking samples of soil, groundwater or other water, air, or building materials, and conducting other invasive testing. Borrower shall cooperate with and provide access to Lender and any such person or entity designated by Lender.

21

Section 10.5.    OPERATIONS AND MAINTENANCE PROGRAMS.  If recommended by the Environmental Report or any other environmental assessment or audit of the Property, Borrower shall establish and comply with an operations and maintenance program with respect to the Property, in form and substance reasonably acceptable to Lender, prepared by an environmental consultant reasonably acceptable to Lender, which program shall address any asbestos containing material or lead based paint that may now or in the future be detected at or on the Property. Without limiting the generality of the preceding sentence, Lender may require (a) periodic notices or reports to Lender in form, substance and at such intervals as Lender may specify, (b) an amendment to such operations and maintenance program to address changing circumstances, laws or other matters, (c) at Borrower's sole expense, supplemental examination of the Property by consultants specified by Lender, (d) access to the Property by Lender, its agents or servicer, to review and assess the environmental condition of the Property and Borrower's compliance with any operations and maintenance program, and (e) variation of the operations and maintenance program in response to the reports provided by any such consultants.

## ARTICLE 11. - INDEMNIFICATION

Section 11.1.    GENERAL INDEMNIFICATION.  Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties (defined below) from and against any and all Losses (defined below) imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any one or more of the following (a) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (b) any use, nonuse or condition in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (c) performance of any labor or services or the furnishing of any materials or other property in respect of the Property or any part thereof; (d) any failure of the Property to be in compliance with any Applicable Laws; (e) any and all claims and demands whatsoever which may be asserted against Lender by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants, or agreements contained in any Lease; (f) Borrower's breach of any term, covenant, condition, representation or warranty contained herein; or (g) the payment of any commission, charge or brokerage fee to anyone which may be payable in connection with the funding of the Loan evidenced by the Note and secured by this Security Instrument. Any amounts payable to Lender by reason of the application of this Section shall become immediately due and payable and shall bear interest at the Default Rate from the date loss or damage is sustained by Lender until paid. The term "Losses" shall mean any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, fines, penalties, charges, fees, judgments, awards, amounts paid in settlement of whatever kind or nature (including but not limited to attorneys' fees and other costs of defense). The term "Indemnified Parties" shall mean (a) Lender, (b) any prior owner or holder of the Note, (c) any servicer or prior servicer of the Loan, (d) any Investor (defined below) or any prior Investor in any Participations (defined below), (e) any trustees, custodians or other fiduciaries who hold or who have held a full or partial interest in the Loan for the benefit of any Investor or other third party, (f) any receiver or other fiduciary appointed in a foreclosure or other Creditors Rights Laws proceeding, (g) any officers, directors, shareholders, partners, members, employees, agents, servants, representatives, contractors, subcontractors, affiliates or subsidiaries of any and all of the foregoing, and (h) the heirs, legal representatives, successors and assigns of any and all of the foregoing (including, without limitation, any successors by merger, consolidation or acquisition of all or a substantial portion of the Indemnified Parties' assets and business), in all cases whether during the term of the Loan or as part of or following a foreclosure of the Loan.

Section 11.2.    MORTGAGE, DOCUMENTARY STAMPS AND/OR INTANGIBLE TAX.  Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any tax or fee on the making and/or recording of this Security Instrument, the Note or any of the Other Security Documents.

Section 11.3.    DUTY TO DEFEND; ATTORNEYS' FEES AND OTHER FEES AND EXPENSES.  Upon written request by any Indemnified Party, Borrower shall defend such Indemnified Party (if requested by any Indemnified Party, in the name of the Indemnified Party) by attorneys and other professionals approved by the Indemnified Parties. Notwithstanding the foregoing, any Indemnified Parties may, in their sole discretion, engage their own attorneys and other professionals to defend or assist them, and, at the option of Indemnified Parties, their attorneys shall control the resolution of any claim or proceeding. Upon demand, Borrower shall pay or, in the sole discretion of the Indemnified Parties, reimburse, the Indemnified Parties for the payment of reasonable fees and disbursements of attorneys, engineers, environmental consultants, laboratories, surveyors, title searches and other professionals in connection therewith, which any Indemnified Parties may engage as a result of any Losses.

Section 11.4.    ENVIRONMENTAL INDEMNITY.  As between Borrower and Lender, all risk of loss

22

associated with non-compliance with Environmental Laws, or with the presence of any Hazardous Material at, upon, within, contiguous to or otherwise affecting the Property, shall lie solely with Borrower. Accordingly, Borrower shall bear all risks and costs associated with any loss (including any loss in value attributable to Hazardous Materials), damage or liability therefrom, including all costs of removal of Hazardous Materials or other remediation required by Lender or by law. Borrower shall indemnify, defend and hold Lender harmless from and against all loss, liabilities, damages, claims, costs and expenses (including reasonable costs of defense) arising out of or associated, in any way, with the non-compliance with Environmental Laws, or the existence of Hazardous Materials in, on, or about the Property, or a breach of any representation, warranty or covenant contained in Article 10 hereof, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute or common law, including those arising from the joint, concurrent, or comparative negligence of Lender; however, Borrower shall not be liable under such indemnification to the extent such loss, liability, damage, claim, cost or expense results solely from Lender's gross negligence or willful misconduct. Borrower's obligations hereunder shall arise upon the discovery of the presence of any Hazardous Material, whether or not any governmental authority has taken or threatened any action in connection with the presence of any Hazardous Material, and whether or not the existence of any such Hazardous Material or potential liability on account thereof is disclosed in any site assessment and shall continue notwithstanding the repayment of the Note or any transfer or sale of any right, title and interest in the Property (by foreclosure, deed in lieu of foreclosure or otherwise). Of even date herewith, Borrower and other persons or entities (collectively, Borrower and such other parties, the "Indemnitors") may as circumstances require execute and deliver a certain environmental indemnity agreement in favor of the Lender incorporating the environmental indemnities set forth herein as well as additional provisions and requirements with respect to environmental matters (the "Environmental Indemnity"). In the event an Environmental Indemnity is executed, it shall be included in the definition of "Other Security Documents".

## ARTICLE 12. - WAIVERS

**Section 12.1.** WAIVER OF COUNTERCLAIM. Borrower hereby waives the right to assert a counterclaim, other than a mandatory or compulsory counterclaim, in any action or proceeding brought against it by Lender arising out of or in any way connected with this Security Instrument, the Note, any of the Other Security Documents, or the Obligations.

**Section 12.2.** MARSHALLING AND OTHER MATTERS. Borrower hereby waives, to the extent permitted by law, the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale hereunder of the Property or any part thereof or any interest therein. Further, Borrower hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of this Security Instrument on behalf of Borrower, and on behalf of each and every person acquiring any interest in or title to the Property subsequent to the date of this Security Instrument and on behalf of all persons to the extent permitted by applicable state or federal law.

**Section 12.3.** WAIVER OF NOTICE. Borrower shall not be entitled to any notices of any nature whatsoever from Lender except (a) with respect to matters for which this Security Instrument specifically and expressly provides for the giving of notice by Lender to Borrower and (b) with respect to matters for which Lender is required by applicable state or federal law to give notice, and Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Security Instrument does not specifically and expressly provide for the giving of notice by Lender to Borrower.

**Section 12.4.** WAIVER OF STATUTE OF LIMITATIONS. Borrower hereby expressly waives and releases to the fullest extent permitted by law, the pleading of any statute of limitations as a defense to payment of the Debt or performance of its Other Obligations.

**Section 12.5.** SOLE DISCRETION OF LENDER. Wherever pursuant to this Security Instrument (a) Lender exercises any right given to it to approve or disapprove, (b) any arrangement or term is to be satisfactory to Lender, or (c) any other decision or determination is to be made by Lender, the decision to approve or disapprove all decisions that arrangements or terms are satisfactory or not satisfactory, and all other decisions and determinations made by Lender, shall be in the sole discretion of Lender, except as may be otherwise expressly and specifically provided herein.

**Section 12.6.** WAIVER OF FORECLOSURE DEFENSE. Borrower hereby waives any defense Borrower might assert or have by reason of Lender's failure to make any tenant or lessee of the Property a party defendant in any foreclosure proceeding or action instituted by Lender.

23

6.B.   GB

## ARTICLE 13. - NOTICES

Section 13.1.        NOTICES. All notices or other written communications hereunder shall be deemed to have been properly given (a) upon delivery, if delivered in person with receipt acknowledged by the recipient thereof, (b) one (1) Business Day (defined below) after having been deposited for overnight delivery with any reputable overnight courier service, or (c) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, addressed to Borrower or Lender, as the case may be, at the addresses set forth on the first page of this Security Instrument or addressed as such party may from time to time designate by written notice to the other parties.

Either party by notice to the other may designate additional or different addresses for subsequent notices or communications. For purposes of this Subsection, "Business Day" shall mean a day on which commercial banks are not authorized or required by law to close in New York, New York.

## ARTICLE 14. - CHOICE OF LAW

Section 14.1.        CHOICE OF LAW. This Security Instrument and any determination of deficiency judgments shall be governed, construed, applied and enforced in accordance with the laws of the state in which the Property is located and applicable federal law.

Section 14.2.        PROVISIONS SUBJECT TO LAW. All rights, powers and remedies provided in this Security Instrument may be exercised only to the extent that the exercise thereof does not violate any applicable state or federal law and are intended to be limited to the extent necessary so that they will not render this Security Instrument invalid, unenforceable or not entitled to be recorded, registered or filed under any applicable state or federal law.

## ARTICLE 15. - SECONDARY MARKET

Section 15.1.        TRANSFER OF LOAN. Lender may, at any time, sell, transfer or assign the Note, this Security Instrument and the Other Security Documents, and any or all servicing rights with respect thereto, or grant participations therein (the "Participations") or issue mortgage passthrough certificates or other securities evidencing a beneficial interest in a rated or unrated public offering or private placement (the "Securities"). Lender may forward to each purchaser, transferee, assignee, servicer, participant, or investor in such Participations or Securities (collectively, the "Investor") or any Rating Agency rating such Securities, each prospective Investor, and any organization maintaining databases on the underwriting and performance of commercial mortgage loans, all documents and information which Lender now has or may hereafter acquire relating to the Debt and to Borrower, any Guarantor, any Indemnitor(s) and the Property, whether furnished by Borrower, any Guarantor, any Indemnitor(s) or otherwise, as Lender determines necessary or desirable. Borrower irrevocably waives any and all rights it may have under applicable state or federal law to prohibit such disclosure, including but not limited to any right of privacy.

Section 15.2.        COOPERATION. Borrower, any Guarantor and any Indemnitor agree to cooperate with Lender in connection with any transfer made pursuant to this Section, including, without limitation, the delivery of an estoppel certificate required pursuant to the terms hereof and such other documents as may be reasonably requested by Lender. Borrower shall also furnish and Borrower, any Guarantor and any Indemnitor consent to Lender furnishing to such Investors or such prospective Investors or such Rating Agency any and all information concerning the Property, the Leases, the financial condition of Borrower, any Guarantor and any Indemnitor as may be requested by Lender, any Investor or any prospective Investor or any Rating Agency in connection with any sale, transfer or Participations or Securities.

## ARTICLE 16. - COSTS

Section 16.1.        PERFORMANCE AT BORROWER'S EXPENSE. Borrower acknowledges and confirms that Lender shall impose certain administrative processing and/or commitment fees in connection with (a) the extension, renewal, modification, amendment and termination of the Loan, (b) the release or substitution of collateral therefor, (c) obtaining certain consents, waivers and approvals with respect to the Property, or (d) the review of any Lease or proposed Lease or the preparation or review of any subordination, non-disturbance agreement (the occurrence of any of the above

24

shall be called an "Event"). Borrower further acknowledges and confirms that it shall be responsible for the payment of all costs of reappraisal of the Property or any part thereof, whether required by law, regulation, Lender or any governmental or quasi-governmental authority. Borrower hereby acknowledges and agrees to pay, immediately, with or without demand, all such fees (as the same may be increased or decreased from time to time), and any additional fees of a similar type or nature which may be imposed by Lender from time to time, upon the occurrence of any Event or otherwise. Wherever it is provided for herein that Borrower pay any costs and expenses, such costs and expenses shall include, but not be limited to, all reasonable counsel fees of Lender.

Section 16.2.        COUNSEL FEES FOR ENFORCEMENT. (a) Borrower shall pay all reasonable counsel fees incurred by Lender in connection with (i) the preparation of the Note, this Security Instrument and the Other Security Documents; and (ii) the items set forth in this Article, and (b) Borrower shall pay to Lender on demand any and all expenses, including legal fees incurred or paid by Lender in protecting its interest in the Property or in collecting any amount payable under the Note, this Security Instrument or the Other Security Documents, or in enforcing its rights hereunder with respect to the Property, whether or not any legal proceeding is commenced hereunder or thereunder, together with interest thereon at the Default Rate from the date paid or incurred by Lender until such expenses are paid by Borrower.

## ARTICLE 17. - DEFINITIONS

Section 17.1.        GENERAL DEFINITIONS. Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Security Instrument may be used interchangeably in singular or plural form and the word "Borrower" shall mean "each Borrower and any subsequent owner or owners of the Property or any part thereof or any interest therein," the word "Lender" shall mean "Lender and any subsequent holder of the Note," the word "Note" shall mean "the Note and any other evidence of indebtedness secured by this Security Instrument," the word "person" shall include an individual, corporation, limited liability company, partnership, trust, unincorporated association, government, governmental authority, and any other entity, the word "Property" shall include any portion of the Property and any interest therein, and the phrases "counsel fees" shall include any and all attorneys", paralegal and law clerk fees and disbursements, including, but not limited to fees and disbursements at the pre-trial, trial and appellate levels incurred or paid by Lender in protecting its interest in the Property, the Leases and the Rents and enforcing its rights hereunder, whether with respect to retained firms, the reimbursement for the expenses of in-house staff or otherwise.

Section 17.2.        HEADINGS, ETC. The headings and captions of various Articles and Sections of this Security Instrument are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

## ARTICLE 18. - MISCELLANEOUS PROVISIONS

Section 18.1.        NO ORAL CHANGE. This Security Instrument, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

Section 18.2.        LIABILITY. If Borrower consists of more than one person, the obligations and liabilities of each such person hereunder shall be joint and several. This Security Instrument shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors, assigns, heirs, personal representatives, executors and administrators forever.

Section 18.3.        INAPPLICABLE PROVISIONS. If any term, covenant or condition of the Note or this Security Instrument is held to be invalid, illegal or unenforceable in any respect, the Note and this Security Instrument shall be construed without such provision.

Section 18.4.        DUPLICATE ORIGINALS; COUNTERPARTS. This Security Instrument may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original. This Security Instrument may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Security Instrument. The failure of any party hereto to execute this

· 25

G.B.        13

Security Instrument, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

Section 18.5.        NUMBER AND GENDER.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

Section 18.6.        LEGAL DESCRIPTION.  Borrower represents to Lender that it has reviewed and delivered to Lender a copy of the legal description set forth in Exhibit "A"; that such legal description is the accurate and proper legal description of the Land; and Borrower further acknowledges that neither Lender nor Lender's counsel prepared or reviewed such legal description.  Borrower shall indemnify, defend and hold Lender harmless from and against any and all losses, liabilities, claims, damages, expenses, obligations, penalties, actions, judgments, suits, costs or disbursements of any kind or nature whatsoever, including the reasonable fees and actual expenses of Lender's counsel, in connection with any claim that title to the Property is impaired due to or based upon an inaccurate or improper legal description set forth herein.

Section 18.7.        INCONSISTENCIES.  In the event of any inconsistencies between the terms and conditions of this Article and the other provisions of this Security Instrument, the terms and conditions of this Article shall control and be binding.

Section 18.8.        WAIVER OF TRIAL BY JURY.  BORROWER BY ACCEPTANCE OF THIS SECURITY INSTRUMENT, HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THE LOAN, THE APPLICATION FOR THE LOAN, THE NOTE, THIS SECURITY INSTRUMENT OR THE OTHER SECURITY DOCUMENTS OR ANY ACTS OR OMISSIONS OF LENDER OR BORROWER.

[NO FURTHER TEXT - SIGNATURES APPEAR ON NEXT PAGE]

26

**IN WITNESS WHEREOF,** this Security Instrument has been executed by borrower the day and year first above written.

Signed, sealed and delivered
in the presence of:

Print Name:_____

Print Name:_____

Borrower(s):

Gabriel Bravo

Signed, sealed and delivered
in the presence of:

Print Name:_____

Print Name:_____

Borrower(s):

Guadalupe Bravo

This Instrument prepared by:
Upon recording return to:

Antonio Chimienti, Esq.
Bayview Loan Servicing
4425 Ponce de Leon Blvd., 5th Fl.
Coral Gables, Florida 33146
Attention: Collateral Department

27

ACKNOWLEDGMENT

COMMONWEALTH OF        )
PENNSYLVANIA             ss.:
COUNTY OF *Philadelphia*    )

The foregoing instrument was acknowledged before me on January 31, 2006 by Gabriel Bravo and Guadalupe Bravo. He/she is personally known to me or produced _____ as identification, and did/did not take an oath.

[Official Notary Seal]

Notary Public, Commonwealth of Pennsylvania
Print or Type Name: _____
My Commission Expires: _____

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
WENDY FALLON KERSCH, Notary Public
Upper Southampton Twp., Bucks County
My Commission Expires June 14, 2009

28

JAN. 19. 2006  3:57PM   C  ZENS  ABSTRACT                                    NO. 2034   P. 6

 **OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY**

### SCHEDULE C
### Legal Description

File Number:

ALL THAT CERTAIN LOT OR PIECE OF GROUND WITH THE BUILDINGS AND IMPROVEMENTS THEREON ERECTED, DESCRIBED ACCORDING TO A SURVEY THEREOF MADE BY BEN H. JOSEPH, SURVEYOR AND REGULATOR OF THE SECOND DISTRICT ON NOVEMBER 18, 1948, AS FOLLOWS, TO WIT:

SITUATE ON THE WEST SIDE OF NINTH STREET AT THE DISTANCE OF ONE HUNDRED FIFTY-THREE FEET TWO INCHES (153'2') NORTHWARD FROM THE NORTH SIDE OF ELLSWORTH STREET IN SAID WARD AND CITY, THENCE EXTENDING NORTH SEVENTY-EIGHT DEGREES ONE MINUTE, FORTY-TWO SECONDS WEST FIFTY TWO FEET (N. 78 DEGREES 1' 42" W 52') TO A POINT, THENCE NORTH ELEVEN DEGREES, SEVENTEEN MINUTES, EIGHTEEN SECONDS EAST ON A LINE PARALLEL WITH SAID NINTH STREET FOURTEEN FEET SIX AND FIVE-EIGHTHS INCHES (N 11 DEGREES 17' 19" E 14' 6-5/8") TO A POINT, TGEBCE SOUTH SEVENTY-SEVEN DEGREES, THIRTY MINUTES FORTY-TWO SECONDS EAST FIFTY-TWO FEET, ONE-EIGHTH OF AN INCH (S 77 DEGREES 30' 42" E 52' 0-1/8") TO THE WEST SIDE OF NINTH STREET, THENCE SOUTH ELEVEN DEGREES, SEVENTEEN MINUTES, EIGHTEEN SECONDS WEST ALONG THE SAID NINTH STREET FOURTEEN FEET ONE INCH (S 11 DEGREES 17' 18" W 14' 1") TO THE POINT AND PLACE OF BEGINNING.

BEING NO. 1122 SOUTH 9TH STREET.

BEING THE SAME PROPERTY CONVEYED UNTO GABRIEL BRAVO AND GUADALUPE BRAVO BY DEED FROM VINCENT ALESTRA DATED JUNE 6, 2005 AND RECORDED JUNE 13, 2005 AMONG THE DEED BOOKS OF PHILADELPHIA COUNTY, PA IN DOCUMENT ID 51198158.

ALSO BEING THE SAME  PROPERTY CONVEYED UNTO VINCENT ALESTRA BY DEED FROM FRANK RAFFAELE, III, DATED JULY 7, 2003 AND RECORDED JULY 14, 2003 AMONG THE DEED BOOKS OF PHILADELPHIA COUNTY, PA IN DOCUMENT ID 50710820.

Parcel No:

## RIDER TO MORTGAGE AND SECURITY AGREEMENT
{ PENNSYLVANIA }

THIS RIDER is made January 31, 2006, and is incorporated into and shall be deemed to amend and supplement the Mortgage and Security Agreement (the "Security Instrument") of the same date hereof, given by Gabriel Bravo and Guadalupe Bravo (the "Borrower") to secure that certain Promissory Note in the amount of Seventy-One Thousand Two Hundred Fifty and No/100 Dollars ($71,250.00) (the "Note") given to InterBay Funding, LLC, a Delaware Limited Liability Company, (the "Lender"), on the same date hereof and covering the Property described in the Security Instrument and located at 1122 South 9th Street, Philadelphia, PA 19147 (the "Property Address").

In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

1. The Security Instrument is also known as an Open End Mortgage and Security Agreement.

2. The following sentence is added at the end of Section 4.5 (g): All contractors have filed a "no lien stipulation" in the Prothonotary's office in the county where the Property is located.

3. Section 9.12 CONFESSION OF JUDGMENT IN EJECTMENT is added to the Security Instrument and reads as follows: BORROWER HEREBY IRREVOCABLY AUTHORIZES AND EMPOWERS THE PROTHONOTARY, CLERK OR ANY ATTORNEY OF ANY COURT OF RECORD OF THE COMMONWEALTH OF PENNSYLVANIA OR ELSEWHERE, UPON THE OCCURRENCE OF AN EVENT OF DEFAULT, TO APPEAR FOR AND CONFESS JUDGMENT AGAINST BORROWER, AS WELL AS AGAINST ALL PERSONS CLAIMING UNDER, BY OR THROUGH BORROWER, AND IN FAVOR OF LENDER, ITS SUCCESSORS OR ASSIGNS, AS OF ANY TERM, PAST, PRESENT OR FUTURE, WITH OR WITHOUT DECLARATION, FOR POSSESSION, CONTROL OR BOTH OF THE PREMISES, IMPROVEMENTS AND BUILDING EQUIPMENT, WITHOUT THE NECESSITY OF FILING ANY BOND AND WITHOUT ANY STAY OF EXECUTION OR APPEAL. THIS INSTRUMENT, OR A COPY HEREOF VERIFIED BY AFFIDAVIT, SHALL BE SUFFICIENT WARRANT THEREFOR: WHEREUPON, APPROPRIATE PROCESS TO OBTAIN POSSESSION, CONTROL OR BOTH OF THE PREMISES, IMPROVEMENTS AND BUILDING EQUIPMENT, INCLUDING LEVY AND EXECUTION, MAY BE ISSUED FORTHWITH, WITHOUT ANY PRIOR WRIT OR PROCEEDING WHATSOEVER. BORROWER HEREBY RELEASES AND AGREES TO RELEASE LENDER AND SAID ATTORNEYS FROM ALL PROCEDURAL ERRORS AND DEFECTS WHATSOEVER IN ENTERING SUCH JUDGMENT OR JUDGMENTS OR IN CAUSING SUCH WRITS OR PROCESS TO BE ISSUED OR IN ANY PROCEEDING THEREON OR CONCERNING THE SAME, PROVIDED THAT LENDER SHALL HAVE FILED IN SUCH ACTION OR ACTIONS AN AFFIDAVIT OR AFFIDAVITS MADE BY SOMEONE ON LENDER'S BEHALF SETTING FORTH THE FACTS NECESSARY TO AUTHORIZE THE ENTRY OF SUCH JUDGMENT OR JUDGMENTS ACCORDING TO THE TERMS OF THIS INSTRUMENT, OF WHICH FACTS SUCH AFFIDAVIT OR AFFIDAVITS SHALL BE PRIMA FACIE EVIDENCE. IT IS HEREBY EXPRESSLY AGREED THAT IF FOR ANY REASON AFTER ANY SUCH ACTION OR ACTIONS HAVE BEEN COMMENCED THE SAME SHALL BE DISCONTINUED, MARKED SATISFIED OF RECORD OR BE TERMINATED, OR POSSESSION OF THE PREMISES, IMPROVEMENTS OR BUILDING EQUIPMENT REMAINS IN OR IS RESTORED TO BORROWER OR ANYONE CLAIMING



1

-B

UNDER, BY OR THROUGH BORROWER, LENDER MAY, WHENEVER AND AS OFTEN AS LENDER SHALL HAVE THE RIGHT TO AGAIN TAKE POSSESSION OF THE PREMISES, IMPROVEMENTS AND BUILDING EQUIPMENT, BRING ONE OR MORE FURTHER CONFESSIONS IN THE MANNER SET FORTH HEREIN TO RECOVER POSSESSION OF THE PREMISES, IMPROVEMENTS AND BUILDING EQUIPMENT. THE AUTHORITY AND POWER ABOVE GIVEN SHALL CONTINUE FROM TIME TO TIME AND AT ALL TIMES UNTIL FINAL PAYMENT IN FULL OF ALL SECURED INDEBTEDNESS.

4.   Article 19 Special Pennsylvania Provisions is added to the Security Instrument and reads as follows:

FUTURE ADVANCES: The Security Instrument secures such future or additional advances (in addition to the principal amount of the Note) as may be made by Lender or the holder hereof, at its exclusive option, to Borrower or its successors or assigns in title, for any purpose, provided that all such advances are made within 20 years from the date of the Security Instrument or within such lesser period of time as may be provided by law as a prerequisite for the sufficiency of actual notice or record notice of such optional future or additional advances as against the rights of creditors or subsequent purchasers for valuable consideration to the same extent as if such future or additional advances were made on the date of the execution of the Security Instrument. The total amount of indebtedness secured by the Security Instrument may be increased or decreased from time to time, but the total unpaid balance so secured at any one time shall not exceed a maximum principal amount equal to two times the amount first set forth in the Security Instrument, plus interest thereon and any disbursements made under the Security Instrument for the payment of impositions, taxes, assessments, levies, insurance, or otherwise with interest on such disbursements. It is the intent of the parties that the Security Instrument shall secure the payment of the Note and any additional advances made from time to time pursuant to any additional promissory notes or otherwise contemplated under the Loan Documents, all of said indebtedness being equally secured hereby and having the same priority as any amounts advanced as of the date of the Security Instrument. It is agreed that any additional sum or sums advanced by Lender shall be equally secured with, and have the same priority as, the original indebtedness evidenced by the Note and shall be subject to all of the terms, provisions and conditions of the Security Instrument, whether or not such additional loans or advances are evidenced by other promissory notes of Borrower and whether or not identified by a recital that it or they are secured by the Security Instrument. It is further agreed that any additional promissory note or promissory notes executed and delivered pursuant to this paragraph shall automatically be deemed to be included in the term "Note" wherever it appears in the context of the Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Rider to Pennsylvania Mortgage and Security Agreement and agrees that the terms hereof are hereby incorporated into and with the terms of the Security Instrument as if both the Security Instrument and this instrument are one and the same document. Nothing contained herein shall invalidate or change any terms of the Security Instrument except to the extent as maybe explicitly set forth herein.

Signed, sealed and delivered
in the presence of:                                    Borrower(s):

2

282

Print Name: _Gabriel Bravo_

_[signature]_
Gabriel Bravo

Print Name: _____

Signed, sealed and delivered
in the presence of:                                    Borrower(s):

_Guadalupe Bravo_                          _[signature] Guadalupe Bravo_
Print Name: _____        Guadalupe Bravo

_Guadalupe Bravo_
Print Name: _____

3

_J.B_

283

ACKNOWLEDGMENT

COMMONWEALTH OF        )
PENNSYLVANIA             ss.:
COUNTY OF _Philadelphia_     )

The foregoing instrument was acknowledged before me on January 31, 2006 by Gabriel Bravo and
Guadalupe Bravo. He/she is personally known to me or produced
_____lvc._____ as identification, and did/did not take an oath.

[Official Notary Seal]

Notary Public, Commonwealth of Pennsylvania
Print or Type Name: _Wendy Fallon Kersch_
My Commission Expires: _____

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
WENDY FALLON KERSCH, Notary Public
Upper Southampton Twp., Bucks County
My Commission Expires June 14, 2009

4

Assignment 1

**51637499**
**Page: 1 of 4**
02/22/2007 04.06PM

Assignor Ln#:

This Document Recorded
02/22/2007
04:06PM
Doc Code: A    Commissioner of Records, City of Philadelphia

Doc Id: 51637499
Receipt #: 576709
Rec Fee: 124.50

Page 1

## ASSIGNMENT OF MORTGAGE

**FOR GOOD AND VALUABLE CONSIDERATION,** the sufficiency of which
is hereby acknowledged, the undersigned,
**INTERBAY FUNDING, LLC, A DELAWARE LIMITED LIABILITY COMPANY,**
WHOSE ADDRESS IS 4425 PONCE DE LEON BLVD., 4TH FL , CORAL
GABLES, FL 33146, (ASSIGNOR),
by these presents does convey, grant, sell, assign, transfer and
set over the described mortgage together with the certain note(s)
described therein together with all interest secured thereby, all
liens, and any rights due or to become due thereon to
**BAYVIEW LOAN SERVICING, LLC, A DELAWARE LIMITED LIABILITY**
COMPANY, WHOSE ADDRESS IS 4425 PONCE DE LEON BLVD., 5TH FL ,
CORAL GABLES, FL 33146, ITS SUCCESSORS OR ASSIGNS, (ASSIGNEE).
Said mortgage dated 01/31/2006  in the amount of $71,250.00
 made by
**GABRIEL BRAVO AND GUADALUPE BRAVO**
to **INTERBAY FUNDING, LLC**
recorded on 02/17/2006 , in the Office of the Recorder of Deeds
of PHILADELPHIA  County, Pennsylvania, in Book  ,
Page   (or Document No. 51382000 )

Mortgage Premise: 1122 S. 9TH STREET
                  PHIALEDELPHIA, PA 19147

In Witness whereof, the said Corporation has caused this
instrument
to be executed in its corporate name by ROBERT G. HALL  its VICE
PRESIDENT
and authorized signer,
THIS 30TH DAY OF AUGUST IN THE YEAR 2006
**INTERBAY FUNDING, LLC**

BY:
    ROBERT G. HALL
    VICE PRESIDENT

(onn5/FRMPH1

285

Assignor Ln#:

ASSIGNMENT OF MORTGAGE                              Page 2

STATE OF FLORIDA                    COUNTY OF Dade
On 08/30/2006 , before me, Jason James (#DD428371)  the
Undersigned, Notary Public, personally appeared ROBERT G. HALL ,
who acknowledged him/herself to be the VICE PRESIDENT  of
INTERBAY FUNDING, LLC  a corporation, and that s/he as such,
being authorized so to do, executed the foregoing instrument for
the purposes therein contained, by signing the name of the
corporation by themselves as such corporate officers.
IN WITNESS WHEREOF, I hereunto set my hand and official seal.

JASON JAMES
NOTARY PUBLIC - STATE OF FLORIDA
Commission # 1
Expires: MAY 11, 2009

Jason James (#1
My commission expires: 05/11/2009

    I _____, do certify that the address of the above assignee is:
    BAYVIEW LOAN SERVICING, LLC, A DELAWARE LIMITED LIABILITY COMPANY, WHOSE
ADDRESS IS 4425 PONCE DE LEON BLVD., 5TH FL , CORAL GABLES, FL 33146, ITS SUCCESSORS OR
ASSIGNS, (ASSIGNEE).

    Prepared by:
    J. Lesinski/NTC,2100 Alt. 19 North, Palm Harbor, FL 34683 (800)346-9152
Return To:
Nationwide Title Clearing
2100 Alt. 19 North
Palm Harbor, FL 34683

Loan Number                                                    Page 3
Assignment of Mortgage from:
INTERBAY FUNDING, LLC, A DELAWARE LIMITED LIABILITY COMPANY, WHOSE
ADDRESS IS 4425 PONCE DE LEON BLVD., 4TH FL , CORAL GABLES, FL 33146,
(ASSIGNOR),
to:
BAYVIEW LOAN SERVICING, LLC, A DELAWARE LIMITED LIABILITY COMPANY,
WHOSE ADDRESS IS 4425 PONCE DE LEON BLVD., 5TH FL , CORAL GABLES, FL
33146, ITS SUCCESSORS OR ASSIGNS, (ASSIGNEE).

Mortgagor: GABRIEL BRAVO AND GUADALUPE BRAVO

When Recorded Return To:
Nationwide Title Clearing
2100 Alt. 19 North
Palm Harbor, FL 34683

All that certain lot or piece of ground situated in
Mortgage Premise: 1122 S. 9TH STREET
                  PHILAEDELPHIA, PA 19147
PHILADELPHIA
(Borough or Township, if stated), Commonwealth of Pennsylvania.
Being more particularly described in said mortgage.


SEE ATTACHED EXHIBIT A

form5/FRMPH1

287

**Legal Description**

ALL THAT CERTAIN LOT OR PIECE OF GROUND WITH THE BUILDINGS AND IMPROVEMENTS THEREON ERECTED, DESCRIBED ACCORDING TO A SURVEY THEREOF MADE BY BEN H. JOSEPH, SURVEYOR AND REGULATOR OF THE SECOND DISTRICT ON NOVEMBER 18, 1946, AS FOLLOWS, TO WIT:

SITUATE ON THE WEST SIDE OF NINTH STREET AT THE DISTANCE OF ONE HUNDRED FIFTY-THREE FEET TWO INCHES (153'2") NORTHWARD FROM THE NORTH SIDE OF ELLSWORTH STREET IN SAID WARD AND CITY, THENCE EXTENDING NORTH SEVENTY-EIGHT DEGREES ONE MINUTE, FORTY-TWO SECONDS WEST FIFTY TWO FEET (N. 78 DEGREES 1' 42" W 52') TO A POINT, THENCE NORTH ELEVEN DEGREES, SEVENTEEN MINUTES, EIGHTEEN SECONDS EAST ON A LINE PARALLEL WITH SAID NINTH STREET FOURTEEN FEET SIX AND FIVE-EIGHTHS INCHES (N 11 DEGREES 17' 19" E 14' 6-5/8") TO A POINT, TGEBCE SOUTH SEVENTY-SEVEN DEGREES, THIRTY MINUTES FORTY-TWO SECONDS EAST FIFTY-TWO FEET, ONE-EIGHTH OF AN INCH (S 77 DEGREES 30' 42" E 52' 0-1/8") TO THE WEST SIDE OF NINTH STREET, THENCE SOUTH ELEVEN DEGREES, SEVENTEEN MINUTES, EIGHTEEN SECONDS WEST ALONG THE SAID NINTH STREET FOURTEEN FEET ONE INCH (S 11 DEGREES 17' 18" W 14' 1") TO THE POINT AND PLACE OF BEGINNING.

BEING NO. 1122 SOUTH 9TH STREET.

BEING THE SAME PROPERTY CONVEYED UNTO GABRIEL BRAVO AND GUADALUPE BRAVO BY DEED FROM VINCENT ALESTRA DATED JUNE 8, 2005 AND RECORDED JUNE 13, 2005 AMONG THE DEED BOOKS OF PHILADELPHIA COUNTY, PA IN DOCUMENT ID 51198158.

ALSO BEING THE SAME  PROPERTY CONVEYED UNTO VINCENT ALESTRA BY DEED FROM FRANK RAFFAELE, III, DATED JULY 7, 2003 AND RECORDED JULY 14, 2003 AMONG THE DEED BOOKS OF PHILADELPHIA COUNTY, PA IN DOCUMENT ID 50710820.

Parcel No:

# C-27 - Receipt for Post Reassessment of Damages payment on 10-28-21



Your Requested Image

View Front & Back

Save Image                                    Print Image

Privacy Policy    Digital Banking Agreement    Accessibility    Contact Us

Copyright 2022 Santander Bank. All rights reserved. Equal Housing Lender - Member FDIC


**Santander** Business Banking | Online Banking

Your Requested Image

View Front & Back

Save Image　　　　Print Image

Privacy Policy　　Digital Banking Agreement　　Accessibility　　Contact Us

Copyright 2022 Santander Bank. All rights reserved. Equal Housing Lender - Member FDIC

## IN THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In Re: **GABRIEL BRAVO,**
**Debtor**

:     **CHAPTER 13**

:     **BANKRUPTCY NO. 21-12926**

## DEBTOR'S MEMORANDUM OF LAW IN SUPPORT OF HIS OBJECTION TO THE PROOF OF CLAIM FILED BY E-Z CASHING, LLC (CLAIM NO. 1)

The Debtor filed the instant individual chapter 13 bankruptcy case on October 28, 2021. On or about November 1, 2021, E-Z Cashing, LLC ("EZ") filed Proof of Claim No. 1 in this Case, alleging that it had a valid claim secured by the Debtor's real property at 1122 South Ninth Street, Philadelphia, PA. 19147, in the amount of $139, 800.54. On November 19, 2021, the Debtor filed an Objection to this claim, alleging that the claim should be reduced by approximately $30,000 which the Debtor paid to EZ during the course of his 2017 and 2018 bankruptcy cases subsequent to the entry of a consent judgment entered on November 16, 2015, on the obligation at issue, a Note and Mortgage of January 31, 2006, in the amount of $71,250 entered in favor of EZ's assignor and assigned to EZ.

The claim of EZ is based entirely on an Order of the Court of Common Pleas of Philadelphia County ("the CCP") of June 2, 2021 ("the CCP Order"), reassessing EZ's damages from the judgment described above in the amount of $136,865.70. The Debtor alleged that the claim must be reduced by the amount of his payments to EZ during the 2017 and 2018 bankruptcies. A Zoom trial including evidence relevant to this issue was conducted by this court on February 15, 2022. After the trial, this court directed that the parties simultaneously file briefs addressing the stay relief aspects of the case by March 1, 2022, and addressing the claim objection issues by March 18, 2022.

In the hearing, EZ's principal, Joel Weiser, testified that he received certain payments

1

from the Debtor, but he claimed that he did not know the amount.  He did admit that he had not returned nor credited any of those payments.

The Debtor testified, and supported his testimony with receipts, that he had paid at least five $720 payments during his 2017 bankruptcy case and made payments of $1288/month from October, 2018, through February, 2020, and thereafter at least four payments of $1040/month in 2020 during his 2018 bankruptcy case. He also paid $500 to EZ during this case, which Weiser did not deny was paid and must be credited.

In order to minimize the differences regarding what payments the Debtor in fact made, the Debtor forwarded a set of discovery to EZ's counsel on February 17, 2022, in which he asked EZ to specify the date and amount of all payments admittedly received, and whether any refunds had been made or credits had been given.  Although a response by March 1, 2022, was requested, there was no response provided.  As a result, the Debtor filed a Motion to Compel EZ to respond to this discovery, which is scheduled for a hearing on March 29, 2022.  The Debtor believes that this discovery will narrow the issues in determining what payments the Debtor in fact made, none of which have been credited to him. The Debtor also believes that this reaction is part of a "strategy" of counsel for EZ to refuse to make any record regarding the payments made by the Debtor which EZ refused to credit—a strategy that is more properly characterized as an unethical legal defense of refusing to give credit for payments received and retained by a creditor but not credited which this court should not countenance.

EZ presented certain documents relating to the motion which it had filed in the CCP in 2021 to reassess damages on the judgment.  In its initial Motion, EZ purported to give credit for four payments made by the Debtor to it during the 2017 bankruptcy case.  The Debtor pleaded that he had made the additional payments referenced above during the 2017 and 2018

2

bankruptcy cases in New Matter included in his Answer to the Motion to Reassess Damages. No

response was filed to that New Matter, nor has EZ ever denied that the Debtor made payments to

it during the 2017 and 2018 bankruptcy cases which was not credited to the amount claimed by

EZ. No attempt was made to explain why EZ believed that the Debtor was entitled to a credit for

a few payments in the course of the 2017 case and nothing for the much larger payments made

during the course of the 2018 bankruptcy case.

On June 2, 2021, without any accompanying opinion, the CCP entered the CCP Order

which set the reassessed damages at $136,800.54. EZ has attempted to argue that, in doing

so, the CCP intended to disregard the payments which the Debtor made to EZ during the 2017

and 2018 bankruptcy cases. This conclusion flies in the face of the universally recognized

maxim that, if a creditor is paid a certain sum by a debtor after a judgment is entered, that sum

must, at some point, be deducted from the amount due to the creditor. Cf. Heckman v. Reading

Area Water Authority, 560 B.R. 657, 686-89 (Bankr. E.D. Pa. 2016) (alleged missing payment

to creditor not established to have been credited was credited to debtor). Any contrary rule

would encourage misconduct on the part of the creditor. More significantly, the duty of candor

and honesty to the court requires the disclosure of payments actually received and retained by

EZ without crediting same to the Debtor. See Rule of Professional Conduct 3.3 Candor to the

Tribunal (b), (c) (lawyer has a continuing duty not to encourage a client to engage in fraudulent

conduct). It is submitted that refusing to admit that EZ has accepted payments and not credited

them to the Debtor is fraudulent conduct.

The question is then presented how EZ can ask this court to reach a conclusion which

allows EZ to engage in such improper conduct. And this court cannot allow it to do so if another

logical explanation for the entry of the June 2, 2021, CCP Order exists.

The Debtor submits that the only logical conclusion that can be reached is that the CCP did not consider its role in the reassessment process to be anything other than fixing the amount of the reassessed damages, and leaving the crediting of payments to the presumed good faith of the creditor to deduct what it received, or, in the absence of anticipated good faith of the creditor, requiring another determination of that amount in another CCP action or a decision by another court, such as this court, if the creditor failed to perform its duty to credit the payments made.

The Debtor submits that a careful review of the only guideposts of what the duty of the CCP in the reassessment process supports his position that the determination of the credit due to him for post-petition payments was outside the scope of the reassessment process. There is no specific guidance in the applicable Pennsylvania and local procedural Rules regarding the reassessment of damages. There are state and local Rules which address assessment of damages generally, and would appear to apply to any reassessment of damages as well.

The applicable Pennsylvania Rule of Civil Procedure ("PRCP") is PRCP 1037. That Rule appears to assume that the assessment process will typically occur in the context of a default judgment, and that the specifics of the applicable data will be provided to the court by an unopposed praecipe of the plaintiff. See PRCP 1037(a), (b). As to what is to be considered in the reassessment process, PRCP(b)(1) states that "the issues shall be limited to the amount of the damages." Nothing is said about crediting the defendant for the payments made.

The CCP has its own local rule relating to assessment of damages which is even more enlightening about the assessment (or reassessment) process. That Rule is Philadelphia County Rule of Civil Procedure ("Phila RCP") *1037. Phila RCP *1037.2 (B) provides as follows: …

> (B) In summary, the complaint and praecipe for assessment of damages
> must conform to the following format if assessment upon praecipe is sought:

4

(1) Principal amount due;

(2) Interest (rate or per diem and time period;

(3) Escrow taxes and insurance only (monthly rate)

(4) Mortgage insurance premium (monthly rate);

(5) Fees (anticipated and actual);

(6) Late charges (monthly rate and time period);

(7) Court costs (Anticipated and actual); and

(8) Other permissible costs…

EZ did not proceed by praecipe in seeking to assess damages here.  Rather, probably anticipating that its mere computation of the reassessed damages might be contested due to its attempt to ignore the dictates of In re Stendardo, 991 F.2d 1089 (3d Cir. 1992), EZ proceeded by motion, in which the CCP followed Stendardo and, on the basis of the holding of that case, reduced the amount sought by EZ. In the reassessment process, the CCP considered at least some of the various charges which are specified in Phila RCP *1037(B), and rejected EZ's entitlement to same on the basis of Stendardo.

However, conspicuous by its absence in the CCP Order , PRCP 1037, or PhilaRCP *1037 is any reference to the fact that credit must be given for payments made by the obligor.  It is submitted that this omission was not motivated by an attempt to maintain that credit should not be given for payments made.  Rather, as noted in Heckman, supra, it is clear that the process for providing credit for payments made after the judgment is to be made independently from the reassessment process.  See also, e.g. In re MDC Systems, Inc., 488 B.R. 74, 94 (Bankr. E.D. Pa. 2013) (debtor entitled to credit for payment mad after state court judgment).  Also cf. In re Giordano, 234 B.R. 645, 650-52 (Bankr. E.D. Pa. 1999) (debtor entitled to credit for payment if made after claims filed in prior case), and In re Rorie, 98 B.R. 215, 219-21 (Bankr. E.D. Pa. 1989) (creditor successfully argued that assessed judgment amount did not preclude addition of post-judgment interest to total amount of allowed total mortgage claim).

It being so that the crediting of payments is separate from the process of assessing and

296

reassessing damages, the reassessment CCP Order of June 2, 2021, is not to be considered, in

any sense, a determination of the credit to be allowed against a balance due for post-petition

payments due to a creditor who has received payments but not credited them to the payor-

obligor. Therefore, such an order is in no sense to be construed as res judicata of the issue of

payments made or the net balance due on an obligation, or to provide any collateral estoppel

effect as to the payment-crediting process. It is quite simply beyond the scope of what is

perceived as appropriate in the reassessment process.

The amount of the credits due is at least $720 times 5 or $3600 from the payments made

during the 2017 bankruptcy case. In addition, the Debtor paid $1288/month to EZ from October,

2018, through February, 2020. At that time, the pandemic arrived in Philadelphia, severely

impacting the Debtor's restaurant business income. Nevertheless, the Debtor managed to pay

$1040 in four months in 2020, prior to the dismissal of the 2018 bankruptcy case on November

5, 2020. Finally, Mr. Weiser admitted that, after the filing of this case, the Debtor paid

$500 which should be credited to his account, The Debtor is therefore entitled to a credit of at

least $30,507.

However, the impact on the balance is significantly more than the difference between

EZ's claim of $139,800.54 less the Debtor's uncredited payments of $30.507. Rightfully, the

balance due to EZ should have been reduced at each time that a payment was received.

Then, each month the interest should have been calculated on the net balance times the six (6%)

percent interest per annum. Thus far, EZ has calculated its interest at 6% of the total balance of

the November 16, 2015, judgment.

The Debtor is not prepared to engage in that calculation. He will agree to a net claim, as

of the date that the sale of 1122 South Ninth Street occurs, which should be on or before June 1,

297

2022, of approximately $136,865.70 less approximately $30,000, or $107,000. This sum results in a significant windfall to EZ. Nevertheless, in an effort to bring this matter to an equitable and swift conclusion, the Debtor requests that the Objection should be resolved by reducing EZ's claim to no more than $107,000 as of June 1, 2022, which is the latest date at which the Debtor can conceive that EZ will be paid off in full from the proceeds of the sale of 1122 North Ninth Street Philadelphia, PA. 19147, to the buyer of in the proposed sale of that property, which is also the present owner of 1124 North Ninth Street, the other "half" of the Debtor's restaurant.

The hearing on the motion to sell 1122 North Ninth Street is presently continued until April 5, 2022. However, that sale may have to be continued until the fixing of EZ's claim, an allegedly secured claim of the Commonwealth, and the sums cited in the Objection to the sale by City of Philadelphia.


Dated: March 18, 2022

<div style="text-align:right;">

/s/DAVID A. SCHOLL
512 Hoffman Street
Philadelphia, PA. 19148
610-550-1765
Attorney for Debtor

</div>

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: | : CHAPTER 13 |
| | : NO: 21-12926-mdc |
|       GABRIEL BRAVO | : |
|             Debtor, | : |
| | : |

## E-Z CASHING, LLC'S BRIEF IN OPPOSITION TO DEBTOR'S OBJECTION TO PROOF OF CLAIM, ADDRESSING THE SPECIFIC ISSUE OF WHETHER DEBTOR'S CLAIM FOR UNACCREDITED PAYMENTS WAS ACTUALLY LITIGATED BY THE STATE COURT

Creditor, E-Z Cashing, LLC, ("Creditor"), by and through its counsel, Krik Law, hereby submits this Brief in Opposition to Debtor's Objections to Proof of Claim, addressing the specific issue of whether the Debtor's claim for uncredited post-judgment payments was actually litigated by the state court such that the reassessment of Creditors damages is binding on this Court, as follows:

### I.     BACKGROUND

The matter before the Court arises out of Creditor's Proof of Claim filed on or about November 1, 2021 (the "POC")[1] and Debtor's objections thereto filed on November 19, 2021, listed as entry Number 18 on this Court's docket (the "Objections"). Creditor filed its Response to Objections on December 13, 2021, listed as entry 29 on this Court's docket (the "Response"). The POC, Objections, and Response, inclusive of their respective exhibits are incorporated herein by reference.

The POC was calculated, in part[2], based upon the Order of Judge Paula A. Patrick dated June 2, 2021, entered in the Court of Common Pleas of Philadelphia County (the "6/2/21

---

[1] The POC was admitted into evidence as Exhibit C-26 at the 2/15/22 evidentiary hearing (the "Hearing").

[2] Interest accruing after the 6/2/21 Order but is not the subject of the matter before this Court.

Order")[3].  The 6/2/21 was the result of the state court's adjudication of Creditor's state court foreclosure Motion to Reassess Damages with brief (the "Motion to Reassess")[4] and Debtor's Answer thereto with New Matter with brief (the "Answer with New Matter")[5].

Debtor's Objections seek to reduce the POC amount, whereby modifying the 6/2/21 Order, through deduction of alleged uncredited post-judgment payments made by the Debtor in the alleged amount of $31,284.  See the Objections at ¶¶2, 3, and 4[6].  Creditor's Response argues, however, that because the issue of uncredited post-judgment payments was already litigated, the doctrines of res judicata and collateral estoppel bar this Court's reassessment of Creditor's damages up to the date of the 6/2/21 Order.  See the Response at ¶¶2, 3, and 4.

On February 15, 2022, this Court held an evidentiary hearing and heard argument on the Objections and the Response (the "Hearing").  The Court directed the parties to brief the specific issue of whether the Objection claiming uncredited post-judgment payments was actually litigated by the state court such that the reassessment of Creditors damages is binding on this Court.

Debtor filed its Brief on March 18, 2021 ("Debtor's Brief").

II.    **DISCUSSION**

a.  **Standard of Review**

Res judicata and collateral estoppel relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication.  Allen v. McCurry, 449 U.S. 90, 94 (1980).  In addition,

---

[3] The 6/2/21 Order was admitted into evidence as Exhibit C-10 at the Hearing.
[4] The Motion to Reassess was admitted into evidence as Exhibit C-8 at the Hearing.
[5] The Answer with New Matter was admitted into evidence as Exhibit C-9 at the Hearing.
[6] Debtor's Objections also alleged violations of the automatic stay in a prior bankruptcy, same being denied; no testimony or evidence was proffered by Creditor at the Hearing and this allegation was not requested to be briefed.

these doctrines "promote the comity between state and federal courts that has be recognized as the bulwark of the federal system." Id. at 96. In deciding whether the Debtor's Objection at issue is precluded based upon its prior litigation in the Philadelphia Court of Common Pleas, this Court must apply Pennsylvania law. Abdulhay v. Bethlehem Medical Arts, L.P., 425 F.Supp.2d 646, 656 (E.D. Pa. 2006), citing, McNasby v, Crown, Cork & Seal Co., 888 F.2d 270, 276 (3rd Cir. 1989).

### b. Res Judicata

To determine whether the Objection claiming uncredited post-judgment payments was actually litigated by the state court such that the reassessment of Creditor's damages in the 6/2/21 Order is precluded by the doctrine of res judicata, it is necessary to consider the elements required for the doctrine to prevail. In Pennsylvania, the court applies a four-prong requirement in order for a second action to be precluded. Id. The two actions must share the identity of the "(1) thing sued on; (2) cause of action; (3) persons and parties to the action; and (4) quality or capacity of the parties suing or sued." Id. These elements are all met.

Fist, Debtor is once again litigating over his alleged uncredited post-judgment payments made prior to the 6/2/21 Order. These were initially raised in the Answer with New Matter. See C-9 at ¶¶11, 18, and respective brief, generally. The identity of the subject matter is the same as is raised in the Objection; satisfying the first prong.

Second, to determine whether causes of action are identical for purposes of res judicata, there are four criteria, including, whether (1) the acts complained of and the demand for relief are the same; (2) the theory of recovery is the same; (3) the witnesses and documents necessary at trial are the same; and (4) the material facts alleged are the same. O'Leary v. Liberty Mutual Insurance Co., 923 F.2d 1062, 1065 (3d Cir. 1991). All of these criteria are met.

The acts complained of and the demand for relief are the same, being the alleged uncredited

post-judgment payments and the reduction of Creditor's damages.  In the state court proceeding,

Debtor challenged the amount of Creditor's damages, in part[7], under the theory of payment.  The

theory of recovery is identical in this instant action as Debtor alleges that payments must be

credited in order to "fix" Creditor's POC damage's amount.  See the Objections at ¶¶2, 3, and 4.

Additionally, the witnesses and documents necessary are the same: the Debtor and Creditor, and

evidence of payment.  At the Hearing, Debtor testified as to alleged payments and introduced

exhibits D-1 through D-27, purporting to be evidence of various payments by Debtor. In the state

court, debtor alleged the same payments were uncredited yet elected not to attach any

documentary evidence to the Answer with New Matter.  Regardless, such documentary evidence

would have to have been identical.  Despite Debtor's counsel's insistence that the lack of a state

court evidentiary hearing means the objection was not actually litigated, the state court, in its

discretion, disposed of the Motion to Reassess without a hearing pursuant to Pa.R.C.P.

208.4(a)(1).  If it wished to develop an additional record for disputed facts through Debtor's

testimony, Debtor could have requested an order for the issuance of a rule to show cause

pursuant to Pa.R.C.P. 208.4(b)(1).  As set forth herein, Debtor did not avail himself of any

available recourse of the 6/2/21 Order.  Lastly, the material facts are the same: in each instance,

the payments alleged to be uncredited and unaccounted for in the 6/2/21 Order are the same.

Compare Answer with New Matter at ¶18 and Objection at ¶2[8].  Therefore, the essence of the

---

[7] Notably, Debtor's Answer with New Matter challenged Creditor's assessment of certain other damages under other applicable legal theories, and such other damages ($16,169.55) were not awarded to the Creditor by the state court.

[8] The discrepancy of $100.00 is de minimis and is likely the result of scrivener error.  Furthermore, at the Hearing, this Court found several pieces of Debtor's evidence to be redundant.

claims asserted by Debtor in state court are similar, if not identical, to the claims brought in the

Bankruptcy Court.

Third and fourth, conspicuously, the persons and parties to the action are the same

and their quality or capacity are identical: Gabriel Bravo as the debtor and E-Z Cashing, LLC as

the creditor.  With all four-prongs met, the Objections are barred by the doctrine of res judicata.

### c.   Collateral Estoppel

Under Pennsylvania law, which adopts the requirements of the Restatement (Second)

of Judgments, a prior determination of a legal issue is conclusive in a subsequent action between

the parties on the same or different claim when: (1) the issue was actually litigated; (2) the issue

was determined by a valid and final judgment; and (3) the determination was essential to the

judgment.  O'Leary, 923 F.2d at 1067.  Each of these requirements is met.

#### i.   Actually Litigated

"An issue is actually litigated when it is properly raised by the pleadings or otherwise,

and is submitted for determination, and it is determined."  Abdulhay at 656, quoting, O'Leary, at

1066.  It is undoubtable that the issue of the alleged uncredited payments raised by Debtor in his

Answer with New Matter before the state court are identical to those alleged uncredited

payments raised in the Debtor's Objection before this Court.  In each instance, the theory of

payment and allegations of uncredited and unaccounted for payments in the 6/2/21 Order are the

same.  Compare Answer with New Matter at ¶18 and Objection at ¶2 [ see FN. 8].

Debtor's failure, despite opportunity, to provide documentary evidence with his

Answer with New Matter or request from the state court an order a rule to show cause for an

evidentiary hearing does not negate the fact of issues being raised in the written pleadings.

There can also be no dispute that the factual issues of uncredited payments were submitted for

determination, and actually determined, by the state court.  As stated above, the state court has

the authority to dispose of issues without an evidentiary hearing despite Debtor's assertion

otherwise.

      Debtor also wrongfully attempts to argue that the issue was not determined because

Creditor failed to respond in writing to the issue as raised as Debtor's New Matter, <u>see</u> Answer

with New Matter at ¶18, an issue first raised at the Hearing by counsel.  Further claiming

Debtor's argument should have been deemed admitted.  This reasoning is flawed because no

actual written response to Debtor's New Matter was required for a determination of the issues.

Debtor's New Matter failed to include a Notice to Plead in accordance with Pa.R.C.P. 1026(a),

which states in relevant part that "no pleading need be filed unless the preceding pleading … is

endorsed with a notice to plead." 231 Pa. Code §1026 (2022).

      Furthermore, the Objection alleges that the state court "did not consider it appropriate

to deduct any of the payments made by the Debtor to the [Creditor]…" <u>See</u> Objection at ¶2.

Debtor's Brief then "submits that the only logical conclusion … is that the [state court] … [left]

the crediting of payments to the presumed good faith of the creditor …, or, …, requiring another

determination of that amount in another [state court] action or decision by another court, such as

this court".  <u>See</u> Debtors Brief at page 4.  This, a self-serving conclusion reached after failing to

take the available legal recourse procedurally.  Debtor's counsel is also frustrated by the fact that

the 6/2/21 Order was "without any accompanying opinion" <u>Id</u>. at page 3.  It is specifically denied

that the 6/2/21 Order required written opinion, absent appeal; or provides any opinion upon

which the Debtor's assumption of the Court's reasoning or his own "logical conclusion" can be

based.  Moreover, there must exist a clear presumption that a court considers all written

averments and arguments when adjudicating matters before it, even if on the papers alone.

### ii.  Valid Final Judgment and Essential Determination

Had the Debtor wished to know Judge Patrick's reasoning for the 6/2/21 Order, he could have acted, filed a motion for reconsideration, an appeal, or other.  The dockets will reflect that no such action was taken[9].  The 6/2/21 Order therefore became a final and conclusive order as of July 2, 2021, with the amount of damages then due precluding retroactive assessment upon allegations of the same uncredited payments.  This determination is essential to the judgment held by Creditor and all actions taken by Creditor thereafter in determining its rights to the collateral and collection of its lawful judgment.  Any assertion that an argument calling for the crediting of payments is outside the scope of the reassessment process is preposterous where the damages are, mathematically, the monetary amount which remains owed to the Creditor accounting for all charges and credits sought by both parties.

### d.  The Rooker-Feldman Doctrine

This Court, as well as any other federal court other than the United States Supreme Court, is precluded from disturbing a decision on the merits rendered by a state court.  In re Levine, 228 B.R. 164, at 165 (Bankr. W.D. Pa. 1998).  The Rooker-Feldman doctrine provides that a federal district court lacks the jurisdiction to hear a collateral attack on a state court judgment or to review final determinations of state court decisions. Instead, the proper court in which to obtain such review is the U.S. Supreme Court. See Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923); District of Columbia Court of Appeals v. Feldman, 460 U.S. 462 (1983). This Court therefore lacks subject matter jurisdiction over the value of Creditor's reassessed judgment calculated prior June 2, 2021. The failure of Debtor to take any further action to challenge the 6/2/21 Order ensured Creditor that Debtor would not have access to the federal court system to

---

[9] Debtor's counsel claims to be relying on the Bankruptcy Court to do so. See Debtor's Brief at page 4.

relitigate identical claims in as much as Debtor is precluded from seeking further redress from the state court.

Creditor is not asking this Court to reach a conclusion as to its assessed damages calculated in the 6/2/21 Order.  See Debtor's Brief at page 3, framing the question presented as "how EZ can ask this court to reach a conclusion …".  Rather, Debtor is the disappointed party which objected to the POC and seeks this Court's redetermination of the issues actually litigated in the state court.  Creditor is specifically arguing that such conclusion was already made and cannot be addressed or modified by this Court.  This Court technically need not even rule on the on the applicability of the doctrines of res judicata and collateral estoppel, upon applicability of the Rooker-Feldman doctrine.

### III.    CONCLUSION

Based upon the Court's lack of subject matter jurisdiction, and the doctrines of res judicata and collateral estoppel, the elements for which having been overtly met as set forth above, this Court should deny the Objections of Debtor to Creditor's POC.

Debtor's brief is yet another attempt to relitigate disputed facts, stating the same assertions and conclusions for which counsel failed to properly assert, discover, or litigate substantively and procedurally in state court, and now comes to this Federal Court seeking intervention and further reassessment of these same issues.  Respectfully, counsel's attempt to seek discovery after the close of the evidentiary record in both the state court and at this Hearing is demonstrative of counsel's blatant disregard for the orderly prosecution of claims and decisions of the court; instead, such action is vexatious with a sole purpose of hoping to further challenge these identical adjudicated issues[10]. Fatally, despite continued proverbial bites at the

---

[10] Creditor intends to respond to discovery and any related motions.

apple, "Debtor is not prepared to engage in that calculation.  (but) He will (conveniently) agree to a net claim … ."  See Debtor's Brief at page 6.  Brazenly, Debtor's counsel couches this as an "unethical legal defense[11]" proffered by Creditor's counsel in violation of the Rules of Professional Conduct; any such allegation being specifically denied.

The reassessment of Creditor's damages, through June 2, 2021, is binding on this Court and any objection thereto must be denied.

<div align="center">KRIK LAW</div>

DATE:  **3/18/21**              BY:  */s/ Justin L. Krik*

**JUSTIN L. KRIK, ESQUIRE**
**ATTORNEY ID #203006**
**KRIK LAW**
**1500 JFK Blvd., Suite 630**
**Philadelphia, PA 19102**
**(267) 831-3180**

---

[11] See Debtor's Brief at pages 2 and 3.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

```
-----------------------------------------------------x
In re                                :
                                     :        Chapter 13
        GABRIEL BRAVO                :
                                     :        Bankruptcy No. 21-12926(MDC)
                        Debtor.      :
-----------------------------------------------------x
```

### PRAECIPE TO WITHDRAW DOCUMENT

TO THE CLERK OF THE BANKRUPTCY COURT:

Kindly withdraw the following document filed by the City of Philadelphia:

Objection to Debtor's Motion for Permission to Sell Real Estate, filed on March 2, 2022

[Docket No. 54].

Respectfully submitted,

THE CITY OF PHILADELPHIA

Dated: October 6, 2022        By:    /s/ Pamela Elchert Thurmond
                                     PAMELA ELCHERT THURMOND
                                     Senior Attorney
                                     PA Attorney I.D. 202054
                                     City of Philadelphia Law Department
                                     Tax & Revenue Unit
                                     1401 JFK Blvd., 5th Floor
                                     Philadelphia, PA  19102-1595
                                     215-686-0508 (phone)
                                     215-686-0588 (facsimile)
                                     Email: Pamela.Thurmond@phila.gov

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | : | Chapter 13 |
| Gabriel Bravo, | : | |
| Debtor. | : | Bankruptcy No. 21-12926-MDC |

# O R D E R

    **AND NOW**, on October 28, 2021, Gabriel Bravo (the "Debtor") filed a voluntary petition under chapter 13 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code").[1]

    **AND**, on November 1, 2021, E-Z Cashing, LLC ("Claimant," and together with the Debtor, the "Parties") filed a proof of claim (the "Claim") against the Debtor, asserting a claim of $139,800.54, based on a judgment obtained against the Debtor on November 29, 2016, in the Court of Common Pleas of Philadelphia County, Pennsylvania (the "Pennsylvania Court"), and the subsequent reassessment of damages under that judgment, by Order entered by the Pennsylvania Court on June 2, 2021 (the "Damages Reassessment Order").[2]

    **AND**, on November 19, 2021, the Debtor filed an objection to the Claim (the "Claim Objection"), on the grounds that the Damages Reassessment Order did not consider any post-judgment payments the Debtor made to Claimant, which were asserted to total $31,784.00 (the "Post-Judgment Payments").[3]

    **AND**, on December 13, 2021, the Claimant filed a response to the Claim Objection (the

---

[1] Bankr. Docket No. 1.

[2] Claim 1-1.

[3] Bankr. Docket No. 18.

"Response"),[4] asserting that the Damages Reassessment Order is a final order and denying that

it failed to consider the asserted Post-Judgment Payments, which the Debtor raised in his Answer

to the Claimant's motion to reassess damages in the Pennsylvania Court by asserting the Post-

Judgment Payments as a New Matter (the "Answer and New Matter").

**AND**, on February 15, 2022, the Court held an evidentiary hearing (the "Hearing") on the

Claim Objection and the Response, after which the Court directed the Parties to submit post-

Hearing briefs (the "Briefs") addressing whether the asserted Post-Judgment Payments issue was

actually litigated before and decided by the Pennsylvania Court.

**AND**, on March 18, 2022, the Parties submitted the Briefs.[5]

**AND**, upon consideration of the Claim, the Claim Objection, the Response, the evidence

presented at the Hearing, and the Briefs.

It is hereby **ORDERED and DETERMINED** that:

1.      The Claim Objection is **OVERRULED**.

2.      As an initial matter, the Court finds that it has jurisdiction to determine the

allowability and amount of the Claim.   Claimant argues in its Brief that this Court is barred by

the *Rooker-Feldman* doctrine from exercising jurisdiction to determine the allowed amount of

the Claim, because the Damages Reassessment Order already determined what the Claimant is

owed.   Claimant's Brief, at §II(d).   The *Rooker-Feldman* doctrine "prohibits District Courts

from adjudicating actions in which the relief requested requires determining whether the state

court's decision is wrong or voiding the state court's ruling."   *Walker v. Horn*, 385 F.3d 321,

---

[4] Bankr. Docket No. 29.

[5] Bankr. Docket Nos. 64, 65.

2

329 (3d Cir. 2004) (internal quotation omitted).   For *Rooker-Feldman* to apply, four elements

must be met: (1) the federal plaintiff must have lost in state court, (2) the plaintiff must complain

of injuries stemming from the state court judgment, (3) the state court judgment was rendered

before the federal suit was initiated, and (4) the plaintiff is inviting the district court to review

and reject the state court judgment.   *Great Western Mining & Mineral Co. v. Fox Rothschild*,

615 F.3d 159, 166 (3d Cir. 2010).

      3.     Whether or not the other elements are met, the Court finds the second is not.   The

Claim Objection is not complaining of injuries stemming from the Damages Reassessment

Order.   The Debtor's objection is based on the Claimant's alleged failure to credit the Debtor for

the Post-Judgment Payments the Debtor allegedly made during his prior bankruptcy cases.   That

alleged failure pre-existed the Damages Reassessment Order, and therefore it is not the Damages

Reassessment Order that inflicted the injury for which the Debtor now seeks relief.   *See id.*

("[W]hen the source of the injury is the defendant's actions (and not the state court judgments),

the federal suit is independent, even if it asks the federal court to deny a legal conclusion reached

by the state court … A useful guidepost is the timing of the injury, that is, whether the injury

complained of in federal court existed prior to the state-court proceedings and thus could not

have been 'caused by' those proceedings.").   The Court is therefore not precluded by the

*Rooker-Feldman* doctrine from exercising jurisdiction to determine the allowability and amount

of the Claim.

      4.     Notwithstanding that the Court has jurisdiction to determine allowance of the

Claim, the Claimant also argues that the principles of *res judicata* and collateral estoppel bar the

Claim Objection.   Claimant's Brief, at §§II(b) and (c).   Here the Claim is based on the

Damages Reassessment Order entered by the Pennsylvania Court. Claimant is correct that the Court must apply Pennsylvania claim preclusion law to determine the preclusive effect of a Pennsylvania judgment. *McNasby v. Crown Cork and Seal Co., Inc.*, 888 F.2d 270, 276 (3d Cir. 1989). Under Pennsylvania law, the invocation of *res judicata* requires that the two actions share an identity of the: (1) thing sued upon or for; (2) cause of action; (3) persons and parties to the action; and (4) capacity of the parties to sue or be sued." *O'Leary v. Liberty Mut. Ins. Co.*, 923 F.2d 1062, 1065 (3d Cir. 1991).

5. Critically, it applies not only to claims actually litigated, but also to claims which could have been litigated during the first proceeding if they were part of the same cause of action. *Moncrief v. Chase Manhattan Mortg. Corp.*, 275 Fed. Appx. 149, 153 (3d Cir. 2008) (quoting *Balent v. City of Wilkes-Barre*, 542 Pa. 555, 669 A.2d 309, 313 (1995) and finding that the appellant's fraud claim was barred under Pennsylvania claim preclusion law because it was based on the same transaction as the mortgage forming the basis of a foreclosure action, and therefore it could have been raised in that action); *Balent*, 669 A.2d at 313 (drawing the distinction between *res judicata*, which bars a later action on claims which could have been litigated during the first proceeding if they were part of the same cause of action, and collateral estoppel, which prevents *re-litigation* of an issue in a later action, even if based on a different cause of action) (citing *Allen v. McCurry*, 449 U.S. 90, 94, 101 S. Ct. 411, 414 (1980)).

6. Here, the elements of *res judicata* are met. There can be no dispute that the action in the Pennsylvania Court and the present action involve the same parties in the same capacity. Moreover, the Claimant's claim in the Pennsylvania Court was for asserted damages based on the Debtor's default on a loan. The Debtor's assertion that he should be credited for

4

his Post-Judgment Payments in determining the Claimant's damages was part of the same

transaction and the same cause of action.   The Debtor could have litigated the Post-Judgment

Payments in connection with the Damages Reassessment Order, and in fact raised the issue in his

Answer and New Matter.   Whether the Pennsylvania Court considered and rejected the Post-

Judgment Payments, or alternatively did not consider them at all because the Debtor failed to

properly follow Pennsylvania procedure in asserting them,[6]  does not change the fact that they

arose from the same claim and cause of action as the Claimant's and could have been litigated in

connection therewith.   *Res judicata* therefore bars the Debtor from asserting them here as the

basis for the Claim Objection.[7]

Dated:   October 18, 2022

MAGDELINE D. COLEMAN
CHIEF U.S. BANKRUPTCY JUDGE

David A. Scholl, Esquire
Law Office of David A. Scholl
512 Hoffman Street
Philadelphia, PA 19148

Justin L. Krik, Esquire
Krik Law
1500 John F. Kennedy Boulevard, Suite 630
Philadelphia, PA 19102

---

[6] Claimant asserts the Debtor failed to comply with Pa. R.C.P. 1026(a) in asserting a claim for credit for
the Post-Judgment Payments in his Answer and New Matter.   The Pennsylvania Court did not, however,
address the Post-Judgment Payments or the Answer and New Matter in the Damages Reassessment
Order, and this Court therefore is unable to determine the basis for that Court not crediting the alleged
payments.

[7] Although the Claim Objection is barred by the application of *res judicata,* the Court notes that, based on
the record made at the Hearing, and in particular the testimony of the Claimant's principal, Joel Weiser,
there was compelling evidence the Claimant failed to credit a significant amount of Post-Judgment
Payments the Debtor made when seeking the Damages Reassessment Order.   The Court found Mr.
Weiser's testimony not credible and elusive.   Nonetheless, the Court does not resolve that issue in light
of its finding that *res judicata* precludes it.

5

Kenneth E. West, Esquire
Chapter 13 Standing Trustee
1234 Market Street, Suite 1813
Philadelphia, PA 19107

United States Trustee
Custom House
200 Chestnut Street, Suite 502
Philadelphia, PA 19106

## IN THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In Re:  GABRIEL BRAVO,
               Debtor                      :       **CHAPTER  13**

                                       :       **BANKRUPTCY NO. 21-12926**

### DEBTOR'S MOTION FOR RECONSIDERATION OF COURT'S ORDER OF OCTOBER 18, 2022

1.   The Debtor filed the instant individual chapter 13 bankruptcy case on October 28, 2021.

2.   On or about November 1, 2021, E-Z Cashing, LLC ("EZ") filed Proof of Claim No. 1 in this case, alleging that it had a valid claim secured by the Debtor's real property at 1122 South Ninth Street, Philadelphia, PA.  19147, in the amount of $139, 800.54.

3.   On November 19, 2021, the Debtor filed an Objection to this claim, alleging that the claim should be reduced by approximately $30,000 which the Debtor paid to EZ during the course of his 2017 and 2018 bankruptcy cases subsequent to the entry of a consent judgment entered on November 16, 2015, at which time the Debtor was represented by counsel prior to , counsel in his 2017 bankruptcy case, James D. Moran,Esq., on the obligation at issue, a Note and Mortgage of January 31, 2006, in the amount of $71,250, entered in favor of EZ's assignor and assigned to EZ.

4.   The claim of EZ is based entirely on an Order of the Court of Common Pleas of Philadelphia County ("the CCP")  of June 2, 2021 ("the CCP Order"), reassessing EZ's damages from the judgment described above in the amount of $136,865.70.

5.   The Debtor alleged that the  claim must be reduced by the amount of his payments to EZ during the 2017 and 2018 bankruptcies.

6.   A Zoom trial including evidence relevant to this issue was conducted by this court

1

on February 15, 2022.

      7.   After the trial, this court directed that the parties simultaneously file briefs addressing the stay relief aspects of the case by March 1, 2022, and addressing the claim objection issues by March 18, 2022.

      8.   In the hearing, EZ's principal, Joel Weiser, testified that he received certain payments from the Debtor, but he claimed that he did not know the amount.   He did admit that he had not returned nor credited any of those payments.

      9.   The Debtor testified, and supported his testimony with receipts, that he had paid at least five $720 payments during his 2017 bankruptcy case and made payments of $1288/month from October, 2018, through February, 2020, and thereafter at least four payments of $1040/month in 2020 during his 2018 bankruptcy case. He also paid $500 to EZ during this case, which Weiser did not deny was paid and must be credited.

      10.   EZ presented certain documents relating to the motion which it had filed in the CCP in 2021 to reassess damages on the judgment.  In its initial Motion for ressessment , EZ purported to give the Debtor credit for four payments made by the Debtor to it during the 2017 bankruptcy case.  The Debtor pleaded that he had made the additional payments referenced above during the 2017 and 2018 bankruptcy cases in New Matter included in his Answer to the Motion to Reassess Damages.

      10.   No response was filed to that New Matter, nor has EZ ever denied that the Debtor made payments to it during the 2017 and 2018 bankruptcy cases which was not credited to the amount claimed by EZ, which totaled over $30,000.  No attempt was made to explain why EZ believed that the Debtor was entitled to a credit for a few payments in the course of the 2017 case and nothing for the much larger payments in excess of $30,000 made during the course of

310

the 2018 bankruptcy case.

11.   On June 2, 2021, without any accompanying opinion, the CCP entered the CCP

Order which set the reassessed damages at $136,800.54.  EZ has attempted to argue that, in

doing so, the CCP intended to disregard the payments which the Debtor made to EZ during the

2017 and 2018 bankruptcy cases.  This conclusion flies in the face of the universally recognized

maxim that, if a creditor is paid a certain sum by a debtor after a judgment is entered, that sum

must, at some point, be deducted from the amount due to the creditor.  Cf.  Heckman v. Reading

Area Water Authority, 560 B.R. 657, 686-89 (Bankr. E.D. Pa. 2016) (alleged missing payment

to creditor not established to have been credited was credited to debtor).  Any contrary rule

would encourage misconduct on the part of the creditor.

12.   More significantly, the duty of candor and honesty to the court requires the

disclosure of payments actually received and retained by EZ without crediting same to the

Debtor.  See Rule of Professional Conduct 3.3 Candor to the Tribunal (b), (c) (lawyer has a

continuing duty not to encourage a client to engage in fraudulent conduct).  It is submitted that

refusing to admit that EZ has accepted payments and not credited them to the Debtor is

fraudulent conduct.

13.   This court rendered its decision on the Objection on October 18, 2022.  The

sole articulated basis for the decision was the doctrine of res judicata, the court having properly .

rejected the argument of EZ that its position was supported by the Rooker-Feldman Doctrine.

In its res judicata analysis, this court stated that the reassessment of damages constituted the

same "thing sued upon" and same "cause of action" as EZ's claim against the Debtor.  However,

this court conceded that, because the state court entering the reassessment order never explained

its decision and therefore it was impossible to determine "[w]hether the Pennsylvania Court

considered and rejected the Post-Judgment Payments, or alternatively did not consider them at all" for any reason, and that this circumstance "does not change the fact that they arose from the same claim and cause of action" as the EZ Claim.

      14. In totally overruling the Debtor's objections, this court neglected to give the Debtor any credit for the $500 payment after the filing of this bankruptcy case which even Joel Weiser, the principal of EZ, and his counsel agreed that he was entitled to be credited.

      15. However, addressing the much more substantial question of the Debtor's right to Credit for any of the more than $30,000 which the Debtor paid to EZ during his 2017 and 2018 bankruptcy cases for which this court refused to give the Debtor credit, it is submitted that there was no basis to conclude here that the amount of a reassessment and the total claim of EZ are in fact the same thing and the same cause of action. That there is a distinction is supported by the principle that a creditor is bound to give credit to its debtor for all payments which are made to it and retained under the general principles of honesty and good faith between parties who engage in any transaction, be it in a business or in a non-business consumer transaction. When the most basic elements of honesty and good faith is in substantial part violated by one of the parties to any transaction, that party is chargeable with extrinsic fraud from which any court of law must deny that party relief which serves the fraudulent actions of that party. In such a case, the court must refrain from applying such theories as res judicata to serve the ends of the perpetuator of fraud. See Long v. Shorebank Development Corp., 182 F.3d 548 (7th Cir. 1999)).

      16. This court recognized the inherently fraudulent conduct of EZ when it characterized the testimony of Mr. Weiser, the principal of EZ who attempted to justify his refusal to credit the payments made to it by the Debtor, as "not credible and elusive." This characterization was, if

4

312

anything, a gross understatement.  The actions of Mr. Weiser were nothing short of a brazen attempt to cheat the Debtor by failing to give him any credit for payments in excess of $30,000 made to him in good faith and in no way returned to him for no justifiable reason.  No court of equity can rightfully support such conduct on any legal or logical basis.  Thus, in <u>Long</u>, <u>supra</u>, where the court observed that the plaintiff was subjected to fraud which was comparable in scope and nature to that perpetuated here by Weiser, the court refused to apply res judicata in the wrongdoer's favor.  182 F.3d at 561-62. The Debtor would be justified in asserting this argument in an appeal or a new, separate proceeding instituted in this bankruptcy case.

17. The instant Motion is maintained pursuant to Federal Rule of Bankruptcy Procedure 9023, which incorporates Federal Rule Federal Rule of Civil Procedure ("FRCP") 59.  Motions pursuant to FRBP 9023 or FRCP 59 are appropriate when there is either (1) an intervening change in the law; (2) availability of new evidence which was not available when the order was entered; and (3) a need to correct a clear error of law or a need to prevent a manifest injustice. <u>See, e.g.,</u> <u>Max's Seafood Café ex rel Lou-Ann, Inc. v. Quinteros,</u> 176 F.3d 669, 677 (3d Cir. 1990); and <u>In re Reading Broadcasting, Inc.,</u> 386 B.R. 562, 567 (Bankr. E.D. Pa.  2008). Criterion (3) may be invoked here, because this court failed to consider the effect of the law providing that the failure of a litigant to deal with another with whom he contracts with honesty and good faith constitutes fraud which precludes the application of res judicata in that party's favor.

WHEREFORE, the Debtor requests that this court will enter an Order to vacate,

alter, or amend the Order of October 18, 2022, overruling his Objections to EZ's proof of claim

filed in this case.

_____
/s/ DAVID A. SCHOLL
512 Hoffman Street
Philadelphia, Pennsylvania  19148
610-550-1765.
Attorney for Debtor

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: | : CHAPTER 13 |
| | : NO: 21-12926-mdc |
| GABRIEL BRAVO | : |
| Debtor, | : |
| | : |

## E-Z CASHING, LLC'S RESPONSE IN OPPOSITION
## TO DEBTOR'S MOTION FOR RECONSIDERATION

Respondent, E-Z Cashing, LLC's hereby responds in opposition to Debtor's Motion for

Reconsideration as follows and incorporates E-Z Cashing, LLC's Response in Opposition to

Debtor's Objection to Proof of Claim and Counterclaim, as well as, E-Z Cashing, LLC's Brief in

Opposition Addressing the Specific Issue of Whether Debtor's Claim for Unaccredited Payments

was Actually Litigated by the State Court:

1. Admitted.

2. Admitted in part, denied in part. It is solely admitted that Respondent filed the Proof of

   Claim ("POC") with the following calculations:

| | |
|---|---|
| Consent Judgment | $136,865.70 |
| (Reassessed Damages per 6/2/21 Order) | |
| | |
| Interest on Consent Judgment (6/2/21 – 10/27/21) | $   2,934.84 |
| (148 days x $19.83 per diem) | |
| | |
| **TOTAL (PRE-PETITION)** | **$139,800.54** |

Without waiver and by way of further response, the calculation of the POC was

determined by the State Court pursuant to the 6/2/21 Order which is final. The balance

of the averment characterizing the proof of claim as "alleged" or otherwise insinuating

invalidity is denied as a conclusion of law to which no response is required.

315

3.  Denied as stated.  Debtor's Objection to Claim is a document that speaks for itself in its
    entirety.  Without waiver and by way of further response, the allegations contained in
    Debtor's Objection to Claim have been overruled by this Court based upon the doctrine
    of *res judicata*.

4.  Denied as stated.  It is solely admitted that the POC is based, in part, on the assessment
    of damages entered by the Court of Common Pleas Order dated 6/2/21, which is final
    and unappealable.  The balance of the POC are interest charges pursuant to the consent
    judgment.

5.  Denied.  The averments contained within this paragraph are denied as conclusions of law
    to which no response is required pursuant to the applicable rules.  Without waiver and by
    way of further response, this allegation and claims associated therewith have been
    adjudicated by the State Court and are barred from being relitigated under the doctrine of
    *res judicata*.

6.  Admitted.  By way of further response, while a zoom trial was conducted on the
    Debtor's Objection to Claim and evidence was gathered, this Court determined that it
    was unable to relitigate these allegations or change the adjudication of the State Court
    based upon the doctrine of *res judicata*.  Furthermore, post hearing and any reasonable
    opportunity for discovery, Debtors counsel inappropriately sought to obtain additional
    alleged evidence from Respondent to support Debtor's brief on the issue of whether the
    claims were "actually litigated"; demonstrating that there was insufficient evidence on
    the record by which Debtor could support its objections.

7.  Admitted.

8. Denied as stated. Respondent is without sufficient information to form a belief as to the exact wording of Respondent's testimony at the February 15, 2022, hearing. Without waiver and by way of further response, the nature of Respondent's testimony does not alter the fact that the claims have already been litigated at are barred by the doctrine of *res judicata*.

9. Denied as stated. Respondent is without sufficient information to form a belief as to the exact wording of any testimony at the February 15, 2022, hearing. Without waiver and by way of further response, the nature of testimony does not alter the fact that the claims have already been litigated at are barred by the doctrine of *res judicata*.

10. Denied as stated. Without waiver and by way of further response, Respondent's State Court Motion to Reassess Damages speaks for itself in its entirety. It is, however, admitted that Debtor pled his claims for additional payments in his Answer with New Matter to the State Court Motion to Reassess Damages; an admission that such claims not only could be raised, but were raised in the State Court action.

10(sic). Denied. The averments contained within this paragraph are denied as conclusions of law to which no response is required pursuant to the applicable Rules. Without waiver and by way of further response, it is specifically denied that a response was required to Debtor's State Court New Matter, specifically where Debtor's counsel failed to include a Notice to Plead in accordance with State Court Rules of Civil Procedure 1026(a). It is further specifically denied, following the State Court's adjudication and entry of the now final and unappealable 6/2/21 Order, that Respondent was required to provide any information on the alleged issue to the Debtor. Debtor's characterization that Respondent's lack of response to or lack of explanation of Debtor's allegations is

somehow an admission of guilt is specifically denied.

11. Denied.  The averments contained within this paragraph are denied as conclusions of law to which no response is required pursuant to the applicable Rules.  Without waiver and by way of further response, Debtor's characterization of Respondent's argument is entirely denied and incorrect.  Respondent claimed that since the issues were raised by the Debtor before the State Court, there is a presumption that the State Court considered all arguments in front of it, including allegation of Debtor's additional payments.  It is illogical to assume that without an opinion, the State Court must have missed something.  Nevertheless, Debtor's recourse to the failure of the 6/2/21 Order to account as he wished would have been to seek reconsideration or appeal the State Court, neither of which occurred.  This issue is barred by the doctrine of *res judicata*.

12. Denied.  The averments contained within this paragraph are denied as conclusions of law to which no response is required pursuant to the applicable Rules.  Brazenly, Debtor's counsel previously couched Debtor's circumstances as an "unethical legal defense" proffered by Creditor's counsel in violation of the Rules of Professional Conduct; any such allegation being specifically denied.  Now, Debtor's counsel has inappropriately accused Respondent's counsel of violating a duty of Candor to the Tribunal, same being specifically denied.  Debtor's counsel fails to accept responsibility for the plentitude of procedural errors, one of which being the failure to appeal the State Court's Order, which has led to this situation in which Debtor's claim objections are barred, as was properly found by this Court

13. Admitted in part, denied in part.  It is solely admitted that this Court entered its opinion on October 18, 2022 ("Opinion).  Any characterization thereof is specifically denied as

the Opinion speaks for the Court.  Without waiver and by way of further response,

Respondent maintains that the identical claims for credit were previously raised by the

Debtor in State Court and therefore presumed to have been considered by the State Court

in rendering the 6/2/21 Order.  Nevertheless, with or without an opinion, the claims for

credit were raised (or could have been raised or appealed) and arose from the same claim

and cause of action.

14. Denied.  Respondent is without sufficient information to form a belief as to the Court's

intent.

15. Denied.  The claims set fort in this paragraph are barred by the doctrine of *res judicata*.

Without waiver and by way of further response, Debtor's rationale is misplaced in that a

reassessment of damages in foreclosure proceedings is specifically for the purpose of

determining the creditor's post-judgment total claim at a given point in time.  In this

instance, Debtor raised these claims for credit by New Matter.  The 6/2/21 Order, once

final and unappealable, fixed Respondent's total claim through that date.  E-Z Cashing,

LLC's POC included the reassessment amount as part of its updated total claim to

include interest; they are directly related and arise from the same claim or cause of

action.  The balance of this averment is denied as a conclusion of law to which no

response is required.  Notwithstanding, Debtor's allegations of fraud are inappropriate.

Arguendo, the fact remains that we are not aware of why the Debtor's claims for credits

were denied by the State Court, or why E-Z Chasing, LLC's entire claim for reassessed

damages was not awarded.  But the fact that there is a possibility that these claims were

offset by the State Court means that Debtor's lack of credit could not be fraud, but the

result of final order of the State Court.    Additionally, Debtor has offered no new facts

for this Court's consideration.

16. Denied.  The averments contained within this paragraph are denied as conclusions of law

to which no response is required pursuant to the applicable Rules.  Without waiver and

by way of further response, while giving deference to this Court's characterization of the

Respondent's principal, this Court appropriately determined that the Debtor's claims

have been litigated and barred by the doctrine of *res judicata.*  This Court's

characterization of the Respondent's principal does not rise to the level of fraud.

Notwithstanding, Debtor's allegations of fraud are inappropriate and slanderous.

Arguendo, the fact remains that we are not aware of why the Debtor's claims for credits

were denied by the State Court, or why E-Z Chasing, LLC's entire claim for reassessed

damages was not awarded.  But the fact that there is a possibility that these claims were

offset by the State Court means that Debtor's lack of credit could not be fraud, but the

result of final order of the State Court.

17. Denied.  The averments contained within this paragraph are denied as conclusions of law

to which no response is required pursuant to the applicable Rules.  Debtor has offered no

change in law, no new evidence, and no error of law.  Arguendo, the fact remains that

we are not aware of why the Debtor's claims for credits were denied by the State Court,

or why E-Z Chasing, LLC's entire claim for reassessed damages was not awarded.  But

the fact that there is a possibility that these claims were offset by the State Court means

that Debtor's lack of credit could not be fraud, but the result of final order of the State

Court.

WHEREFORE, E-Z Cashing LLC respectfully requests that Debtor's Motion for

Reconsideration be denied.

**KRIK LAW**

**DATE:  11/15/22**　　　　　　　**BY:  /s/ Justin L. Krik**
　　　　　　　　　　　　　　　　**JUSTIN L. KRIK, ESQUIRE**
　　　　　　　　　　　　　　　　**ATTORNEY ID #203006**
　　　　　　　　　　　　　　　　**KRIK LAW**
　　　　　　　　　　　　　　　　**1500 JFK Blvd., Suite 630**
　　　　　　　　　　　　　　　　**Philadelphia, PA 19102**
　　　　　　　　　　　　　　　　**(267) 831-3180**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: | : CHAPTER 13 |
| | : NO: 21-12926-mdc |
| GABRIEL BRAVO | : |
| Debtor, | : |
| | : |

## <u>ORDER</u>

AND NOW, this          day of               , 2022, upon consideration of the Debtor's

Motion for Reconsideration and the response thereto, it is ORDERED, ADJUDGED and

DECREED that the Motion for Reconsideration is DENIED.

**BY THE COURT:**

_____
                                              **J.**

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

IN RE:                                          : CHAPTER 13
                                                : NO: 21-12926-mdc
     GABRIEL BRAVO                          :
              Debtor,                     :
                                                :
_____ :


## CERTIFICATE OF SERVICE

     I hereby certify that a true and correct copy of the foregoing Response to Debtor's

Motion for Reconsideration was served on the date listed below via ECF as follows:

David A. Scholl, Esquire                Kenneth West
Law Offices of David A. Scholl          1234 Market Street, Suite 1813
512 Hoffman Street                      Philadelphia, PA  19107
Philadelphia, PA 19148                  *Chapter 13 Standing Trustee*
*Attorney for Debtor*
                                        Office of the U.S. Trustee
                                        200 Chestnut Street, Suite 502
                                        Philadelphia, PA  19106


*U.S. Trustee* and the following by regular mail, postage prepaid, as follows:

Gabriel Bravo
1168 South 9th Street
Philadelphia, PA 19147


### KRIK LAW


**DATE:  11/15/22          **          **BY:  */s/ Justin L. Krik*          **
                                       **JUSTIN L. KRIK, ESQUIRE**
                                       **ATTORNEY ID #203006**
                                       **KRIK LAW**
                                       **1500 JFK Blvd., Suite 630**
                                       **Philadelphia, PA 19102**
                                       **(267) 831-3180**

323

# IN THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In Re:  **GABRIEL BRAVO,**
          **Debtor**

                               :      **CHAPTER  13**

                               :      **BANKRUPTCY NO. 21-12926**

## ORDER SUR DEBTOR'S MOTION FOR RECONSIDERATION OF COURT'S ORDER OF OCTOBER 18, 2022

AND NOW, this 22nd day of November 2022, after oral argument this date on the Debtor's Motion for Reconsideration of Court's Order of October 18, 2022, it is hereby ORDERED as follows:

1.   The Motion is GRANTED as to the $500 payment made by the Debtor to E. Z. Cashing, LLC in November 2021.  The Debtor shall be given credit for that payment at settlement.

2.   For the reasons stated on the record at that hearing, in all other respects, the Motion is DENIED.

_____
MAGDELINE D. COLEMAN
CHIEF U.S. BANKRUPTCY JUDGE

1

# IN THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: GABRIEL BRAVO,            :        **CHAPTER 13**
       Debtor

                              :        **BANKRUPTCY NO.  21-12926**

## NOTICE OF APPEAL

GABRIEL BRAVO, the Debtor in the above case ("the Debtor"), hereby appeals to the United States District Court for the Eastern District of Pennsylvania, under 28 U.S.C. section 158(a)(1), from the Orders entered in this case dated November 22, 2022, which denied in significant part, the Debtor's Motion for Reconsideration of the Court's Order of October 18, 2022, which overruled the Debtor's Objection to the Proof of Claim filed in this case by E-Z Cashing, LLC.  The names of all parties interested in the Order and the names, addresses, and telephone numbers of their respective attorneys are as follows:

Parties:  The Debtor; E-Z Cashing, LLC; Kenneth West; United States Trustee's Office

Attorney for Debtor:  David A. Scholl, Esq., 512 Hoffman St., Philadelphia, PA.  19148, 610-550-1765

Attorney for E-Z Cashing, LLC, Justin L. Krik, Esq., Krik Law, 1500 JFK Blvd., Suite 630, Philadelphia, PA.  19103, 267-381-3180

Kenneth West, Standing Chapter 13 Trustee, 1234 Market St., Suite 1813, Philadelphia, PA. 19107, 215-627-1377

United States Trustee's Office, 900 Market St., Suite 300, Philadelphia, PA. 19107, 215-597-

4411

_____
/s/DAVID A. SCHOLL
512 Hoffman Street
Philadelphia, PA. 19148
610-550-1765
Attorney for Appellant

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | Chapter 13 |
| Gabriel Bravo, | : | |
| Debtor. | : | Bankruptcy No. 21-12926-MDC |

# O R D E R

**AND NOW**, on October 28, 2021, Gabriel Bravo (the "Debtor") filed a voluntary

petition under chapter 13 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the

"Bankruptcy Code").[1]

**AND**, on November 1, 2021, E-Z Cashing, LLC ("Claimant," and together with the

Debtor, the "Parties") filed a proof of claim (the "Claim") against the Debtor, asserting a claim

of $139,800.54, based on a judgment obtained against the Debtor on November 29, 2016, in the

Court of Common Pleas of Philadelphia County, Pennsylvania (the "Pennsylvania Court"), and

the subsequent reassessment of damages under that judgment, by Order entered by the

Pennsylvania Court on June 2, 2021 (the "Damages Reassessment Order").[2]

**AND**, on November 19, 2021, the Debtor filed an objection to the Claim (the "Claim

Objection"), on the grounds that the Damages Reassessment Order did not consider any post-

judgment payments the Debtor made to Claimant, which were asserted to total $31,784.00 (the

"Post-Judgment Payments").[3]

**AND**, on October 18, 2022, the Court entered an Order overruling the Claim Objection

---

[1] Bankr. Docket No. 1.

[2] Claim 1-1.

[3] Bankr. Docket No. 18.

on the grounds that it was barred by application of the doctrine of *res judicata* (the "Claim Objection Order").[4]

**AND**, on October 30, 2022, the Debtor filed a motion (the "Motion to Reconsider")[5] pursuant to Federal Rule of Civil Procedure 59, made applicable to bankruptcy cases pursuant to Rule of Bankruptcy Procedure 9023, for reconsideration of the Claim Objection Order, asserting that "a need to correct a clear error of law or a need to prevent a manifest injustice" exists because this Court "failed to consider the effect of the law providing that the failure of a litigant to deal with another with whom he contracts with honesty and good faith constitutes fraud which precludes the application of *res judicata* in that party's favor."

**AND**, on November 15, 2022, the Claimant filed a response to the Motion to Reconsider (the "Response").[6]

**AND**, on November 22, 2022, the Court held a hearing on the Motion to Reconsider and the Response (the "Reconsideration Hearing"), at which time the Court ruled that it would deny the Motion to Reconsider, with the exception of a $500 payment that Claimant failed to credit the Debtor in the Claim and for which the Court failed to account in overruling the Claim Objection (the "Bench Ruling").

**AND**, on November 22, 2022, the Court entered an order memorializing the Bench Ruling granting in part and denying in part the Reconsideration Motion (the "Reconsideration Order").[7]

---

[4] Bankr. Docket No. 106.

[5] Bankr. Docket No. 111.

[6] Bankr. Docket No. 114.

[7] Bankr. Docket No. 118.

**AND**, on December 4, 2022, the Debtor filed a Notice of Appeal with respect to the Reconsideration Order.[8]

**AND**, Rule 8003-1 of this Court's Local Bankruptcy Rules provides that, where an order is the subject of an appeal, within 30 days of the docketing of the notice of appeal, the presiding bankruptcy judge may "file a written opinion in support of the order or a written supplemental opinion that amplifies any written opinion or recorded oral bench ruling or opinion."   L.B.R. 8003-1.

Pursuant to L.B.R. 8003-1, and consistent with the Court's Bench Ruling, it is hereby

**ORDERED, ADJUDGED, AND DETERMINED** that:

1.      The evidence presented to the Court at the hearing on the Claim Objection established that the Debtor argued to the Pennsylvania Court, prior to entry of the Damages Reassessment Order, that the Post-Judgment Payments needed to be credited when reassessing the Claimant's damages.   The Debtor presented the Pennsylvania Court with the Post-Judgment Payments in his response to the Claimant's motion for reassessment of damages.   The Pennsylvania Court then issued the Damages Reassessment Order.   In the Claim Objection Order, this Court explains that because the Post-Judgment Payments not only could have been litigated, but actually were, the doctrine of *res judicata* precluded the Debtor from relitigating the issue through the Claim Objection.

2.      The Reconsideration Motion sought reconsideration of the Claim Objection Order on the basis that *res judicata* is inapplicable because Claimant was bound to act with honesty and good faith in seeking the Damages Reassessment Order, and the failure to credit the Debtor for

---

[8]  Bankr. Docket No. 120.

the Post-Judgment Payments constituted extrinsic fraud.   In support, the Debtor cited *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 561-62 (7th Cir. 1999), asserting that there the court "refused to apply res judicata in the wrongdoer's favor."   Reconsideration Motion, at 16.

3.     As the Court observed at the Reconsideration Hearing, however, the facts here are nothing like the facts in *Shorebank*.   There, the Seventh Circuit found that *res judicata* did not apply to a state court judgment against a tenant where the landlord had effectively fraudulently induced the tenant not to participate in or defend the action.   In a subsequent suit in state court by the tenant for damages arising from the prior state court judgment, the state court had found that the suit was not precluded because the complaint demonstrated the prior judgment was procured by fraud and therefore was void.   The Seventh Circuit found *res judicata* did not apply because the fraud alleged would have precluded the state court from even having jurisdiction and would have rendered its judgment void.

4.     The *Shorebank* case is distinguishable from the case here, where there has been no finding that the Damages Reassessment Order was procured by fraud.   By the Reconsideration Motion, Debtor seeks to equate Claimant's failure to credit the Post-Judgment Payments when seeking the Damages Reassessment Order with procuring the judgment by fraud. However, where Debtor raised the repayments with the Pennsylvania Court prior to the entry of the Damages Reassessment Order, and therefore the Pennsylvania Court presumably considered them when issuing the order, there is no basis for asserting that the judgment was procured by extrinsic fraud.

5.     Notwithstanding the above, and as set forth in the Reconsideration Order, because Claimant acknowledged that a Post-Judgment Payment the Debtor made in the amount of

4

17

$500.00 in November 2021 was not credited, the Debtor shall be given credit for that payment.


Dated:   December 30, 2022

MAGDELINE D. COLEMAN
CHIEF U.S. BANKRUPTCY JUDGE

David A. Scholl, Esquire
Law Office of David A. Scholl
512 Hoffman Street
Philadelphia, PA 19148

Justin L. Krik, Esquire
Krik Law
1500 John F. Kennedy Boulevard, Suite 630
Philadelphia, PA 19102

Kenneth E. West, Esquire
Chapter 13 Standing Trustee
1234 Market Street, Suite 1813
Philadelphia, PA 19107

United States Trustee
Custom House
200 Chestnut Street, Suite 502
Philadelphia, PA 19106