**IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CIVIL ACTION NO. 22-4820**

**IN RE: GABRIEL BRAVO,**

**Debtor and Appellant**

**BRIEF OF APPELLANT**

**DAVID A. SCHOLL, ESQUIRE**
**512 Hoffman Street**
**Philadelphia, PA.  19148**
**610-550-1765**
**Attorney for Appellant**

# **TABLE OF CONTENTS**

TABLE OF CONTENTS……………………………………………………………i

TABLE OF CITATIONS……………………………………………………………ii

CORPORATE DISCLOSURE STATEMENT……………………………………...3

STATEMENT OF BASIS OF APPELLATE JURISDICTION…………………………4

STATEMENT OF ISSUES ON APPEAL AND STANDARD OF REVIEW……..……5

STATEMENT OF CASE………………………………………………..……6

SUMMARY OF ARGUMENT…………………………………………...…..…9

ARGUMENT…………………………………………………………………...10

    1.   THE BANKR. CT.'S CONCLUSION THAT THE RESULT OF THE CLAIM OBJECTION WAS FIXED BY THE CCP'S REASSESSMENT ORDER IS ERRONEOUS, SINCE THE "THING SUED UPON" AND THE "CAUSE OF ACTION" WERE NOT THE SAME IN THE TWO MATTERS…………...…………………………………………………10

    2.   THE CONDUCT OF EZ IN FAILING TO CREDIT THE DEBTOR FOR HIS PAYMENTS AS THEY WERE MADE WAS SO GROSSLY INEQUITABLE AND UNFAIR AS TO PROPERLY BE CHARACTERIZED AS FRAUD, WHICH BARS THE INVOCATION OF RES JUDICATA IN FAVOR OF EZ, A FRAUDULENT ACTOR…………………………..19

CONCLUSION………………………………………………………………22

CERTIFICATION OF SERVICE………………………………………………..23

## TABLE OF CITATIONS

**Statutes**

28 U.S.C. section 158(a)(1)……………………………………………..………………..………..4

**Cases**

Balent v. City of Wilkes-Barre**,** 542 Pa. 555, 600 A.2d 309 (1993)……………………..………………16

Easter Materials Chemical Co. v. Mahan, 225 F.3d 330 (3d Cir. 2000)...............................................15

Heckman v. Reading Area Water Authority, 560 B.R. 567 (Bankr. E.D. Pa. 2016)……………………14

.In re Giordano, 234 B. R. 645 (Bankr. E.D. Pa. 1999)……………………………………………...14

In re MDC Systems, Inc., 488 B.R. 74 (Bankr. E.D. Pa. 2013)………………………………………...14

In re Montsalvo, 157 B.R. 510 (D.P.R. 1993)……………………………………………..……...21

In re Mullarkey, 536 F.3d 215 (3d Cir. 2008)……………………………………………….………15

In re Razzi, 533 B.R. 469 (Bankr, E.D. Pa.  2015)……………………………………….…………….21

In re Rorie, 215 B.R. 219 (Bankr, E.D. Pa.1989)……………………………………...……..……...14

In re Stendardo, 991 F.2d 1089 (3d Cir. 1991)……………………………………………….……...7

Long v. Shorebank Development Corp, 182 F.3d 548 (7th Cir. 1999)………………………………...20

Montcrief v. Chase Manhattan Mortgage Corp., 273 Fed. Appx. 149 (3d Cir. 2008)…………………16

O'Leary v. Liberty Mutual Ins, Co., 923 F,2d 1062 (3d Cir. (1991)….…………………………...13

**CORPORATE DISCLOSURE STATEMENT**

Gabriel Bravo is an individual, not a corporation.  Therefore, he does not have a "parent corporation," and he does not have any "stock."

**STATEMENT OF BASIS OF APPELLATE JURISDICTION**

This is an appeal filed on December 4, 2022, from an Order of October 18, 2022, overruling the Objection of the Debtor to the Proof of Claim filed by E-Z Cashing, LLC, and of November 22, 2022, seeking reconsideration of the Order of October 18, 2022, entered by the United States Bankruptcy Court for the Eastern District of Pennsylvania. This court has jurisdiction to hear this timely appeal pursuant to 28 U.S.C. section 158(a)(1).

**STATEMENT OF ISSUES ON APPEAL AND STANDARD OF REVIEW**

1.   Whether the bankruptcy court correctly determined that res judicata barred the Debtor from arguing that he was entitled to receive credit for payments which he had made to the creditor in the course of two prior bankruptcy cases? (standard of review is plenary—whether the court made an error of law).

2.  Whether the failure of a creditor to admit that payments made to it by the Debtor in the course of two prior bankruptcy cases constituted such improper conduct or fraud that res judicata should not have been applied in favor of that creditor (standard of review is plenary—whether the court made an error of law)

## STATEMENT OF THE CASE

On January 31, 2006, the Debtor, Gabriel Bravo ("the Debtor") and his wife, Guadalupe

Bravo ("the Bravos"), made a loan in the amount of $71,250 from Interbay Funding, LLC ("Interbay').

A Note and Mortgage provided that the Bravos' property at 1122 South Ninth Street, Philadelphia, PA.

19147 ("the Property") would secure the loan.  The assignee of the loan from Interbay, Bayview Loan

Servicing, LLC ("Bayview"), commenced an action to foreclose on the Property in the Court of

Common Pleas of Philadelphia County ("the CCP") on June 3, 2015.   This action was resolved by the

agreement of the Bravos that a judgment in the amount of $105,613.62 could be entered against them

by agreement on November 29, 2016.

The above judgment was apparently assigned by Bayview to E-Z Cashing, LLC prior to

the scheduling of a sheriff's sale of the Property.  A sheriff's sale of the Property by EZ was undone by

the failure of the sale purchaser to comply with the terms of the sale.  When EZ rescheduled the sale, it

was stayed by the Debtor's filing a Chapter 13 bankruptcy case in the United States Bankruptcy Court

for the Eastern District of Pennsylvania ("the Bankr. Ct.") on October 31, 2017, at Bankr. No. 17-

17384 ("the First Bankr.").  The First Bankr. was dismissed on September 6, 2018.  During the course

of the First Bankr., the Debtor paid at least four, and possibly as many as six, payments of

$720/monthly to EZ.

On September 7, 2018, the Debtor filed Bankr. No. 18-15931("the 2d Bankr.") in the Bankr. Ct.

During the course of most of that case, until the pandemic required the Bravos to close a restaurant

which they operated from the Property and an adjoining rental property at 1124 South Ninth Street,

Philadelphia, PA.  19147 in Spring, 2020, the Debtor paid $1288/month to EZ.  EZ accepted all of the

payments made in the course of the two bankruptcy cases, and never returned any of the payments

made.  The 2d Bankr. was dismissed on November 2, 2020.

When EZ scheduled the Property for a sheriff's sale on November 5, 2021, the Debtor filed a

third bankruptcy case on October 28, 2021, in the Bankr. Ct., at Bankr. No. 21-12926 ("the Present Case"). As it developed, the value of the Property had appreciated significantly between 2020 and 2021. The Bravos therefore had an offer to purchase the Property for $200,000, a sum sufficient to pay off the security interest of EZ. Although the proposed purchaser tried to reduce his offer, the Debtor found a replacement buyer, able and willing to pay $200,000 for the Property without financing. In a closing which occurred on December 9, 2022, the Bravos were able to realize $200,000, which generated proceeds sufficient to satisfy EZ's mortgage.

The dispute which gave rise to this appeal developed when EZ filed a motion to reassess its damages in the CCP on February 23, 2021. In that motion, EZ argued that its damages should be reassessed at $153,035.20, which included interest on the Note at the contract rate and additional fees and costs through the date of the filing of the motion. The Debtor opposed the motion, claiming that EZ should receive no more than the amount of its judgment, plus statutory post-petition interest, under the precepts of In re Stendardo, 991 F.2d 1089 (1991). In arriving at the amount, it asserted was due, EZ disclosed only four $720/month payments made during the First Bankr. as credits to the Bravos. In addition to their arguments disputing the balance, based on Stendardo, the Bravos sought to claim an additional credit of about $30,000 on account of the payments made and accepted by EZ during the 2d Bankr.

On June 2, 2021, the CCP entered an Order reassessing EZ's damages at $136,865.70. The CCP gave no explanation for its decision. However, this figure was the exact amount that the Debtor argued that the damages should have been reassessed pursuant to Stendardo, without giving credit to them for any payments made to EZ during the First Bankr. and admittedly should have been deducted from the amount due to EZ or any of the payments made during the 2d Bankr.

On November 1, 2021, EZ filed a Proof of Claim in the amount of $139,800.54, the amount set forth in the CCP order of June 2, 2021, plus interest at six percent since that date. On November 19,

2021, the Debtor filed an Objection to the claim, noting that none of his bankruptcy payments were credited, but arguing that all of the payments made to EZ during both bankruptcy cases should have been credited.

At a Zoom trial of February 15, 2022, the Debtor presented evidence, in the form of receipts, for each of his payments during both bankruptcy cases. The principal of EZ, Joel Weiser, admitted receiving certain payments from the Debtor during the bankruptcies, and not giving credit therefor, but refused to state the dates or amounts of these payments.

The Bankr. Ct., in an Order of October 18, 2022, overruled the Objections, holding that the Debtor was bound to the amount set forth in the CCP order of June 2, 2021. The Debtor's request for reconsideration of this Order and a failure of EZ to credit even a payment of $500 received after the filing of the Present Case, to which Weiser admitted at the hearing in the trial record the Debtor was entitled to credit. On the date of the hearing, November 22, 2022, the court entered an order, denying all relief except the request for credit of the $500 payment. On December 30, 2022, the court filed an Order explaining why it refused to reconsider most of its Order of October 18, 2022, in light of an argument that the fraud of EZ should have precluded the argument that res judicata applied.

The Debtor reported that, at the settlement of the sale of the Property on December 9, 2022, at which EZ was paid $147,471.35 from the sale proceeds and satisfied its lien against the Property, and to which the Debtor agreed to prevent further accrual of interest.

8

## SUMMARY OF THE ARGUMENT

The clear preponderance of the evidence—the Debtor's production of receipts admitted evidence—compared to that of E-Z Cashing—the indecisive and hesitant testimony of EZ's principal—establishes that the Debtor made significant payments to EZ during his First and Second Cases without receiving credit for same.  Nevertheless, the Bankr. Ct. failed to deduct the payments made and not credited from the allowed claim of EZ.  The court's reasons for this were erroneous.  First, the court held that the "thing sued upon" and the "cause of action" in a prior CCP reassessment action which failed to credit the payments were the same that the CCP was obliged to credit payments in the reassessment process. Secondly, the court held that the payment issue was  "actually litigated" by the CCP although the issue was clearly raised by the Debtor and simply not addressed by the CCP, citing cases where the plaintiff was barred because it attempted to argue a new issue which it could have but failed to raise with the initial decision-maker.  Here, the Debtor raised the issue that his payments were not credited, and the CCP failed to "actually litigate" the issue of the payments to be credited, either because the CCP did not believe that this was a part of its duty in reassessment, or for some other unarticulated reason.

Also, the Debtor contended that EZ's failure to credit payments received by it constituted fraud on its part in the initial proceeding, which should have precluded it from asserting res judicata in its support in this matter.  It was not significant that the fraud of EZ was "extrinsic," but simply that it engaged in fraud, which was not resolved prior to rendering its decision.

**ARGUMENT**

1.   **THE BANKR. CT.'S CONCLUSION THAT THE RESULT OF THE CLAIM OBJECTION WAS FIXED BY THE CCP'S REASSESSMENT ORDER IS ERRONEOUS, SINCE THE "THING SUED UPON" AND THE "CAUSE OF ACTION" WERE NOT THE SAME IN THE TWO MATTERS**

The Debtor commences this argument by describing and quoting from certain

statements at the Zoom trial of February 15, 2022.  The first 113 pages of the Transcript addressed the

Debtor's motion to extend the automatic stay beyond 30 days, to which EZ, after the Debtor submitted

his Brief in support thereof on March 1, 2022, withdrew its opposition.  The portion of the Transcript

addressing the issue at hand to which the Debtor directs this court initially is pages 134 to 144 thereof:

Q  (by Mr. Scholl):  …During the period of time that Mr. Bravo was in bankruptcy,

in 2017, which lasted until 2018, … did you get any payments from Mr. Bravo?

 A  (by Mr. Weiser) I don't remember specifically any time frames from the years past, so I

don't recall exactly if I got any payments then. …

…

Q  Then [quoting from paragraph 11 of the motion to reassess damages] underneath that

it states, does it not, less payments received, four payments of 720 each, 2880.

A  I see that.

Q  …Is that not agreement that Mr. Bravo is entitled to credit for the payments that he made?

A  That—that's what is seems to say what it is

…

Q  …Now, during the 2018 case, didn't Mr. Bravo make payments to you, to EZ Cashing?

A  I don't—I don't recall.  I haven't really reviewed those records from prior to the state—

the state—the state reassessment of damages case.

Q  Nobody's talking about the state reassessment damages case.  All I'm asking about is the

payments you received during the 2018 bankruptcy case.  Do you have a record of that?

A  I don't recall.  I have not reviewed any records.

…

Q  Did you look at the exhibits that Mr. Bravo submitted before the hearing today [on

February 10, 2022]

A  It's not—I may have seen something briefly, but I'm not 100 percent sure.

 …

Q  …how many payments do you think Mr. Bravo paid during the 2018 case?

A  I don't—sitting here, I don't recall.  I don't know.

Q  Well, do you recall that he paid you  $1288 a month for every month?

A  I don't remember.

Q  But he may have, is that right?

A  It's possible.  I do not recall.  I have not seen it.

Q  …Did you give Mr. Bravo credit for any of those payments … at any time?

A  I—I believe I have given him –that credit for payments that [sic] received, yes.

Q  Where did you give him credit for that?... Can you show us any calculations that

indicate where you did give Mr. Bravo credit for any of those payments?

A  I don't recall any calculations now from the years past.

Q  … you don't know how many payments you got.  You don't know if it's one or

two, or 10, or 20.

A  I don't recall.  I got—I've—you know, I've not—I don't remember from the past

and –you know, that are before the reassessment in this case.

…

Just so I understand, are you contending that you did give Mr. Bravo credit at some time and at

some place for any of the payments during the 2018 case?

A  I don't—I don't recall now getting payments or what payments were given in a specific time.
I do think that if I would have gotten payments, I would have credited it, but I don't recall, any,
you know, specific payments or specific instances.

Q  …Did you send any payments back to Mr. Bravo and say, Mr. Bravo, I shouldn't accept
these payments, I'm going to send them back to you.

A  I don't—I don't recall if I ever sent back payments.

Commenting on the testimony of Mr. Weiser, Judge Coleman stated, in her decision of
October 18, 2022, that "based on the record made at the Hearing and the testimony of the Claimant's
principal, Joel Weiser, there was compelling evidence the Claimant failed to credit a
significant amount of Post-Judgment Payments the Debtor made when seeking the Damages
Reassessment Order.  The Court found Mr. Weiser's testimony not credible and elusive.  Nevertheless,
this Court does not resolve that issue in light of its finding that res judicata precludes it."  The Debtor
observes that this is a very mild assessment of the totally evasive testimony of Mr. Weiser quoted
above.  The Debtor would further comment, as the following discussion indicates, that the court's
ultimate disposition, unfavorable to the Debtor, does not suggest that the application of res judicata
should allow a final result so different than the facts suggested would have been appropriate.

The Debtor also notes the following statements from the court during the
hearing, appearing at pages 156-57 of the Transcript:

> If $30,000 of payments was made, somebody better tell me something
> about where they went.  That's all I'm telling you.  If those payments
> were made, I'm not sure what kind of weight I'm giving because this
> is a court of equity.  I'm telling you counsel, if I get some proof of 30,000
> that  I'm not just going to say they went poof.  I'm going to send you back

somewhere.  You got—this is not—that's not how I operate. And this isn't

a "I got you."

Judge Coleman expressed an interest in receiving evidence regarding payments

by the Debtor.  The Debtor then proceeded to present testimony, referring to the Exhibits which

he had produced, on February 10, 2022, noted on pages 160 to 189 of the Transcript.  All of the

supporting documents were admitted into evidence, at page 205 of the Transcript.  At the conclusion of

the hearing, at page 220, Judge Coleman reiterated that she believed at that time that the important

issue in resolving the dispute, was what the CCP "actually litigated," and she stated that "if he [Mr.

Bravo] did make those payments, how is Mr. Weiser or EZ Cash harmed for payments they got?"

Unfortunately, when she got around to writing her Order of October 18, 2022,

Judge Coleman appeared to forget about her prior pronouncements, and reached a result which was

inconsistent with the evidence that was produced at the hearing.  In rendering that decision, Judge

Coleman initially rejected EZ's argument that the court lacked jurisdiction to decide the Objection

based on the Rooker-Feldman Doctrine.  However, she nevertheless rendered a decision contrary to the

Debtor on the grounds of res judicata.  Therein, the court identifies the prerequisites for application of

res judicata as a showing of an identity of four matters: (1) the "thing sued upon;" (2) the "cause of

action;" (3) parties; and (4) capacity of parties, citing O'Leary v. Liberty Mut. Ins. Co., 923 F.2d 1062,

1065 (3d Cir. 1991).  The court is correct that the parties and their respective capacities are identical.

However, the court offers no discussion as to why a reassessment of damages in a state court

proceeding is identical to a determination of a proof of claim in a bankruptcy case, nor why these are

determined to be identical "causes of action."  Furthermore, it cites no cases to support these

conclusions.

A proof of claim measures the full amount to which a creditor is entitled to in payment

from the presumably-scarce assets of the debtor in a bankruptcy case.  To determine this sum

accurately, the court is obliged to consider the obligations of the debtor, and the credits to which the debtor is entitled from the creditor.  There can scarcely be a dispute that, in determining the right to what a creditor is due from the debtor, consideration must be given to payments which the debtor has made to the creditor on account of the obligation.

Apparently, the court believed that the foregoing principles were also fully applicable to a determination of the amount which was to be reassessed against the defendant in litigation between the creditor and the debtor.  However, there is nothing in the applicable state Rule of Civil Procedure 1037 (a), (b), or the applicable local Philadelphia County Rule *1037.2(B) which explicitly states anything at all regarding credits to the judgment debtor for any reasons at all, including giving credit for payments made at any time.  Therefore, although these rules are very detailed in explaining what charges are permitted to creditors, they are completely silent on if or how credits for payments or otherwise are to be allowed to debtors.

It should be perfectly clear that debtors are in fact entitled to credit for their payments to creditors on obligations.  See, e.g. Heckman v. Reading Area Water Authority, 560 B.R. 657. 686-89 (Bankr. E.D. Pa. 2016) (alleged missed payment to creditor not established to have been credited to debtor was deducted from amount owed); and In re MDC Systems, Inc., 488 B.R. 74, 94 (Bankr. E.D. Pa. 2013) (debtor was entitled to credit for payment court found had been made after state court judgment).  Also cf.  In re Giordano, 234 B.R. 645, 650-52 (Bankr. E.D. Pa. 1999) (debtor entitled to credit for payment if it were found made after claims were filed in prior bankruptcy case); and In re Rorie, 215, B.R. 219-21 (Bankr. E.D. Pa.1989) (creditor successfully argued that assessed judgment amount did not preclude addition of post-judgment interest to total amount of allowed total mortgage claim).

Therefore, it is submitted that it is quite likely that the CCP, in reassessing EZ's damages believed that its only duty was to determine the gross amount that the Bravos were obliged to pay to

EZ on its judgment, without giving any credit for payments made.  That would explain why the CCP did not deduct the amount of the Debtor's payments in the First Bankr., even though EZ itself acknowledged that, if credit for payments made after entry of the judgment entered was to be given, these amounts were to be deducted from the assessment.

Because it is so clear that a judgment debtor is entitled to credit for payments made, it is quite possible that the CCP assumed that EZ would give the Debtor credit for the payments which the Bravos had made, or would do so prior to finally determining what amount EZ was due from the Debtor. There is certainly no indication that the CCP concluded that payments were made and not credited, and that so proceeding was, for any reason, justified.

It is, of course, very dangerous to assume that the CCP had some unarticulated justified basis for refusing to give credit to the Debtor for the payments which he testified and presented almost conclusive evidence were made, but not credited to him.  Res judicata should be carefully applied only in those instances where the facts and law support the result that the prior ruling is in fact meant to be conclusive, and that the prior court ruling was made on a logical basis light of the pertinent facts and law.  Compare In re Mullarkey, 536 F.3d 215, 226-27 (3d Cir. 2008) (res judicata should not arise from certain decisions, in this case a decision on stay relief, since such a determination is not intended to be a final determination of the creditor's rights against the debtor), and Eastern Minerals Chemical Co. v. Mahan, 225 F.3d 130, 335-39 (3d Cir. 2000) (res judicata was not properly applied when the "cause of action" in an initial determination was not properly found the same as that in the present action),

Perhaps the key to the decision is the court's discussion regarding whether the issue of payments made by the Debtor to EZ was "actually litigated" by the CCP.  In contrast to her (it is submitted, accurate) statements at the hearing that a decision of the CCP which did not "actually litigate" the issue of whether payments were actually made by the Debtor and not credited to him, which is clearly supported by the evasive testimony of Mr. Weiser when questioned about those issues,

the court states the following in its Opinion: "Critically, it [res judicata] applies not only to claims actually litigated during the first proceeding but also to claims which could have been litigated during the first proceeding if they were part of the same cause of action."  The court then cites to only two sources, Moncrief v. Chase Manhattan Mortgage Corp., 273 Fed. Appx. 149, 153 (3d Cir. 2008); and Balent v. City of Wilkes -Barre, 542 Pa. 555, 609 A. 2d 309, 313 (1993).

Moncrief was not published in the Federal Reporter and takes the form of draft of a per curiam memorandum to explain the affirmance of a pro se appeal.  The only supporting citation on the res judicata issue is Balent, a state court decision.  However, what is substantively significant in both of those cases is the respective courts' rulings were based on the courts' findings that the respective plaintiffs could have, but failed to, assert different theories for recovery than had been previously specifically ruled on by the respective courts.  In other words, the plaintiffs in both of these cases were found to have been "at fault:" for failing to originally assert the specific grounds which had not been previously "actually litigated."  Here, however, the Debtor clearly raised the issue of his payments which had not been credited to the Bravos to the CCP.  The CCP simply failed to "actually litigate" the issue of the Bravos' credit for the payments made.  Therefore, the Debtor was in no sense "at fault" for the failure of the CCP to rule on these claims, as were the plaintiffs in Moncrief and Balent.  In sum, Judge Coleman had "it right the first time."  What happened here is that the CCP simply failed to rule on an issue which had been adequately and squarely raised before it but which it failed to "litigate" or decide, for reasons which are unknown and possibly unknowable.

Whatever else can be said about the CCP's ruling is uncertain, but this much can be safely said. It was unfair and without truly applicable precedent to rule, as the court did, that the CCP's ruling on reassessment was res judicata which could be invoked against the Debtor in this claims dispute, especially when the facts established at the hearing clearly established that the issue of credit for the Debtor's payments to EZ was simply overlooked by the CCP.

The state and local Rules relating to reassessment of damages are painstaking in setting forth the specific items that may serve as a basis for reassessed damages. However, those Rules make no specific statements that the judgment debtor is required to receive credit for all payments which the debtor has made. Therefore, the reassessment Rules can be read as justifying an ignoring of the judgment debtor's payments. It is thus conceivable that a court could conclude that it is not part of its duty in engaging in reassessment of damages.  However, it should be perfectly clear that debtors are entitled to defend creditors' claims which fail to determine the payments or other credits to which the debtor is entitled.

There is almost no other way to explain the failure of the CCP to provide credit to the Debtor for his payments to EZ.  Not only did the CCP fail to in any way explain why it failed to give the Debtor credit for his payments, but it went so far as to disregard the allegations of EZ itself in the reassessment motion that the Debtor was indisputably entitled to at least some of the amount of his payments made by the Debtor in the course of his First Bankr. Case, which EZ itself conceded in the text of the motion.  There can be no explanation for this failure to credit any of the payments by the Debtor to EZ in the course of either of his prior bankruptcy cases except that the CCP did not believe that its duty extended to determining what payments for which the Debtor was entitled to credit.

The uncertainty about what the CCP thought it was about certainly should have precluded the Bankr. Ct. from assuming that the reassessment process in the CCP was the same "thing sued upon" and the same "cause of action" as was at issue in the claims litigation in the bankruptcy court.  That was especially true when it became obvious that EZ, without rightfully so proceeding and with no justification articulated in any sense for its actions, did not intend to give the Debtor any credit whatsoever for any of his substantial payments.

17

Therefore, it became clear that EZ was urging this court not to give any credit to the Debtor for his payments, irrespective of the fact that they were duly made, not credited, and not returned, thereby allowing EZ to engage in a taking of the Debtor's payments, made in the totally good faith and logical assumption that they would be credited.

In sum, the Bankr. Ct.'s reliance on res judicata as a basis for ruling against him was sorely misplaced and must be forthwith remedied by this court on appeal.

2.   **THE CONDUCT OF EZ IN FAILING TO CREDIT THE DEBTOR FOR HIS PAYMENTS AS THEY WERE MADE WAS SO GROSSLY INEQUITABLE AND UNFAIR AS TO PROPERLY BE CHARACTERIZED AS FRAUD, WHICH BARS THE INVOCATION OF RES JUDICATA IN FAVOR OF EZ, A FRAUDULENT ACTOR.**

The Debtor submits that it is the duty of every creditor to credit any payment made to it and retained by it without any exception as soon as the payment is made.  This obligation becomes even more important when the obligation at issue, like here, is a mortgage from which the balance should be recalculated at the time of any payment, and further interest due should be computed only after every payment is credited.  For example, as soon as EZ retained the first of the $720 payments which it received in the course of the First Bankr., it should have deducted that payment from the balance due and computed the interest remaining due on the account based on the new, reduced balance.  It should then have followed the same procedure when it received the next $720 payment, and so forth, through the remittance and retention of the numerous payments of $1288 in the 2d Bankr., which were far in excess of the regular payments of principal and interest due, which computed to less than $500/month.  In this way, the balance due to EZ would have been reduced by far more that the mere sum of the Debtor's total payments made and not credited, which came to about $30,000.

These calculations are, moreover, just and proper, because EZ has had possession of the funds paid since they were paid and should not be permitted to hold the payments made, having full ability to use or invest such funds as it deemed fit.  Therefore, the balance rightfully due to the Debtor as a consequence of EZ's wrongful conduct is not properly calculated without going over each payment made and recomputing the proper interest calculation as of the time of each payment made and wrongfully retained by EZ.

The resulting "rightful balance" can then be compared to the large total sum of $147,471.20 which was distributed to EZ from the sale proceeds of the Property sale on December 9, 2022, and EZ should be ordered to pay the difference to the Debtor forthwith, plus any appropriate attorneys' fees.

As can be observed from perusal of the Transcript at the trial of February 15, 2022, and even the colloquy with counsel during the hearing on the Debtor's motion for reconsideration on November 22, 2022, the principal of EZ, Joel Weiser, and his counsel have been consistently evasive in responding to direct questions regarding when and how much they received from the Debtor without giving him any credit for the payments.

The issue of whether the Bravos were given credit for their payments was reprised at the hearing of November 22, 2022, on the motion for reconsideration, when the court asked counsel for EZ in straightforward language (at page 7-8 of the Transcript) :  "But let me just ask you this, Mr. Krik. Was he given credit or—(Mr. Krik interjected  "Yes") or not?  Was he given credit or not?  Yes or no?" Despite his seeming earlier answer affirmatively, Mr. Krik, upon further consideration, later stated:  "I don't have that answer."

The court again lets him off without giving an answer.  Again, it is submitted that this is an unfortunate reprisal of the court letting EZ off when it is quite clear that it never gave the Debtor any credit for his payments.

The Debtor denies that such conduct is in any sense "normal," or "legal," or "fair."  It is in fact the most obvious and odious type of conduct in which any sort of legitimate business can engage, and properly deserves the characterization of fraud.  It is well-established that, even if EZ's conduct might otherwise be properly characterized as protected by the principles of res judicata, the fraud of its perpetrator precludes such employment of the conduct.  See generally Long v. Shorebank Deveopment Corp., 182 F.3d 548, 561-62 (7th Cir.  1999).

Therefore, even if res judicata could be said to apply in this case, and the Debtor denies that it should or could be, the Debtor raises the fraud of EZ as a further reason why res judicata should not be permitted to be invoked by EZ as a basis for any ruling its favor.

Rather, the Debtor urges that the commonsense principle that he should have been entitled to credit for his payments to EZ at the time he made them, and a recalculation of EZ's rightful claim against him be made accordingly.

Further, in light of the bad faith of EZ's contentions throughout the litigation of this dispute, the Debtor should be entitled to recoup his attorney's fees in connection with the claim litigation in the Bankr. Ct. and in connection with this appeal from EZ.

The court, in its Memorandum of December 30, 2022,  attempts to distinguish the fraudulent conduct at issue in Long from that of EZ by contending that the fraud at issue in Long is "extrinsic, " i. e., related to conduct not at issue on the merits of the matter at issue.  However, even when allegations of fraud are related to the merits of the matter at issue but are unresolved, the courts have ruled that the issue of fraud must be resolved before res judicata can be applied.  See In re Montalvo, 157 B.R. 510. 512 (D.P.R. 1993); and In re Razzi, 533 B.r. 469, 479-80 (Bankr. E.D. Pa. 2015).  Briefly stated, conduct which is fraudulent should not, in any circumstances, serve as a basis for a ruling in favor of the perpetuator of a fraud, as occurred here.

**CONCLUSION**

For all of the reasons set forth herein, the Debtor submits that this court should reverse the decision of the Bankruptcy Court and remand this matter to the Court with instructions to recalculate the proper claim of EZ against the Debtor, and should award attorney fees against EZ and in favor of the Debtor in opposing EZ's claim as filed in the Bankruptcy Court and in connection with this appeal.

_____
/s/DAVID A. SCHOLL
512 Hoffman Street
Philadelphia, PA.  19148
610-550-1765
Attorney for Debtor

**CERTIFICATION OF SERVICE**

I hereby certify that I served a copy of the Brief of Appellant in this matter upon counsel for the Appellee, Justin L. Krik, Esquire, 1500 JFK Blvd., Suite 630, Philadelphia, PA.  19102; Kenneth West, Esq., Standing Chapter 13 Trustee, 1234 Market St., Suite 1813, Philadelphia, PA.  19107; and the United States Trustee's Office, 900 Market St., Suite 300, Philadelphia, PA.  19107, by first-class postage pre-paid on January 25, 2023.

                        _____

/s/DAVID A. SCHOLL
512 Hoffman Street
Philadelphia, PA.  19148
610-550-1765
Attorney for Appellant-Debtor

23